Larry E. Prince (ISB#1759)
Kirk S. Cheney (ISB#9416)
E-Mail:  lprince@hollandhart.com
         kscheney@hollandhart.com
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:   (208) 343-8869

Attorneys for Creditor Wells Fargo Bank,
National Association

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>WALKER LAND & CATTLE, LLC,<br><br>Debtor. | Case No. 13-41437-JDP<br>Chapter 11 |

## SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO)

# TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS, RULES OF INTERPRETATION AND
COMPUTATION OF TIME** ...............................................................................1

1.1.    Defined Terms. ...............................................................................................1

1.1.    Definitions. .....................................................................................................1

1.2.    Rules of Interpretation. ..................................................................................1

1.3.    Computation of Time. .....................................................................................1

1.4.    Currency of the United States. .......................................................................2

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS AND U.S.
TRUSTEE FEES** ................................................................................................2

2.1.    Establishment of the Administrative Claims Bar Date ...................................2

2.2.    Administrative Claims. ...................................................................................2

2.3.    DIP Credit Facility Claim. ..............................................................................3

2.4.    Insurance Financing Claim. ...........................................................................3

2.5.    Professional Compensation and Reimbursement Claims. ..............................3

2.6.    Priority Tax Claims. ........................................................................................3

2.7.    Priority Non-Tax Claims ................................................................................4

2.8.    U.S. Trustee Fees ...........................................................................................4

**ARTICLE III. SUMMARY OF CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS** ...................................4

3.1.    General Provisions and Summary. .................................................................4

3.2.    Classification and Treatment of Claims and Equity Interests. ......................7

**ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN** ......................................19

**ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN** .................................19

5.1.    Continuing Existence. ...................................................................................19

5.2.    Vesting of Assets in Liquidating WLCC. .....................................................20

5.3.    Plan Administrator .........................................................................................20

5.4.    Wind Down Committee. ................................................................................30

5.5.    Monetization of Assets. .................................................................................31

5.6.    Preservation of the Causes of Action ...........................................................34

5.7.    Dissolution of Creditors' Committee. ...........................................................35

5.8.    Managers, Members and Officers.................................................35

5.9.    Wind Down and Dissolution of the Debtor .................................35

5.10.   Cash Collateral..............................................................................36

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...........36**

6.1.    General Settlement of Claims........................................................36

6.2.    Interim Distributions on Account of Allowed Claims..................36

6.3.    Final Distributions on Allowed Claims.........................................37

6.4.    Administrative Fund and Disputed Claims Reserve......................37

6.5.    Set Off and Recoupment...............................................................39

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS...................................40**

7.1.    Resolution of Disputed Claims.....................................................40

**ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS...............41**

8.1.    Rejection of Executory Contracts..................................................41

8.2.    Claims Based on Rejection of Executory Contracts......................41

**ARTICLE IX. [THIS ARTICLE IS INTENTIONALLY LEFT BLANK.]...........42**

**ARTICLE X. INJUNCTION AND RELATED PROVISIONS ...................42**

10.1.   Injunction......................................................................................42

10.2.   Releases .........................................................................................42

**ARTICLE XI. BINDING NATURE OF PLAN ....................................42**

**ARTICLE XII. RETENTION OF JURISDICTION...............................43**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS...............................44**

13.1.   Modification of Plan......................................................................44

13.2.   Revocation of Plan........................................................................44

13.3.   No Discharge..................................................................................45

13.4.   Successors and Assigns .................................................................45

13.5.   Reservation of Rights ....................................................................45

13.6.   Payment of Statutory Fees ............................................................45

13.7.   Section 1125(e) Good-Faith Compliance .....................................45

13.8.   Further Assurances ........................................................................45

13.9.    Severability. ................................................................................................45

13.10.    Service of Documents. .................................................................................46

13.11.    Governing Law ...........................................................................................47

13.12.    Filing of Additional Documents ....................................................................47

**LIST OF EXHIBITS:**

- Exhibit A – Definitions

- Exhibit B – Executory Contracts

## INTRODUCTION

Creditor Wells Fargo Bank, National Association ("Wells Fargo") (the "Plan Proponent") hereby proposes the following liquidation plan ("Plan") for Walker Land & Cattle, LLC ("Debtor"). This Plan treats all of the assets of Debtor and proposes a resolution of the outstanding Claims against Debtor through the liquidation and monetization of all of the Debtor's and the Estate's Assets. The Plan provides for all Creditors to be paid in full from the sale or other monetization of the Assets by no later than approximately December 31, 2015. Reference is made to the Disclosure Statement served herewith, which contains a discussion of the Debtor's assets, its business troubles, reorganization and liquidation alternatives, and certain related matters. The Plan Proponent urges all Holders of Claims and Equity Interests to carefully read this Plan.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### 1.1. **Definitions.**

Unless the context requires otherwise, the terms set forth in Exhibit A hereto shall have the meanings set out therein when used in capitalized form herein.

### 1.2. **Rules of Interpretation.**

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3. **Computation of Time.**

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 1

1.4.    **Currency of the United States.**

All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS AND U.S. TRUSTEE FEES**

2.1.    **Establishment of the Administrative Claims Bar Date**

2.1.1.    Except as otherwise provided herein, on or before 5:00 p.m., prevailing Mountain time, on the Administrative Claims Bar Date, each holder of an Administrative Claim shall File with the bankruptcy Court and serve on counsel for (i) the Debtor, (ii) the Plan Proponent (iii) the Unsecured Creditor's Committee and (v) the Plan Administrator, any request for payment of an Administrative Claim.  Requests for payment of an Administrative Claim must include, at a minimum: (i) the name of the Holder of the Administrative Claim; (ii) the amount of the Administrative Claim; (iii) the basis of the Administrative Claim; and (iv) all supporting documentation for the Administrative Claim.

2.1.1.    The request for payment of an Administrative Claim will be timely Filed only if it is Filed with the Bankruptcy Court by 5:00 p.m., prevailing Mountain time, on the Administrative Claims Bar Date.  Requests for payment of Administrative Claims may not be delivered by facsimiles, telecopy, or electronic mail transmission.

2.1.2.    Notwithstanding anything herein to the contrary: (a) the Professionals shall <u>not</u> be required to file a request for payment of an Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead File final fee applications in accordance with Section 2.5 below; and (b) the DIP Lender shall not be required to File a request for payment of the DIP Credit Facility Claim, as such Claim will be paid in accordance with Section 2.3 hereof; and (c) the Insurance Financing Lender shall not be required to File a request for payment of the Insurance Financing Claim, as such Claim will be paid in accordance with Section 2.4 hereof.

2.2.    **Administrative Claims.**

The Administrative Claims consisting of the DIP Credit Facility Claim, the Insurance Financing Claim and the Professional Fee Claims, shall be paid as provided in Sections 2.3, 2.4 and 2.5 hereof.  Unless otherwise agreed to by a Holder of an Allowed Administrative Claim and the Plan Administrator, the Plan Administrator shall pay in Cash each other Holder of an Allowed Administrative Claim, in full satisfaction, settlement, release and discharge of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim: (a) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date that is five (5) Business Days after such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (c) at such time and upon such

terms as may be agreed upon by such Holder and the Plan Administrator; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### 2.3. **DIP Credit Facility Claim.**

The DIP Credit Facility Claim shall be paid in full in Cash from the proceeds of the DIP Lender's collateral on or before January 31, 2015, in full satisfaction thereof and in accordance with the terms and conditions of the DIP Credit Facility.  Upon, and as of, the payment in full of the DIP Credit Facility Claim, all Liens of the DIP Lender on the Assets will be deemed terminated and of no further force and effect and the DIP Lender shall duly execute and file or, as applicable, record all releases of mortgages, terminations of deeds of trust, uniform commercial code termination statements and other documents necessary to terminate of record all such Liens.

### 2.4. **Insurance Financing Claim.**

The unpaid balance of the Insurance Financing Claim shall be paid in full in Cash from the Administrative Fund in accordance with the terms and conditions of the Insurance Financing Facility.  Upon, and as of, the payment in full of the Insurance Financing Claim, all Liens of the Insurance Financing Lender on the Assets will be deemed terminated and of no further force and effect and the Insurance Financing Lender shall duly execute and file or, as applicable, record all UCC termination statements and other documents necessary to terminate of record all such Liens.

### 2.5. **Professional Compensation and Reimbursement Claims.**

The deadline for submission by Professionals for Bankruptcy Court approval of a Professional Fee Claim shall be thirty (30) days after the Effective Date.  Any Professional or other Person or Entity that is required to File and serve a request for approval of a Professional Fee Claim and fails to timely File and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or participating in Distributions under the Plan on account thereof.  If the Bankruptcy Court approves, by Final Order, the payment of a Professional Fee Claim, the Plan Administrator shall pay, in Cash, from the Administrative Fund, the applicable Professional, the approved unpaid amount of his/her Professional Fee Claim in Cash as soon as practicable thereafter.  All Professionals shall, before the Effective Date, provide to Debtor, the Plan Proponent, the Unsecured Creditors Committee and the Plan Administrator an estimate of their Professional Fee Claim.

### 2.6. **Priority Tax Claims**

The Plan Administrator is not aware of any Priority Tax Claims.  To the extent there are allowed Priority Tax Claims, the Plan Administrator shall pay in Cash each Holder of an Allowed Priority Tax Claim, in full satisfaction of such Allowed Priority Tax Claim, in two equal installments payable July 1, 2015, with the remaining balance being payable December 31, 2015.  The Plan Administrator may prepay the Holder of an Allowed Priority Tax Claim at any time without penalty and no Holder of an Allowed Priority Tax Claim shall be entitled to any

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 3

payment on account of pre-Effective Date interest accrued on or a penalty arising after the Petition Date with respect to or in connection with such Allowed Priority Tax Claim.

### 2.7. **Priority Non-Tax Claims**

The Plan Administrator shall pay in Cash from the Administrative Fund each Holder of an Allowed Priority Non-Tax Claim, in full satisfaction of such Allowed Priority Non-Tax Claim, on the later of (a) thirty (30) days after the Effective Date; (b) the date that is five (5) Business Days after such Allowed Priority Non-Tax Claim becomes Allowed; and (c) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law.

### 2.8. **U.S. Trustee Fees**

The Plan Administrator shall pay the U.S. Trustee in Cash from the Administrative Fund all U.S. Trustee Fees accruing on or before the Confirmation Date at the time provided in 28 U.S.C. § 1930. All such fees that arise after the Confirmation Date, but before the closing of this Chapter 11 Case, shall be paid in Cash by the Plan Administrator at the time provided in 28 U.S.C. § 1930. The Plan Administrator shall File an abbreviated monthly report with the U.S. Trustee's office setting forth the gross receipts of and the gross payments from Liquidating WLCC.

## ARTICLE III.
## SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### 3.1. **General Provisions and Summary.**

3.1.1.    All Claims, except Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims, as described in Article II have not been classified and are not entitled to vote on this Plan.

3.1.2.    A Claim is placed in a particular Class only to the extent that the Claim falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

3.1.3.    Adequate protection payments received by a Creditor pursuant to the Cash Collateral Orders on account of its Allowed Secured Claim and Distributions received by a Creditor pursuant to this Plan on account of its Allowed Secured Claim shall be applied by such Creditor to its Allowed Secured Claim as follows: first, to post-petition attorney's fees and costs incurred by the Creditor; second, to post-petition interest as set forth in the documents that govern the Creditor's Claim; and third, to the Creditor's pre-petition Claim.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 4

3.1.4.      Distributions received by a Holder of a General Unsecured Claim on account of its Allowed General Unsecured Claim shall be applied by such Creditor as follows: first to the Creditor's Allowed pre-petition Claim, second to interest from the Petition Date to the Effective Date at the Federal Judgment Rate, third to interest from the Effective Date to the date its Allowed pre-petition Claim is paid in full at the State Judgment Rate, and fourth to its post-petition attorney's fees and costs to the fullest extent permitted by the Bankruptcy Code and other applicable law.

3.1.5.      To the extent that after the Administrative Fund has been funded as provided herein, there remains Cash available on the Effective Date to pay Holders of Allowed Secured Claims the monthly amount provided in the Cash Collateral Orders for the month of October 2014 (the "Monthly Payment Amount"), the Plan Administrator may, after first obtaining the Wind Down Committee's approval, make Distributions on the 15th day of each month after the Effective Date to such Holders of Allowed Secured Claims in the Monthly Payment Amount.  In the event the remaining Cash is not sufficient to continue to pay Holders of Allowed Secured Claims through the later of one year after the Effective Date and December 31, 2015, an amount equal to the Monthly Payment Amount, the Plan Administrator may, after first obtaining the approval of the Wind Down Committee, make a monthly distribution(s) to Holders of Allowed Secured Claims in an amount equal to their Pro Rata share (based on the aggregate of the Monthly Payment Amounts) of the amount determined by the Plan Administrator to be Distributed.  Nothing herein shall be construed to require the Plan Administrator to make the monthly Distributions provided for in this Section 3.1.5

3.1.6.      The loan, credit, and other transactional documents between the Creditor and a Debtor shall be modified as of the Effective Date so as to be consistent with the terms and conditions of this Plan and, as, as modified, shall remain in full force and effect.  This Plan shall not affect a Creditor's rights against third parties such as Guarantors.

3.1.7.      Notwithstanding anything herein to the contrary, the Plan Administrator may, subject to the approval of the Wind Down Committee, abandon Assets to the Creditor having a Lien thereon which it believes, in the exercise of its reasonable discretion, do not, after taking into consideration the other Assets upon which a Creditor has a Lien, have sufficient value to pay in full the Holder of the Claim secured by the first priority Lien on the particular Asset(s), plus the cost of sale.  In the event an Asset is abandoned by the Plan Administrator, the Holder of a Claim secured by a Lien on such Asset will have a General Unsecured Claim to the extent that its Claim exceeds the value of the abandoned Asset.  In the event the Plan Administrator and the Holder of a Claim secured by a Lien on the abandoned Asset cannot agree upon the value of the abandoned Asset, the Plan Administrator shall request the Bankruptcy Court to determine the value of the abandoned Asset and the Bankruptcy Court shall retain jurisdiction to determine such value.

3.1.8.      The following table classifies Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distributions pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim to be classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of

such Claim qualifies within the description of such different Class (such as unsecured deficiency Claims, if any).  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

      3.1.9.        Summary of Classification of Claims and Equity Interests.

| Class | Claim | Status | Voting |
|---|---|---|---|
| 1. | Wells Fargo's Secured Claim | Impaired | Yes |
| 2. | Rabo's Secured Claims | Impaired | Yes |
| 3. | Bank of Commerce's Secured Claim | Impaired | Yes |
| 4. | Roland L. Walker and Dorothy M. Walker Family Trust U/A/D July 20, 1993, Segregated Spousal Trust's Secured Claim | Impaired | Yes |
| 5. | Estate of Roland L. Walker's Claim | Impaired | Yes |
| 6. | Dorothy M. Walker Family Limited Partnership's Claim | Impaired | Yes |
| 7. | Deere & Company's Secured Claims | Impaired | Yes |
| 8. | Agricredit Acceptance LLC's Secured Claim | Impaired | Yes |
| 9. | CNH Capital America LLC's Secured Claim | Impaired | Yes |
| 10. | Toyota Credit Corporation's Secured Claim | Impaired | Yes |
| 11. | Ally Financial Inc.'s Secured Claims | Impaired | Yes |
| 12. | AAAUrethane, Inc.'s Claim | Impaired to the extent it is not a Holder of an Allowed Administrative Claim | Yes to the extent it is not a Holder of an Allowed Administrative Claim |
| 13. | Commercial Credit Group Inc. 's Secured Claim | Impaired | Yes |
| 14. | Farm Credit Services of America, PCA's Secured Claim | Impaired | Yes |
| 15. | Les Schwab Tire Centers of Boise, Inc.'s Claim | Impaired to the extent it is not a Holder of an Administrative Claim | Yes to the extent it is not a Holder of an Administrative Claim |
| 16. | U.S. Bank National Association as Trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-Through Certificates, Series 2006-WF2's Claim | Impaired | Yes |
| 17. | Estate of Blair M. Walker's Claim | Impaired | Yes |
| 18. | Bonneville County Treasurer's Claim | Not Impaired | No |

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 6

| Class | Claim | Status | Voting |
|---|---|---|---|
| 19. | Fremont County Tax Collector's Claim | Not Impaired | No |
| 20. | Jefferson County Treasurer's Claim | Not Impaired | No |
| 21. | General Unsecured Claims | Impaired | Yes |
| 22. | Equity Interests | Impaired | Yes |

3.1.10.    Notwithstanding anything to the contrary in this Plan, each Secured Creditor (not including Classes 7 and 10) that seeks to have its incurred fees (including attorney fees), costs and/or charges included in its Secured Claims shall, by no later than 30 days after the Effective Date, serve a request pursuant to Bankruptcy Code § 506(b) for such fees, costs and/or charges on the Plan Administrator, the Office of the United States Trustee and parties who have Filed a notice or other pleading requesting notice of such requests for fees, costs and/or charges. Wells Fargo shall, on or before the Effective Date, provide to each Holder of a Secured Claim notice of the requirements contained in this Section 3.1.10. The Plan Administrator, a Holder of an Allowed Claim or Equity Interest and the Office of the United States Trustee may object to the amount of the requested fees, costs and/or charges. Any objection(s) to such requests shall be filed no later than 45 days after the Effective Date. In the event an objection is filed, the Bankruptcy Court shall, pursuant to Bankruptcy Code §506(b) determine the amount of such fees, costs and/or charges that will be Allowed. If an objection is not timely filed, the requested fees, costs and/or charges shall be included in the Allowed Claim. For the avoidance of doubt, the Plan Administrator may, in his sole and absolute discretion, object to any such requested fees, costs and/or charges without consulting with the Wind Down Committee and without his decision being subject to review by the Wind Down Committee.

