Larry E. Prince (ISB#1759)
Kirk S. Cheney (ISB#9416)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:   (208) 343-8869
Email:  lprince@hollandhart.com
            kscheney@hollandhart.com

Attorneys for Creditor
Wells Fargo Bank, National Association

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| In re: | |
| WALKER LAND & CATTLE, LLC, | Case No. 13-41437-JDP<br>Chapter 11 |
| Debtor. | |

## WELLS FARGO BANK'S MEMORANDUM IN SUPPORT OF CONFIRMATION OF SECOND AMENDED CHAPTER 11 LIQUIDATION PLAN, AND IN OPPOSITION TO CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN

Wells Fargo Bank, National Association ("Wells Fargo"), by and through its counsel of record, Holland & Hart LLP, submits this *Memorandum in Support of Wells Fargo's Second Amended Chapter 11 Liquidation Plan, and in Opposition to Confirmation of Debtor's Chapter 11 Plan* (the "Memorandum").

This Memorandum is submitted in support of the Second Amended Chapter 11 Liquidation Plan (Dkt. 684) (the "Creditors' Plan") filed by Wells Fargo on February 20, 2015,

and in opposition to the Debtor's Second Amended Chapter 11 Plan (Dkt. 501) (the "Debtor's

Plan"), filed by Walker Land & Cattle, LLC (the "Debtor").[1]

## I.    INTRODUCTION

There is only one confirmable plan before the Court, and it is the Creditors' Plan.  The

Debtor's Plan cannot be confirmed for a number of reasons, at least two of which render the

Debtor's Plan so clearly infeasible that they independently doom the Debtor's Plan.  First, the

Debtor's Plan depends entirely on a substantial real estate sale for which the Debtor has obtained

no binding, written contract.  The Debtor did not submit any evidence to establish that this sale

could or would occur, and the evidence is now closed.  Without such evidence, the Debtor's Plan

fails, literally in the first month.  Second, despite overwhelming, unanimous and uncontroverted

testimony (and Debtor's actual price history) establishing that potato prices are extremely

volatile, the Debtor's Plan requires potato prices to rise and consistently remain well above their

historic averages every single year for at least the next seven years.  The Debtor's plan will fail if

this dubious projection is incorrect for any single year—even if every other self-serving

projection (e.g., yields, shrink, tare, "cost savings") in the Debtor's budget is adopted.  In

addition to these fatal flaws, the Debtor's Plan is unconfirmable on a number of other grounds

set forth below.

The Creditors' Plan, in contrast, is a classic liquidating plan that conforms to the

requirements of the Bankruptcy Code.  The objections raised against the Creditors' Plan

misconstrue the requirements of Bankruptcy Code § 1129.  They presuppose that a liquidating

plan must in every sense replicate a chapter 7 liquidation, but that's not what the Bankruptcy

---

[1] Pursuant to the Court's directions, Wells Fargo has filed a Second Amended Plan incorporating
all supplements and modifications.  Presumably the Debtor will do the same, but as of the filing
of this Memorandum, the Debtor's fully amended plan has not been filed.  Therefore, all
citations herein are to the Debtor's Second Amended Plan.  *See* Ex. 100.

Code requires.  Ultimately, the objections reflect nothing more than the equity holders' desire to retain control of the Debtor while creditors are expected to bear all the risk of the Debtor's continuing losses.  If the Debtor is allowed to operate outside the Court's supervision, creditors can have no confidence that the Debtor's managers will operate the Debtor transparently, in the interest of the Debtor's creditors and equityholders, rather than in the interest of the Walkers' web of affiliated companies.

## II.     ARGUMENT

### A.     The Debtor's Plan Cannot be Confirmed.

#### 1.     *Voting Results.*

The Debtor and Wells Fargo each submitted ballot summaries.[2]  There are no significant discrepancies between the summaries.  It is undisputed that neither the Debtor's Plan nor the Creditors' Plan satisfies Bankruptcy Code § 1129(a)(8).  That is, neither plan was accepted by every impaired class.  Thus, in order to be confirmed, either plan must satisfy the "cram down" requirements of § 1129(b).  It is also undisputed that each plan satisfies § 1129(a)(10), because at least one impaired class of claims has accepted each plan, not counting votes of insiders.  Finally, it is undisputed that neither plan was accepted by more than one-half in number and by at least two-thirds in amount of allowed general unsecured claims.[3]

#### 2.     *Confirmation Burden*

The Debtor has the burden of proving by a preponderance of evidence that the Debtor's Plan satisfies each of the applicable requirements of sections 1129(a) and 1129(b) of the Bankruptcy Code.  If the Debtor fails to satisfy any applicable requirement, the Court must deny

---

[2] Dkt. 611 and 612.

[3] *See* 11 U.S.C. § 1126(c).

confirmation of the Debtor's Plan. *See In re Root*, No. 09-00645-TLM, 2012 WL 5193840, at *2 (Bankr. D. Idaho Oct. 19, 2012).

       3.     *The Debtor's Plan is Not Feasible.*

To be confirmed, a bankruptcy plan must be "feasible"—that is, the proponent must show that confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).[4] "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, (9th Cir. 1985) (quotation marks omitted). In order to be feasible a plan must have "a reasonable probability of success." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986). The evidence clearly establishes that the Debtor's Plan is not feasible.

       a)    <u>The Debtor's Plan Depends on a $6.2 Million Real Estate Sale For Which it Apparently Has No Signed Contract.</u>

The Debtor's Plan proposes to sell 1,354 acres known as the Steel Farm for $6,183,000.00 immediately upon confirmation.[5] The Debtor's Plan provides for roughly $2.4 million of payments to be made to creditors from closing of the sale.[6] Thus, immediately upon confirmation, a substantial plan payment will be due.

---

[4] During the confirmation hearing, equity holders suggested that if the Debtor's Plan is confirmed but ultimately fails, Wells Fargo will not be harmed because it will still have its state law liquidation remedies. That argument reads § 1129(a)(11) out of the Code. Unless a plan proponent demonstrates that future liquidation is not likely, that proponent's plan cannot be confirmed.

[5] *See* Ex. 100 at 41-42.

[6] *See, e.g.,* Ex. 100 at 17 and Ex. 150 at 8.

But the Debtor introduced no written, binding contract for the sale of the Steel Farm into evidence, and the evidence is now closed.  The Debtor's Plan includes only an unsigned, non-binding draft of a purchase and sale agreement.[7]   Moreover, the purported sale is expressly "contingent on an option agreement that allows seller to re-purchase 50% of the land at a later date."[8]  The Debtor did not introduce even a draft of this option agreement.  Pursuant to Idaho's statute of frauds, an agreement to sell real estate is invalid unless it is in writing and signed.  *See* Idaho Code § 9-503.  Without a signed contract for the Steel Farm in evidence, there is no basis to conclude that the Debtor will make its first required plan payments.  Tellingly, Boyd Foster, whose empty signature block is on the draft agreement, was included on the Debtor's witness list for the confirmation hearing, presumably to testify about the potential sale.[9]  He was never called.

The Debtor's Plan is not feasible on this ground alone.  *See In re Eugene Pipe, LLC*, No. 11-60920, 2012 WL 1597265, at *3 (Bankr. D. Or. May 7, 2012) (refusing to consider for confirmation purposes a possible sale where proposed purchaser "has not executed an asset purchase agreement and the term sheet is unsigned and non-binding"); *In re Sovereign Oil Co.*, 128 B.R. 585, 587 (Bankr. M.D. Fla. 1991) (rejecting plan premised on joint ventures where debtor had "no contracts for these ventures and there exists no concrete evidence that these will ever advance beyond the negotiation stage and amount to anything more than a hope which is not supported by hard evidence"); *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (plan was not feasible that proposed to pay claims through sale of real estate, but there was no assurance that the sale would occur).

---

[7] *See* Ex. 100 at 57-59.

[8] *See* Ex. 100 at 57.

[9] *See* Dkt. 594 at 1.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 5

      b)      <u>The Debtor's Plan Requires Potato Prices to be Consistently and Significantly Above Historical Averages for at Least the Next 7 Years.</u>

The Debtor's Plan proposes to pay creditors' claims over time pursuant to an operating budget (Ex. 170) (the "Budget") that runs through 2021.  The Budget reflects a big bet on potatoes.  Though the Debtor reduced potato acreage for the 2014 crop year, it plans to ramp up potato acreage beginning in the 2015 crop year, with potato acreage increasing from 4,246 acres for the 2014 crop to 5,555 acres for the 2015 crop.[10]  This is an increase of 30%.  This increase in acreage will, of course, increase the Debtor's risk of failure if its projected potato prices are not achieved.

The Budget balances only because, among other reasons, the Debtor has used an unrealistically high potato price throughout the life of the Budget.  The Budget uses the following potato prices (per cwt): $7.43 for the 2014 crop;[11] $7.87 for the 2015 and 2016 crop; $7.83 for the 2017 crop; $7.70 for the 2018 to 2021 crops; and $7.87 for the 2022 crop.[12]  In contrast, the Debtor's actual 5-year weighted average potato price is $6.712 /cwt.[13]  Thus, the Debtor's Budget assumes (and requires) that the price of potatoes will be immediately and consistently 10.6% to 17.25% higher than the Debtor's historical average.  But these projected prices seem to be pulled out of thin air.  The Debtor provided no evidence to support them—Sam Cook testified that he got them from management, and Roland Walker simply stated in

---

[10] Compare Ex. 125 with Ex. 171.  For the crop years 2016 to 2022, the Debtor's potato acreage fluctuates between 5,084 and 5,495 acres per year.

[11] The Budget doesn't explicitly list the price assumption for 2014 potatoes, but the price can be derived by calculation.  *See* Ex. 299-KK and testimony of Chuck Hoyt and Sam Cook on February 6, 2015.

[12] *See* Ex. 170 at 1, 3, 5, 7, 9, 11, 13 and 15.

[13] *See* Ex. 299-KK at 2; *see also* Debtor's Ex. 105, listing an even lower average potato price of $6.66 /cwt.

conclusory fashion that he believed they were achievable, without any explanation of the basis for that conclusion.

The Court does not have to credit the testimony of Wells Fargo's experts to see that the Debtor's projections are unrealistic.  Common sense, general familiarity with the potato market, and the Debtor's own historical averages demonstrate that it is so.  Potato prices go up and down.  Every witness who was asked admitted as much.  And the uncontroverted evidence is that the 5-year average is the best indicator of price.

This flaw alone renders the Debtor's Plan not feasible.  The evidence shows that even if every other dubious assumption in the Debtor's budget is accepted as true (yield, shrink, tare, cost savings, etc.) the Budget will not balance if potato prices fall below the projected range.  By way of illustration, Exhibit 299-KK shows that even if the Debtor achieves everything else in its Budget, except that it sells its 2014 potatoes for $6.712 /cwt (its 5-year average) rather than the $7.43 /cwt assumed by the Budget, and then potato prices increase 1% each year thereafter, the Debtor will lack sufficient cash to make plan payments next year in January and July 2016, and will be consistently cash-negative starting in April 2017.

An even more likely scenario is set forth in Exhibit 299-M, which shows that the Debtor will, by August 2015, lack sufficient cash to make plan payments and harvest the 2015 crop, if the Debtor sells its potatoes for the price projected by Well Fargo's potato price expert, Bruce Huffaker.  Mr. Huffaker is a nationally renowned expert on potato prices, and about 770 subscribers (including the Walkers) pay for his weekly price insights.  Again, the Debtor's Budget is unsound whether or not the Court credits Mr. Huffaker's testimony, but Mr. Huffaker credibly testified as follows: (1) potato prices are extremely volatile; (2) 2014 U.S. potato

production was up 1.9% over the 2013 crop season; and (3) the forecast for fresh shipments is up 3.9% over the 2013 crop season.

All of this demonstrates that the price for the 2014 potato crop will be lower than it was for the 2013 potato crop, for which the Debtor received an average of $5.79 /cwt.[14]  Accordingly, Mr. Huffaker testified that 2014 potato prices would average $5.37, with an 18% deviation either direction (for a range $4.40 to $6.44).  He further testified that over a longer time frame, the most reasonable estimate for potato prices would be the five year average market price ($6.83), increased by 1% each year.  Under that scenario, the Debtor would quickly be unable to make plan payments.[15]

c)      The Debtor's Operational Improvements are Already Reflected in the Budget.

The Debtor's manager, Roland Walker, testified about various operational improvements and cost savings that the Debtor has made.  Some of them are questionable—for example, the Debtor employed petiole sampling well before the bankruptcy.  Others are at best temporary— the Debtor's supply of spare parts eventually must run out, and when it does, the Debtor has given itself no capital expenditure allowance in the Budget.  Ultimately, the biggest driver of the Debtor's 2014 crop cost reduction may simply be that the Debtor chose to plant 27% fewer acres of potatoes in 2014.[16]  The uncontroverted evidence is that the cost per acre of potatoes is 3 to 4 times the cost per acre of the Debtor's other crops.[17]

---

[14] *See* Exs. 281 and 282.

[15] *See* Ex. 299-N at 2.

[16] *Compare* Ex. 196, showing potato acres falling from 5,581 to 4,246 from 2012 to 2014 *with* Ex. 176, showing total acres increasing from 10,229 to 11,376 over the same period.