**3.2.    Classification and Treatment of Claims and Equity Interests.**

3.2.1.    Class 1 – Wells Fargo's Secured Claim.

(a)    Classification. Class 1 consists of Wells Fargo's Secured Claim.

(b)    Voting. Class 1 is Impaired and the holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment. Wells Fargo's Class 1 Secured Claim (Proof of Claim No. 56) is secured by, among other things, Liens on certain of the Debtor's real property and life insurance policies, and the Debtor's crops, equipment (other than titled vehicles), accounts receivable, rights to payment, inventory, general intangibles and other assets described in the Cash Collateral Orders and the collateral documents, and the proceeds of the foregoing. Wells Fargo's Claim is Allowed in full and is fully secured. The Plan Administrator shall sell the real and personal property, collect the accounts receivable, rights to payment and the value of the life insurance policies and monetize the other Assets which secure Wells Fargo's Allowed Secured Claim in accordance with Sections 5.5 and 5.6 hereof. The Plan Administrator shall pay Wells Fargo's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set forth in the documents that govern Wells Fargo's Allowed Secured Claim and its pre-petition and post-petition attorney's fees and costs) in Cash from the proceeds of Wells Fargo's collateral, and only from such proceeds (after the payment of Claims secured by Liens on such

collateral having priority over Wells Fargo's Liens) as provided in Sections 5.5 and 5.6 hereof. Wells Fargo shall retain its Liens on the collateral until a particular parcel of real property, item of personal property or other asset is sold or otherwise monetized in accordance with Sections 5.5 and 5.6 hereof, at which time Wells Fargo's Lien on the same shall be transferred to the proceeds of such sale or other monetization with the same priority as existed on the parcel or item sold or monetized.  Distributions on account of Wells Fargo's Allowed Secured Claim shall be made by the Plan Administrator as provided in Sections 5.5.2(e) and 5.6 hereof.

      3.2.2.      Class 2 – Rabo's Secured Claims.

      (a)      Classification.  Class 2 consists of Rabo's Secured Claims.

      (b)      Voting.  Class 2 is Impaired and the holder of the Class 2 Claims is entitled to vote to accept or reject the Plan.

      (c)      Treatment.  Rabo's Class 2 Secured Claims (Proofs of Claim Nos. 60-64) are secured by, among other things, Liens on certain of the Debtor's real property and other assets described in the Cash Collateral Orders.  Rabo's Claims are Allowed in full and are fully secured.  The Plan Administrator shall sell the real property which secures Rabo's Allowed Secured Claim in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Rabo's Allowed Secured Claims (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Rabo's Claim and its pre-petition and post-petition attorney's fees and costs), in Cash from the sale proceeds, and only from the sale proceeds, of Rabo's collateral as provided in Section 5.5 hereof.  Rabo shall retain its Liens on the collateral until a particular parcel of real property is sold in accordance with Section 5.5 hereof, at which time Rabo's Lien on such parcel shall be transferred to the proceeds of such sale with the same priority as existed on the parcel sold.  Distributions on account of Rabo's Allowed Secured Claims shall be made by the Plan Administrator as provide in Section 5.5.2(e) hereof.

      3.2.3.      Class 3 – Bank of Commerce's Secured Claim.

      (a)      Classification.  Class 3 consists of Bank of Commerce's Secured Claim.

      (b)      Voting.  Class 3 is Impaired and the holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.

      (c)      Treatment.  Bank of Commerce's Class 3 Secured Claim (Proof of Claim No. 44) is secured, by a Lien on certain of the Debtor's real property.  The Bank of Commerce's Claim is Allowed in full and is fully secured.  The Plan Administrator shall sell the real property which secures the Bank of Commerce's Allowed Secured Claim in accordance with Section 5.5 hereof.  The Plan Administrator shall pay the Bank of Commerce's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Bank of Commerce's Allowed Secured Claim and its pre-petition and post-petition attorney's fees and costs) in Cash from the sale proceeds, and only from the sale proceeds, of the Bank of Commerce's real property collateral as provided in Section 5.5 hereof. Bank of Commerce shall retain its Lien on the collateral until the parcel of real property is sold

in accordance with Section 5.5 hereof, at which time Bank of Commerce's Lien on such parcel shall be transferred to the proceeds of such sale with the same priority as existed on the parcel sold.  Distribution on account of Bank of Commerce's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

        3.2.4.     Class 4 – Roland L. Walker and Dorothy M. Walker Family Trust U/A/D July 20, 1993, Segregated Spousal Trust's Secured Claim.

        (a)     Classification.  Class 4 consists of Roland L. Walker and Dorothy M. Walker Family Trust U/A/D July 20, 1993, Segregated Spousal Trust's ("Walker Trust") Secured Claim.

        (b)     Voting.  Class 4 is Impaired and the holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

        (c)     Treatment.  The Debtor's Schedules (Schedule D) lists the Estate of Roland L. Walker as having a non-contingent, liquidated and undisputed Claim secured by certain parcels of the Debtor's real property.  Dorothy M. Walker and the Estate of Roland L. Walker, however, assigned to the Walker Trust its Claim against the Debtor secured by the real property listed in the Debtor's Schedules by an assignment recorded on October 27, 2011, in Bonneville County as Instrument No. 1401959, in Fremont County as Instrument No. 536199 and in Jefferson County as Instrument No. 394173 (the "Estate Assignment").  Walker Trust is therefore the holder of the Class 4 Secured Claim.  The Walker Trust Class 4 Secured Claim is secured by a Lien on certain of the Debtor's real property.  Walker Trust's Claim is Allowed and may be fully secured.  Walker Trust however, subordinated its Claim to Wells Fargo's Claim (Class 1) pursuant to a subordination agreement dated as of June 13, 2013 (the "Walker Trust Subordination Agreement").  Pursuant to the Walker Trust Subordination Agreement, Walker Trust's Allowed Secured Claim will not be paid until such time as Wells Fargo's Allowed Secured Claim is paid in full.  The Plan Administrator shall sell the real property which secures Walker Trust's Allowed Secured Claim in accordance with Section 5.5 hereof.  In the event Wells Fargo's Allowed Secured Claim is not paid in full from the proceeds of the Assets which secure the payment of Wells Fargo's Allowed Secured Claim, the Plan Administrator shall pay Wells Fargo in Cash from the sale proceeds of the real property securing Walker Trust's Allowed Secured Claim (after the payment of Claims secured by Liens on such real property having priority over Walker Trust's Secured Claim) such an amount as is necessary to pay Wells Fargo's Allowed Secured Claim in full.  Subject to the terms of the preceding sentences, and after Wells Fargo's Claim has been paid in full, the Plan Administrator shall pay Walker Trust's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Walker Trust's Claim and its pre-petition and post-petition attorney's fees and costs) in Cash (after payment of Claims secured by Liens on the real property having priority over Walker Trust's Liens) from the sale proceeds, and only from the sale proceeds, of Walker Trust's real property collateral as provided in Section 5.5 hereof.  Walker Trust shall retain its Liens on the collateral until a particular parcel of real property is sold in accordance with Section 5.5 hereof, at which time Walker Trust's Lien on such parcel shall be transferred to the proceeds of such sale with the same priority as existed on the parcel sold. Subject to the Walker Trust Subordination Agreement and the terms hereof, Distributions on

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 9

account of Walker Trust's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

3.2.5.        Class 5 – Estate of Roland L. Walker's Claim.

(a)        Classification.  Class 5 consists of the Estate of Roland L. Walker's Claim.

(b)        Voting.  The Estate of Roland L. Walker's Claim is Impaired and the holder of the Class 5 Claim will be entitled to vote to accept or reject the Plan.

(c)        Treatment.  The Debtor's Schedules (Schedule D) lists the Estate of Roland L. Walker as having a non-contingent, liquidated and undisputed Claim secured by certain parcels of the Debtor's real property.  Bankruptcy Rule 3003(b)(1) provides: "The schedules of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and amount of the Claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated.  It shall not be necessary for a creditor or equity security Holder to file a Proof of Claim or interest except as provided in subdivision (c)(2) of this rule." Pursuant to the Estate Assignment, the Estate of Roland L. Walker and Dorothy M. Walker assigned to Walker Trust its Claim against the Debtor secured by the real property listed in the Debtor's Schedules.  As a result of the Estate Assignment, the Estate of Roland L. Walker does not have a Secured Claim.  The Estate of Roland L. Walker's Class 5 Claim shall be, as of the Effective Date, Disallowed in full and the Estate of Roland L. Walker will not receive any payment whatsoever hereunder on account of the Estate of Roland L. Walker's Class 5 Claim. The Estate of Roland L. Walker subordinated any Claim it may have against Debtor to Wells Fargo's Secured Claim (Class 1) pursuant to a subordination agreement dated January 15, 2010 (the "Estate Subordination Agreement").  To the extent the Estate of Roland L. Walker has an Allowed General Unsecured Claim, it will be paid, subject to the Estate Subordination Agreement, as provided in Class 21, General Unsecured Creditors.

3.2.6.        Class 6 – Dorothy M. Walker Family Limited Partnership's Claim.

(a)        Classification.  Class 6 consists of Dorothy M. Walker Family Limited Partnership's ("Walker Family Limited Partnership") Claim.

(b)        Voting.  The Walker Family Limited Partnership's Claim is Impaired, and the holder of the Class 6 Claim will be entitled to vote to accept or reject the Plan.

(c)        Treatment.  The Debtor's Schedules (Schedule D) lists the Walker Family Limited Partnership as having a non-contingent, liquidated and undisputed Claim secured by certain parcels of real property (the "Walker Family Limited Partnership Claim"). Bankruptcy Rule 3003(b)(1) provides: "The schedules of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and amount of the Claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated.  It shall not be necessary for a creditor or equity security holder to File a Proof of Claim or interest except as provided in subdivision (c)(2) of this rule."  The title insurance policies relating to the property generally described in the Schedules as securing the Walker Family Limited Partnership's Claim,

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 10

do not list any mortgages or other Lien in favor of the Walker Family Limited Partnership. The Walker Family Limited Partnership did not File a secured Proof of Claim. It Filed an Unsecured Claim (Claim No. 117) in an unspecified amount for an alleged indemnification Claim against the Debtor. The Walker Family Limited Partnership Claim is Disallowed in full and the Walker Family Limited Partnership will not receive any payments whatsoever hereunder on account of the Walker Family Limited Partnership Claim. The Walker Family Limited Partnership subordinated any Claims it may have against Debtor to Wells Fargo's Secured Claim (Class 1) pursuant to a subordination agreement dated June 13, 2013 (the "Partnership Subordination Agreement"). To the extent the Walker Family Limited Partnership has an Allowed General Unsecured Claim, it will be paid, subject to the Partnership Subordination Agreement, as provided in Class 21, General Unsecured Creditors.

3.2.7.     Class 7 – Deere & Company's Secured Claims.

(a)     Classification. Class 7 consists of Deere & Company's Secured Claims.

(b)     Voting. Class 7 is Impaired and the holder of the Class 7 Claims is entitled to vote to accept or reject the Plan.

(c)     Treatment. Deere & Company's Class 7 Secured Claims (Proofs of Claim Nos. 88-110) are secured by Liens on certain of the Debtor's equipment. Deere & Company's Claims are Allowed in full and are fully secured. The Plan Administrator shall sell the equipment which secures Deere & Company's Allowed Secured Claims in accordance with Section 5.5 hereof. The Plan Administrator shall pay Deere & Company's Allowed Secured Claims (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Deere & Company's Claims and its pre-petition and post-petition attorney's fees and costs) in Cash from the sale proceeds, and only from the sale proceeds, of Deere & Company's equipment collateral (after the payment of Claims secured by Liens on the equipment having priority over Deere & Company's Liens, if any) as provided in Section 5.5.2(e) hereof. Deere & Company shall retain its Liens on the collateral until a particular item of equipment is sold in accordance with Section 5.5 hereof, at which time Deere & Company's Lien on such equipment shall be transferred to the proceeds of such sale with the same priority as existed on the equipment sold. Distributions on account of Deere & Company's Allowed Secured Claims shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

3.2.8.     Class 8 – Agricredit Acceptance LLC's Secured Claim.

(a)     Classification. Class 8 consists of Agricredit Acceptance LLC's ("Agricredit") Secured Claim.

(b)     Voting. Class 8 is Impaired and the holder of the Class 8 Claim is entitled to vote to accept or reject the Plan.

(c)     Treatment. Agricredit's Secured Claim (Proof of Claim No. 1) is secured by Liens on the Debtor's two Logan 30 Pro Scoopers, Serial Nos. 12-1688 and 12-1689 (the "Scoopers"). Agricredit's Claim is Allowed in full and may be fully secured. The Plan

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 11

Administrator shall sell the Scoopers in accordance with Section 5.5 hereof. The Plan Administrator shall pay Agricredit's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Agricredit's Claim and its pre-petition and post-petition attorney's fees and costs to the extent Agricredit's Claim is fully secured) in Cash from the sale proceeds, and only from the sale proceeds, of the Scoopers (after the payment of Claims secured by Liens on the Scoopers having priority over Agricredit's Lien, if any) as provided in Section 5.5 hereof. Agricredit shall retain its Liens on the Scoopers until they are sold in accordance with Section 5.5 hereof, at which time Agricredit's Lien on the Scoopers shall be transferred to the proceeds of such sale with the same priority as existed on the Scoopers. Distributions on account of Agricredit's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e).

   3.2.9.  Class 9 –CNH Capital America LLC's Secured Claim.

    (a)  Classification. Class 9 consists of CNH Capital America LLC's ("CNH Capital") Secured Claim.

    (b)  Voting. Class 9 is Impaired and the holder of the Class 9 Claim is entitled to vote to accept or reject the Plan.

    (c)  Treatment. CNH Capital's Secured Claim (Proof of Claim No. 2) is secured by a Lien on the Debtor's Great Plains Turbo Chisel Model TC5113, Serial No. GPA1234X (the "Chisel"). CNH Capital's Claim is Allowed in full and may be fully secured. The Plan Administrator shall sell the Chisel in accordance with Section 5.5 hereof. The Plan Administrator shall pay CNH Capital's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern CNH Capital's Claim and its pre-petition and post-petition attorney's fees and costs to the extent CNH Capital's Claim is fully secured) in Cash from the sale proceeds, and only from the sale proceeds, of the Chisel (after the payment of Claims secured by Liens on the Chisel having priority over CNH Capital's Lien, if any) as provided in Section 5.5hereof. CNH Capital shall retain its Lien on the Chisel until the Chisel is sold in accordance with Section 5.5 hereof, at which time CNH Capital's Lien on the Chisel shall be transferred to the proceeds of such sale with the same priority as existed on the Chisel. Distributions on account of CNH Capital's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

   3.2.10.  Class 10 – Toyota Motor Credit Corporation's Secured Claims.

    (a)  Classification. Class 10 consists of Toyota Motor Credit Corporation's ("Toyota") Secured Claims.

    (b)  Voting. Class 10 is Impaired and the holder of the Class 10 Claims is entitled to vote to accept or reject the Plan.

    (c)  Treatment. Toyota's Secured Claims (Proofs of Claim Nos. 5 and 6) are secured by Liens on the Debtor's 2008 Toyota Sequoia, VIN: 5TDB767A788022010; and 2013 Toyota Tundra, VIN: 5TFHY511DX281537 vehicles (the "Toyota Vehicles"). Toyota's Claim is Allowed in full and may be fully secured. The Plan Administrator shall sell the Toyota

Vehicles in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Toyota's Allowed Secured Claims (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Toyota's Claims and its pre- and post-petition attorney's fees and costs to the extent Toyota's Claims are fully secured) in Cash from the sale proceeds, and only from the sale proceeds, of the Toyota Vehicles as provided in Section 5.5 hereof. Toyota shall retain its Liens on the Toyota Vehicles until the Toyota Vehicles are sold in accordance with Section 5.5 hereof, at which time Toyota's Lien on the Toyota Vehicles shall be transferred to the proceeds of such sale with the same priority as existed on the Toyota Vehicles. Distributions on account of Toyota's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

      3.2.11.     Class 11 – Ally Financial Inc.'s Secured Claims.

         (a)     Classification.  Class 11 consists of Ally Financial Inc.'s ("Ally") Secured Claims.

         (b)     Voting.  Class 11 is Impaired and the holder of the Class 11 Claims is entitled to vote to accept or reject the Plan.

         (c)     Treatment.  Ally's Secured Claims (Proofs of Claim Nos. 11 and 12) are secured by Liens on the Debtor's 2013 Jeep Grand Cherokee, VIN: 1C4RJFAG2DC503133 and 2013 Chevrolet Silverado, VIN: 1GCNKPEX4DZ371873 (the "Ally Vehicles").  Ally's Claims are Allowed in full and may be fully secured.  The Plan Administrator shall sell the Ally Vehicles in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Ally's Allowed Secured Claims (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Ally s Claims and its pre-petition and post-petition attorney's fees and costs to the extent Ally's Claim is fully secured) in Cash from the sale proceeds, and only from the sale proceeds, of the Ally Vehicles as provided in Section 5.5 hereof.  Ally shall retain its Liens on the Ally Vehicles until the Ally Vehicles are sold in accordance with Section 5.5 hereof, at which time Ally's liens on the Ally Vehicles shall be transferred to the proceeds of such sale with the same priority as existed on the Ally Vehicles. Distributions on account of Ally's Allowed Secured Claims shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

      3.2.12.     Class 12 – AAAUrethane, Inc.'s Claim.

         (a)     Classification.  Class 12 consists of AAAUrethane Inc.'s ("AAAUrethane") Claim, to the extent it is not an Allowed Administrative Claim.