[17] *See* Ex. 299-Q at 1.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 8

Even assuming, however, that the Debtor fully realizes its hoped-for operational improvements for years to come, the Budget already reflects those improvements.  In other words, the Budget incorporates a best-case scenario on the expense side, and still barely balances, and does so only because of the inflated revenue projections described above.

          d)      <u>Numerous Other Aspects of the Budget Render the Debtor's Plan Not Feasible.</u>

The Budget includes other questionable assumptions.  For example, the assumed yields are unrealistic.  The Debtor's weighted 10-year average potato yield is 363 cwt per acre, but the Budget projects yields rising to a weighted average of 411-412 cwt per acre for most of the budget, a 17% increase over historical performance.[18]  In the past 10 years, the Debtor's potato yield has exceeded 400 cwt per acre only once, yet the Debtor projects that its weighted average potato yield will be 411-412 cwt per acre from 2018 to 2022.  Projected yields for other crops are similar: the Budget projects barley yields every year of 115 bushels per acre, higher than the Debtor has ever achieved in the past nine years, and higher than the Debtor's nine year average of 103.84 bushels per acre;[19] and alfalfa yields of 7 tons per acre from 2015 forward, although the only history provided by the Debtor, and the University of Idaho's study for eastern Idaho, suggest that a more realistic yield is 6.00 tons per acre.

The Debtor has a habit of making unachievable budget projections.  With respect to its 2013 potatoes, the Debtor made various unrealistic (and ultimately incorrect) projections after the potatoes were harvested and any supposed quality issues would already have been known.  At the April 3, 2014 cash collateral hearing, the Debtor projected that it would sell its 2013

---

[18] *Compare* Ex. 104 at 2 *with* Ex. 170 at 7-16; *see also* Ex. 299-M at 9.

[19] *Compare* Ex. 104 at 3 *with* Ex. 170 at 1-16; *see also* Ex. 299-M at 9.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 9

potatoes for $9.00 /cwt.[20]  It then reduced its projection to $7.50 /cwt.[21]  Ultimately, it received

$5.79 /cwt.[22]  The Debtor has similarly been unable to accurately project its cash flows.  The

Debtor's original budget[23] substantially overestimated ending cash for each month, so much so

that by October 2014 (after which a new budget[24] was substituted in its place), the Debtor had

only $722,060 cash on hand versus $3,816, 853 in the original budget[25]—an error of

approximately $3.1 million.  Even the substitute budget turned out to be wildly inaccurate: the

Debtor projected an ending cash balance of $2,715,853 (including the cash reserve) for

December 2014, but the actual ending balance was $1,367,511, an approximately $1.35 million

budgeting error in the first month.[26]

  Ironically, the Debtor repeatedly emphasized throughout the confirmation hearing that

the Debtor's disastrous 2012 crop year and its 2013 crop year results were "aberrations" that

could happen to any farmer, apparently in hopes of deflecting any blame from the Debtor's

managers.  But these protestations only prove Wells Fargo's point and confirm that the Debtor's

Plan is not feasible, because the Debtor's Budget assumes consistent, undeviating performance at

or above anything the Debtor has historically achieved.   The Budget includes only a meager

annual contingency line item (roughly $68,000), and a cash reserve of just $250,000.  Therefore,

it cannot withstand any downward volatility.

---

[20] *See* Ex. 299-U at 11.

[21] *See* Ex 259.

[22] *See* Exs. 281 and 282.

[23] *See* Ex. 103.

[24] *See* Ex. 170.

[25] Compare Ex. 103 at 24 with Ex. 258 at 4.

[26] Compare Ex. 170 at 21 with Ex. 299-FF at 2.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 10

Yet, as this Court has noted, farming is "predictably unpredictable." *In re Wiersma*, 03.1 IBCR 42, 51. Risks will continue to attend the Debtor's operations, just like any other farmer. Weather risks will always exist. Indeed, weather problems have impacted even the 2014 crop, resulting in lower yields and prices for barley, wheat and hay. Market risks, too, will always exist. For example, the Debtor admits that the $13.4 million loss on the 2012 crop was the result of the Debtor holding its potatoes too long, betting incorrectly that better prices would materialize later in the year.[27] Sam Cook testified that the Debtor's management still generally believes in this strategy, and there's no reason it couldn't backfire again in the future. Yet the Debtor's Budget seems to assume that weather and market risks exist only in the past.

To explain other prepetition losses, the Debtor seeks to blame Wells Fargo. Regarding the large losses on the 2013 crop, the Debtor contends that the crop was harmed by excessive weeds because Wells Fargo advanced funds too slowly, leaving the Debtor unable to apply sufficient chemicals. But uncontroverted testimony of Greg Mondon established that Wells Fargo funded $2 million on March 4, 2013 and $1.5 million on March 26, 2013, for a total of $3.5 million.[28] Between December 28, 2012 and March 2013, Wells Fargo also allowed $950,000 of the 2012 crop proceeds to be used for the 2013 crop. In contrast, the Debtor received no funds in connection with the 2014 crop until the cash collateral order entered as of April 10, 2014,[29] and even then was authorized to use only $357,682 for chemicals until April 23, 2014, yet the Debtor has not complained of any weed problems with the 2014 crop.[30] Also,

---

[27] *See* Ex. 101 at 14.

[28] *See* Ex. 246.

[29] *See* Ex. 115.

[30] Wells Fargo advanced an additional $3 million to the Debtor on May 2, 2013. *See* Ex. 246 at 1. Thus, Wells Fargo made $7.45 million available to the Debtor by May 2, 2013. In contrast,

the Debtor fails to explain why, if the 2013 crop really was subpar because it was afflicted by weeds and suberization, the Debtor made no mention of this in the April 2014 cash collateral hearings (long after harvest), when the Debtor was projecting $9.00 /cwt  and $7.50 /cwt on its 2013 potatoes.[31]  A better explanation for the 2013 crop season is management failures combined with the frost and seed rot issues that Roland Walker testified about.

Another aspect of the Budget that renders the Debtor's Plan not feasible is the significant balloon payments it requires, including a balloon payment of approximately $18.1 million to Wells Fargo in 2021.  The Debtor offered nothing beyond speculation to show that it would be able to refinance its debt and make these payments.  Although the Debtor's banking expert, Russell Haycock, initially testified that he thought the Debtor could refinance the debt, he later admitted that lenders typically look for historical profitability, plus a debt service coverage ratio of at least 1.25 times, and that he had no idea whether the Debtor's Budget, if achieved, would provide sufficient profitability or an adequate debt service coverage ratio.  Moreover, if the Steel Farm sale occurs as the Debtor's budget assumes, the value of available real estate collateral will fall well below the balance on Wells Fargo's debt, as described in greater detail below.  A new lender would thus have to be willing to refinance Wells Fargo's debt and be less than fully secured by real estate collateral.

e)    Portion Control Fresh is a Speculative, Unproven Venture.

To justify its lofty revenue projections, the Debtor points to a new venture called Portion Control Fresh, LLC ("PCF").  Although the details of the relationship are less than clear, the

---

the actual amount Debtor spent on chemicals and fertilizer in April 2014 was $774,906, far less than was available to it in 2013.  *See* Ex. 173 at 94.

[31] *See* Ex. 299-U at 11 and Ex. 259.

Debtor suggests that its relationship with PCF enables it to obtain higher prices for its smaller potatoes. The Court should give little weight to these contentions.

First, PCF is a speculative, unproven venture. Keith Walker testified that PCF has shipped only a single load of potatoes to one customer. There is no evidence PCF has even been paid for that load. Each of the PCF "contracts" in evidence is nothing more than a non-binding statement that *if* the prospective purchaser chooses to buy, PCF will supply potatoes at a certain price.[32]

This Court and other courts have rejected plans that relied on unproven ventures. *See Wiersma*, 03.1 IBCR 42, 51 (debtor's plan to use bank's collateral to start a new dairy in Georgia was "akin to a forced extension of venture capital to a startup concern," and was not feasible); *see also In re Trans Max Technologies, Inc.*, 349 B.R. 80, 95 (Bankr. D. Nev. 2006) (rejecting plan based on promising, but unproven, technology).

Second, testimony of Roland and Keith Walker established that PCF is operating without a PACA license. Although PCF is a distinct entity, it is "using" the PACA license of McNeil Fruit & Vegetable, LLC, a company that is no longer in business.[33] This is a violation of 7 USC § 499c. *See also Potato Sales Co. v. Department of Agric.*, 92 F.3d 800, 803 (9th Cir. 1996) ("PACA in turn provides that no entity may carry on the business of a commission merchant, dealer, or broker in perishable agricultural commodities without a valid and effective PACA license.").

Third, even if PCF proves viable, it will impact only a small portion of one subset of the Debtor's potato sales. In other words, PCF is, literally and figuratively, "small potatoes." If the

---

[32] *See* Exs. 189, 198, 199, 199C, 199D.

[33] *See* Exs. 299-S and 299-T.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 13

Debtor is unable to sell its larger potatoes for the prices in the Budget, a handful of specialty

sales of small potatoes will not rescue the Budget.

    4.    *The Debtor's Plan's Treatment of Wells Fargo Violates the Bankruptcy Code.*

        a)    <u>The Debtor's Proposed Interest Rate for Wells Fargo's Claim is Not Fair and Equitable</u>

Wells Fargo holds a claim in excess of $21 million.[34]  Wells Fargo's claim arises

primarily from one-year operating loans, which included a term loan for the amounts the Debtor

failed to timely repay on its 2012 crop year operating line of credit and a 2013 crop year

operating line of credit.  The interest rate on Wells Fargo's prepetition loan documents is a

floating rate of 1-month LIBOR + 3.5%, and, after default, an additional 4%.[35]  Thus, the present

rate is a variable rate of 1-month LIBOR + 7.50%.

The  Debtor's Plan proposes that Wells Fargo will be paid on a 25-year amortization

schedule, with semi-annual installments of $765,298.92, until year seven (July 1, 2021), at which

time the full balance will be paid in a balloon payment of approximately $18.1 million, not

including post-petition attorneys fees, costs and expenses.  Simple interest will accrue on Wells

Fargo's claim at a fixed rate of 5% per annum.[36]

The Debtor's Plan cannot be confirmed because its proposed treatment of Wells Fargo's

class (Class 9) is not fair and equitable under Bankruptcy Code § 1129(b)(2)(A).  Specifically, it

appears that, by proposing to stretch out Wells Fargo's claim and pay it back over time, the

Debtor seeks to satisfy Bankruptcy Code § 1129(b)(2)(A)(i).  A plan satisfies § 1129(b)(2)(A)(i)

if a secured creditor retains the liens securing its claim, and the creditor receives "deferred cash

---

[34] *See* Ex. 220.  Wells Fargo is also entitled to its post-petition interest, fees and costs.

[35] *See* Ex. 220 and 246.

[36] *See* Ex. 100 at 17.

payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." The present value of the stream of payments proposed by the Debtor is less than the amount of Wells Fargo's claim.

The Debtor's proposed conversion of Wells Fargo's interest rate from a variable rate to a fixed rate is inappropriate.  Prior to the bankruptcy, Wells Fargo made one year, variable rate crop loans to the Debtor, with a first priority lien on the crops.  Wells Fargo's representative, Gregory Mondon, testified that Wells Fargo would never consensually enter into a 7-year fixed rate loan like the one the Debtor is proposing.  A plan's treatment of a secured creditor, including the interest rate, should be in line with commercial realities.  *See, e.g., In re Howe Farms LLC*, Case No. 13-61601, Dkt. 110, at 9-10 (Bankr N.D.N.Y. October 16, 2014) (denying confirmation because "neither Debtor's proposed repayment term nor the interest rate to be applied . . . are reasonable or consistent with customary lending practices or market rates").

Indeed, this Court has noted that stretching secured claims out with fixed rates is "problematic."  *See* May 30, 2013 transcript of *In re Van Straalen*, Case No. 12-41276, at 7 (Bankr. D. Idaho).[37]  It is problematic because "[i]t imposes a high degree of risk on the lender. When you fix the interest rate, effectively, depending on where you fix it, unless you're willing to fix it really, really high, it means you're asking the lender to roll the dice that things will get better, not worse."  *Id.*

Witnesses, including the Debtor's banking expert, Russell Haycock, unanimously agreed that interest rates are at historic lows, that they are bound to rise, and that a lender locked into a fixed rate loan will be exposed to substantial interest rate risk.  The fact that Wells Fargo's

---

[37] A transcription of the audio file of the *Van Straalen* hearing is attached hereto as Exhibit A.

collateral includes real estate does not justify the fixed rate. Even the Debtor's "pure" real estate lenders receive interest rate resets under the Debtor's Plan: Bank of Commerce's rate resets annually and cannot be less than 6% per annum,[38] and Rabo Agrifinance's rate resets every three years.[39] Moreover, the evidence shows that Wells Fargo is not fully secured by its real estate collateral if the Steel Farm is sold, as described in greater detail below.