         (b)     Voting.  Class 12 is Impaired and the holder of the Class 12 Claim is entitled to vote to accept or reject the Plan.

         (c)     Treatment.  AAAUrethane's Secured Claim (Proof of Claim No. 29) provides that it is secured by a Lien on the real property commonly known as the shop, located on the Arco Highway (the "Shop Property").  AAAUrethane's has, however, filed a Motion for Approval of Administrative Expense Claim (Dkt. No. 362) in which it states that it will amend its Proof of Claim to be an administrative claim if the Court grants its motion.  To the

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 13

extent AAAUrethane has an Allowed Administrative Claim, it will be paid as provided in Section 2.7 hereof, it's Secured Claim shall be Disallowed in full, it shall release and terminate of record all Liens on the Assets and, in any event, any such Liens shall be deemed terminated without any further action by AAAUrethane.  To the extent AAAUrethane has an Allowed Secured Claim, the Plan Administrator shall sell the Shop Property as provided in Section 5.5 hereof.  The Plan Administrator shall pay AAAUrethane's Secured Claim, to the extent it is Allowed (which may include pre-petition and post-petition interest at the rate set out in the documents that govern AAAUrethane's Claim and its pre-petition and post-petition attorney's fees and costs to the extent AAAUrethane, Inc.'s Claim is fully secured) in Cash (after the payment of Claims secured by Liens on the Shop Property having priority over AAAUrethane's Lien) from the sale proceeds, and only from the sale proceeds, of the Shop Property as provided in Section 5.5 hereof.  AAAUrethane shall retain its Lien, if any, on the Shop Property until the Shop Property is sold in accordance with Section 5.5 hereof, at which time the AAAUrethane Lien on the Shop Property, if any, shall be transferred to the proceeds of such sale with the same validity and priority as existed on the Shop Property.  Distributions on account of AAAUrethane's Allowed Secured Claim, if any, shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

        3.2.13.     Class 13 – Commercial Credit Group, Inc.'s Secured Claim.

        (a)     Classification.  Class 13 consists of Commercial Credit Group, Inc.'s ("Commercial Credit") Secured Claim.

        (b)     Voting.  Class 13 is Impaired and the holder of the Class 13 Claim is entitled to vote to accept or reject the Plan.

        (c)     Treatment.  Commercial Credit's Secured Claim (Proof of Claim No. 35) is secured by Liens on four (4) 2011 STC 530 Quad Axle Stainless Steel Agricultural Commodity Trailers, S/N: 4S9SU5341BB168017; 4S9SU5341BB168018; 4S9SU5341BB168020; and 4S9SU5341BB168021 (the "Commercial Credit Trailers").  Commercial Credit's Claim is Allowed in full and is fully secured.  The Plan Administrator shall sell the Commercial Credit Trailers in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Commercial Credit's Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Commercial Credit's Claim and its pre-petition and post-petition attorney's fees and costs) in Cash from the proceeds of the sale, and only from the proceeds of the sale, of the Commercial Credit Trailers as provided Section 5.5 hereof.  Commercial Credit shall retain its Liens on the Commercial Credit Trailers until the Commercial Credit Trailers are sold in accordance with Section 5.5 hereof, at which time Commercial Credit's Liens on the Commercial Credit Trailers shall be transferred to the proceeds of such sale with the same priority as existed on the Commercial Credit Trailers.  Distributions on account of Commercial Credit's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

3.2.14.    Class 14 – Farm Credit Services of America, PCA's Secured Claim.

(a)    Classification.  Class 14 consists of Farm Credit Services of America, PCA's ("Farm Credit") Secured Claim.

(b)    Voting.  Class 14 is Impaired and the holder of the Class 14 Secured Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment.  Farm Credit's Secured Claim (Proof of Claim No. 38) is secured by Liens on three (3) Reinke 2060 Center Pivots (1-6 Towers, serial numbers 0408-40413-2060; 0408-40482-2060; and 0408-40414-2060) and nine (9) Reinke Corner Systems (serial numbers 0408-01513-2060; 0408-01512-2060; 0408-01511-2060; 0408-01514-2060; 0408-01517-2060; 0408-01519-2060; 0408-01516-2060; 0408-01518-2060; and 0408-01520-2060) (the "Sprinkler Equipment").  Farm Credit's Claim is Allowed in full and may be fully secured.  The Plan Administrator shall sell the Sprinkler Equipment in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Farm Credit' Allowed Secured Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern Farm Credit's Claim and its pre-petition and post-petition attorney's fees and costs to the extent Farm Credit's Claim is fully secured) in Cash (after the payment of Claims secured by Liens on the Sprinkler Equipment having priority over Farm Credit's Lien, if any) from the proceeds of the sale, and only from the sale proceeds, of the Sprinkler Equipment as provided in Section 5.5 hereof.  Farm Credit shall retain its Liens, if any, on the Sprinkler Equipment until the Sprinkler Equipment is sold in accordance with Section 5.5 hereof, at which time Farm Credit's Lien on the Sprinkler Equipment shall be transferred to the proceeds of such sale with the same priority as existed on the Sprinkler Equipment.  Distributions on account of Farm Credit's Allowed Secured Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.

3.2.15.    Class 15 – Les Schwab Tire Centers of Boise, Inc.'s Claim.

(a)    Classification.  Class 15 consists of Les Schwab Tire Centers of Boise, Inc.'s ("Les Schwab") Claim.

(b)    Voting.  Class 15 is Impaired and the holder of Les Schwab's Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment.  Les Schwab's Claim (Proof of Claim No. 50) provides that it is secured by Liens on certain of the Debtor's vehicle tires, to the extent the tires still exist (the "Tires") in the amount of $1,691.20.  Les Schwab's Proof of Claim, however, also contains a priority Claim in the amount of $1,523.60.  A review of the Proof of Claim establishes that the $1,523.60 priority Claim is included in the $1,691.20 secured Claim and that based on the invoices attached to the Proof of Claim, it appears $1,359.70 may have been for goods received by the Debtor within twenty (20) days of the Petition Date (Section 503(b)(9)).  These invoices also show that Magic Valley Tire of Rupert, Inc., and not Les Schwab, provided some of the goods.  Further, there is not any evidence attached to the Proof of Claim that Les Schwab has a Lien on the Tires.  To the extent Les Schwab has an Allowed Administrative Claim, it will be paid as provided in Section 2.7 hereof.  Subject to the Plan Administrator's right to abandon to

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 15

Les Schwab the Tires, the Plan Administrator shall sell the Tires in accordance with Section 5.5 hereof.  The Plan Administrator shall pay Les Schwab's Class 15 Secured Claim, if any, (which may include pre-petition and post-petition interest at the rate set out in the documents that govern Les Schwab's Claim and its pre-petition and post-petition attorney's fees and costs to the extent Les Schwab's Claim is fully secured) in Cash (after the payment of Claims secured by Liens on the Tires having priority over Les Schwab's Liens) from the proceeds, and only from the proceeds, of the sale of the Tires as provided in Section 5.5 hereof.  Les Schwab shall retain any Lien it may have on the Tires until the Tires are sold in accordance with Section 5.5 hereof, at which time Les Schwab's Lien on the Tires, if any, shall be transferred to the proceeds of such sale with the same validity and priority as existed on the Tires.  Distributions on account of Les Schwab's Allowed Secured Claim, if any, shall be made as provided in Section 5.5.2(e) hereof.

      3.2.16.    Class 16 - U.S. Bank National Association, as Trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-Through Certificates, Series 2006-WF2 Claim.

      (a)    Classification.  Class 16 consists of U.S. Bank National Association, as Trustee for Citigroup Mortgage Loan Trust, Inc., Mortgage Pass-Through Certificates, Series 2006-WF2's Claim ("U.S. Bank, Trustee").

      (b)    Voting.  Class 16 is Impaired and the holder of the Class 16 Claim is entitled to vote to accept or reject the Plan.

      (c)    Treatment.  U.S. Bank, Trustee's Claim (Proof of Claim No. 113) provides that it is secured by a Lien on real property located at 397 North 3400 East, Lewisville, Idaho (the "Lewisville Property").  The Debtor's Schedules (Schedule A) state that although legal title to the Lewisville Property is in the name of the Estate of Blair Walker (the "Estate of Blair Walker"), the Debtor is the equitable owner of the Lewisville Property.  If it is determined that the Debtor was, and Liquidating WLCC is, the equitable owner of the Lewisville Property or the Debtor or Liquidating WLCC is entitled to a Lien on or other interest in the Lewisville Property, the Plan Administrator shall sale the Lewisville Property in accordance with Section 5.5 hereof and the Plan Administrator shall pay U.S. Bank, Trustee's Class 16 Claim (which shall include pre-petition and post-petition interest at the rate set out in the documents that govern U.S. Bank, Trustee's Claim and its pre-petition and post-petition attorney's fees) in Cash from the proceeds, and only from the proceeds of the sale, of the Lewisville Property.  U.S. Bank, Trustee shall retain its Lien on the Lewisville Property until the Lewisville Property is sold in accordance with Section 5.5 hereof, at which time U.S. Bank, Trustee's Lien on the Lewisville Property shall be transferred to the proceeds of such sale with the same priority as existed on the Lewisville Property.  Distributions on account of U.S. Bank, Trustee's Claim shall be made by the Plan Administrator as provided in Section 5.5.2(e) hereof.  In the event it is determined by Final Order of the Bankruptcy Court that the Estate of Blair Walker is the owner of the Lewisville Property and that neither the Debtor nor Liquidating WLCC own or have a Lien on or other interest in the Lewisville Property, U.S. Bank, Trustee's Claim shall be, as of the date of the Final Order, Disallowed in full, U.S. Bank, Trustee will not receive any payment hereunder whatsoever on account of U.S. Bank, Trustee's Claim and U.S. Bank, Trustee may enforce all of its rights and Claims against the Estate of Blair Walker and the Lewisville Property.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 16

3.2.17.    Class 17 – Estate of Blair M. Walker's Claim.

(a)    Classification.  Class 17 consists of the Estate of Blair M. Walker's ("Estate of Blair Walker") Claim.

(b)    Voting.  Class 17 is Impaired and the holder of the Class 17 Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment.  The Estate of Blair Walker Filed a Claim in the amount of $53,626.58 (Proof of Claim No. 126) which provides that it is secured by the Lewisville Property (the "Estate of Blair Walker Claim").  The Claim is, however, not a secured Claim, but instead is based on the allegation that the Estate of Blair Walker owns the Lewisville Property (see Section 3.2.16 hereof) and that it is entitled to any equity in the Lewisville Property.  The Estate of Blair Walker Claim shall, as of the Effective Date, be Disallowed in full and the Estate of Blair Walker will not receive any payment hereunder whatsoever on account of the Estate of Blair Walker Claim.  In the event it is determined by a Final Order of the Bankruptcy Court that the Estate of Blair Walker is the sole owner of the Lewisville Property and that neither the Debtor nor Liquidating WLCC have a Lien on or any other interest in the Lewisville Property, the Estate of Blair Walker shall retain its rights in the Lewisville Property as provided in the Final Order, subject to the Lien in favor of U.S. Bank, Trustee.

3.2.18.    Class 18 – Bonneville County Treasurer's Secured Claim Classification – Class 18 consists of the Bonneville County Treasurer's ("Bonneville County") Secured Claim.

(a)    Voting.  Class 18 is not Impaired and the holder of the Class 18 Claim is not entitled to vote to accept or reject the Plan.

(b)    Treatment.  Bonneville County's Claim (Proof of Claim No. 14) is for 2013 real estate taxes.  It is the Plan Proponent's understanding that the first half of the Debtor's 2013 Bonneville County real estate taxes were timely paid on or before December 20, 2013, and the second half of the Debtor's 2013 real estate taxes due Bonneville County were paid on or before June 20, 2014.  As a result, Bonneville County's Secured Claim has been paid in full and Bonneville County will not receive any payments whatsoever hereunder on account of Bonneville County's Secured Claim.

3.2.19.    Class 19 – Fremont County Tax Collector's Secured Claim

(a)    Classification – Class 19 consists of the Fremont County Tax Collector's ("Fremont County") Secured Claim.

(b)    Voting.  Class 19 is not Impaired and the holder of the Class 19 Claim is not entitled to vote to accept or reject the Plan.

(c)    Treatment.  Fremont County's Claim (Proof of Claim No. 48) is for 2013 real estate taxes.  It is the Plan Proponent's understanding that the first half of the Debtor's 2013 Fremont County real estate taxes were timely paid on or before December 20, 2013 and the second half of the Debtor's 2013 real estate taxes due Fremont County were paid

on or before June 20, 2014.  As a result, Fremont County's Secured Claim has been paid in full and Fremont County will not receive any payments whatsoever hereunder on account of Fremont County's Secured Claim.

3.2.20.    Class 20 – Jefferson County Treasurer's Secured Claim

(a)    Classification – Class 20 consists of the Jefferson County Treasurer's ("Jefferson County") Secured Claim.

(b)    Voting.  Class 20 is not Impaired and the holder of the Class 20 Claim is not entitled to vote to accept or reject the Plan.

(c)    Treatment.  The Debtor's schedules (Amended Schedule D) lists Jefferson County as having a non-contingent, liquidated and undisputed Secured Claim in the amount of $0.00.  It is the Plan Proponent's understanding that the first half of the Debtor's 2013 Jefferson County real estate taxes where timely paid on or before December 20, 2013 and the second half of the Debtor's 2013 real estate taxes due Jefferson County were paid on or before June 20, 2014.  As a result, Jefferson County's Secured Claim has been paid in full and Jefferson County will not receive any payments whatsoever hereunder on account of Jefferson County's Secured Claim.

3.2.21.    Class 21 – General Unsecured Claims

(a)    Classification – Class 21 consists of General Unsecured Claims.

(b)    Voting.  Class 21 is Impaired and the holders of Class 21 Claims are entitled to vote to accept or reject the Plan.

(c)    Treatment.  The Plan Administrator shall, from the Unsecured Creditors Fund, first pay the Holder of each Allowed General Unsecured Claim in Cash Pro Rata its Allowed General Unsecured Claim (without post-petition interest and attorney's fees).  To the extent there is Cash remaining in the Unsecured Creditors Fund after the payment in full of Allowed General Unsecured Claims (without post-petition interest and attorney's fees), the Plan Administrator shall, from the Unsecured Creditors Fund, pay each Holder of an Allowed General Unsecured Claim Pro Rata: (i) interest on such Claim from the Petition Date to the Effective Date, at the Federal Judgment Rate, which is 0.11% per annum; and from the Effective Date to the Distribution Date, at the State Judgment Rate, which is 5.125% per annum; and (ii) the attorney's fees and costs incurred by it from and after the Petition Date, to the fullest extent permitted by the Bankruptcy Code and other applicable law.  Notwithstanding anything herein to the contrary, the Unsecured Creditors Fund shall include: (i) all proceeds, after payment of the costs of sale, received by the Plan Administrator from the collection or sale of Assets upon which there are not any then perfected Liens (such as certain of the Debtor's titled motor vehicles and certain of the Debtor's real property, after the DIP Lender has been paid in full on the DIP Credit Facility Claim); (ii) all proceeds from the sale of Assets after payment in full of the costs of sale and the Holders of Allowed Secured Claims having Liens thereon; (iii) the remaining proceeds, if any, from the enforcement of the Causes of Action, after payment of all fees and costs for the enforcement of the such Causes of Action, and after payment in full of

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 18

Holders of Secured Claims having Liens thereon; (iv) any amounts held in a Disputed Claims
Reserve as provided in Section 6.4.2 hereof; (v) any unclaimed amounts as provided in Section
6.4.3(c) hereof; and (vi) all amounts held in the Administrative Fund after the payment in full of
Wells Fargo's Allowed Secured Claim and all costs and expenses associated with the Wind
Down.  Distributions on account of Allowed General Unsecured Claims shall be made by the
Plan Administrator as soon as practical.   Provided, however, that if at any time the Unsecured
Creditor's Fund contains $500,000 or more the Plan Administrator shall, not more than 90 days
after such Fund contains at least $500,000, Distribute 50% of such Fund to the Holders of
Allowed General Unsecured Claims.

      3.2.22.    Class 22 – Equity Interests.

      (a)    Classification – Class 22 consists of all Equity Interests.

      (b)    Voting.  Class 22 is Impaired and the Holders of Class 22 Equity
Interests are deemed to reject the Plan.

      (c)    Treatment.  The Holders of Class 22 Allowed Equity Interests shall
retain their Equity Interests in Liquidating WLCC in the same percentages as they held in the
Debtor.  In the event Allowed General Unsecured Claims in Class 21 have been paid in full,
including interest, costs and attorney's fees as set forth in Section 3.2.21 hereof and in the further
event all of the fees and costs of the Plan Administrator have been paid in full, including fees and
costs of professionals retained by the Plan Administrator, then, in that event, and only in that
event, the Plan Administrator shall pay each Holder of an Allowed Equity Interest in Cash Pro-
Rata according to their percentage of Allowed Equity Interests in the Debtor from the remaining
amounts held in the Unsecured Creditors Fund.  Any Distributions to Holders of Allowed Equity
Interests shall be made by the Plan Administrator as soon as practical.