In addition, the Debtor's proposed 5% fixed interest rate does not provide Wells Fargo with at least the present value of its allowed secured claim because the 5% proposed rate is simply too low. The United States Supreme Court held in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), that in a chapter 13 case, the appropriate cramdown interest rate on a secured claim should be calculated by beginning with the prime interest rate and adjusting it upward for risk factors. *Id.* at 479. Such risk factors may include "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* Though *Till* suggests that a typical risk adjustment may be in the range of 1-3%, courts after *Till* have readily applied higher risk adjustments when there was a significant risk of non-payment. *See, e.g., In re Griswold Building, LLC*, 420 B.R. 666 (Bankr. E.D. Mich. 2009) (adding 5% risk premium to prime rate); *In re Dargahi*, 2008 WL 618954 (Bankr. C.D. Ca. Mar. 3, 2008) (adding 5% risk adjustment to certain tranches of debt).

Indeed, the DIP lender in this case, CHS Capital LLC, charged a fully floating variable rate of 7.00%.[40] This was so even though the DIP loan was for a term of less than one year, and the loan was secured by a first priority lien on the Debtor's 2014 crops and its unencumbered

---

[38] *See* Ex. 151 at 2.

[39] *See* Ex. 150 at 8.

[40] *See* Ex. 299-GG.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 16

real property, as well as a junior lien on essentially all of the Debtor's equipment and remaining real property.

Wells Fargo's interest rate experts, Gerald Trebesch[41] and Gregory Mondon, each analyzed the risk factors applicable to the Debtor and to the Plan's proposed treatment of Wells Fargo, and each concluded that an appropriate interest rate should be a variable rate of at least Prime + 4%.[42]  Those risk factors include following:

Collateral Position.  Wells Fargo obtained additional real estate collateral in 2013, but is in second position behind Rabo Agrifinance in most of that collateral.  Indeed, although Debtor's Exhibit 108 shows Wells Fargo with $1.1 million of first lien real estate collateral and $23.4 million of second lien real estate collateral, those totals include $2.1 million for the Stanger farm (on which Wells Fargo does not have a lien) and $6.2 million for the Steel farm (which will purportedly be sold).  Once those amounts are removed, and liquidation costs are applied (at 15%, per Debtor's Exhibit 107), Wells Fargo is left with only $13.9 million of real estate collateral value to secure a claim in excess of $21 million.  Moreover, under Rabo's stipulation with the Debtor,[43] Rabo's claim could accrue interest (including 10% default interest), of more than 14%, further eroding the value of Wells Fargo's real estate position.  Further, in order to protect its second lien position, Wells Fargo could be required to pay over $10.4 million in cash to the first lien holders.[44]

---

[41] Some dispute arose at the confirmation hearing regarding Mr. Trebesch's competency to testify because he has been retired since late 2009.  Mr. Mondon and Mr. Haycock, however, each testified that the principles of credit analysis had not changed since then, and their methodology was consistent with Mr. Trebesch's.

[42] The Prime Rate is presently 3.25%.

[43] *See* Ex. 150.

[44] This includes $9.95 million to Rabo and $464,762 to Commerce Bank.  *See* Exs. 150 at 8 and 151 at 2.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 17

Meanwhile, Wells Fargo cannot be sure whether its lien on Debtor's crop will have any value at all, because the Debtor reserves the right to obtain unlimited super-priority crop funding each year.[45]  Nor can Wells Fargo count on the value of its lien on equipment—each witness who was asked, including Russell Haycock, testified that the equipment will continue to depreciate. In addition, there are numerous purchase money liens which have priority over Wells Fargo's lien on some of the equipment.

Financial Performance.  Each of the banking experts, including Mr. Haycock, testified that the most reliable source of information about a borrower's creditworthiness is the borrower's own historical performance, including both the good and the bad years.  Mr. Mondon and Mr. Trebesch each testified that the Debtor's working capital (current assets – current liabilities) is poor, and its debt service coverage low.  Mr. Haycock admitted that lenders typically look for debt service coverage ratios exceeding 1.25, but that he hadn't calculated the Debtor's debt service coverage ratio.

The Debtor's historical financial performance has not been good.  From year-end 2012 to year-end 2013, the Debtor's Net Worth declined from $11.7 million to -$91,129.00.[46]  Over the same period, its working capital declined from negative $5.4 million to negative $29.6 million.[47] The Debtor lost $13.4 million (not including loss on investments of approximately $2 million) in 2013.[48]  In the full year of operations from the Petition Date to November 30, 2014, the Debtor lost $6,701,161.[49]

---

[45] *See* Ex. 101 at 17.

[46] *Compare* Ex. 215 at 6 *with* Ex. 214 at 7.

[47] *Compare* Ex. 215 at 5-6 *with* Ex. 214 at 6-7.

[48] *See* Ex. 214 at 9.

[49] *See* Ex. 299-EE.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 18

Projections.  Mr. Mondon and Mr. Trebesch testified that the Debtor's financial projections are unrealistic, as set forth above.

Balloon Payment.  The Debtor's plan requires several balloon payments, including an $18.1 million balloon payment to Wells Fargo in 2021.  This essentially requires the Debtor to obtain new financing, and the Debtor presented no evidence beyond vague speculation as to the likelihood such a refinancing could be achieved.  This increases the risk of the Debtor's Plan.

Lack of Loan Documents.  As described below, the Debtor's Plan does not provide Wells Fargo with any loan documents or covenants, even though Wells Fargo's prepetition loan documents included a robust set of covenants.  This lack of covenants and documents increases Wells Fargo's risk.

Fixed Rate.  The fixed 5% rate in the Debtor's Plan increases Well Fargo's risk, as described above, because it places all of the risk of interest rate increases on Wells Fargo and witnesses testified unanimously that rates will likely rise.

Related Party Transactions.  As described by the Debtor's auditor, the volume of related party transactions makes it difficult to monitor the Debtor or to obtain an accurate picture of the Debtor's performance.  This difficulty is heightened because under the Debtor's Plan, Wells Fargo does not receive various lender protections that it has now.  There is little reason to believe that the related party transactions that have plagued the Debtor will subside after bankruptcy, and the addition of PCF to the equation only makes matters worse.

Mr. Mondon and Mr. Trebesch each testified about these risks and their conclusions that at least 4% must be added to the prime rate of interest.  The Debtor's banking expert, Mr. Haycock, on the other hand, merely stated that a 5% fixed rate for 7 years "seems reasonable to me."  He provided no analysis of the risk factors or why he concluded that 5% was "reasonable."

Notably, even Mr. Haycock testified that the Debtor is a high risk borrower, and if he were a

credit officer at a bank that was asked to offer take-out financing on the terms in the Debtor's

Plan, he would advise his bank to refuse.  Accordingly, the Debtor's proposed 5% fixed interest

rate on Wells Fargo's claim is inadequate, and the Debtor's Plan is not fair and equitable as to

Wells Fargo.  Because of the risk factors present in this case, at least 4.00% must be added to the

prime rate, which is currently 3.25%.  In addition, the rate must be variable, not fixed.

> **b)**    The Debtor's Plan is Not Fair and Equitable Because it Strips
> Wells Fargo of its Covenants.

Wells Fargo's prepetition credit agreement includes a robust set of covenants, including

financial ratio covenants, reporting covenants, and certain limitations on the Debtor's activities.[50]

Covenants protect lenders by increasing their ability to monitor and protect their collateral, and

to maximize the likelihood of repayment.  The Debtor's Plan, in contrast, does not include any

loan documents or covenants in favor of Wells Fargo.

The Debtor's Plan is not fair and equitable if it seeks to strip Wells Fargo of these

protections.  *See Van Straalen*, Case No. 12-41276 at 8 (acknowledging "some fairly

sophisticated loan covenants in the bank's documentation," and noting that "the problem I saw

with this plan is that this didn't really address whether or not the loan terms would continue in

effect or be modified"); *In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr. D. Mass. 1994)

(recognizing that "[t]he covenants to be included in the loan documents of a cramdown need not

precisely track the covenants in the parties' existing loan agreement . . . [but that] the covenants

should not leave the lender so bare of protection as to greatly increase the risk"); *Fannie Mae v.

Vill. Green I, GP*, 2014 U.S. Dist. LEXIS 9337 (W.D. Tenn. Jan. 27, 2014) (reversing plan

---

[50] *See* Ex. 246 at 23-33.

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 20

confirmation because bankruptcy court abused its discretion when it held that loan covenant

modifications were fair and equitable).

    c)    The Debtor's Plan Does Not Satisfy Any of the Alternative "Fair and Equitable" Requirements.

A plan can be "fair and equitable" as to a secured claimant by satisfying any of the three

clauses of Bankruptcy Code § 1129(b)(2)(A).  The sections above explain that the Debtor's Plan

fails to satisfy the first clause, § 1129(b)(2)(A)(i), because it does not provide Wells Fargo with

the present value of its collateral.  It appears, however, that the Debtor's proposed treatment of

Wells Fargo actually is an attempt to satisfy a combination of clauses (i) and (ii).  That is, the

Debtor's primary approach is to attempt to comply with clause (i), by repaying Wells Fargo's

claim over time, with Wells Fargo allegedly retaining its liens.  The Debtor's Plan, however,

goes on to provide that the Debtor may sell Wells Fargo's collateral free and clear of Wells

Fargo's lien. [51]  This latter treatment is subject to clause (ii) of § 1129(b)(2)(A), which states that

a plan may provide "for the sale, subject to section 363(k) of this title, of any property that is

subject to the liens securing such claims, free and clear of such liens, with such liens to attach to

the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of

this subparagraph."  11 U.S.C. § 1129(b)(2)(A)(ii).  The Debtor's Plan, however, does not

comply fully with clause (ii), and the Debtor cannot rely on partial compliance with multiple

clauses to satisfy § 1129(b).

As explained in Wells Fargo's pre-hearing objection to confirmation of the Debtor's

Plan,[52] under the Supreme Court's recent *RadLAX* case, a bankruptcy plan must comply

independently and completely with at least one clause of section 1129(b)(2)(A).  *See* 132 S. Ct.

---

[51] *See* Ex. 150 (modified plan sale provision) at 11.

[52] *See* Dkt. 575.

2065, 2072 (2012) ("(i) is the rule for plans under which the creditor's lien remains on the property, (ii) is the rule for plans under which the property is sold free and clear of the creditor's lien, and (iii) is a residual provision covering dispositions under all other plans").  This is especially evident here, where the Debtor's proposed treatment is self-contradictory—on the one hand, Debtor is suggesting that Wells Fargo will retain its lien on real estate and crops, but on the other hand, the Debtor may sell real estate and crops free and clear of Wells Fargo's lien and use the proceeds to pay other creditors, and also may obtain unlimited superior liens on the crops.[53]

The Debtor's proposed treatment of Wells Fargo does not comply independently with clauses (ii) or (iii).  It does not comply with clause (ii) for two reasons.  First, under *RadLAX*, clause (ii) requires that secured creditors be allowed to credit bid, and the Debtor's Plan provides no such rights.  *See* 132. S. Ct. at 2073.  Second, clause (ii) requires that if a creditor's collateral is sold free and clear of liens, the creditor's lien must attach to the sale proceeds, and the plan must provide "for the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph."  The Debtor's Plan does not provide such treatment, because it expressly authorizes the Debtor to use the proceeds of Wells Fargo's collateral to pay other creditors and fund business operations.[54]  This proposed "treatment of such liens on proceeds" does not satisfy

---

[53] *See* Ex. 150 (modified plan sale provision) at 11-12.  This treatment also violates § 1129(b)(2)(A)(ii) because a plan is not fair and equitable under that subsection if the debtor may subordinate the creditor's lien, or sell collateral and use the proceeds for operating purposes.  *See In re Ford Prods. Corp.*, 159 B.R. 693, 695 (Bankr. S.D.N.Y. 1993) (plan that required secured creditor to subordinate its lien was not fair and equitable); *In re Hoff*, 54 B.R. 746, 753 (Bankr. D.N.D. 1985) (plan that allowed proceeds of collateral to be used for operating expenses was not fair and equitable).

[54] For example, with the Steel Farm sale proceeds, the Debtor's Plan proposes to pay creditors other than lien holders, and also fund operations.  With respect to crops, the Debtor Plan proposes to sell them free and clear of liens and use the proceeds to "fund ongoing business operations."  *See* Ex. 150 at 11.

clause (i) because Wells Fargo does not retain its lien,[55] and it does not satisfy clause (iii) because Wells Fargo does not realize the indubitable equivalent of its claim

The Debtor's Plan does not comply with clause (iii) because a floating lien on ill-defined future assets is not the indubitable equivalent of cash proceeds arising from a sale. *See In re Arnold & Baker Farms*, 85 F.3d 1415, 1422 (9th Cir. 1996) (substitute collateral is not indubitably equivalent if it increases the creditor's risk exposure). Further, *RadLAX* expressly forbids reliance on the "indubitable equivalent" clause if the plan proposes to sell assets free and clear of claims. *See* 132. S. Ct. at 2073.

Another aspect of the Debtor's Plan that is not fair and equitable as to Wells Fargo is § 7.1, which provides a 45-day grace period for plan payments. Even if the Debtor's proposed stream of payments provided Wells Fargo with the present value of its allowed claim (which it does not), that present value is reduced if payments are delayed up to 45 days. Moreover, another secured creditor, Rabo Agrifinance, is exempted from this 45-day grace period,[56] implicating not only "fair and equitable" concerns, but also "unfair discrimination" under § 1129(b)(1). Rabo also is exempted from other significant provisions of the Debtor's Plan, including § 3.5, which would have allowed the Court to review Rabo's attorney fees for reasonableness.