## ARTICLE IV.
## ACCEPTANCE OR REJECTION OF THE PLAN

    The Plan Proponent reserves the right to seek confirmation of this Plan under section
1129(b) of the Bankruptcy Code.  The Plan Proponent further reserves the right to modify in
accordance with Section 13.1 hereof.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

    5.1.   **Continuing Existence.**

    From and after the Effective Date, Liquidating WLCC shall continue in existence, under
the sole direction of the Plan Administrator, solely for the purposes consistent with the terms of
this Plan, which include (a) effectuating the Wind Down, (b) liquidating and otherwise
monetizing the Assets, (c) enforcing and prosecuting Claims, interests, rights and privileges of
Liquidating WLCC and the Estate, including the Causes of Action, (d) resolving Disputed
Claims, (e) administering this Plan and taking such actions as are necessary to effectuate this
Plan, and (f) filing appropriate Tax Reports for Liquidating WLCC.  The Plan Administrator, and

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 19

only the Plan Administrator, shall have power to bind Liquidating WLCC or to take other action concerning Liquidating WLCC.  Officers and employees of the Debtor, whose assistance the Plan Administrator requires to effectuate the liquidation and Wind Down of Liquidating WLCC, may, in the Plan Administrator's sole discretion, continue as employees of Liquidating WLCC, for the purpose of assisting the Plan Administrator with the liquidation and Wind Down of Liquidating WLCC.  Such officers and employees shall be subject to the Plan Administrator's authority to direct Liquidating WLCC, and shall not take any actions inconsistent with the Plan Administrator's directions or instructions, nor shall they take any action that would hinder or obstruct the Plan Administrator from performing its duties under this Plan.  The costs and expenses relating to such officers and employees shall be satisfied from amounts held in the Administrative Fund.  Liquidating WLCC shall also maintain those books, records and bank accounts necessary to effectuate the liquidation and Wind Down.  The Holders of Allowed Equity Interests shall continue to be "members" as that term is defined in the Idaho Uniform Limited Liability Company Act, Idaho Code § 30-6-102(12) and "partners" as that term is defined in the Internal Revenue Code of 1986, as amended of Liquidating WLCC.  Such members and Liquidating WLCC's manager(s) and its remaining officers and employees shall be subject to the Plan Administrator's authority to direct Liquidating WLCC, and shall not take any actions inconsistent with the Plan Administrator's directions or instructions, nor shall they take any action that would hinder or obstruct the Plan Administrator from performing its duties under this Plan.

Officers, employees, members and managers of Liquidating WLCC shall cooperate with the Plan Administrator in performing its duties as Plan Administrator.  Such obligation shall include, without limitation, an obligation to assist in resolving tax matters that arise in connection with the affairs of Liquidating WLCC.

### 5.2.    **Vesting of Assets in Liquidating WLCC.**

Except as otherwise provided in this Plan, pursuant to section 1141 of the Bankruptcy Code, on the Effective Date, all Assets of the Debtor and the Estate and any other Assets acquired by the Debtor or the Estate shall vest in Liquidating WLCC, free and clear of all Liens, Claims, charges or other encumbrances.  Except as otherwise provided in this Plan or the Confirmation Order, on and after the Effective Date, Liquidating WLCC may use, acquire or dispose of Assets, and compromise or settle any Claims, without supervision or approval by the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5.3.    **Plan Administrator**

#### 5.3.1.    Appointment of the Plan Administrator

As of and after the Effective Date, the Plan Administrator shall be solely responsible for implementing the liquidation and Wind Down contemplated by this Plan, including monetizing or abandoning any Assets, pursuing, settling or abandoning Causes of Action, resolving all Claims and distributing Cash pursuant to this Plan.  On the Effective Date, the Plan Administrator shall exercise all powers and rights previously exercised by Debtor's officers, managers and members (but shall not be a member of Liquidating WLCC), and shall have the

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 20

power to direct Debtor's and Liquidating WLCC's officers, managers, members, and employees. Liquidating WLCC shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator.  All Assets of the Estate shall be transferred to Liquidating WLCC and managed and Distributed solely by the Plan Administrator pursuant to the terms of this Plan, and, except as otherwise provided herein, shall be held in the name of Liquidating WLCC free and clear of all Liens, Claims, charges or other encumbrances against the Debtor, and Equity Interests in the Debtor, except for rights to such Distributions provided to Holders of Allowed Claims and Allowed Equity Interests as provided herein.

### 5.3.2.    Actions Against the Plan Administrator

The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

### 5.3.3.    Term and Compensation of the Plan Administrator

Subject to the terms of this Plan in Section 5.3.6 regarding removal or resignation of the Plan Administrator, the Plan Administrator shall serve until satisfaction of the following: (a) the full liquidation, administration and distribution of the Assets, and the satisfaction of the terms of this Plan; (b) the dissolution of Liquidating WLCC; and (c) the final closing of the Chapter 11 Case.  The Plan Administrator shall be compensated from the Administrative Fund in accordance with Sections 5.3.8 of this Plan.

### 5.3.4.    Powers and Obligations of the Plan Administrator

(a)    The Plan Administrator shall be a fiduciary of Liquidating WLCC and shall, subject to the oversight of the Wind Down Committee, have all powers, authorities and responsibilities specified in this Plan.  In particular, the Plan Administrator's rights, duties and powers shall include the following:

(i)    The Plan Administrator shall hold all powers as would have been applicable to any of Debtor's officers, managers or members (but shall not be a member of Liquidating WLCC) with like effect as if authorized, exercised and taken by unanimous action of such officers, managers and members.

(ii)    The Plan Administrator shall be authorized to take all steps necessary to effectuate the Wind Down and to take such other actions as the Plan Administrator determines are in the best interests of the Holders of Claims and consistent with the Wind Down Budget.

(iii)    The Plan Administrator, in its reasonable business judgment, and in an expeditious and orderly manner, shall cause Liquidating WLCC to liquidate, and convert all of the Assets to Cash and make all Distributions in accordance with this Plan. The liquidation of the Assets may be accomplished either through the sale of the Assets (in

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 21

whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

(b)    The Plan Administrator shall be expressly authorized to do the following, in each case to the extent consistent with the Plan, the Wind Down Budget and subject to the oversight of the Wind Down Committee:

(i)    cause Liquidating WLCC to institute, prosecute, collect, compromise and settle any Causes of Actions in accordance herewith and without further approval or application to the Bankruptcy Court, except as otherwise provided herein, including, prosecuting and/or settling the Causes of Action pending in any court of appropriate jurisdiction;

(ii)    cause Liquidating WLCC to participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding and litigate or settle such Causes of Action on behalf of the Liquidating WLCC or the Estate, or to pursue such Causes of Actions to settlement or judgment;

(iii)    open and maintain bank accounts in the name of Liquidating WLCC, draw checks and drafts thereon by the sole signature of the Plan Administrator and terminate such accounts as the Plan Administrator deems appropriate;

(iv)    cause Liquidating WLCC to make Distributions and take other actions consistent with this Plan and the implementation hereof, including the establishment, reevaluation, adjustment and maintenance of appropriate reserves in accordance with this Plan;

(v)    cause Liquidating WLCC to collect, liquidate and monetize all Assets pursuant to this Plan and to administer the Wind Down and closing of this Chapter 11 Case;

(vi)    cause Liquidating WLCC to file, prosecute or object to any Claims that are not Allowed in this Plan, and compromise or settle any such Claims prior to or after objection, without supervision or approval of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than those restrictions expressly imposed by this Plan, or to seek Bankruptcy Court approval for any Claims settlements made after objection;

(vii)    cause Liquidating WLCC to retain or engage professionals, employees and consultants, and to pay from the Administrative Fund the reasonable fees and charges incurred by the Plan Administrator, the Wind Down Committee and Liquidating WLCC's professionals and employees that relate to the implementation of this Plan, without application to the Bankruptcy Court, but subject to review by and approval of the Wind Down Committee as set forth in this Plan;

(viii)    [Intentionally deleted];

(ix)    cause Liquidating WLCC to invest Cash or moneys received by Liquidating WLCC or otherwise held by Liquidating WLCC in accordance with this Plan (which shall be in compliance with section 345 of the Bankruptcy Code);

(x)    execute any documents or pleadings and take any other actions related to, or in connection with, the liquidation and monetization of the Assets and the exercise of the Plan Administrator's powers granted herein, including the exercise of Liquidating WLCC's rights to conduct discovery and oral examination of any party under Bankruptcy Rule 2004;

(xi)    enter into any agreement or execute any document required by or consistent with this Plan, and perform all of its obligations thereunder;

(xii)    cause Liquidating WLCC to preserve Liquidating WLCC's documents, as necessary, to pursue Causes of Action and conduct the Wind Down, and to abandon or destroy documents upon the Plan Administrator's determination that the documents are no longer necessary or beneficial to Liquidating WLCC;

(xiii)    cause Liquidating WLCC to purchase and maintain all insurance policies and pay from the Administrative Fund all insurance premiums and costs that the Plan Administrator deems necessary or advisable;

(xiv)    administer payouts of the Professional Fee Claims upon Bankruptcy Court approval of Professional Fee Claims;

(xv)    grow, harvest, manage, store, safeguard, and sell Liquidating WLCC's 2014 crop;

(xvi)    lease the real and personal property Assets pending their sale;

(xvii)    sell the Assets by private or public sale, free and clear of liens, subject to the right of creditors having a lien on such Assets and make credit bids pursuant to U.S.C. § 363(k);

(xviii)    choose not to liquidate or monetize, and instead abandon, any Asset that is burdensome or of inconsequential value to Liquidating WLCC, subject to the approval of the Wind Down Committee; and

(xix)    take all other actions not inconsistent with the provisions of this Plan, which the Plan Administrator deems reasonably necessary or desirable with respect to administering this Plan.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 23

The Plan Administrator shall not grow any 2015 crops.

      5.3.5.     Oversight by Wind Down Committee

      (a)     Oversight by the Wind Down Committee.

The Wind Down Committee shall have the right to consult with and oversee the Plan Administrator in all respects regarding the Plan Administrator's administration of Liquidating WLCC, the discharge of its duties under this Plan, the effectuation of the Plan and the Distribution of Assets, and the Plan Administrator shall follow any directions and comply with any restrictions provided by the Wind Down Committee regarding the foregoing. The Plan Administrator shall meet and confer, telephonically or as otherwise agreed, with the Wind Down Committee on a regular basis, as well as at the request of the Wind Down Committee or as needed to address any other matters which could reasonably be expected to have a material effect on the amount of Distributions to be made by the Plan Administrator or Liquidating WLCC or the cost of administering the Wind Down. The Plan Administrator shall respond to any reasonable request of the Wind Down Committee for information. To the extent such information is subject to any privilege or protection against disclosure, the Wind Down Committee and the Plan Administrator shall enter into a confidentiality agreement. The Wind Down Committee shall have standing to object to any action taken by the Plan Administrator or to seek to enforce the Plan Administrator's responsibilities under the Plan and this Agreement. Notwithstanding anything in this Plan to the contrary, to the extent the Plan Administrator, the Wind Down Committee, and, as applicable, Wells Fargo, disagree about the Plan Administrator's rights, duties or powers, any aspect of the interpretation, administration or implementation of the Plan, or the Plan Administrator's proposed course of action, each of the Plan Administrator and the Wind Down Committee shall be entitled to seek relief from the Bankruptcy Court to resolve any such conflict.  The Bankruptcy Court shall retain jurisdiction to resolve any such conflict.  The Bankruptcy Court's Final Order on such conflict shall be binding on and followed by the Plan Administrator, the Wind Down Committee, and, as applicable, Wells Fargo.  The Plan Administrator shall not be required to follow any directions or comply with any restrictions provided by the Wind Down Committee or, as applicable, Wells Fargo regarding the same pending the Bankruptcy Court's Final Order.

      (b)     Periodic Reports to the Wind Down Committee

Each quarter, the Plan Administrator shall compile a report (the "Quarterly Wind Down Report") and deliver such report to the Wind Down Committee. The Quarterly Wind Down Report shall disclose, in each case with respect to the preceding quarter (the "Reporting Period"), (i) the amount of any Distributions made during the Reporting Period and to whom the distributions were made, (ii) the amount of Claims settled during the Reporting Period, including the amount of such Claims as Filed or scheduled and the Allowed amount of such Claims pursuant to the settlement, (iii) a summary of any material steps taken during the Reporting Period by the Plan Administrator or Liquidating WLCC to litigate or settle any Causes of Action, (iv) the fees and expenses paid during the Reporting Period to the Plan Administrator, any professionals retained by the Plan Administrator and any professionals retained by Liquidating

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 24

WLCC, and (v) any other matters which could reasonably be expected to have a material effect on the amount of Distributions to be made by the Plan Administrator or Liquidating WLCC.

(c)      Wind Down Budget and Divergences Therefrom

The Wind Down Budget shall be prepared by the Plan Administration within ten (10) Business Days after the Effective Date.  The Wind Down Budget shall be subject to the approval of the Wind Down Committee.  After the Wind Down Budget has been approved by the Wind Down Committee, it shall govern the use of the Administrative Fund.

In the event that the Plan Administrator determines, in its reasonable judgment, that the amounts expected to be paid from the Administrative Fund are likely to exceed the Wind Down Budget and prior to paying any amounts in excess of the Wind Down Budget, the Plan Administrator shall provide written notice to the Wind Down Committee of the amount by which the Plan Administrator expects to exceed the Wind Down Budget and the reason for such excess costs.  Upon receipt of such notice, the Plan Administrator and the Wind Down Committee shall consult in good faith to revise the Wind Down Budget or reduce the costs and expenses of the Wind Down as needed. In no event may the Plan Administrator expend funds from the Administrative Fund which exceed the Wind Down Budget without the prior written consent of the Wind Down Committee.

5.3.6.      Resignation or Removal of Plan Administrator

In the event of the dissolution, bankruptcy, insolvency or removal of the Plan Administrator, a successor Plan Administrator may be appointed by the Wind Down Committee. The Plan Administrator may resign at any time upon 30 days' notice to the Bankruptcy Court and the Wind Down Committee.  The Wind Down Committee may remove (by majority vote) the Plan Administrator at any time for cause.  Any party in interest may move the Bankruptcy Court for the removal of the Plan Administrator for cause upon providing notice to the Plan Administrator and the Wind Down Committee; provided, however, that if the Plan Administrator or any other party in interest shall object to such removal within 21 days of such notice, such removal shall not be effective until approved by the Bankruptcy Court.  In the event of the resignation or removal of the Plan Administrator, the Wind Down Committee may, by majority vote and without the necessity of approval from the Bankruptcy Court, designate a person or other Entity to serve as successor Plan Administrator.  No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his, her or its predecessors.  Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge and deliver to the Bankruptcy Court and the Wind Down Committee a written instrument accepting such appointment.  Thereupon, such successor Plan Administrator, without any further action required, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

Notwithstanding any other provision in this Plan, upon the resignation or removal of a Plan Administrator, a Plan Administrator shall continue to serve in such capacity until such time as (a) a successor Plan Administrator is identified and accepts the appointment on substantially

the same terms as the resigning Plan Administrator, and (b) notice is provided to the Bankruptcy Court of such successor Plan Administrator.

### 5.3.7. Retention of Professionals

(a)    As of and after the Effective Date, the Plan Administrator may, in accordance with the Wind Down Budget, and subject to prior approval of the Wind Down Committee, cause Liquidating WLCC to retain professionals, including attorneys, accountants, auditors and other agents on behalf of Liquidating WLCC, as necessary or desirable to carry out the actions necessary to effectuate the Wind Down and close this Chapter 11 Case.  Each such professional may be retained without Bankruptcy Court approval and without application to the Bankruptcy Court or any other court of competent jurisdiction.

(b)    The Wind Down Committee may, in accordance with the Wind Down Budget, retain professionals, including law firms or financial advisors, to aid the Wind Down Committee in the performance of its responsibilities pursuant to the terms of this Plan, including the oversight of the Plan Administrator without Bankruptcy Court approval and without application to the Bankruptcy Court or any other court of competent jurisdiction.

### 5.3.8. Compensation of Plan Administrator and Professionals

(a)    The Plan Administrator shall receive compensation for services rendered and expenses incurred in fulfilling its duties pursuant to this Plan, including any necessary services rendered and expenses incurred prior to the Effective Date.  The Plan Administrator shall be compensated at the rate of $175.00 per hour, with a bonus incentive of $100,000.00 if all Allowed Administrative Claims, Priority Claims, Secured Claims and General Unsecured Claims are paid in full by the later of one year after the Effective Date and December 31, 2015 and a bonus incentive of $50,000.00 if all such Claims are paid in full after the later of one year after the Effective Date and December 31, 2015, but on or before the later of fifteen months after the Effective Date and March 31, 2016.  The foregoing bonus incentives shall not be included in the Administrative Fund or the Wind Down Budget, but shall be paid from, and to the extent of, the amounts remaining in the Unsecured Creditors Fund prior to any Distributions to Holders of Class 22 Equity Interests.  The Plan Administrator shall also be entitled to reimbursement for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals, in accordance with and subject to the Wind Down Budget.  The compensation and reimbursement of the Plan Administrator's expenses shall be paid in accordance with the Administrative Fund Procedures and the Wind Down Budget and shall not be subject to approval of the Bankruptcy Court. Notwithstanding the foregoing, in the event that the Plan Administrator's expenses exceed the amount allotted by the Wind Down Budget, the Plan Administrator shall provide notice thereof to the Wind Down Committee and shall not pay such expenses absent the prior written consent, by majority vote, of the Wind Down Committee.

(b)    The members of the Wind Down Committee shall not receive compensation for services rendered in fulfilling their duties pursuant to the Plan.  The members of the Wind Down Committee shall be entitled to reimbursement for all reasonable out-of-pocket

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 26

expenses incurred in connection with their responsibilities under this Plan, such as travel, lodging and meals, in accordance with and subject to the Wind Down Budget. The reimbursement of the expenses of the members of the Wind Down Committee shall be paid in accordance with the Administrative Fund Procedures and shall not require approval of the Bankruptcy Court. Notwithstanding anything to the contrary in this Plan: (i) the Plan Administrator may, without first obtaining approval of the Wind Down Committee, object to the post-confirmation expenses of the Wind Down Committee by filing an objection with the Bankruptcy Court; (ii) the Bankruptcy Court shall retain jurisdiction to resolve any such objection; and (iii) the Bankruptcy Court's Final Order on such objection shall be binding and followed by the Plan Administrator and the Wind Down Committee.