---

[55] *See, e.g., In re Hoff*, 54 B.R. 746, 753 (Bankr. D.N.D. 1985) (denying confirmation of plan that proposed to sell cattle collateral, but use the sale proceeds for operating and other expenses, because such treatment did not constitute retention of lender's lien).

[56] *See* Ex. 150 at 10.

5.     *The Debtor's Plan Fails to Provide for Wells Fargo's Post-Petition Interest, Fees and Costs on its Oversecured Claim as Required Under 11 U.S.C. § 506(b).*

The evidence shows that although Wells Fargo's equity cushion is declining, and at risk of future declines, Wells Fargo is oversecured.  Thus, Wells Fargo is entitled to interest and reasonable attorneys fees, costs and charges under Bankruptcy Code § 506(b).  The Debtor's Plan fails to provide for these components of Wells Fargo's claim, as it must.  *See GE Capital Corp. v. Future Media Prods.*, 547 F.3d 956, 961 (9th Cir. 2008) (holding that bankruptcy court improperly declined to award contractual default interest to creditor); *see In re Kord Enters. II*, 139 F.3d 684, 687 (9th Cir. 1998) (requiring payment of attorney fees to oversecured creditor).[57] The Debtor's Plan does not expressly provide for the payment of such amounts, and accordingly cannot be confirmed.

6.     *The Debtor's Plan Should Not Be Confirmed Because its Proposed Appointment of Officers and Directors Would Violate 11 U.S.C. § 1129(a)(5)(A).*

Bankruptcy Code § 1129(a)(5)(A) requires that a debtor's future officers and directors be disclosed, and that their appointment under the plan is "consistent with the interests of creditors and equity security holders, and with public policy."  11 U.S.C. § 1129(a)(5)(A)(ii).  The Debtor proposes to appoint Roland Walker, Lorin Walker and Sam Cook as managers of the reorganized Debtor, and to appoint an advisory board that includes Keith Walker.[58]  These appointments are not consistent with the interests of creditors.

---

[57] Wells Fargo's agreements provide for attorney fees.  *See, e.g.*, Ex. 246 at 37 (requiring Debtor to pay "all fees and expenses, including attorney fees and expenses, incurred by Bank in the enforcement or attempted enforcement" of the obligations under the credit agreement, including "any bankruptcy or similar proceeding").

[58] *See* Ex. 101 at 32-35.

The evidence shows that the Walkers are subject to serious and significant conflicts of interest. They operate a tangled web of affiliated entities that transfer funds back and forth with little or no financial controls or transparency. This led the Debtor's auditor, Galusha, Higgens & Galusha PC, to issue a "Disclaimer of Opinion" in connection with the Debtor's 2013 financial statements, which noted that "the volume of related party transactions . . . resulted in a lack of verifiable data." [59]

In addition, Galusha's audit team leader, Judith Brower, testified about numerous problems and red flags her team encountered during its audit of the Debtor, for example: the accrual of substantial uncollectible related party receivables, the lack of controls over related party transactions, management's lack of awareness about balance sheet transactions and the purposes behind them, and accounting systems that allow entries without an audit trail. [60]

The Debtor's Plan appoints Keith Walker to the Debtor's advisory board. Keith is the president of Walker Produce Co., Inc., the entity whose transactions with the Debtor made it impossible for the auditor to render an opinion on the Debtor's books. Indeed, the evidence establishes that after the Petition Date, Walker Produce, without relief from the automatic stay, setoff approximately $182,500 that it owed the Debtor,[61] and the Debtor took no action to protest this setoff. Keith is also the president of PCF, which presumably will purchase potatoes from the Debtor. When the Debtor transacts with Walker Produce or PCF, whose interest will Keith represent? Moreover, the evidence shows that Walker Produce is insolvent and McNeil Fruit is

---

[59] *See* Ex. 214 at 3.

[60] *See* Ex. 203.

[61] *See* Ex. 299-A.

out of business.[62]  It is difficult to understand why the Debtor insists on continuing to do business

with these entities, unless it is because the Walkers hope to use the Debtor to prop them up, as it

did before bankruptcy.  The Debtor's auditor observed that prior to bankruptcy, Walker Produce

set the prices for the Debtor, and transactions leaned in Produce's favor.[63]  If the Debtor's Plan is

confirmed and the Court's supervision reduced, it is very likely that the Debtor will revert to the

same behavior.

Sam Cook also has divided loyalties: he never produced a resignation letter as Chief

Financial Officer of McNeil Development, despite being admonished by the Court to avoid

conflicting loyalties and obligations.  Presumably, to this day, Mr. Cook is paid $50,000 per year

(25% of his salary) from McNeil Development, a company that owes money to the Debtor.  Mr

Cook testified that he works only about 2 hours a month for McNeil Development, which

amounts to about $2,000 per hour.  In addition, Mr. Cook has acted on behalf of Walker Produce

in its banking relationship with Bank of Commerce, including, as recently as December 2014, in

loan negotiations with Bank of Commerce.  He submitted borrowing base certificates to Bank of

Commerce and answered questions about Walker Produce on Walker Produce's behalf.  This

was done even though in February 2014 the Court had clearly expressed concern about this type

of conflict of interest and lack of loyalty to the Debtor.[64]

---

[62] Ex. 299-D establishes Walker Produce's insolvency.  On page 2, it shows Walker Produce to
have total shareholders equity of $531,605.  If, however, the uncollectible $2.9 million
receivable from McNeil Fruit & Vegetable is subtracted, as it should be, Walker Produce's
equity falls well below zero.  Keith Walker and Lynette Green testified that McNeil Fruit &
Vegetable was out of business on April 30, 2014.  Exhibit 299-E establishes that McNeil Fruit is
insolvent, having negative equity even with related party receivables included.

[63] *See* Ex. 210 at 12 and 14.

[64] *See* Ex. 299-CC at 5-6.

Roland Walker owes loyalties to family-operated Walker Produce and other entities. During Roland Walker's testimony, he continuously referred to various Walker-related companies as "we" or "us," apparently recognizing no distinction among himself, the Debtor, and his related companies, including Walker Produce.  This is consistent with the auditor's observation that the Debtor's managers see "no differentiation" among the various family-owned companies,[65] which makes it difficult to determine whether any transaction is arm-length.[66]  Sam Cook testified that he considered many of the receivables owed by these companies uncollectible simply because Roland Walker told him they were.

Though the Debtor modified its Plan to add a Collection Committee tasked with collecting related party receivables, [67] that committee is unlikely to be effective for several reasons.  First, though it limits explicit credit extensions, the modification creates no impediment to the Debtor simply paying expenses on behalf of its affiliated companies, which has been the Debtor's historical practice and has created many related party receivables.  In the words of the Debtor's auditor, "WL&C became a literal dumping ground for other entity expenses."[68] Second, the modification expressly allows the Debtor to continue to sell potatoes through Walker Produce, which will allow the Debtor to make implicit credit extensions to that entity.[69]   Third, though the modification requires the Collection Committee to attempt to collect any post-petition receivables that are 90 days past due, nothing prevents the Debtor from setting extremely lenient due dates (or none at all) with related parties.  Pre-petition receivables will not be assigned to the

---

[65] *See* Ex. 210 at 12.

[66] *Id.* at 17.

[67] *See* Ex. 199A.

[68] *See* Ex. 205 at 9.

[69] *See id.* at 1.

Collection Committee if the Debtor collects 50% of the receivable, potentially leaving the other 50% as a windfall to the related party.[70]  Finally, the Collection Committee cannot be expected to be very effective when Roland Walker admitted on the stand that it was stacked with his own supportive friends and associates.  The Collection Committee's two additional members, other than the existing unsecured creditors' committee, are Dirk Parkinson and Dan Bowles, each of whom spoke in favor of the Walkers at the March 11, 2014 cash collateral hearing.[71]

The $1 million wire transfer payment Walker Produce made to the Debtor on January 28, 2015 to enable the Debtor to pay off its DIP lender, CHS, is another example of the transparency issues and confusion that continue to plague the Debtor.[72]  Roland Walker testified that it was an advance on future potato sales made with funds obtained from Frank Tiegs, similar to what occurred in late 2012 and early 2013.[73]  Sam Cook testified that Roland Walker was wrong, and that the wire transfer payment was an out of the ordinary course of business payment for the sale of potatoes.  Wells Fargo doesn't know which is correct, but this exchange calls the credibility of at least one of them into question, and is instructive (and typical) in several respects.  First, if the Debtor's top managers cannot agree when they are compelled to explain a related party transaction under oath, imagine the difficulty of trying to monitor the Debtor's operations after confirmation, when the Debtor is no longer under the Court's supervision.  What the Court saw is the Debtor's management on its *best* behavior—and that was not good.  Second, the record shows that Roland Walker is not a capable, attentive manager.  Roland Walker managed various companies that lost tens of millions of dollars from 2008 to 2013, and he now has tens of

---

[70] *See id.* at 2.

[71] *See* Dkt. 229 at 2.

[72] *See* Ex. 199-O.

[73] *See* Ex. 224 at 2; *see also* Ex. 295 at 1.

millions of dollars of unsatisfied judgments against him.[74]  He has a negative net worth of over

$13 million[75] and his companies owe his parents' trusts millions of dollars.[76]  These failures are

relevant not only because they demonstrate Roland Walker's management shortcomings, but also

because his ongoing personal financial crises will continue to distract him from his duties to the

Debtor.

**B.    The Creditors' Plan Should Be Confirmed.**

  *1. Voting Results.*

  The Creditors' Plan was accepted by at least one class of impaired claims, but not by

each class of impaired claims.[77]  Thus, the Creditors' Plan, like the Debtor's Plan, must satisfy

the cramdown provisions of Bankruptcy Code § 1129(b).  It does.

  Various objections to the Creditors' Plan were received prior to the confirmation hearing

and addressed by Wells Fargo at Dkt. 608.  Creditors' objections were largely resolved by Wells

Fargo's plan supplement.[78]  Walker Produce objected that the Creditors' Plan did not expressly

allow setoff,[79] and Wells Fargo supplemented the Plan to so provide.[80]  The only substantive

objection of the Unsecured Creditors' Committee was that the definition of "Effective Date" in

the Creditors' Plan was confusing,[81] and that definition was clarified by Wells Fargo's plan

---

[74] *See* Exs. 299-H to 299-K.

[75] *See* Ex. 221.

[76] *See* Exs. 222 and 223.

[77] *See* Dkt. 612.  The Creditors' Plan satisfies the requirements of § 1129(a)(10) because the following impaired classes of non-insiders have accepted the Creditors' Plan: Class 1 (Wells Fargo); Class 7 (Deere & Co.); and Class 10 (Toyota Credit Corporation).

[78] *See* Dkt. 615.

[79] *See* Dkt. 571.

[80] *See* Dkt. 615 at 3.

[81] *See* Dkt. 578 at 2-3.

supplement, as well.[82]  Commercial Credit Group filed an objection but failed to press that

objection or participate in the confirmation hearing, apparently recognizing that its objection was

based on misinterpretation of the Creditors' Plan, and amounted to nothing more than griping

based on that misinterpretation.    The Debtor and its equity holders continue to oppose

confirmation of the Creditors' Plan.

> 2.    *No Resolicitation is Required.*

Wells Fargo modified certain sections of its Amended Plan after voting had concluded.[83]

The Court requested briefing regarding whether these modifications require resolicitation of

votes.  Bankruptcy Rule 3019(a) and Bankruptcy Code § 1127(a) do not require resolicitation of

votes here for at least two reasons.

First, "[p]lan modifications do not require a new disclosure statement and court approval

unless the modifications are material."  *In re Simplot*, 2007 Bankr. LEXIS 2936, at \*39 (Bankr.

D. Idaho Aug. 28, 2007).  "The best test of whether a modification is material is "whether the

modification so affects any creditor or interest holder who accepted the plan that such entity, if it

knew of the modification, would be likely to reconsider its acceptance." 9 COLLIER ON

BANKRUPTCY ¶ 3019.01 (15th ed. rev. 2009).   The vast majority of the modifications to the

Creditors' Plan are procedural or technical changes that are not material.  *See In re Mt. Vernon*

*Plaza Community Urban Redevelopment Corp.*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987)

("None of the changes negatively affects the repayment of creditors, the length of the plan or the

protected property interests of parties in interest.").

---

[82] *See* Exs. 299-C and 299-LL.

[83] *See* Dkt. 671.

Second, resolicitation is required only as to adversely impacted creditors or equity holders who previously accepted the plan. *In re American Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988). In fact, Judge Myers held in *Simplot* that a party who previously rejected the plan lacks standing even to object that resolicitation is required. *See In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *13 (Bankr. D. Idaho Aug. 28, 2007). In the Ninth Circuit, a creditor's failure to vote constitutes a rejection. *See Bell Road Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 215 (9th Cir. B.A.P. 1989), ("[T]he failure or inability of a creditor to vote on confirmation of a plan is not equivalent to acceptance of the plan."); *In re Root*, No. 09-00645-TLM, 2012 WL 5193840, at *3 (Bankr. D. Idaho Oct. 19, 2012) ("[C]lasses cannot be 'deemed' to have accepted by silence.").