(c)    On or before the last day of each month following the month for which compensation is sought, each professional seeking compensation for services rendered to and expenses incurred for the Plan Administrator's professionals or the Wind Down Committee's, shall serve a monthly statement on the Plan Administrator and the Wind Down Committee detailing the compensation and expense reimbursement sought; provided, however, that any professional's failure to serve a monthly statement on such parties for any one or more months shall not waive or impair the right of such professionals to subsequently seek compensation for all or any number of such months in a later statement delivered to such parties. The Plan Administrator and the Wind Down Committee shall have 10 days from the date such statement is received to review the statement and object to such statement by serving a written objection on the professional setting forth the precise nature of the objection and the amount at issue. At the expiration of the 10-day period, the Plan Administrator shall promptly pay the amounts requested from the Administrative Fund, except for the portion of such fees and disbursements to which an objection has been made or which exceeds the Wind Down Budget. The parties shall attempt to consensually resolve objections, if any, to any monthly statement or, to the extent the compensation exceeds the Wind Down Budget, amend the Wind Down Budget in accordance with this Plan. If the parties are unable to reach a consensual resolution, the professional may seek payment of such fees and disbursements by filing a motion with the Bankruptcy Court on proper notice to the Plan Administrator and the Wind Down Committee.

(d)    On or before the last day of each month following the month for which compensation is sought, the Plan Administrator shall serve a monthly statement on the Wind Down Committee detailing the compensation and expense reimbursements sought; provided, however, that the Plan Administrator's failure to serve a monthly statement on such parties for any one or more months shall not waive or impair the right of the Plan Administrator to subsequently seek compensation for all or any number of such months in a later statement delivered to such parties. The Wind Down Committee shall have ten (10) days from the date such statement is received to review the statement and object to such statement by serving a written objection on the Plan Administrator setting forth the precise nature of the objection and the amount at issue. At the expiration of the 10-day period, the Plan Administrator shall promptly pay the amounts requested from the Administrative Fund, except for the portion of such fees and disbursements to which an objection has been made or which exceeds the Wind Down Budget. The parties shall attempt to consensually resolve objections, if any, to any monthly statement or, to the extent the compensation exceeds the Wind Down Budget, amend the Wind Down Budget in accordance with this Plan. If the parties are unable to reach a

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 27

consensual resolution, the Plan Administrator may seek payment of such fees and disbursements by filing a motion with the Bankruptcy Court on proper notice to the Wind Down Committee.

(e)     On or before the last day of each month following the month for which expense reimbursement is sought, each member of the Wind Down Committee shall serve a monthly statement on the Plan Administrator detailing the expenses it seeks to have reimbursed; provided, however, that any Wind Down Committee member's failure to serve a monthly statement on the Plan Administrator for any one or more months shall not waive or impair the right of such member to subsequently seek reimbursement for expenses for all or any number of such months in a later statement delivered to the Plan Administrator. The Plan Administrator shall have ten (10) days from the date such statement is received to review the statement and object to such statement by serving a written objection on the Wind Down Committee member setting forth the precise nature of the objection and the amount at issue. At the expiration of the 10-day period, the Plan Administrator shall promptly pay the amounts requested from the Administrative Fund, except for the portion of such expense to which an objection has been made or which exceeds the Wind Down Budget. The parties shall attempt to consensually resolve objections, if any, to any monthly statement or, to the extent the compensation exceeds the Wind Down Budget, amend the Wind Down Budget in accordance with this Plan. If the parties are unable to reach a consensual resolution, the Wind Down Committee member may seek reimbursement of such expenses by filing a motion with the Bankruptcy Court with proper notice to the Plan Administrator and the other members of the Wind Down Committee.

5.3.9.    Insurance

In accordance with the Wind Down Budget and the oversight of the Wind Down Committee, the Plan Administrator shall be authorized to obtain all reasonably necessary insurance coverage for itself, the Wind Down Committee, the members, agents, Representatives, employees or independent contractors of the Plan Administrator, the Wind Down Committee, and Liquidating WLCC, including coverage with respect to (a) the Assets and (b) the liabilities, duties and obligations of the Plan Administrator, the Wind Down Committee and their Representatives under this Plan (in the form of an errors and omissions policy, general liability directors' and officers' insurance ("D&O") or otherwise). To the extent it is available, the D&O coverage shall remain in effect for the period through which Claims can be made against any covered persons. The D&O insurance must have first dollar coverage acceptable to the Plan Administrator in effect for at least $1 million. The cost of any insurance shall be paid in accordance with the Wind Down Budget and the Administrative Fund Procedures.

5.3.10.    Standard of Care; Indemnification; Exculpation.

(a)     Standard of Care

The Plan Administrator shall perform the duties and obligations imposed on the Plan Administrator by this Plan with reasonable diligence and care under the circumstances. The Wind Down Committee shall perform the duties and obligations imposed on the Wind Down Committee by this Plan with reasonable diligence and care under the circumstances.

(b)    Exculpation

The Plan Administrator, the members of the Wind Down Committee and their employers and the directors, officers, affiliates, employees, employers, professional agents or Representatives of the Plan Administrator and the Wind Down Committee, each in its capacity as such (the "Exculpated Parties") shall not be liable for losses, Claims, damages, liabilities, obligations, settlements, proceedings, suits, judgments, causes of action, litigation, actions, investigations (whether civil or administrative and whether sounding in tort contract or otherwise), penalties, costs, and expenses, including reasonable fees and disbursements (collectively referred to herein as "Losses") incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Exculpated Party's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties and obligations under this Plan, the Confirmation Order, any other order of the Bankruptcy Court or applicable law or as may arise by reason of any action, omission, or error of an Exculpated Party; provided, however, that the foregoing limitation shall not apply to any acts or omissions ultimately and finally determined by Final Order of a court of competent jurisdiction to be the direct result of such Exculpated Party's fraud, willful misconduct or gross negligence.  None of the Exculpated Parties is deemed to be responsible for any other Exculpated Party's actions or inactions.

(c)    Indemnification

Liquidating WLCC shall indemnify and hold harmless (a) the Plan Administrator (in its capacity as such), (b) the members of the Wind Down Committee, and (c) any director, officer, affiliate, employee, employer, agent or Representative of the Plan Administrator or the Wind Down Committee, each in its capacity as such (the "Indemnified Parties"), from and against and with respect to any and all Losses and any costs and expenses, including attorneys' fees, incurred, caused by, relating to, based upon or arising out of (directly or indirectly) the Exculpated Party's execution, delivery, and acceptance of or the performance or nonperformance of its powers, duties and obligations under this Plan, the Confirmation Order, any other order of the Bankruptcy Court or applicable law, other than acts or omissions ultimately and finally determined by Final Order of a court of competent jurisdiction to be the direct result of such Indemnified Party's fraud, willful misconduct or gross negligence, with respect to Liquidating WLCC or the implementation or administration of this Plan.  To the extent that an Indemnified Party asserts a Claim for indemnification as provided above, the legal fees and related costs incurred by counsel to such Indemnified Party in monitoring and participating in the defense of the Claims giving rise to such asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor). The indemnification provisions of this Section 5.3.10(c) shall survive any termination or completion of this Plan.

5.3.11.    Limit of Liability.

The Exculpated Parties shall be entitled to rely upon the exculpation, indemnification and limitation of liability provisions set forth in the Plan. No Exculpated Party shall be liable for incidental or consequential damages under any circumstances, even if it has been advised of the

possibility of such damages. The aggregate liability of each Exculpated Party, whether in tort, contract or otherwise, is limited to the amount of fees paid to such Exculpated Party for services rendered in relation to the Chapter 11 Case.

### 5.3.12.    Investment Obligations

With the oversight of the Wind Down Committee, the Plan Administrator shall invest and reinvest the liquid Assets consistent with the obligations of a Plan Administrator under section 345 of the Bankruptcy Code and in accordance with the terms of this Plan. The Plan Administrator shall not be liable in any way for any loss or other liability arising from any investment, or the sale or other disposition of any investment, made in accordance with this Section 5.3.12, except for any such loss or liability arising from the Plan Administrator's fraud, gross negligence or willful misconduct.

### 5.3.13.    Tax Filings and Notices.

The Plan Administrator shall prepare and provide to, or file with, the appropriate taxing authorities and other parties all Tax Reports, including all federal, state and local tax returns for Liquidating WLCC, as may be required under the Bankruptcy Code, this Plan, or by applicable law of other jurisdictions.

### 5.3.14.    Timely Performance.

In accordance with the terms of this Plan, the Plan Administrator shall make reasonable continuing efforts to investigate, prosecute, abandon, or settle the Causes of Action, object to and reconciled Disputed Claims, liquidated and monetize the Assets, make timely Distributions, and not unduly prolong the duration of Liquidating WLCC's existence.

## 5.4.  **Wind Down Committee.**

### 5.4.1.    Creation of Wind Down Committee

(a)    As of and after the Effective Date, the Wind Down Committee and its members shall conduct their actions in accordance with the laws of the State of Idaho and shall be created to (1) employ and oversee the Plan Administrator; (2) oversee the prosecution and/or settlement of the Causes of Action; (3) oversee objections to Claims and settlement and/or compromise of such objections; and (4) oversee the sale, monetization and Distribution of the Assets. The Wind Down Committee shall consist of three members.  Wells Fargo, Rabo and the Creditor's Committee shall each be entitled to select one member of the Wind Down Committee. Each member of the Wind Down Committee shall have one vote.  Actions taken by the Wind Down Committee shall be by a majority vote of its members.  At such time as the Allowed Claim(s) of Well Fargo or Rabo, as the case may be, are paid in full, then the Wind Down Committee representative appointed by such creditor shall resign from the Wind Down Committee; provided, however, that such resignation shall not be effective until the resigning member's replacement is chosen.  The resigning member's final act as a member of the Wind Down Committee shall be to cooperate in selecting and appointing its replacement.  In the event the member selected by the Creditor's Committee resigns or is removed, its replacement shall be

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 30

selected as set forth below.  Each foregoing replacement member of the Wind Down Committee shall be a Holder of an Allowed General Unsecured Claim (other than a Related Unsecured Creditor), or a Representative thereof, and shall be selected by the members of the Wind Down Committee who shall give preference to the Holder(s) of the largest Allowed General Unsecured Claims.  The Wind Down Committee may retain professionals, including additional attorneys, accountants or financial advisors, and other agents on behalf of the Wind Down Committee as necessary or desirable to carry out the actions of the Wind Down Committee as described herein.

(b)    Except as otherwise ordered by the Bankruptcy Court, any of the Wind Down Committee's reasonable fees or expenses, as applicable (including the reasonable fees and expenses of professionals and other agents and Representatives retained by the Wind Down Committee), shall be paid from the Administrative Fund by Liquidating WLCC or the Plan Administrator without further order of the Bankruptcy Court, but subject to the Wind Down Budget and the Administrative Fund Procedures.

(c)    The Confirmation Order shall state that, without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Wind Down Committee or any of its members in their official capacity, with respect to their status, duties, powers, act or omissions as members of the Wind Down Committee, in any forum other than the Bankruptcy Court.

### 5.5.    Monetization of Assets.

5.5.1.    Sale and Other Monetization of Assets.

Except for Assets which the Plan Administrator, after taking into consideration the Claims of Creditors having a first priority Lien thereon and the cost of sale, determines do not have value to Liquidating WLCC and the Estate, the Plan Administrator shall sell all real and personal property of Liquidating WLCC, collect all of its accounts receivable and the value of all of its life insurance policies, enforce Liquidating WLCC's Causes of Action and otherwise monetize all of Liquidating WLCC's Assets.  All Liens on the Assets shall be transferred to the proceeds of such sale, collections, lease and other monetization with the same priority as existed on the items sold, collected or otherwise monetized.

The Plan Administrator shall sell Assets in the manner provided below in the order that it, in its reasonable business judgment, determines.  All sales shall be for Cash, shall be free and clear of Liens with the Liens to attach to the proceeds of the sale with the same validity and priority as existed on the items sold and shall be made without further Bankruptcy Court approval.  The Plan Administrator may, in the exercise of its reasonable business judgment and after first obtaining approval from the Wind Down Committee of the terms and conditions of the lease, lease any of the Assets for Cash pending their sale, without further Bankruptcy Court approval.  The Plan Administrator shall, upon receipt, pay the net lease payments (after deducting the cost of leasing the Asset, including any compensation to brokers) to the Holder(s) of an Allowed Claim which is secured by a Lien on the leased Asset in the order of the Lien priority thereon.

5.5.2.    Sale Procedures.

The Plan Administrator shall comply with the following sales procedures for the sale of Assets, other than the 2014 crops which shall be governed by subsection (d) below:

(a)    After first obtaining approval from the Wind Down Committee of the terms and conditions of the proposed sale, including the amount by which any Overbid(s) (as defined below) must exceed the proposed sale price, the Plan Administrator shall provide notice of any proposed private sale of an Asset(s) to all parties included on the Court's mailing matrix within not more than seven days after the Plan Administrator accepts a conditional offer to sell an Asset(s).  The notice shall, at a minimum, include: (i) a description of the Asset(s) to be sold; (ii) the time and place of the sale; (iii) the sales price; (iv) the amount by which any Overbid(s) must exceed the proposed sale price; (v) the estimated fair market value of the Asset(s) to be sold and a brief statement of the basis for the estimate; (vi) the name of each Creditor having a Lien on the Asset(s) to be sold along with the priority of each such Lien; (vii) the identity of the proposed purchaser and the purchaser's relationship, if any, to any party-in-interest in this Chapter 11 Case; (viii) the proposed Distribution of the sale proceeds, including any reimbursement for the costs of the sale (including advertising expenses, the costs of repairing the Asset(s) for sale, if any, and any compensation to brokers or other professionals to be paid from the sale proceeds): and (ix) notification that unless a Holder of an Allowed Claim or Equity Interest Files an objection to the proposed sale within 5 Business Days of the mailing of the notice, the Plan Administrator may proceed with the sale without a court order or hearing.  In the event a Holder of an Allowed Claim or Equity Interest Files such an objection, the Plan Administrator shall promptly obtain a hearing date for the Bankruptcy Court to resolve the objection.

Any Entity may, within 7 Business Days after the Plan Administrator mails the notice (the "Overbid Period"), submit to the Plan Administrator an offer to purchase the Asset(s) on the same terms and conditions as the proposed sale, except for a higher price than the proposed purchase price (the "Overbid").  In the event the Plan Administrator receives an Overbid(s) during the Overbid Period, the Plan Administrator shall proceed to negotiate with the original proposed purchaser and the party(s) making the Overbid(s) for a period of not more than 3 Business Days.  At the end of such period, the Plan Administrator shall, subject to the approval of the Wind Down Committee, accept the bid it determines to be in the best interests of Creditors (after taking into consideration such factors as the bidder's ability to perform and the bid price) and proceed to close the sale without an order from the Bankruptcy Court or hearing.

(b)    After first obtaining the approval from the Wind Down Committee of the terms and conditions of the proposed public auction, the Plan Administrator shall provide notice to all parties included on the Court's mailing matrix of any proposed public auction of an Asset(s) not less than 21 Business Days before the auction.  The notice shall, at a minimum, include: (i) a description of the Asset(s) to be sold; (ii) the time and place of the public auction; (iii) a description of how the public auction will be conducted; (iv) the name and address of the auctioneer(s); (v) the name of each Creditor having a Lien on the Asset(s) to be sold and the priority of each such Lien; (vi) the proposed Distribution of the sale proceeds, including any reimbursement for the costs of the sale (including advertising expenses, the costs of repairing the

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 32

Asset(s) for sale, if any, and any compensation to brokers, auctioneers or other professionals to be paid from the sale proceeds); and (vii) notification that unless a Holder of an Allowed Claim or Equity Interest Files an objection to the proposed auction within 7 Business Days of the mailing of the notice, the Plan Administrator may proceed with the auction without a court order or hearing.  In the event a Holder of an Allowed Claim or Equity Interest Files such an objection, the Plan Administrator shall promptly obtain a hearing date for the Bankruptcy Court to resolve the objection.

(c)     Any Creditor having a Lien on an Asset to be sold shall be entitled to make a credit bid(s) at either a private sale or public auction of such Asset; provided, however (i) in the event such Creditor is the successful bidder it, at closing, shall pay the Plan Administrator in Cash for the cost of the sale including advertising expenses, the costs of repairing the Asset(s) for sale, if any, and the fees of brokers, auctioneers or other professionals directly providing services for the sale; and (ii) Creditors having junior priority Liens on the Asset(s) to be sold shall not be allowed to credit bid until it has first bid in Cash an amount equal to: (i) the Claim of the Creditor(s) having a priority Lien on the Asset(s) to be sold (including creditors having priority pursuant to a subordination agreement, including the Walker Trust Subordination Agreement); and (ii) the costs of the sale.

(d)     Subject to the Wind Down Committee and Wells Fargo's approval of the terms and conditions of the sale, the Plan Administrator shall sell Liquidating WLCC's 2014 crops, without an order from the Bankruptcy Court or hearing, at such times as it, in its reasonable business judgment, determines to be in the best interest of Creditors.