The only modification to the Creditors' Plan that could arguably be viewed as material is the modification that allows Court review of the attorney fee component of oversecured creditors' claims.[84] This affects only oversecured creditors. Only two secured creditors other than Wells Fargo accepted the Creditors' Plan. They are Deere & Co. (Class 7) and Toyota Motor Credit Corp. (Class 10). Deere and Toyota are excluded from the provision at issue.[85] Thus, there is no previously accepting creditor whose claim is being materially altered, and no need for resolicitation.

The danger Rule 3019 seeks to guard against is that a plan proponent will obtain acceptance of one plan and then attempt to apply that acceptance to a materially altered plan. *Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *13 ("The Plan Proponents do not seek to

---

[84] *See* Dkt. 671 at 2.

[85] Deere's exclusion is also appropriate because Deere's attorney fees have also been allowed under the Debtor's Plan by stipulation. *See* Dkt. 147. Toyota's exclusion is also appropriate because its claim is de minimis, totaling less than $28,000. *See* Ex. 101 at 58.

perpetuate a prior DJS acceptance as a deemed acceptance of the Modified Joint Plan. The

adequacy of disclosure to support such a deemed acceptance is simply not an issue for DJS.

Therefore, DJS is not aggrieved.").  Here, Wells Fargo is not attempting to perpetuate the

acceptance of any creditor whose treatment has been materially altered, and thus no further

disclosure or voting is necessary.

       *3.   Confirmation Burden.*

Wells Fargo, as the proponent of the Creditors' Plan, has the burden of proving by a

preponderance of evidence that the Creditors' Plan satisfies each of the applicable requirements

of sections 1129(a) and 1129(b) of the Bankruptcy Code.

Wells Fargo does <u>not</u> have to prove that the Creditors' Plan replicates every provision of

chapter 7, or that it affords equity holders every protection of chapter 7.  Such a requirement is

nowhere to be found in section 1129.  Instead, Congress provided equity holders with two

relevant protections: the absolute priority rule (§ 1129(b)(2)(C)) and the best interest test (§

1129(a)(7)).  These rules require, in summary, that if there are varying priorities of equity

holders, each class of equity holders receives its fixed liquidation preference before any junior

class is paid, and that each equity holders receives not less than it would receive if the debtor

were liquidated in chapter 7.  Notably, this latter provision does not say that a chapter 11 plan

must utilize the exact same process or procedures as a chapter 7 case, only that each creditor and

equity holder will receive at least as much as it would in chapter 7.  *See* 11 U.S.C. § 1129(a)(7)

("each holder of a claim or interest . . . will receive or retain under the plan on account of such

claim or interest property of a value, as of the effective date of the plan, that is not less than the

amount that such holder would so receive or retain if the debtor were liquidated under chapter 7

of this title on such date").

    *4.    The Creditors' Plan is Proposed in Good Faith and is An Appropriate Form of Chapter 11 Plan.*

Bankruptcy Code § 1129(a)(3) requires that the plan be proposed "in good faith and not by any means forbidden by law." The term "good faith" is not defined in the Bankruptcy Code. However, a plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002). Good faith is determined with reference to the totality of the circumstances. *Id.*

The Creditors' Plan proposes to repay creditors in full by liquidating all of the Debtor's assets over the course of a year. The Creditor's Disclosure Statement estimates that all creditors will be repaid in full, with interest, in order of priority, with money potentially left over for equity.[86]

The Creditor's Plan represents a straightforward application of the Bankruptcy Code's priority scheme, and is cut from the same mold as many other liquidating plans, which are routinely approved across the country. *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 (2008) ("Chapter 11 expressly contemplates liquidations."); *In re Sanders Grain Farms*, Case No. 06-40163, Dkt. 202 (Bankr. D. Idaho March 15, 2007) (confirming creditor's plan to liquidate farming partnership over debtor's objection); *In re Deer Park*, 136 B.R. 815, 818 (B.A.P. 9th Cir. 1992) (explaining that a liquidating plan is a valid form of chapter 11 plan); *In re Jorgensen*, 66 B.R. 104 (B.A.P. 9th Cir. 1986) (confirming creditor's liquidating chapter 11 plan for farmer over debtor's objection).

---

[86] *See* Dkt. 464 at 37-38.

The Debtor's equity holders do not like the Creditors' Plan, obviously, because they wish to retain control of the Debtor and continue to operate it. But that does not make the Creditors' Plan a bad faith plan. Nor is the Creditors' Plan in bad faith simply because it does not elevate the equity holders' interests above those of creditors. *See, e.g., In re 431 W. Ponce De Leon, LLC*, 515 B.R. 660, 673 (Bankr. N.D. Ga. 2014) (plan was not filed in bad faith that "contemplate[d] the disposition of all estate property without an analysis of the tax consequences" to debtors' members, because the tax consequences did not affect the debtors, which were pass-through entities).

5.    *The Creditors' Plan is Feasible.*

A chapter 11 plan is feasible if it "has a reasonable probability of success." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986).

Gary Rainsdon, the proposed Plan Administrator under the Creditors' Plan, testified that the Creditors' Plan is achievable. Mr. Rainsdon is an experienced liquidator with a broad network of contacts. He testified that the real estate could be leased for the upcoming crop season and sold within a year; that the equipment could be auctioned through professional auctioneers; and that the crops could continue to be stored and sold in the open market. Numerous questions were raised at the confirmation hearing about his other time commitments as a chapter 7 trustee, and he testified that along with his staff, he could devote sufficient time to this case to carry out his duties effectively. In addition, the Creditors' Plan authorizes him to retain or hire employees as necessary, and he testified that he would do that if needed.[87]

In addition, the Creditors' Plan, as amended, allows Mr. Rainsdon to petition the Court to resolve any disagreements between him and the Wind Down Committee, so there is no potential

---

[87] *See* Dkt. 684 at 22.

for a stalemate.[88]  Likewise, under the Creditors' Plan as amended, there is no possibility that the

Wind Down Committee could be deadlocked when selecting a replacement for a departing Wind

Down Committee member.[89]

The Creditors' Plan, as amended, also requires Wells Fargo to allow up to $1.75 million

of its collateral to be used to fund the administration of the Creditors' Plan.[90]  The

uncontroverted evidence is that this amount, which includes a large contingency, is sufficient to

fund the Creditors' Plan.

6.    *The Creditors' Plan Satisfies the Best Interest Test.*

Bankruptcy Code § 1129(a)(7) is known as the "best interest test."  It provides, in

relevant part, as follows:

> (7) With respect to each impaired class of claims or interests--
>
> (A) each holder of a claim or interest of such class--
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

As described above, nowhere does § 1129(a)(7) require that a chapter 11 liquidating plan

must actually be carried out in precisely the same manner as a chapter 7 liquidation.  Rather, it

"mandates that nonaccepting impaired creditors <u>receive not less</u> under a chapter 11 plan than

they would in a chapter 7 liquidation."  *In re Martin*, No. 01-03064, 2003 WL 25273864, at *6

(Bankr. D. Idaho Feb. 28, 2003) (emphasis added).  That is, the outcome—the present value of

distributions to a claimant—must equal or exceed that of a hypothetical chapter 7 case.  No

---

[88] *See* Ex. 299-LL at 3 and 4.

[89] *See* Ex. 299-LL at 5.

[90] *See* Dkt. 684 at 37.

evidence was introduced to show that creditors or equity holders would receive more in a chapter 7 liquidation.

Indeed, Gary Rainsdon, an experienced chapter 7 trustee, testified that he expected liquidation under the Creditors' Plan to be very similar to a chapter 7 liquidation, except that he would have preferred the compensation model of a chapter 7 case, because he could have gotten paid more under that model. Under Bankruptcy Code § 326, a chapter 7 trustee's compensation is calculated based on the value of assets disbursed. Based on the Debtor's estimate of the value of its assets,[91] this could result, under Section 326(a), in a maximum of $1,933,887.63 in presumptive statutory compensation for a chapter 7 trustee, unless "extraordinary circumstances" justify a deviation from the presumptive statutory amount. *See In re Rowe*, 750 F.3d 392 (4th Cir. 2014); *Hopkins v. Asset Acceptance LLC (In re Salgado-Nava)*, 473 B.R. 911 (B.A.P. 9th Cir. 2012). And even if a hypothetical chapter 7 trustee did not receive the full statutory amount, he or she almost certainly would receive more than the $175,000 to $350,000 compensation that the proposed plan administrator estimates he may receive under the Creditors' Plan.[92]

In addition, although the Creditors' Plan, as amended, allows parties in interest to seek court review under various circumstances, the Creditors' Plan frees the plan administrator from the need to obtain court approval for many actions, particularly where no party objects. This will reduce expenses and streamline the liquidation. The Ninth Circuit has made clear that it is appropriate for the bankruptcy court's oversight to be more relaxed after confirmation. *See Sw. Marine Inc. v. Danzig,* 217 F.3d 1128, 1140 (9th Cir. 2000) ("[O]nce the bankruptcy court confirms a plan of reorganization, the debtor is free to go about its business without further

---

[91] *See* Ex. 101 at 47.

[92] *See* Dkt. 464 at 36.

supervision or approval of the court, and concomitantly, without further protection of the court."); *see also In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *7 (Bankr. D. Idaho Aug. 28, 2007) (confirming plan pursuant to which estate representative liquidated estate and distributed proceeds without necessity of further approvals).

The Creditors' Plan provides that "[t]he Plan Administrator shall be a fiduciary of Liquidating WLCC."[93]  This means, of course, that he will subordinate his personal interests to those of Liquidating WLCC, including its equity holders.  Mr. Rainsdon testified that he would seek to maximize the value of assets for all creditors and equity holders, and that he would carefully observe his fiduciary duties.  The Debtor's equity holders appear to be dismissive of this obligation, but that's not a problem with the Creditors' Plan—rather, it suggests that the equity holders just don't want to believe Mr. Rainsdon's testimony.

In short, the evidence shows that creditors and equity holders will receive at least as much under the Creditors' Plan as they would under a hypothetical chapter 7 case.

>    7.    *The Creditors' Plan Does Not Discriminate Unfairly.*

Bankruptcy Code § 1129(b) requires that a cramdown plan "does not discriminate unfairly."  The Creditors' Plan does not discriminate unfairly.  "In a nutshell, if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly with respect to the dissenting class."  *See* Kenneth N. Klee, All You Ever Wanted to Know About Cram Down Under the Bankruptcy Code, 53 Am. Bankr. L.J. 133, 142 (1979).  This does not require that every similar claim be treated exactly the same, but that there

---

[93] *See* Dkt. 684 at 21.

is a reasonable, good-faith basis for any discrimination.  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 657 (9th Cir. 1997).

The Creditors' Plan proposes to pay all creditors in full, with interest.  Equity holders will share pro rata in any surplus.  This does not constitute unfair discrimination.  *See In re Sound Radio, Inc.*, 93 B.R. 849, 855 (Bankr. N.J. 1988) ("Neither of the plans discriminates unfairly, since all creditors are to be paid in full and all shareholders are to receive the same amount per share.").

The Debtor and certain equity holders have suggested that the Creditors' Plan unfairly favors Wells Fargo.  This is untrue.  To the extent Wells Fargo has a more prominent role in the Creditors' Plan, it is a result of Wells Fargo's status as a perfected secured creditor with the largest claim in the case, and because the Creditors' Plan will be funded with Wells Fargo's collateral.  For example, Wells Fargo is entitled to appoint one member to the three-member Wind Down Committee.[94]  Greg Mondon testified that the rationale behind the Wind Down Committee's composition is that it represents the three largest constituencies in the case: the two largest secured creditors, and unsecured creditors collectively.  This simply reflects economic reality and the fundamental priority scheme expressed in the Bankruptcy Code.  Rabo Agrifinance and Wells Fargo are entitled to appoint representatives because their claims are by far the largest claims against the Debtor, comprising in the aggregate more than 65% of all of the Debtor's liabilities, and their claims are secured by the vast majority of Debtor's assets.[95]

Nevertheless, it is inaccurate to view the Wind Down Committee as a permanent committee of secured creditors: as soon as Wells Fargo or Rabo Agrifinance is paid in full, a

---

[94] *See* Dkt. 684 at 30.

[95] *See* Debtor's Summary of Schedules, Dkt. 77, as amended.

second unsecured creditor representative will take over its spot on the Wind Down Committee,
creating a majority of unsecured creditors.  And even before that occurs, Section 5.3.5(a) allows
the Plan Administrator or the Wind Down Committee to petition the court if they cannot agree
with one another or with Wells Fargo.[96]

To take another example, Well Fargo is entitled to approve the terms of sale for the 2014
crop.  That is because the 2014 crop is the main category of liquid collateral securing Wells
Fargo's claim.  Before bankruptcy Wells Fargo had a first priority lien on this collateral, and it
was the main source to which Wells Fargo could look for repayment from the Debtor.

8. *The Creditors' Plan is Fair and Equitable.*

A cramdown plan must also be "fair and equitable" with respect to each impaired class
that has not accepted the plan.  Bankruptcy Code § 1129(b)(2) describes what constitutes "fair
and equitable" treatment for secured, unsecured, and equity classes, and the Creditor's Plan
provides precisely that treatment.