(e)     Except for Causes of Action which shall be governed by Section 5.6, the Plan Administrator shall, after the payment of the sale or other monetization costs of an Asset, (including the Plan Administrator's attorney's fees): (i) pay the net proceeds of the Asset(s) immediately upon receipt to the Holder(s) of an Allowed Claim which is secured by a Lien on the Asset(s) sold or otherwise monetized in order of the Lien priority thereon; (ii) in the event there is not a Holder of an Allowed Claim which is secured by a Lien on the Asset(s) sold or otherwise monetized, immediately upon receipt deposit the net proceeds of the Asset(s) in the Unsecured Creditor's Fund; and (iii) after the Holder(s) of the Allowed Claims which are secured by a Lien on the Asset(s) sold or otherwise monetized have been paid in full, immediately upon receipt deposit the remaining net proceeds in the Unsecured Creditor's Fund; Provided, however, when the Asset(s) sold is real estate, the payment to the Holder(s) of an Allowed Claim which is secured by a Lien on the real estate sold shall be made directly to such Holder(s) from the closing agent for the sale.

5.5.3.     Deadline for Liquidation.  The Plan Administrator shall use its reasonable efforts to arrange for the sale of all of the Assets by the later of eight months after the Effective Date and August 31, 2015, by either private or public sale.  If the sale of all of the Assets does not close by the later of ten months after the Effective Date and October 31, 2015, the Plan Administrator shall sell such remaining Assets at public auction on or before the later of one year after the Effective Date and December 31, 2015.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 33

5.5.4.    No Transfer Tax.  Pursuant to Section 1146 of the Bankruptcy Code, the sale or transfer of Assets pursuant to this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment.

5.6.    **Preservation of the Causes of Action**

5.6.1.    Liquidation of Causes of Action.  As of the Effective Date, all rights related to the Causes of Action shall vest in Liquidating WLCC, which such rights may be enforced only by the Plan Administrator whether arising before or after the Petition Date.  The Plan Administrator's right to commence, prosecute or settle Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Estate and Liquidating WLCC.  No Entity may rely on the absence of a specific reference in this Plan or the Disclosure Statement with respect to any Cause of Action against them as any indication that the Plan Administrator will not pursue any and all available Causes of Action against such Entity.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in this Plan or a Final Order, the Plan Administrator expressly reserves the right to prosecute all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon, after or as a consequence of Confirmation, the Effective Date or consummation of this Plan.

Wells Fargo's Disclosure Statement (Dkt. 464, p. 23) references certain prepetition transfers that could give rise to Avoidance Actions if the Debtor was insolvent at the time of those transfers.  Based on the information available to Wells Fargo, it does not appear that the Debtor was insolvent at the time the transfers.  Nevertheless, the Plan Administrator will evaluate any potential Avoidance Actions and reserves the sole and exclusive right to prosecute, settle or otherwise dispose of any such Avoidance Actions.

The Plan Administrator reserves, and shall retain the right to prosecute, settle or otherwise dispose of all of the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during this Chapter 11 Case or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Entity shall vest in the Plan Administrator.  The Plan Administrator shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any party (except for the Wind Down Committee) or further notice to or action, order or approval of the Bankruptcy Court.

The proceeds, after the payment of collection costs, including attorney's fees, of any Causes of Action: (a) shall be paid by the Plan Administrator upon receipt first to the Holders of Secured Claims having Liens thereon according to the priority of such Liens and then, after all such Secured Claims have been paid in full, the remaining proceeds shall be deposited into the

Unsecured Creditors Fund; and (b) in the event there is not a Holder of an Allowed Claim which is secured by a Lien thereon, such proceeds shall, upon receipt, be deposited by the Plan Administrator into the Unsecured Creditor's Fund.

        5.6.2.     <u>Intervention</u>.  On the Effective Date, and without having to obtain any further order of the Bankruptcy Court, the Plan Administrator is, subject to the terms of this Plan and the oversight of the Wind Down Committee, authorized to (a) intervene as plaintiff, movant or additional party, as appropriate, in any Cause of Action (whether asserted in actions, adversary proceedings, contested matters, motions or otherwise, which were filed prior to the Effective Date) and (b) intervene or be substituted in place of the Estate in connection with the prosecution of any objections to Claims.

### 5.7.   **Dissolution of Creditors' Committee**

On the Effective Date, the Creditors' Committee shall dissolve and its respective members shall be discharged and released from all further authority, rights, duties, responsibilities and obligations relating to this Chapter 11 Case; provided, however, that the Creditors' Committee shall continue to have a right to be heard with respect to any and all (a) applications for Professional Fee Claims and (b) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code, if applicable.

### 5.8.   **Managers, Members and Officers**

On and after the Effective Date, the Plan Administrator shall have the sole power to bind and to direct Liquidating WLCC and Liquidating WLCC's managers, members and officers shall thereafter exercise their powers, authority, rights, duties, responsibilities and obligations under the direction of the Plan Administrator  and Liquidating WLCC shall continue as a limited liability company.  The Debtor's and Liquidating WLCC's managers and members shall not have any right or authority whatsoever to remove the Plan Administrator or to diminish or otherwise effect the Plan Administrator's authority, rights, duties, responsibilities and obligations hereunder.  The Plan Administrator shall not be required to seek the approval or authorization of Debtor's or Liquidating WLCC's managers or members to take any action provided for or contemplated by this Plan and the Debtor's and Liquidating WLCC's managers and members shall not have any rights to approve or prevent actions taken by the Plan Administrator pursuant to this Plan.  Debtor's and Liquidating WLCC's managers and members shall not, in any manner, interfere with or attempt to diminish the Plan Administrator's powers, authorities, rights, duties, responsibilities and obligations of the Plan Administrator and shall not file any Tax Reports with regard to Debtor, whether as Liquidating WLCC or otherwise, without the prior written consent of the Plan Administrator.

### 5.9.   **Wind Down and Dissolution of the Debtor**

As soon as practicable after the Effective Date, the Plan Administrator shall, without any further action by Debtor's former managers, officers or members:  (1) take any action reasonably necessary to effectuate the Wind Down; (2) file a certificate of dissolution for Liquidating WLCC, together with all other necessary limited liability company documents, to effect the

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 35

dissolution of Liquidating WLCC under applicable non-bankruptcy law; (3) complete and file all of Debtor/Liquidating WLCC's final or otherwise required federal, state and local Tax Reports, as applicable; (4) request an expedited determination for any unpaid tax liability of the Debtor, whether as Liquidating WLCC or otherwise, or of its Estate, regarding any tax incurred during the administration of this Chapter 11 Case, as determined under applicable tax laws; (5) liquidate and otherwise monetize the Assets; (6) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan; and (7) comply with any regulatory requirements imposed on Liquidating WLCC under applicable law.

Filing of Liquidating WLCC's certificate of dissolution by the Plan Administrator and all actions of the Plan Administrator pursuant to this Plan shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including any action by the members of Debtor, whether as Liquidating WLCC or otherwise, or by the former members, officers or managers, as applicable, of Debtor, whether as Liquidating WLCC or otherwise.  All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Plan Administrator on behalf of Liquidating WLCC and shall take all steps necessary to allow and effect the prompt dissolution as provided herein, without the payment of any fee, tax or charge, and without need for the filing of reports or certificates, except as the Plan Administrator may determine in its sole discretion or as may be requested by the Wind Down Committee.  Upon entry of a final decree in the Chapter 11 Case, if not previously dissolved, Liquidating WLCC shall be deemed automatically dissolved and wound up without any further action or formality which might otherwise be required under applicable non-bankruptcy law.

### 5.10.    **Cash Collateral**

On the Effective Date, the Debtor's authorization to use Cash Collateral (as that term is defined in the Cash Collateral Orders) shall terminate without further order of the Bankruptcy Court; provided, however, the Adequate Protection Liens (as defined in the Cash Collateral Orders) and the Adequate Protection provided in the Cash Collateral Orders shall remain binding, valid and in full force and effect.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### 6.1.    **General Settlement of Claims.**

Unless otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, Distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims and controversies resolved pursuant to this Plan.

### 6.2.    **Interim Distributions on Account of Allowed Claims**

The Plan Administrator shall make Distributions in strict accordance with the terms of this Plan, including, without limitation, Sections 5.5. and 5.6, to the Holders of Allowed Secured

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 36

Claims after the sale or other monetization of the Assets upon which a Secured Creditor has a Lien, to Holders of Allowed General Unsecured Claims as provided in Section 3.2.21(c) and to Holders of Allowed Equity Interests as soon as practical.

### 6.3.    Final Distributions on Allowed Claims.

Notwithstanding anything herein to the contrary, upon (1) the settlement and satisfaction, or disallowance, of all Administrative, Professional Fee and Priority Claims, (2) the completion and prosecution and/or settlement of all objections to all other Claims, and the Causes of Action, (3) the liquidation of all Assets and (4) the completion of all matters necessary to effectuate the Wind Down, the Plan Administrator shall distribute, as soon thereafter as reasonably practicable, all remaining Assets and proceeds thereof pursuant to the terms of this Plan.

### 6.4.    Administrative Fund and Disputed Claims Reserve

#### 6.4.1.    Administrative Fund.

Not later than 10 days after the Effective Date, the Plan Administrator shall cause Liquidating WLCC to establish the Administrative Fund.  The initial amount of the Administrative Fund shall be based on the Wind Down Budget, and shall be funded from Liquidating WLCC's cash on hand, to the extent such cash exists.  The Plan Administrator shall pay from the Administrative Fund all costs and expenses related to carrying out the activities of Liquidating WLCC under this Plan.  If the amount in the Administrative Fund derived from Liquidating WLCC's cash on hand is insufficient for the Plan Administrator to carry out his duties under this Plan, the Plan Administrator shall make a written request to the Wind Down Committee to add funds to the Administrative Fund.  Wells Fargo shall then contribute additional funds to the Administrative Fund, from the proceeds of Assets upon which Wells Fargo had a Lien, up to a total amount of $1,750,000.00 (which total shall include any previous contributions of WLCC's cash on hand).  If this additional amount proves insufficient, the Plan Administrator may make additional requests for funds, and Wells Fargo may, in its discretion, allow additional proceeds of Assets upon which it had a Lien to be added to the Administrative Fund.  Notwithstanding anything herein to the contrary, all amounts paid out of the Administrative Fund shall be paid in accordance with the Administrative Fund Procedures.

#### 6.4.2.    Disputed Claims Reserve.

Prior to making Distributions required to be made under this Plan to Holders of a particular Class, the Plan Administrator shall establish a separate Disputed Claims Reserve for any Disputed Claims in such Class, which shall be administered by the Plan Administrator.  The Plan Administrator shall reserve in Cash or other Assets, for Distribution on account of each Disputed Claim in the applicable Class, the *Pro Rata* portion of the full asserted amount (or such lesser amount as may be estimated by the Court in accordance with Section 7.1.3 of each Disputed Claim in the Class.

To the extent that the Assets placed in a Disputed Claims Reserve consist of Cash, such Cash shall be deposited in an interest-bearing account.  Liquidating WLCC shall hold Assets in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately

determined to be Allowed.  The Disputed Claims Reserve shall be closed and extinguished by the Plan Administrator when all Distributions and other dispositions of Cash or other Assets required to be made to the particular Class hereunder shall have been made in accordance with the terms of this Plan.  Upon closure of the Disputed Claims Reserve, all Cash or other Assets held in the Disputed Claims Reserve shall revest in and become the Assets of Liquidating WLCC and be available for Distribution Pro Rata to the Holders of Allowed Claims in the Class and, if no other Holders exist in such class, then for Distribution Pro Rata to the Holders of Allowed General Unsecured Claims.

### 6.4.3.    Delivery of Distributions

(a)    Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Plan Administrator at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder, or (ii) the last known address of such Holder if no Proof of Claim is Filed or if the Plan Administrator has been notified in writing of a change of address.  If any Distribution is returned as undeliverable, the Plan Administrator may, in its discretion and as the Plan Administrator deems appropriate, attempt to determine the current address of the Holder of the Claim with respect to such Distribution; provided, however, that no Distribution to any Holder shall be made unless and until the Plan Administrator has determined the then-current address of the Holder, at which time the Plan Administrator shall make such Distribution to such Holder without the payment of interest caused by the delay in resending the Distributions.

Amounts in respect of any undeliverable Distributions made by the Plan Administrator shall be returned to, and held in trust by, Liquidating WLCC until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Section 6.4.3(c) hereof below.  The Plan Administrator shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that the Plan Administrator's discretion may not be exercised in a manner inconsistent with any of this Plan's express requirements.

(b)    Minimum Distributions

Notwithstanding anything herein to the contrary, if a Distribution to be made to a Holder of an Allowed Claim totals $25.00 or less in the aggregate, no such Distribution shall be made to that Holder unless a request therefor is made in writing to the Plan Administrator.

(c)    Unclaimed Property

Except with respect to Assets held in the Disputed Claims Reserve, Distributions that are not claimed within the expiration of one year from the Distribution Date on which such Distribution was made shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in Liquidating WLCC.  The Claims upon which such Distributions are based shall be automatically canceled and expunged.  After the expiration of one year from the Distribution Date on which such Distribution was made, the Claim of any

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 38

Entity to those Distributions shall be released and forever barred, notwithstanding federal or state escheat laws to the contrary. Nothing contained in this Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. All funds or other Assets that vests or revests in Liquidating WLCC pursuant to this Article shall be distributed by the Plan Administrator to the other Holders of Allowed Claims in that Class in accordance with the provisions of this Plan and if no other Holders exist in such Class, then Pro Rata to the Holders of Allowed General Unsecured Claims.

6.4.4.    Manner of Cash Payments Under this Plan

Cash payments made pursuant to this Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

6.4.5.    Time Bar to Cash Payments by Check

Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Section 6.4.5 shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check shall be made in writing on or before the first anniversary of the date of the issuance of the voided check. After such date, all Claims in respect of void checks shall be released and forever barred. The proceeds of such checks shall revest in and become the property of Liquidating WLCC as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed in accordance with Section 6.4.3(c).

6.4.6.    Compliance with Tax Requirements

In connection with making Distributions under this Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit. All Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements. The Plan Administrator may withhold an entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding or reporting requirements of any governmental unit. Any property so withheld will then be paid by the Plan Administrator to the appropriate authority. If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding or reporting requirements of any governmental unit within six months from the date the Holder was first notified in writing of the need for such information, or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Section 6.4.3(a).

6.5.    **Set Off and Recoupment**

Except as provided herein, the Plan Administrator may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to this Plan

in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate, Liquidating WLCC or the Plan Administrator may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim under this Plan shall constitute a waiver or release by the Debtor, the Estate, Liquidating WLCC or the Plan Administrator of any right of setoff or recoupment that any such Entity may have against the Holder of any Claim.  Holders of Claims against the Estate may also set off their Claims to the full extent permitted by Bankruptcy Code § 553.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

**7.1.    Resolution of Disputed Claims**

      7.1.1.    Allowance of Claims

After the Effective Date, the Plan Administrator shall maintain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan, including Claims Allowed hereunder, or in any other Final Order of the Bankruptcy Court.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until the Plan Administrator determines, in its sole discretion, that such Claim shall be Allowed or such Claim is Allowed pursuant to Final Order of the Bankruptcy Court.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court under Bankruptcy Rule 9019, or otherwise, shall be binding on all parties.

      7.1.2.    Objections to Claims

After the Confirmation Date until the applicable Claims Objection Bar Date, the Plan Administrator shall maintain the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment such objections.  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court, but subject to the oversight of the Wind Down Committee.  Any objections to Claims pending on the Effective Date shall be taken over and exclusively prosecuted by the Plan Administrator.

      7.1.3.    Claims Estimation

After the Confirmation Date, the Plan Administrator may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law, and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator has previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during any litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed, contingent or

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 40

unliquidated Claim, such estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, Liquidating WLCC or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

### 7.1.4.      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the applicable Claims Objection Bar Date.

### 7.1.5.      No Distributions Pending Allowance

If any portion of a Claim is a Disputed Claim, no Distribution provided hereunder shall be made on account of such Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.1.6.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions, if any, shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide the Distribution, if any, that would have been made to such Holder on the previous Distribution Dates had such Allowed Claim been allowed on such Distribution Dates.

## ARTICLE VIII.
## TREATMENT OF EXECUTORY CONTRACTS

### 8.1.      Rejection of Executory Contracts

Except with respect to the Executory Contracts set forth in **Exhibit B** hereto as having been, or as being, assumed by Liquidating WLCC, this Plan shall constitute a motion to reject all of the Executory Contracts that remain with the Estate. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a finding that such rejections are in the best interest of the Debtor, its Estate and all parties in interest in this Chapter 11 Case.

### 8.2.      Claims Based on Rejection of Executory Contracts

Claims created by the rejection of Executory Contracts pursuant to Section 8.1 of this Plan must be Filed with the Bankruptcy Court and served on the Plan Administrator and the Wind Down Committee no later than 30 days after the Effective Date. Any Claims arising from the rejection of an Executory Contract pursuant to Section 8.1 for which Proofs of Claim are not timely Filed will be forever barred from assertion against the Debtor, the Estate, Liquidating WLCC, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, all such Claims that

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 41

are timely Filed as provided herein shall be treated as General Unsecured Claims under this Plan and shall be subject to all of the provisions of this Plan.  All Claims arising from the rejection of an Executory Contract shall, as of the Effective Date, be subject to the releases, indemnification, exculpation, injunctions and other provisions set forth in this Plan.