Under the Creditor's Plan, secured creditors are treated in compliance with section
1129(b)(2)(A)(ii): the Debtor's property will be sold, secured creditors' liens on such property
will attach to the proceeds of sale, and they will be paid in full with interest.[97]  Unsecured
creditors are treated in compliance with section 1129(b)(2)(B): their claims will be paid in full in
cash.[98]  Equity holders are treated in compliance with section 1129(b)(2)(C): they will receive
the surplus after all claims with priority over theirs are satisfied,[99] and no claims junior to their
equity interests will receive or retain any interest.

---

[96] *See* Dkt. 684 at 24.

[97] *See* Dkt. 684 at 31-33.

[98] *See* Dkt. 684 at 18-19.

[99] *See* Dkt. 684 at 19.

## III.   CONCLUSION

For the reasons set forth in this Memorandum, Wells Fargo requests that the Court

confirm the Creditors' Plan.

DATED February 20, 2015          HOLLAND & HART LLP


By     /s/ *Larry E. Prince*
          Larry E. Prince, of the firm
          Attorneys for Creditor, Wells Fargo Bank,
          National Association

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- Thomas Timbridge Bassett tom.bassett@klgates.com, pam.miller@klgates.com
- Steven William Boyce swboyce@smithbanks.net, sknueppel@smithbanks.net
- Craig W Christensen cwcc@ida.net
- Gregory L Crockett gregcrockett@hopkinsroden.com, tammytheiler@hopkinsroden.com
- Barry W Davidson bdavidson@dbm-law.net, cnickerl@dbm-law.net;sabrahamson@dbm-law.net;reception@dbm-law.net;ccusack@dbm-law.net
- Bart M Davis bartdavis@me.com, theresacarson@me.com
- Karl R Decker kdecker@holdenlegal.com, jtimberlake@holdenlegal.com;chomer@holdenlegal.com
- Dan C Dummar dan@beardstclair.com
- Monte C Gray montegray@cableone.net, livg@cableone.net;mikezlawoffice@cableone.net
- Daniel C Green dan@racinelaw.net, rag@racinelaw.net;sab@racinelaw.net;brc@racinelaw.net
- Charles A Homer chomer@holdenlegal.com, jtimberlake@holdenlegal.com;aulrich@holdenlegal.com
- Michael R Johnson mjohnson@rqn.com, dburton@rqn.com;docket@rqn.com
- R Ron Kerl Ron@cooper-larsen.com, kelli@cooper-larsen.com
- Mary P Kimmel ustp.region18.bs.ecf@usdoj.gov
- Jay A Kohler cindy@kohlerlawif.com
- David Henry Leigh dleigh@rqn.com, sglendening@rqn.com
- Robert J Maynes mayneslaw@hotmail.com, robert.maynes@gmail.com;rosie.mayneslaw@gmail.com;brenda.mayneslaw@gmail.com;maynestaggart@gmail.com;maynestaggartecf@gmail.com
- Bruce K Medeiros bmedeiros@dbm-law.net, sabrahamson@dbm-law.net;cnickerl@dbm-law.net;reception@dbm-law.net
- Joseph M Meier jmeier@cosholaw.com, jbean@cosholaw.com
- Stephen A Meikle sammeikle@msn.com
- James K Miersma ecfid@rcflegal.com
- Derrick J O'Neill doneill@rcolegal.com, ecfid@rcolegal.com
- Randall A Peterman rap@moffatt.com, kad@moffatt.com;ecf@moffatt.com;moffattthomas@hotmail.com;kgm@moffatt.com
- James A Rubenstein Jim.Rubenstein@lawmoss.com, Maureen.Montpetit@lawmoss.com
- Lance J Schuster lance@beardstclair.com, shaunie@beardstclair.com;hammer@beardstclair.com;jessica@beardstclair.com
- Sheila Rae Schwager sschwager@hawleytroxell.com, cdavenport@hawleytroxell.com
- Matthew K Shriver ecfid@rcolegal.com, mshriver@rcolegal.com
- Marvin Marion Smith mmsmith@smithbanks.net, marci@smithbanks.net
- James A Spinner spinjim@cableone.net

- Steven L Taggart staggart101@gmail.com, rosie.mayneslaw@gmail.com,maynestaggartecf@gmail.com;maynestaggartecf@gmail.com
- Aaron J Tolson ajt@aaronjtolsonlaw.com
- Brian T Tucker bttucker@nhptlaw.net
- US Trustee ustp.region18.bs.ecf@usdoj.gov
- Jeffrey M Wilson jeff@wilsonmccoll.com, louis@wilsonmccoll.com

/s/ Larry E. Prince
of Holland & Hart LLP

7506251_1

WELLS FARGO BANK'S PLAN CONFIRMATION MEMORANDUM - 42

# EXHIBIT A

## HEARING TRANSCRIPT – VAN STRAALEN

### May 30, 2013

| | Speaker | Content |
|---|---|---|
| 1 | Speaker | Content |
| 2 | Judge: | Thank you for your courtesy in allowing me that recess.  I appreciate it very |
| 3 | | much.  Alright, we next move to the matter of Arie and Alice Van Straalen, 12- |
| 4 | | 41276.  See this date and time set by the Court for hearing on all matters.  Courts |
| 5 | | were all ruling concerning confirmation of debtors amended Chapter 11 plan. |
| 6 | | Preliminary hearing motion for stay relief, Wells Fargo Bank.  Continued hearing |
| 7 | | on debtor's motion to use cash collateral.  Mr. Clark represents the debtors, good |
| 8 | | morning, again.  Mr. Prince for Wells Fargo Bank, good morning. |
| 9 | Mr. Prince: | Good morning, Your Honor. |
| 10 | Judge: | Mr. Shirley for Evans Grain. |
| 11 | Mr. Shirley: | Yes. |
| 12 | Judge: | Welcome.  Ms. Kimmell for the US Trustee.  Welcome, Ms. Kimmell.  Before the |
| 13 | | Court goes any further, I'm going to ask the parties if there is any developments |
| 14 | | or anything that I have to be aware of.  In other words, to simply address the |
| 15 | | status of the case if you will, Mr. Clark, would you like to begin? |
| 16 | Mr. Clark: | There's actually been quite a lot that's happened.  After the prior hearing, the |
| 17 | | debtors and the bank had been working on a new budget for cash collateral with |
| 18 | | basically waiver of adequate protection payments for at least three months, a new |
| 19 | | budget, new feed program, replacement of some cattle, those items have both |
| 20 | | been increased in the new budget, Mr. Cargisle, Dr. Cargisle, forgive me, has |

1

| 1 | | been working a lot with Mr. Gomez from the bank to review the projections and |
|---|---|---|
| 2 | | the numbers for what this new feeding program would do.  My understanding is |
| 3 | | that they've been getting along extremely well and they've, we're in agreement |
| 4 | | that the Court could issue a new cash collateral order which we have drafted.  Mr. |
| 5 | | Prince actually did the drafting of the order, and Mr. Clue and I did the drafting of |
| 6 | | the budget.  That would extend through September.  And assuming that we would |
| 7 | | be filing a new disclosure statement or a modified plan based on the new numbers |
| 8 | | at that time.  Might have been a little presumptuous on our part to look at it like |
| 9 | | that, but frankly, we thought that actually getting the new feed program in that we |
| 10 | | talked about and seeing what it would do would be the most beneficial thing for |
| 11 | | everybody. |
| 12 | Judge: | So, as we sit here this morning, Mr. Clark, where do you see things? |
| 13 | Mr. Clark: | I see things that the new plan as proposed is based on a budget that's not accurate |
| 14 | | at the moment.  Hopefully would be, the new budget would be a lot more |
| 15 | | accurate.  I think we need some time to see this program, the new feeding |
| 16 | | program that Dr. Cargisle has requested be implemented, go forward, and to show |
| 17 | | that the plan itself is more feasible and handle the matter thereafter.  I understand |
| 18 | | the Court has the current plan under advisement.  I also understand that the |
| 19 | | evidence on the interest rate and so forth.  But, the Court was exactly right, the |
| 20 | | issue is there needs to be more milk.  And what the new budget would do is |
| 21 | | provide that. |
| 22 | Judge: | We have three matters on the calendar this morning.  What I'm looking for is |
| 23 | | guidance from the parties as to what you would look to the Court to do this |

2

| | | |
|---|---|---|
| 1 | | morning, Mr. Clark. I appreciate all of this going on, frankly, I think it's just |
| 2 | | great news in many respects, commendable, but what is it you want me to do this |
| 3 | | morning? I'm prepared to do whatever we need to do. |
| 4 | Mr. Clark: | Well, I hate to withdraw the currently-proposed plan but I actually think that |
| 5 | | might be the smart thing to do under the circumstances if the Court would allow |
| 6 | | us to do such and file an amended disclosure statement with the new numbers and |
| 7 | | the modified plan toward the end of the month of September. With the |
| 8 | | implementation of the order that Mr. Prince or I will upload later today or |
| 9 | | tomorrow. |
| 10 | Judge: | The notion is then there would be, we would not proceed on the bank's motion for |
| 11 | | stay of relief and that there would be a stipulation concerning for the use of cash |
| 12 | | collateral? |
| 13 | Mr. Clark: | Correct, Your Honor. The documentation has actually been prepared. |
| 14 | Judge: | Thank you. Mr. Prince? |
| 15 | Mr. Prince: | Your Honor, I concur with Mr. Clark's comments. By way of further |
| 16 | | background, the bank put a may adequate protection payment, if you'll recall, that |
| 17 | | that was approved at the hearing. |
| 18 | Judge: | It was reduced, right? |
| 19 | Mr. Prince: | Well, the amount that was agreed to was the $21,000 but the bank unilaterally |
| 20 | | reduced it to the $16,000 in order to at least get a start on this new program. |
| 21 | Judge: | On the feed program. |
| 22 | Mr. Prince: | On the feed program. And then what occurred was is that the bank asked the |
| 23 | | debtor to prepare a budget based on its own analysis of what was needed for the |

3

| 1 | | new feed program.  That was done.  That was submitted to the bank.  The |
| 2 | | provided for no adequate protection payments to the bank for four months – June, |
| 3 | | July, August, September.  And, the bank agreed to that without changes in order |
| 4 | | to provide the debtor with what the debtor proceeds are the necessary funds to |
| 5 | | increase the quality of the feed, to increase milk production, and to increase the |
| 6 | | quality of the heard.  So, as a result of that, we then have negotiated, circulated to |
| 7 | | all parties here today, the proposed cash collateral order.  Admittingly being a bit |
| 8 | | presumptuous here, but we felt we needed to be proactive. |
| 9 | Judge: | Sure. |
| 10 | Mr. Prince: | And, we have approval of all of the parties to that cash collateral order and to that |
| 11 | | budget that is attached to the proposed cash collateral order.  As to the motion for |
| 12 | | relief from stay, we had agreed that that would just be continued on to the next |
| 13 | | time that we'd have our next hearing on our cash collateral order sometime in |
| 14 | | September, presumptively, and so that could just be trailing with it. |
| 15 | Judge: | Okay. |
| 16 | Mr. Prince: | And, again, all on the assumption that the Court was going to deny confirmation, |
| 17 | | but allow the debtors time in order to see if they can milk their way out of this. |
| 18 | Judge: | Alright.  Thank you, Mr. Prince.  Mr. Shirley, do you want to comment? |
| 19 | Mr. Shirley: | What's happened has been reflected accurately between, so far, so I don't need to |
| 20 | | make any comment. |
| 21 | Judge: | Your client's on board with that general approach? |
| 22 | Mr. Shirley: | It is. |
| 23 | Judge: | Thank you.  Ms. Kimmel, US Trustee's, comments? |

4

| | | |
|---|---|---|
| 1 | Ms. Kimmel: | Thank you, Your Honor.  We have seen the, we are in agreement with the |
| 2 | | approach that's being provided today, we have seen the cash collateral draft order |
| 3 | | and budget that's been presented and I think all parties have looked at it that are |
| 4 | | here today and on board and so giving the debtor more time to see if it can't reach |
| 5 | | its projections. |
| 6 | Judge: | Thanks very much.  I genuinely appreciate the insight.  I also want to know how |
| 7 | | much, I want you to know how much I would commend the parties for their |
| 8 | | efforts to privately get together and come to some resolution, it's so much better, |
| 9 | | you're so much better at it than the judge, as a spectator, is.  It just makes good |
| 10 | | sense.  And, it's always refreshing to inject a little good sense into a court |
| 11 | | proceeding I think, so.  I have about ten pages of detailed notes here I was going |
| 12 | | to refer to this morning in connection with my ruling on confirmation, I think it |
| 13 | | perhaps would be more constructive for me to simply make a few, terse summary |
| 14 | | comments.  And, I'll simply start out by saying that my approach with respect to |
| 15 | | confirmation of the debtor's existing plan is, as far as I can tell, wholly consistent |
| 16 | | with what the parties have been discussing, so.  For the record, concerning the |
| 17 | | Court's ruling on confirmation of the amended plan, I'm going to provide the |
| 18 | | following comments.  In summary, the Court would conclude that confirmation of |
| 19 | | that plan should be denied for just a couple of reasons I'm going to touch on.  I'm |
| 20 | | not going to attempt here to decide all the issues because I don't think that would |
| 21 | | be constructive at this point.  And, the Court would be inclined to allow the |
| 22 | | debtors, of course, an opportunity to file what I think would be a seconded |
| 23 | | amended plan, right, Mr. Clark? |