## ARTICLE IX.
### [THIS ARTICLE IS INTENTIONALLY LEFT BLANK.]

## ARTICLE X.
### INJUNCTION AND RELATED PROVISIONS

10.1.  **Injunction.**

Except as otherwise expressly provided in this Plan, all Holders of Claims against or Equity Interests in Debtor or the Assets are permanently enjoined, from and after the Effective Date, from (1) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against or Equity Interest in Debtor or the Assets; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Assets; and (3) creating, perfecting or enforcing any encumbrance or any kind against the Assets.  Notwithstanding the foregoing, a Creditor is not enjoined and may enforce its rights related to its Claim against parties other than the Debtor (such as guarantors) and the property of parties other than the Debtor (such as the property of third parties who granted a Lien on its property to secure the repayment of a Creditor's Claim against the Debtor).

10.2.  **Releases**

To the fullest extent permitted by applicable law, neither the Plan Proponent, the Creditors Committee nor any of their Representatives, shall have or incur any liability to any Holder of a Claim against or an Equity Interest in Debtor, or any other party in interest, or any of their Respective officers, directors, subsidiaries, affiliates, members, managers, shareholders, partners, representatives, employees, attorneys or agents or any of their respective successors and assigns, for any pre-Confirmation Date act or omission in connection with, relating to, or arising out of, this Chapter 11 Case, the solicitation of acceptances of this Plan, and the pursuit of Confirmation of this Plan, except for their fraud, breach of fiduciary duty, willful misconduct, or gross negligence as determined by a final order of the Bankruptcy Court.

## ARTICLE XI.
### BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THIS PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THIS CHAPTER 11 CASE, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN OR VOTED (OR IS DEEMED TO HAVE VOTED) TO REJECT THIS PLAN.

**ARTICLE XII.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain the maximum legally permissible jurisdiction over this Chapter 11 Case and all Entities with respect to all matters related to this Chapter 11 Case, the Debtor and this Plan, including jurisdiction to:

12.1.1.    for periods ending on or before the Effective Date, grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan;

12.1.2.    except as otherwise provided in this Plan, allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of any Claim, and the resolution of any and all issues related to the release of Liens upon payment of a Secured Claim;

12.1.3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which the Debtor is a party or with respect to which the Debtor may be liable; and to adjudicate and, if necessary, liquidate, any Claims arising therefrom;

12.1.4.    ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

12.1.5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the date hereof or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Plan Administrator after the Effective Date; provided, however, that the Plan Administrator shall reserve the right to commence actions in all appropriate forums and jurisdictions;

12.1.6.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan or the Disclosure Statement;

12.1.7.    resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

12.1.8.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

12.1.9.    issue injunctions and enforce them, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any

Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

        12.1.10.   resolve any cases, controversies, suits or disputes with respect to the releases, indemnifications, exculpations, injunctions and other provisions contained in this Plan, and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, indemnifications, exculpations, injunctions and other provisions;

        12.1.11.   enter and implement such orders, or take such other actions as may be necessary or appropriate, if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

        12.1.12.   resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

        12.1.13.   enter an order concluding this Chapter 11 Case.

### ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

**13.1.**    **Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Plan Proponent reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Plan Proponent may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency in, this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

**13.2.**    **Revocation of Plan.**

The Plan Proponent reserves the right to revoke or withdraw this Plan before the Confirmation Date and to File subsequent chapter 11 plans.  If the Plan Proponent revokes or withdraws this Plan, or if Confirmation or the Effective Date does not occur, then: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts effected by this Plan, if any, and any document or agreement executed pursuant hereto, shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity, (ii) prejudice the Plan Proponent's or any other Entity's rights in any manner, or (iii) constitute an admission, acknowledgement, offer or undertaking by the Plan Proponent or any other Entity.

13.3.   **No Discharge.**

As provided in Section 1141(d)(3) of the Bankruptcy Code, no discharge will be entered.

13.4.   **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, such Entity's heir, executor, administrator, successor or assign.

13.5.   **Reservation of Rights**

Except as expressly set forth herein, including with respect to votes cast on ballots, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Plan Proponent or any other Entity with respect to this Plan, shall be, or shall be deemed to be, an admission or waiver of any rights of: (a) the Plan Proponent with respect to the Holders of Claims against, or Equity Interests in, the Debtor, or other Entity; or (b) any Holder of a Claim or an Equity Interest, or other Entity, before the Effective Date.

13.6.   **Payment of Statutory Fees**

The Plan Administrator shall pay from the Administrative Fund all fees payable pursuant to 28 U.S.C. § 1930(a) for each quarter (including any fraction thereof) until this Chapter 11 Case is closed.

13.7.   **Section 1125(e) Good-Faith Compliance**

The Plan Proponent, Liquidating WLCC and the Plan Administrator and each of their respective Representatives, shall be deemed to have acted in "good-faith" under section 1125(e) of the Bankruptcy Code in connection with the confirmation and consummation of this Plan.

13.8.   **Further Assurances**

The Debtor or Liquidating WLCC, as applicable, all Holders of Claims and Equity Interests and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents, and take any other actions as may be reasonably necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

13.9.   **Severability.**

If, before Confirmation, any term or provision hereof is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted;

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 45

provided, however, that any such alteration or interpretation must be in form and substance reasonably acceptable to the Plan Proponent and, to the extent such alteration or interpretation affects the rights or treatment of Holders of General Unsecured Claims, the Creditors' Committee or its members; provided further, however, that the Plan Proponent may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order, alteration or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.10.  **Service of Documents.**

Any notice, request or demand required or permitted to be made or provided to or on the Plan Proponent under this Plan shall be: (i) in writing; (ii) served by: (a) certified mail, return receipt requested; (b) hand delivered; (c) overnight delivery service; (d) first class mail; or (e) facsimile transmission; (ii) deemed to have been duly given or made when actually delivered or, in the case of a facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to Plan Proponent:

Wells Fargo Bank
c/o Gregory J. Mondon
Credit Resolution Group
MAC #U1228-062 299
P.O. Box 45490
Salt Lake City, UT 84145-0490
Telephone: (801) 246-1576
Facsimile (801) 363-4330

With a copy to Wells Fargo's Counsel:

Larry E. Prince
Kirk S. Cheney
Holland & Hart LLP
800 W. Main St., Ste 1750
P. O. Box 2527
Boise, ID 83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

Any party listed above may alter the address for receiving notice hereunder by filing a notification of such alteration with the Bankruptcy Court.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 46

13.11. **Governing Law**

Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) provides otherwise, the laws of the state of Idaho shall govern the construction and implementation of this Plan and any agreements, documents and instruments executed in connection with this Plan.

13.12. **Filing of Additional Documents**

On or before the Effective Date, the Plan Proponent may File with the Bankruptcy Court all agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Dated: February 20, 2015

Respectfully submitted,

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: ___/s/ Gregory J. Mondon_____
       Gregory J. Mondon
       Vice President

HOLLAND & HART, LLP

By: ___/s/ Larry E. Prince_____
       Larry E. Prince
       Attorneys for Wells Fargo Bank, National Association

7038257_4

**EXHIBIT A**

**TO CHAPTER 11 LIQUIDATION PLAN**

DEFINITIONS

Unless the context requires otherwise, the following terms shall have the meanings set forth herein when used in capitalized form in the Chapter 11 Liquidation Plan.

1.    "*Administrative Claims*" means Claims for costs and expenses of administration under sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries or commissions for services and payments for goods and other services); (b) the DIP credit Facility Claim; and (c) the Insurance Financing Claim.  Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

2.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a Holder of an Administrative Claim to File a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II herein.

3.    "*Administrative Fund*" means the reserve established by the Plan Administrator within ten (10) Business Days of the Effective Date with the approval of the Wind Down Committee that shall from time to time contain the amount of funds set forth in the Wind Down Budget and such funds shall be used by the Plan Administrator, in accordance with the Administrative Fund Procedures, to perform its duties and pay expenses in accordance with this Plan and the Wind Down Budget, including (a) the reasonable costs and expenses of Liquidating WLCC in the Wind Down; (b) the Plan Administrator's reasonable fees, costs and expenses; (c) the reasonable fees and expenses of the professionals of the Plan Administrator and the Wind Down Committee retain as of and after the Effective Date; (d) the cost to obtain and maintain the insurance or indemnity policy(ies) as provided herein; and (e) any taxes, interest, or penalties that Liquidating WLCC may incur pursuant to this Plan, applicable law or by order of the Bankruptcy Court.  If the amount in the Administrative Fund derived from Liquidating WLCC's cash on hand is insufficient for the Plan Administrator to carry out his duties under this Plan, the Plan Administrator shall make a written request to the Wind Down Committee to add funds to the Administrative Fund.  Wells Fargo shall then contribute additional funds to the Administrative Fund, from the proceeds of Assets upon which Wells Fargo had a Lien, up to a total amount of $1,750,000.00 (which total shall include any previous contributions of WLCC's cash on hand).  If this additional amount proves insufficient, the Plan Administrator may make additional requests for funds, and Wells Fargo may, in its discretion, allow additional proceeds of Assets upon which it had a Lien to be added to the Administrative Fund.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 48

4.      "*Administrative Fund Procedures*" means the following procedures, which shall govern the use of the funds from the Administrative Fund:

(a)      Amounts to be paid from the Administrative Fund pursuant to the Wind Down Budget must be submitted in writing to the Wind Down Committee from and after the Effective Date.

(b)      The Wind Down Committee shall have ten (10) days from the date it receives notice as set forth in subparagraph (a) above to object in writing to any amount to be paid from the Administrative Fund on the basis that it: (i) is not consistent in kind or amount with the Wind Down Budget, or (ii) is not reasonably necessary for the Wind Down of the Estate.

(c)      In the event an objection is made by the Wind Down Committee and an agreement cannot be reached between the Wind Down Committee and the Plan Administrator or the claimant, as the case may be, the amount of any such payment still in dispute shall be determined by Final Order of the Bankruptcy Court.

(d)      Once the amount to be paid has either been agreed to or determined by Final Order of the Bankruptcy Court, as set forth in paragraph (c) above, the Plan Administrator shall promptly pay such Claim from the Administrative Fund.

(e)      Upon the dissolution of Liquidating WLCC, all right, title and interest in and to any amounts in the Administrative Fund that are not used to pay costs associated with the Wind Down, as set forth in this Plan, shall be distributed first to Wells Fargo if its Allowed Claim has not been paid in full and then in accordance with Sections 3.2.21 and 3.2.22 of the Plan.

5.      "*Allowed*" means, with respect to any Claim against in the Debtor and except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor in its Schedules Filed in the Chapter 11 Case as undisputed, noncontingent and liquidated in amount and as to which the Debtor, the Plan Administrator or other parties-in-interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim Filed in the Chapter 11 Case that either is not Disputed by the Claims Objection Bar Date or has been allowed by a Final Order; (c) a Claim Filed or asserted in the Chapter 11 Case that is allowed: (i) in a stipulation of amount and nature of Claim executed prior to the Effective Date and approved by the Bankruptcy Court; or (ii) in any stipulation or written agreement with the Plan Administrator of the amount and nature of the Claim executed on or after the Effective Date and approved by the Bankruptcy Court; (d) a Claim that is allowed pursuant to the terms of this Plan or (e) a Disputed Claim that the Plan Administrator ultimately determines will not be objected to (such Claim being deemed allowed at the time such determination is made).  With respect to any Equity Interest in the Debtor, "*Allowed*" means the Holders of Equity Interests and the percentages thereof set forth in the Debtor's List of Equity Security Holders – Amended (Dkt. No. 72).

6.      "*Assets*" means all of the rights, title and interest of the Debtor, the Estate or Liquidating WLCC in, to and under any and all of its assets and property, whether tangible,

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 49

intangible, real or personal, of any nature whatsoever, including all assets and property of the
Estate under and pursuant to Section 541 of the Bankruptcy Code and all assets and property
acquired by the Estate or the Debtor after the Petition Date or by Liquidating WLCC as of or
after the Effective Date, including Cash, the Causes of Action, the Avoidance Actions, rights and
interests in property and the Books and Records.

7.      "*Avoidance Actions*" means any and all actions, causes of action, suits, and rights
to payment existing or arising under Sections 544, 545, 547, 548, 550 and 553(b) of the
Bankruptcy Code, including but not limited to state law remedies available pursuant to Section
544 of the Bankruptcy Code.

8.      "*Bankruptcy Code*" means the Bankruptcy Reform Act of 1978, as codified in
Title 11 of the United States Code, 11 U.S.C. §§101-1532, as now in effect or hereafter
amended, and as applicable to Debtor's Chapter 11 Case and applicable portions of Titles 18 and
28 of the United States Code.

9.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of
Idaho.

10.      "*Bankruptcy Rules*" means, collectively, the Federal Rules of Bankruptcy
Procedure promulgated under section 2075 of title 28 of the United States Code and the Official
Bankruptcy Forms, the Federal Rules of Civil Procedure, as applicable to this Chapter 11 Case or
proceedings therein, and the Local Rules of the Bankruptcy Court, all as now in effect or
hereafter amended, and as applicable to this Chapter 11 Case.

11.      "*Books and Records*" means all books and records of the Debtor and the Estate,
including, without limitation, all documents and communications of any kind, whether physical
or electronic.

12.      "*Business Day*" means any day, other than Saturdays, Sundays or "legal holidays"
(as defined in Bankruptcy Rule 9006(a)).

13.      "*Cash*" means legal tender of the United States of America or the equivalent
thereof, including, but not limited to, bank deposits, checks and similar items.

14.      "*Cash Collateral Orders*" means the following cash collateral orders entered by
the Bankruptcy Court in this Chapter 11 Case:  Interim Order Authorizing Use of Cash Collateral
(Dkt No. 42); Second Interim Order Authorizing Use of Cash Collateral (Dkt. No. 114); Third
Interim Order Authorizing Use of Cash Collateral (Dkt. No. 222); Fourth Interim Order
Authorizing Use of Cash Collateral (Dkt. No. 255); Fifth Interim Order Authorizing Use of Cash
Collateral (Dkt. No.283); Sixth Interim Order Authorizing Use of Cash Collateral (Dkt. No.
315); and Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and
Adequate Protection Liens (Dkt. No. 321).

15.      "*Causes of Action*" means, individually or collectively, any and all actions, causes
of action, choses in action, suits, accounts, controversies, agreements, promises, rights to legal
remedies, rights to equitable remedies, rights to payment and Claims held by Debtor or the Estate

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 50

as of the Effective Date, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, except that "Causes of Action" shall not include the Avoidance Actions.

16.    "*Chapter 11 Case*" means the chapter 11 case commenced when the Debtor Filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with case number: 13-41437-JDP.

17.    "*Claim*" means a "claim" as such term is defined in section 101(5) of the Bankruptcy Code.

18.    "*Claims Objection Bar Date*" means the bar date for objecting to proofs of Claim, which shall be the first Business Day that is ninety (90) days after the Effective Date; *provided*, *however*, that the Plan Administrator may seek additional extensions of this date from the Bankruptcy Court, upon notice and a hearing.

19.    "*Class*" means a category of Holders of Claims or Equity Interests herein and pursuant to Section 1122(a) of the Bankruptcy Code.

20.    "*Confirmation*" means entry by the Bankruptcy Court of the Confirmation Order in the Chapter 11 Case.

21.    "*Confirmation Date*" means the date of entry of the Confirmation Order on the docket maintained by the Clerk of the Bankruptcy Court with respect to this Chapter 11 Case within the meaning of Bankruptcy Rule 5003 and 9021.

22.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code, to consider confirmation of this Plan under section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

23.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code in form and substance satisfactory to the Plan Proponent.

24.    "*Creditor*" means a "creditor" as such term is defined in section 101(10) of the Bankruptcy Code.

25.    "*Creditors' Committee*" means the official committee of unsecured creditors appointed in this Chapter 11 Case pursuant to section 1102(a) of the Bankruptcy Code, as such committee may be reconstituted from time to time.

26.    "*Debtor*" means Walker Land & Cattle, LLC, including in its capacity as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 51

27.    "*DIP Credit Facility*" means that certain Agricultural Loan Agreement by and among Debtor, the DIP Lender and others pursuant to which the DIP Lender will advance up to the principal amount of $5,200,000.00 to Debtor in 2014 for the purchase of fertilizer, chemicals and fuel from Valley Wide Cooperative and Valley Agronomics.  The DIP Credit Facility was approved by that certain Order Granting Motion for Authority to Incur Secured Credit 11 USC § 364(c) and (d) (Dkt. No. 318).

28.    "*DIP Credit Facility Claim*" means the Claim arising under or in connection with the DIP Credit Facility.

29.    "*DIP Lender*" means CHS Capital, LLC, as the lender providing the DIP Credit Facility.

30.    "*Disclosure Statement*" means the disclosure statement that relates to this Plan, prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court, as amended, modified, or supplemented from time to time.

31.    "*Disputed*" means, with respect to any Claim: (a) listed on the Schedules as unliquidated, Disputed or contingent, unless a proof of Claim has been Filed in a liquidated, noncontingent amount; (b) subject to the terms of this Plan, as to which the Debtor, the Plan Administrator or any other party in interest, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise Disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

32.    "*Disputed Claim*" means any Claim that is not yet Allowed.

33.    "*Disputed Claims Reserve*" means the reserve established and maintained by the Plan Administrator in accordance with Section 6.4.2 of this Plan.

34.    "*Distribution*" means the distribution of Cash or other Assets, as the case may be, made by Liquidating WLCC or the Plan Administrator, as the case may be, in accordance with this Plan.

35.    "*Distribution Date*" means the date the on which a Distribution is affected.

36.    "*Effective Date*" means the first Business Day after the Bankruptcy Court enters the Confirmation Order.  Within five (5) Business Days of the Effective Date, notice of the Effective Date shall be Filed by the Plan Proponent in the Chapter 11 Case.

37.    "*Entity*" shall have the meaning set forth in Section 101(15) of the Bankruptcy Code.

38.    "*Equity Interest*" means any equity security in the Debtor as that term is defined in section 101(16) of the Bankruptcy Code.