5

| 1 | Mr. Clark: | It would be, Your Honor. |
|---|---|---|

| 2 | Judge: | And an amended disclosure statement by a deadline with the understanding that |
|---|---|---|
| 3 | | the debtor would have one more chance to have a confirmable Chapter 11 plan. |
| 4 | | By the same token, the Court would want the debtors to have the best opportunity |
| 5 | | possible to get into a position to present a good plan.  Now, that's the executive |
| 6 | | summary.  The details, I'll simply tell you that based on the evidence and record |
| 7 | | on the hearing, the Court would find and conclude that the amended plan was |
| 8 | | problematic and the debtor had failed to prove that it should be confirmed under |
| 9 | | 1129(b) with respect to the following items:  (1) Mr. Clark, the Court would find |
| 10 | | and conclude that that amended plan, the treatment of the claims of Wells Fargo |
| 11 | | Bank and WFFL or, am I close on that Mr. Prince? |

| 12 | Mr. Prince: | Yes, it's Wells Fargo Financial Leasing. |
|---|---|---|

| 13 | Judge: | Thank you.  Wells Fargo and the other Wells Fargo Bank claim were |
|---|---|---|
| 14 | | impermissible and violated the terms of the Code.  I don't think the debtor can |
| 15 | | either directly or indirectly complete and combine the treatment of those two |
| 16 | | claims.  I think that any confirmable plan would have to recognize that those are |
| 17 | | both distinct, separate, legal creditor's claims and would have to proposed |
| 18 | | treatment for each of them.  I'm not saying that as a matter of law the treatment |
| 19 | | couldn't be the same, but what I am saying is he can't lump them together and |
| 20 | | effectively treat them as a package, even though as a practical matter that may |
| 21 | | become the nature of the parties' relationship in their historical practice.  We're |
| 22 | | talking here about the terms of the bankruptcy law, and the bankruptcy law |
| 23 | | requires that basically any secured claim be separately classified and treated.  So |

6

1     that was a problem, Mr. Clark, I'll also offer this in the way of a constructive

2     comment, the Court was not prepared to approve the proposed terms of treatment

3     of the claim of either secured creditor in this case.  The debtor, I think, is

4     compelled by the case law and 1129(b) to recognize that treatment under a

5     proposed Chapter 11 plan of a secured claim has to be fair and equitable and fair

6     and equitable has a component, I would suggest, requiring that that treatment be

7     similar, not identical but at least in line with general commercial practices.  In

8     other words, the Court was more specifically concerned here with taking what

9     were basically in some respects short-term operating loans and attempting to term

10    those out over extended periods of time.  The Court understood the debtors' plan

11    to be basically using, roughly, a twenty-year amortization and roughly then a ten-

12    year payout period.  With respect to the herd or term notes, I would suggest that

13    the debtor did not prove to me that that was in line with, anywhere close to

14    commercial practices such that that constituted fair or reasonable treatment.

15    Court understands that the Wells Fargo leasing claim is primarily a real estate

16    loan, however, and that that loan could be restructured over a longer term than say

17    a loan secured primarily by personal property and so, I'm not suggesting that that

18    would be impermissible in that case.  What I'm suggesting is, though, that you

19    have to tailor the treatment of the allowed secured claim to the nature of the debt

20    and the type of security and commercial reality.  I'll leave it at that.  No, I won't

21    leave it at that.  I'll also suggest that I heard unanimous agreement that dairy

22    farmers, I think I said this in another decision once, dairy farming, the

23    marketplace, predictably unpredictable, right?  You can, you can reliably predict

7

1    that things will be uncertain.  I'm not trying to be cute, I'm trying to actually state

2    the reality, and everyone here in this room knows it probably better than I do,

3    milk prices will go up, milk prices will go down.  Happy cows produce lots of

4    milk.  Cows who aren't 100% happy may not produce lots of milk, and there's

5    lots of reasons why cows aren't happy.  The bottom line is that when you toss in

6    things like the weather, the international market influences, the government, all of

7    those factors directly impact dairying, I think, to a larger extent, frankly, than a lot

8    of other agricultural businesses and make that a very, I think the word that

9    everyone used on the witness stand is very volatile, volatile, volatile, okay.

10    Because of that, Mr. Clark, I think any attempts to re-amortize significant secured

11    claims over significant periods of time using fixed interest rates is problematic.

12    It's problematic.  I think that imposes a high degree of risk on a lender.  When

13    you fix the interest rate, effectively, depending upon where you fix it, unless

14    you're willing to fix it really, really high, it means that you're asking the lender to

15    roll the dice that things will get better, not worse.  And, we all hope things do get

16    better, always.  Predictably, however, we can't say for sure, so that's a problem.

17    Finally, Mr. Clark, I don't know if you were here in Court earlier today; I'm

18    hoping that whatever plan that we hopefully get to confirm doesn't give rise to

19    issues concerning the continued effect of what are some fairly sophisticated loan

20    covenants in the bank's documentation.  In other words, and the problem I saw

21    with this plan is that this didn't really expressly address whether or not loan terms

22    would continue in effect or be modified.  I'm not saying which is appropriate, all

23    I'm saying is it's now an issue I think that with respect to cases like this that we

8

1   need to pay attention to.  So, perhaps the parties can make that part of their

2   discussion.  Now, the second big issue, the big white elephant in the room is

3   feasibility, right?  I want you to know that it's, I think, irrelevant to talk about

4   feasibility unless you know what the terms and conditions of the proposed plan

5   are.  And so, whatever I might say about feasibility of the last plan is based upon

6   the facts and circumstances that existed in the debtors' operation with respect to

7   that plan and those terms.  Having said that, I would find that, well I would

8   conclude that the Court is not persuaded that the debtors have shown by a

9   preponderance of the evidence that the proposed plan was feasible.  That simply

10  means that there were enough unanswered questions about that program.  About

11  that plan.  That the Court was not persuaded that it ought to sign off on that one.

12  Once again, that begs the question of whether or not the Court would find another

13  plan feasible because that would depend upon what the state of the debtors'

14  operation is at that time and what the new loan, or what the new plan terms are.

15  I'm going to make these observations to hopefully focus everyone and tell you

16  what I don't think some of the issues are, alright?  The Court listened to the

17  evidence and testimony carefully and would find and conclude as a matter of

18  contested fact that the debtors are good dairy farmers and that their herd is

19  generally of fair, excuse me, average to good condition, and that the debtors are

20  confidently and thoughtfully, I think, attempting to provide good care to their

21  animals.  They, maybe I'll approach it from this way and tell you that the Court

22  would decline to find and conclude that there is any, certainly any emergency

23  condition out there that the debtors' condition is in such poor shape that I would

9

1    worry about it going forward.  I'm not.  And, suggestions to the contrary I simply

2    decline to accept.  I was very impressed with the testimony of Dr. Cargilse.  He

3    seems to know a lot about dairy operations in general, but more importantly

4    seems to know a lot about this operation and he was, I thought, measured and

5    reasonable in his assessment of the condition of the operation.  Let's be clear – the

6    animals could use better, more feed.  The animals could be in better shape.  It's

7    not neglect, it's the financial reality of the operation that I think has, that has

8    prevailed and has resulted in any problems that might exist.  I find the debtors,

9    subject to those assumptions, subject to those understandings, I find the debtors'

10   production levels to be basically unremarkable.  I mean, to me they struck me as

11   neither low nor high.  They're in the ballpark of where you would expect them to

12   be, once again, based on the condition of the animals and the feed program.

13   Change the nature and composition of the herd, change the feed program, change

14   some of these conditions, then the milk output, that milk output would be poor.

15   By the same token, I would not think that if those changes were made that, you

16   know, I think everyone would reasonably expect, including Mr. and Mrs. Van

17   Straalen, to produce more milk.  Third issue on feasibility, I would say, prices,

18   well what can you say about prices other than they're better than they have been

19   in the past, and they're also worse than they have been in the past.  They are not at

20   such, I think, critically low levels as to jeopardize the feasibility of any dairy

21   operation.  I mean, we have gone through some times here in Idaho now that

22   we've decided to be a dairy state, we've gone through some crises where basically

23   all dairies were in jeopardy.  Prices have improved to the point where most dairies

10

1    are no longer in jeopardy other than ones with other serious financial problems or

2    other kinds of problems.  I would expect price then to be, of course, an important

3    factor, but I don't think the level of prices is going to be such that it would

4    persuade the Court to simply say I'm not going to confirm any dairy plan because

5    milk prices are just too low.  I think they will, they're workable.  You know,

6    having said that, a component of feasibility in a big dairy operation, I think, I'm

7    not going to say this is a matter of law, but certainly as a matter of fact in the 20

8    or 30 dairy cases I've heard in the last couple, three years, I think it certainly

9    counsels in favor of considering some sort of program to protect yourself from

10   significant variations in price.  I mean, if you want to call it contracts hedging,

11   whatever good or bad word you associate with all that, gambling, I mean,

12   whatever you want to say about that, opinions vary.  But, you know, a modest

13   program that addresses the fact that prices go up and prices go down is probably

14   prudent with respect to most significant dairy operations.  You know, dairymen

15   aren't a lot different in that respect than, for example, our spud farmers.  I mean,

16   sometimes they hit a homerun and sometimes they don't.  And, so, you know, our

17   spud folks, the most prudent, have at least a portion of the crop under contract.

18   And, that's the way they weather the bad years, and that's the way they have

19   something to regret in the good years is the fact that the, on the other hand,

20   they're always in, they continue in business, they don't fail.  So, I'll make those

21   comments about the feasibility of operations.  I'll make one additional comment.

22   The Court was generally impressed and has been generally impressed over the last

23   couple of years now with the insight and analysis provided by Mr. Plume.  Having

11

1          him on board, I think, is an asset.  I want everyone to understand, however, that

2          the Court considers Mr. Plume to primarily be a numbers guy.  I value his

3          analysis.  I don't think Mr. Plume is necessary a great source of expert opinion on

4          the fundamental facts that go into the analysis.  I rely more on other witnesses to

5          do that, including the operator.  Mr. Plume can take data and analyze it and put it

6          into a form that helps the Court understand will this operation cash flow or not,

7          but Mr. Plume, you know, he needs to be encouraged to make sure that he's not

8          offered an opportunity or express an opinion he's not qualified to give.  Mr.

9          Prince, was it Mr. Gomez?  Gomes?

10  Mr. Prince:    Gomes.

11  Judge:         Okay.  The Court was not inclined to rely upon much he gave me by the way of

12          testimony.  I'll simply leave it at that.  The Court would not assign a great deal of

13          weight to his insight here.  Now that doesn't mean that the bank shouldn't.  The

14          bank can do whatever it wants.  Okay.  I'm not ruling on the absolutely priority

15          issues.  I'm not ruling on anything to do with the relatively unique situation here

16          where the bank has stepped into the shoes of the other individual creditor, what is

17          it, Diane?

18  Male Speaker: Diane Van Straalen.

19  Judge:         Van Straalen.  That's a very interesting situation, but Mr. Clark, to the extent that

20          the bank has the legal right to assert that claim, and I haven't seen anything that

21          suggests to me that they don't have that right, that is I think probably puts you on

22          the horns of an absolute priority issue that we have to talk about in connection

23          with any future plans.  I'll let you simply explain all that to your client.  On the

12

1    other hand, the Court would point out that even this plan was accepted by the

2    unsecured collapse and that's a very positive factor in the opinion of the Court.