39.    "*Estate*" means the estate of the Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

40.    "*Executory Contract*" means "executory contract" and "unexpired lease" as used in section 365 of the Bankruptcy Code.

41.    "*Federal Judgment Rate*" means the federal judgment rate described in 28 U.S.C. § 1961 in effect on the Petition Date, which was 0.11% per annum.

42.     "*File*" or "*Filed*" means any pleading, proof of claim, order or other paper that has been entered on the docket of this Chapter 11 Case and properly served in accordance with the Bankruptcy Rules.

43.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to File an appeal, motion for reconsideration or rehearing or a request for a stay, or seek certiorari has expired and no appeal, motion for reconsideration or rehearing, request for a stay or petition for certiorari has been timely Filed; provided, that the possibility of a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, or any other rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

44.    "*General Unsecured Claim*" means a pre-petition unsecured Claim against Debtor that is not entitled to priority under section 507 of the Bankruptcy Code, including any Claim for money borrowed or guaranteed, rejection of executory contracts, unsecured deficiency Claims, and Claims for indemnification, if any.

45.    "*Holder*" means the beneficial holder of a Claim or Equity Interest and, when used in conjunction with a Class, or type of Class of Claims or Equity Interests, the beneficial holder of a Claim or Equity Interest in such Class or of such type.

46.    "*Impaired*" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, "impaired" within the meaning of Sections 1123(a)(4) and 1124 of the Bankruptcy Code.

47.    "*Insurance Financing Claim*" means the Claim arising under or in connection with the Insurance Financing Facility.

48.    "*Insurance Financing Facility*" means that certain Commercial Insurance Premium Finance Agreement in the principal amount of $166,437.60, entered into between Debtor and the Insurance Financing Lender which is attached to the Motion for Approval of Commercial Insurance Premium Finance and Security Agreement (Dkt. No. 302) and approved by that certain Order Approving Commercial Insurance Premium Finance and Security Agreement (Dkt. No. 336).

49.    "*Insurance Financing Lender*" means Capital Premium Financing, Inc. as the lender providing the Insurance Financing Facility.

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 53

50.     "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a Claim, debt or litigation.

51.     "*Liquidating WLCC*" means Walker Land & Cattle, LLC on and after the Effective Date.

52.     "*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, trustee, United States Trustee, estate, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof or other entity.

53.     "*Petition Date*" means November 15, 2013, the date on which Debtor Filed its petition commencing the Chapter 11 case.

54.     "*Plan*" means this amended liquidation plan proposed by the Plan Proponent, including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules, which shall be in form and substance acceptable to the Plan Proponent.

55.     "*Plan Administrator*" shall mean the Entity designated as such by the Plan Proponent in the Disclosure Statement or in a pleading Filed in this Case prior to the entry of the order approving the Disclosure Statement.

56.     "*Plan Proponent*" means Wells Fargo.

57.     "*Plan Supplement*" means the compilation of documents or forms of documents specified in this Plan, including any exhibits to this Plan not included herewith, that the Plan Proponent may File with the Bankruptcy Court on or before the date that is ten (10) days prior to the date of the final Confirmation Hearing and in form and substance acceptable to the Plan Proponent.

58.     "*Priority Claims*" means, collectively, the Priority Non-Tax Claims and the Priority Tax Claims.

59.     "*Priority Non-Tax Claims*" means any Claims other than an Administrative Claim or a Priority Tax Claim, entitled to priority payment under section 507(a) of the Bankruptcy Code.

60.     "*Priority Tax Claims*" means Claims of Governmental Units of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

61.     "*Professional*" means an Entity: (a) retained in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code, and that is compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has

been allowed by Final Order of the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

62.    "*Professional Fee Claim*" means an Allowed Administrative Claim for the compensation of a Professional, and the reimbursement of expenses incurred by such Professional, through and including the Effective Date.

63.    "*Proof of Claim*" means a proof of Claim Filed against Debtor in this Chapter 11 Case.

64.    "*Pro Rata*" means, at any time, the proportion that the face amount of an Allowed Claim or an Allowed Equity Interest in a particular Class bears to the aggregate face amount of all Claims or Equity Interests (including Disputed Claims, but excluding disallowed Claims) in that Class, unless this Plan provides otherwise.

65.    "*Rabo*" means Rabo Agrifinance, Inc.

66.    "*Related Unsecured Creditor*" means an unsecured creditor who is related to the Debtor, directly or indirectly, either through shared ownership, control or familial relationship among any of the Holders of Equity Interests in the Debtor, including those included in the Debtor's related entities class in its plan of reorganization, and expressly including Lorin Walker, O3Co, Dos Lagos, LLC, Roland L. and Dorothy Walker Family Trust, Taylor Crossing communications, LLC, Walker Produce Co., We Fly, LLC, McNeil Development and Spinners of Idaho/Utah.

67.     "*Representatives*" means, with respect to an Entity, such Entity's officers, directors, employees, members (including *ex officio* members), managers, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including its respective officers, directors, employees, members and professionals).

68.    "*Schedules*" means the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

69.    "*Secured Claim*" means a Claim, other than a Setoff Claim, that is secured by a Lien that is valid, perfected and enforceable, and not avoidable, on property in which Debtor or the Estate has an interest, or the proceeds of the sale of such property, to the extent of the value of such interest or Lien.

70.    "*Setoff Claim*" means a Claim of a holder that has a valid right of setoff with respect to such Claim, which right is enforceable under section 553 of the Bankruptcy Code as determined by a Final Order or as otherwise agreed in writing by the Plan Administrator, to the extent of the amount subject to such right of setoff.

71.    "*State Judgment Rate*" means the interest rate provided in Idaho Code § 28-22-104(2) for civil judgments entered by the Idaho state courts that is in effect on the Effective Date, which is 5.125% per annum.  Once set, the State Judgment Rate will not change.

72.    "*Tax Reports*" means all tax returns, reports, certificates, forms, elections or similar statements or documents, including amended tax returns or requests for refunds.

73.    "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Idaho.

74.    "*U.S. Trustee Fees*" means the fees payable under 28 U.S.C. §1930.

75.    "*Unsecured Creditors Fund*" means all Cash held by the Plan Administrator from the sale and liquidation of the Debtor's Assets and the enforcement of the Causes of Action remaining after the payment of: (a) Priority Claims; (b) Administrative Claims; (c) the DIP Credit Facility Claim; (d) the Insurance Financing Claim; (e)  Allowed Secured Claims; (f) the pre- and post-Confirmation U.S. Trustee Fees; and (g) Liquidating WLCC and the Plan Administrator's costs and expenses, including the fees and costs of professionals retained by the Plan Administrator and the Wind Down Committee, if any; provided, however, notwithstanding anything herein to the contrary, the Unsecured Creditors Fund shall include the amounts set forth in the second to the last sentence of Section 3.2.21(c) hereof.

76.    "*Wells Fargo*" means Wells Fargo Bank, National Association.

77.    "*Wind Down*" means, as set forth in Section 5.9 hereof, the wind down and dissolution of Liquidating WLCC following the Effective Date.

78.    "*Wind Down Budget*" means the budget of expenses prepared by the Plan Administrator and approved by the Wind Down Committee which shall, on and after the Effective Date, govern the use of the Administrative Fund, as the same may be amended or modified from time to time with the consent of the Wind Down Committee.

79.    "*Wind Down Committee*" means the committee described in Section 5.4 hereof.

EXHIBIT B

TO CHAPTER 11 LIQUIDATION PLAN

EXECUTORY CONTRACTS

ASSUME/REJECT/MODIFICATIONS

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| Allan R. Shupe 2496 N. 2375 E. Hamer, ID 83425 | Hamer Farmland Lease Agreement | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Allan R. Shupe (Hamer) Lease, executed post-petition is assumed." By its terms the lease expires on December 1, 2015. The Plan Administrator may assign this lease or sublet the property after the Effective Date. |
| Allan R. Shupe 2496 N. 2375 E. Hamer, ID 83425 | Butikofer Farmland Lease Agreement | This lease was rejected by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Allan R. Shupe (Butikofer) Lease, is REJECTED." |
| Alvin Sharp Alvin Sharp Estate c/o Claudia Pullman 3722 E. 400 N. Rigby, ID 83442 | 18 acres located in Jefferson County, Idaho. | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Alvin Sharp Lease and Assignment is assumed." By its terms this lease expires on December 31, 2014. |
| Kent Sperry Hatchett Ranch 46 N. 4600 E. Rigby, ID 83442-5840 | 214.2 Acres located in Bonneville County, Idaho. | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Kent Sperry dba Hatchett Ranch Lease is Assumed." By its terms this lease expires |

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| | | on January 1, 2015. |
| Kingston Properties 477 Shoup Ave., #207 Idaho Falls, ID 83402 | Potato Storage Leases (2) Located in Idaho Falls, Idaho | These leases were assumed by Debtor pursuant to the terms and conditions of the Order Granting Motion to Assume Potato Storage Leases (Dkt. No. 323) entered on April 28, 2014 that states in relevant part that "The two Commercial Agreements between the Debtor and the Kingston Properties, LLP, both dated July 16, 2013 for potato storage are assumed." |
| Heath Lewis Mike Telford 548 North Lewis Lane Rigby, ID 83442 | Feedlot Lease Agreement | This lease is subject to anticipated litigation. The tenant defaulted on the lease and all rights to pursue unpaid, pre-petition and post-petition rents are reserved. |
| Lyle Shupe 2296 E. 1950 N. Hamer, ID 83425 | 100 Acres | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Lyle/Karlene Shupe Lease, executed post-petition, is assumed." By its terms the lease expires on December 1, 2014. |
| Roger & Vicky Sauer 340 N. 3400 E. Lewisville, ID 83431 | 34.5 acres located in Jefferson County, Idaho. | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Roger and Vicky Sauer Lease and Assignment is assumed." By its terms this lease expires on December 31, 2014. |
| SAGN 115 North Morningside Idaho Falls, ID 83402 | 840 Acres | This lease is assumed and will be assigned in connection with the sale of the Debtor's interest in the property covered by the lease. |
| Vernon K. Smith Victoria Smith, | 1043 acres located in Jefferson County, Idaho. | This lease was assumed by Debtor pursuant to the terms and conditions of the |

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 58

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| P.R. 1900 Main Street Boise, ID 83702 | | Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Estate of Vernon K. Smith Lease and Extension is assumed."  By its terms this lease expires on December 31, 2014. |
| Waterstone 1070 Riverwalk Dr., Ste. 200 Idaho Falls, ID 83402 | 37.7 acres Bonneville County, Idaho. | The Debtor permitted this lease to be rejected as a matter of law under § 365(d). |
| Wright Brothers Attn: John H. Wright 1978 Sheridan Road Salt Lake City, UT 84108 | Crop share lease-882 acres Located in Bonneville County, Idaho. | This lease was assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Wright Brothers Company  Lease, executed post-petition, is assumed."  By its terms this lease expires on December 31, 2016.  The Plan Administrator may assign this lease or sublet the property after the Effective Date. |
| C&B Operations dba Bonneville County Implement and Deere Credit, Inc. | Executory contracts pertaining to the acquisition of 8 new lease tractors and proposed trade in tractors, consisting of the following:<br><br>1)  WLC Unit No. 245 1L06330XJBP699303 and WLC Unit No. 265 1L06105RKDP766417, collectively comprising Purchase Order No. 02427999 and Proof of Claim 74;<br><br>2)  WLC Unit No. 244 1L06330XJBP700028 and WLC Unit No. 266 | These Executory Contracts are subject to pending litigation.  To the extent the parties are unable to reach a compromise, these Executory Contracts shall be rejected and the amount of C&B Operations'/Deere Credit Inc.'s asserted unsecured Claims, if any, will be determined in the pending litigation. |

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 59

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| | 1L06105REDP770851, collectively comprising Purchase Order No. 02441968 and Proof of Claim 81;<br><br>3)  WLC Unit No. 228 RW8235R063349 and WLC Unit No. 268 1RW8235RCDD073267, collectively compromising Purchase Order No. 02427899 and Proof of Claim 75;<br><br>4)  WLC Unit No. 224 RW8235R063386 and WLC Unit No. 269 1RW8235RCDD070457, collectively comprising Purchase Order No. 02427907 and Proof of Claim 76;<br><br>5)  WLC Unit No. 230 RW8235R063506 and WLC Unit No. 270 1RW8235RCDD073141, collectively comprising Purchase Order No. 02427912 and Proof of Claim 78;<br><br>6)  WLC Unit No. 223 RW7215RACD008355 and  WLC Unit 271 1RW7215RPDD012805, collectively comprising Purchase Order No. 02428059 and Proof of Claim 80; | |

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| | 7) WLC Unit No. 222 RW7215RVCD008046 and WLC Unit No. 272 1RW7215RTDD01278 5, collectively comprising Purchase Order No. 02427925 and Proof of Claim 77; and<br><br>8) WLC Unit No. 219 RW7215RCCD008068 and WLC Unit No. 273 1RW7200RLDD01271 7, collectively comprising Purchase Order No. 02428018 and Proof of Claim No. 79. | |
| CAC Recovery Services | Potash AntiTrust Litigation Services Agreement | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved. The assumption or rejection of this agreement shall be set forth in a supplement to this Plan. |
| Farm Credit Services | 2007 Case 845 Road Grader | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved. The assumption or rejection of this agreement shall be set forth in a supplement to this Plan. |
| Foster Company Boyd & Laurie Foster P.O. Box 626 Ririe, ID 783443 | 2013 Joint Venture/Crop Share Agreement 490 Acres | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved. The assumption or rejection of this agreement shall be set forth in a supplement to this Plan. |
| Ideal Truck | Four Rental Agreements on | These four Rental Agreements were |

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 61

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| Leasing | Trucks | assumed by Debtor pursuant to the terms and conditions of the Order (Dkt. No. 333) entered on April 30, 2014 that states in relevant part, "The Rental Agreements are assumed and Debtor is authorized to pay the cure payments requested in the Motion to the extent such payments are provided for in its approved cash collateral budget." These agreements will be terminated by the Plan Administrator in accordance with the terms of leases. |
| McNeil Development 1070 Riverwalk Dr. #200 Idaho Falls, ID 83402 | Property Mgt Agreement (oral) | Reject. |
| Steve Worthen Farms 2498 N 2375 E Hamer, ID 83425 | Contractor Services Agreement | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved.  The assumption or rejection of this agreement shall be set forth in a supplement to this Plan. |
| Toyota Financial Services | Lease 2013 Toyota Tundra VIN – 287946 (Unit No. 15) (Proof of Claim No. 4) | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved.  The assumption or rejection of this agreement shall be set forth in a supplement to this Plan.   The Debtor filed a motion to assume this lease (Dkt. No. 442) and the Court entered an order on August 29, 2014 (Dkt No. 458) deferring approval of the lease assumption until either plan confirmation or until after notice of the proposed assumption is provided to all interested parties. |
| Toyota Financial Services | Lease 2013 Toyota Tundra VIN – 288989 (Unit No. 5) (Proof of | The right to provide for the assumption or rejection of this agreement in advance of |

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| | Claim No. 3) | the confirmation hearing is reserved. The assumption or rejection of this agreement shall be set forth in a supplement to this Plan.   The Debtor filed a motion to assume this lease (Dkt, No. 442) and the Court entered an order on August 29, 2014 deferring approval of the lease assumption until either plan confirmation or until after notice of the proposed assumption is provided to all interested parties. |
| Deer Credit, Inc. | Lease 2012 JD STS Combine S670- 6088; 2012 Draper Platform 630D5482, Proof of Claim No. 83 | The Debtor rejected this lease pursuant to an order entered August 7, 2014 (Dkt. No. 444).  Deere Credit's rejection damages for this lease have been set in the unsecured amount of $73,260, which is included in the Class 21 General Unsecured Claims. |
| Deer Credit, Inc. | Lease 2012 JD STS Combine S670- 6827; 2012 Draper Platform 630D5419, Proof of Claim No. 84. | The Debtor rejected this lease pursuant to an order entered August 7, 2014 (Dkt. No. 444).  Deere Credit's rejection damages for this lease have been set in the unsecured amount of $73,260, which is included in the Class 21 General Unsecured Claims. |
| Deer Credit, Inc. | Lease 2012 JD STS Combine S670- 6971; 2012 Draper Platform 630D5438, Proof of Claim No. 85. | The Debtor rejected this lease pursuant to an order entered August 7, 2014 (Dkt. No. 444).  Deere Credit's rejection damages for this lease have been set in the unsecured amount of $73,260, which is included in the Class 21 General Unsecured Claims. |
| Deer Credit, Inc. | Lease 2012 JD STS Combine S670- 5815; 2012 Draper Platform 630D5422, Proof of Claim No. 86. | The Debtor rejected this lease pursuant to an order entered August 7, 2014 (Dkt. No. 444).  Deere Credit's rejection damages for this lease have been set in the unsecured amount of $73,260, which is included in the Class 21 General |

SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN (WELLS FARGO) - 63

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| | | Unsecured Claims. |
| Deer Credit, Inc. | Lease JD Skid Steer Loader 320D- 4431, Proof of Claim No. 87. | The right to provide for the assumption or rejection of this agreement in advance of the confirmation hearing is reserved. The assumption or rejection of this agreement shall be set forth in a supplement to this Plan. The Debtor is currently seeking to assume this lease and if the Court grants its motion to assume the lease, it may be assumed prior to confirmation of this Plan (Dkt. No. 445). |
| InteGrow Malt, LLC | All 2014 Crop Grower Agreements between InteGrow Malt, LLC and Debtor including those certain 2014 Grower Agreements (Fixed Price) dated February 14, 2014, and identified as Contracts MS14-029 through and including MS14-038. | Assumed. |