3    These debtors have been able to basically persuade all of their creditors save and

4    except for the Wells Fargo Bank contingent that they ought to be given a chance

5    to work out other problems.  That's important to the court.  Now, what they need

6    to, I think, is come up with a reasonable proposal for treatment of the Wells Fargo

7    Bank claims under a feasible plan in order to succeed.  In summary then, Court

8    finds and concludes that the plan cannot be confirmed and the Court will deny

9    confirmation.  Now, here's what I want to do.  Number one is I want to set a

10    deadline for the filing of a second amended plan.  Mr. Clark, fair warning.  One of

11    the things I think that rendered your clients' treatment of the Wells Fargo Bank

12    claims not fair and equitable is the last minute amendment to the plan.  The Court

13    is going to do discourage you to the extent that I can of any temptation that goes

14    along with filing last minute amendments to a Chapter 11 plan to deal with

15    objections.  Now, if it's a consensual amendment, fine.  If it doesn't affect anyone

16    else, fine.  But, my problem is is a Chapter 11 plan is a package.  We send the

17    package out and everybody votes on it.  The votes come in, we tally the votes, and

18    then we see where the problems are.  So, debtor then comes in and makes

19    significant changes to the treatment of the most significant secured creditor,

20    number one it's not fair to that creditor, number two I worry about the potential

21    unfairness then of the process because effectively that's a different plan than

22    everyone voted on, so we want to set a deadline for the debtor filing amended

23    plan and I want it to be the plan that the debtors propose.  If there are tweaks and

13

| | | |
|---|---|---|
| 1 | | changes that you need to make by consent, I understand that, I'm not discouraging |
| 2 | | that.  What the Court would not be prepared to do is allow the debtor to make |
| 3 | | significant amendments to this plan after that deadline without the consent of the |
| 4 | | affected parties.  So, what is the debtors' suggestion of an appropriate deadline |
| 5 | | based on your discussions with all the parties here? |
| 6 | Mr. Clark: | Late September, Your Honor. |
| 7 | Judge: | Okay.  I'm going to go a step further, I'm not only going to set that deadline, I'm |
| 8 | | also going to set a date for confirmation hearing on that.  So… |
| 9 | Clerk: | November 6th? |
| 10 | Judge: | 6 November. |
| 11 | Mr. Clark: | For the confirmation date? |
| 12 | Judge: | That's correct. |
| 13 | Mr. Clark: | Okay. |
| 14 | Judge: | So you'll need to set a deadline for filing your amended plan which is adequate |
| 15 | | then to give appropriate notice of that date and time for hearing on confirmation. |
| 16 | Mr. Clark: | Okay. |
| 17 | Judge: | Mr. Prince, do you and your clients have a date in mind because, of course, that |
| 18 | | will impact cash collateral. |
| 19 | Mr. Prince: | No, Your Honor, we actually concur that it should be probably in September in |
| 20 | | order to provide sufficient time so we don't object to a September deadline. |
| 21 | Judge: | Mr. Shirley, would you like to be heard on that? |
| 22 | Mr. Shirley: | We all talked about that beforehand, Your Honor, we're all in agreement that |
| 23 | | that's probably the appropriate time. |

14

1    Judge:          And Ms. Kimmel?

2    Ms. Kimmel:  That should work, I'm just, do you think the disclosure statement will need to be

3                        set for hearing, or, because I'm backing up for the…

4    Judge:          I didn't bring my crystal ball out with me, Ms. Kimmel, so I'm having trouble

5                        answering that question, won't it depend on what's in the amended plan?

6    Ms. Kimmel:  It'll depend on what's in the amended plan or the disclosure statement because

7                        that would mean that…

8    Judge:          You know, frankly, my knee jerk reaction to that is, frankly, yes.

9    Mr. Clark:      I was assuming that, Your Honor.

10   Judge:          Okay.  You cannot get before the Court for approval on the disclosure statement if

11                       you're filing a plan in late September.

12   Mr. Clark:      What are the Court's disclosure statement dates?

13   Judge:          Let's set the deadline for filing the second amended plan and amended disclosure

14                       statement for Friday, August 30th.  I know that rushes you a little bit, but you

15                       need to be back for confirmation before the bad weather sets in.

16   Mr. Clark:      Makes sense.

17   Judge:          We'll tentatively set hearing on confirmation then for 6 November.  Is that

18                       morning or afternoon?

19   Clerk:           9 a.m.

20   Judge:          Put it on the calendar, please.

21   Mr. Clark:      Okay.  How about the disclosure statement hearing?

15

| 1 | Judge: | Well, I'm going to let you work on that.  The deadline for filing the plan and |
| 2 | | disclosure statement is 30 August.  You're going to need to coordinate the time |
| 3 | | for filing that and getting a disclosure statement approved. |
| 4 | Mr. Clark: | I'll get with your clerk and we'll work on a date for that, Your Honor. |
| 5 | Judge: | Yea.  Here's a thought.  I'll just throw this out there.  It's a deadline, Mr. Clark, |
| 6 | | and not everything in the world has to be done at the last minute.  So, if you |
| 7 | | know, you can buy yourself some additional time in terms of tweaking a |
| 8 | | disclosure statement, that sort of thing, it doesn't have to be a traumatic episode if |
| 9 | | you and your clients get around to filing the plan maybe a little earlier.  So. |
| 10 | Mr. Clark: | Well the only reason we were looking at a later date was to give us as much time |
| 11 | | to show the increased production as we could.  And that's what, frankly, all of us |
| 12 | | were talking about.  That was the rationale. |
| 13 | Judge: | Yea, I heard you. |
| 14 | Mr. Clark: | Okay. |
| 15 | Judge: | My rationale is to get the confirmation on the debtors' amended plan by no later |
| 16 | | than November. |
| 17 | Mr. Clark: | Okay. |
| 18 | Judge: | Okay? |
| 19 | Mr. Clark: | Point taken, Your Honor. |
| 20 | Judge: | Okay.  Okay.  That, I think, concludes my part of the hearing save and except for |
| 21 | | talking about the other pending matters.  I'll ask in connection with the Court's |
| 22 | | ruling denying confirmation of the plan, Mr. Clark, you need an order on that? |
| 23 | Mr. Clark: | I do not. |

16

| | | |
|---|---|---|
| 1 | Judge: | Mr. Prince? |
| 2 | Mr. Prince: | No, Your Honor. |
| 3 | Judge: | Mr. Shirley? |
| 4 | Mr. Shirley: | No. |
| 5 | Judge: | Ms. Kimmel? |
| 6 | Ms. Kimmel: | No. |
| 7 | Judge: | Okay, we'll rely upon the admitted entry then.  The Court has denied |
| 8 | | confirmation, authorized the debtor to file a second amended plan on or before |
| 9 | | August 30th and tentatively set hearing on confirmation on that amended plan for |
| 10 | | November 6th.  That's what the minutes will reflect.  Okay.  If the need should |
| 11 | | arise for a formal order later on, the parties can certainly request one.  Okay.  That |
| 12 | | leaves us with debt collateral and your stay relief motion.  Mr. Prince, do you |
| 13 | | want to tell me first where you'd like to be on that? |
| 14 | Mr. Prince: | Your Honor, on the stay relief motion, I would suggest that we continue, we |
| 15 | | would consent and waive the 30-day requirement and have that continued to |
| 16 | | November 6 because, frankly, the stay relief motion is a protective motion that if |
| 17 | | the Court denies confirmation it does not allow additional time that the state could |
| 18 | | be removed in order to exercise rights.  So we would suggest that that be |
| 19 | | continued to the 6th.  As to the cash collateral, since this proposed cash collateral |
| 20 | | order only runs through the 30th, we would suggest that there be at least set |
| 21 | | another cash collateral hearing in September. |
| 22 | Judge: | Okay.  Mr. Clark? |

17

| 1 | Mr. Clark: | I concur with that, Your Honor.  I don't know what the Court's hearing dates are, |
| 2 | | but that… |
| 3 | Judge: | We'll find you one. |
| 4 | Mr. Clark: | Okay. |
| 5 | Judge: | Mr. Shirley? |
| 6 | Mr. Shirley: | I agree. |
| 7 | Judge: | Ms. Kimmel? |
| 8 | Ms. Kimmel: | That's fine, Your Honor. |
| 9 | Judge: | So that parties have tentatively agreed to continued use of cash collateral through |
| 10 | | September.  The Court understands and that agreement for continued use of cash |
| 11 | | collateral will run through September 30th and we'll give you a date for |
| 12 | | additional continued hearing on use of cash collateral in late September whatever |
| 13 | | you have available Madam Clerk. |
| 14 | Clerk: | September 16th at 1:30. |
| 15 | Judge: | 1:30, very good.  Anyone like to veto the date, Mr. Prince? |
| 16 | Mr. Prince: | No, Your Honor. |
| 17 | Judge: | Mr. Shirley, Ms. Kimmel? |
| 18 | Ms. Kimmel: | No, Your Honor. |
| 19 | Judge: | I'll ask the parties to submit an order primary duty for that is on Mr. Clark |
| 20 | | although I understand it will be a joint drafting enterprise.  Signature approval by |
| 21 | | Mr. Clark, Mr. Prince, Mr. Shirley, and Ms. Kimmel.  Any other signatories on |
| 22 | | that? |
| 23 | Mr. Clark: | No, sir. |

18

| | | |
|---|---|---|
| 1 | Judge: | Okay. I want to say this. I applaud the bank's willingness to forego adequate |
| 2 | | protection payments. It was going to be part of my order this morning. The |
| 3 | | debtors should have an opportunity to use money instead of paying down debt to |
| 4 | | improve their operation and at the same time improve the bank's secured position. |
| 5 | | Having said that, I want it understood that any monies that would have been used |
| 6 | | to pay ad3euqate protection to Wells Fargo Bank, the Court would understand on |
| 7 | | this continued use of cash collateral order, have to be used to either basically |
| 8 | | improve the quality of the herd, that is, new animals, replacement animals, |
| 9 | | whatever, additional animals, which will of course be security for the bank's |
| 10 | | claim, right, and/or second, as a component of that, additional, high-quality feed |
| 11 | | for the animals consistent with what you're talking about. The debtors' budget |
| 12 | | depends upon more milk. They have more cows, better feed. Even then it might |
| 13 | | not work, but the point is we know it won't work with this herd and this feed |
| 14 | | program. I'll just provide those comments. You're way ahead of me in |
| 15 | | incorporating the details into the order. I appreciate that, Mr. Prince, and debtors |
| 16 | | will not be making adequate protection bank, is it just the Wells Fargo Bank? |
| 17 | Mr. Clark: | The budget was changed to have no payments to Wells Fargo Bank, there was |
| 18 | | never any payments to _____ as adequate protection. |
| 19 | Judge: | Okay. |
| 20 | Mr. Clark: | The budget was, the prior budget was changed because there was an assumption |
| 21 | | that there was going to be a plan confirmation and unsecured creditors would |
| 22 | | starting to be paid so that was changed to zero, there was an assumption that |
| 23 | | Evans Grain would start to get paid planned payments, that was changed to zero, I |

19

| 1 | | hope I haven't missed any but those assumptions were removed from this budget |
|---|---|---|
| 2 | | in order to provide additional funds. |
| 3 | Judge: | For what months? |
| 4 | Mr. Clark: | June, July, August, September. |
| 5 | Judge: | Thank you, that's what I wanted you to say. |
| 6 | Mr. Clark: | Yes. |
| 7 | Judge: | Thank you very much. |
| 8 | Mr. Clark: | And, in fact, the proposed order, following-up on your comments, Judge, |
| 9 | | expressly provides that the, what would have been paid to Wells Fargo as |
| 10 | | adequate protection are to be used for those purposes and upon request documents |
| 11 | | supporting that be provided to the parties. |
| 12 | Judge: | Okay.  Thank you. |
| 13 | Mr. Clark: | One question on the, the order will address the next hearing on cash collateral, do |
| 14 | | we need a separate order on the removal of stay or can we just have that as… |
| 15 | Judge: | No, we hadn't got to that, but that's fine, we'll deal with that now then.  You'd |
| 16 | | like your hearing on stay relief motion continued to the November 6th date, is that |
| 17 | | correct? |
| 18 | Mr. Prince: | That's correct, Your Honor. |
| 19 | Judge: | Would you contemplate that being a final hearing? |
| 20 | Mr. Prince: | I would think it would still be a preliminary hearing. |
| 21 | Judge: | Your call. |
| 22 | Mr. Prince: | Yea, I think it would still be a preliminary hearing. |
| 23 | Judge: | Okay.  Mr. Clark? |

20

1    Mr. Clark:        I'm good with that, Your Honor.

2    Judge:            On the stay relief motion, we'll continue the preliminary hearing until 6

3                      November at 9:00 a.m.  Mr. Shirley, any questions?

4    Mr. Shirley:      No, Your Honor.

5    Judge:            Ms. Kimmel?

6    Ms. Kimmel:  No, Your Honor.

7    Judge:            Okay.  I'm hoping the debtors are able to acquire some good animals.  Court

8                      happens to know you've got several neighbors that will be liquidating.  I don't

9                      know if that gives you any insight or not, but the bottom line is there are other

10                     dairy operations in the _____ Valley.  I'm sure Mr. Prince, Mr. Shirley are

11                     probably aware of, Ms. Kimmel, are aware of details, but the point is not

12                     everyone is going to make it.  And there are dairy herds that primarily lenders, I

13                     guess, will be required to dispose of and maybe the silver lining is it'll make the

14                     price of a good producing dairy cow a little more attainable by others so the assets

15                     can get put back into production.  I know the beef guys would prefer to see those

16                     cows milked than the other possibilities so, you know, that is over the years one

17                     of the truly, truly challenging things about agricultural reorganization is that you

18                     can't look at agriculture just I think as a generic segment of the economy.  There

19                     are, you know, folks are doing so differently depending upon what kind of

20                     agricultural enterprise they're in.  You talk about high feed prices and what a

21                     terrible impact that has on the dairies, well, the hay and feed producers are doing

22                     pretty good.  They would argue with you.  And, so, you know, it's hard to just say

21

1                          what's good for agriculture is good for all of agriculture.  Anything else that we

2                          can do today, Mr. Clark?

3     Mr. Clark:           I don't think so, Your Honor, I would like to thank the Court for its indulgence.

4     Judge:               Mr. Prince?

5     Mr. Prince:          Nothing further, Your Honor.

6     Judge:               Mr. Shirley?

7     Mr. Shirley:         No, Your Honor.

8     Judge:               Ms. Kimmel?

9     Ms. Kimmel:          No, Your Honor.

10    Judge:               Thank you.  Good luck to all involved; I look forward to hearing the terms of a

11                         consensual Chapter 11 plan have been negotiated.  We're in recess.

12    Clerk:               Please rise.

6238279_2

22