Robert J. Maynes, ISB No. 6905
**MAYNES TAGGART PLLC**
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email: mayneslaw@hotmail.com

*Debtor's counsel*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | Case No. 13-41437 JDP |
| WALKER LAND & CATTLE, LLC | Chapter 11 |
| Debtor. | |

THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION

Walker Land & Cattle, LLC, the Debtor, proposes the following *Third Amended Plan of Reorganization* ("Plan"). This Plan treats all of the assets of Walker Land & Cattle, LLC and proposes a resolution of the outstanding claims against it. Reference is made to the Second Amended Disclosure Statement ("Disclosure Statement"), distributed with this Plan, which contains a discussion of the Debtor's assets, its business troubles, liquidation alternatives, a summary and analysis of this Plan, and certain related matters. Debtor urges all holders of claims to read this Plan and the Disclosure Statement in their entirety before voting to accept or reject this Plan. It is important that you read this Plan carefully, and in conjunction with the Debtor's *Disclosure Statement* to evaluate the impact such Plan will have upon your claim or interest

**EXECUTIVE SUMMARY**

Under this Plan, all of its creditors will be paid in full over the term of the Plan, as follows:

1. The Debtor has agreements to sell $6,183,000.00 in real property upon confirmation of this Plan and pay during the first twelve months:
   o The amounts outlined in Sections 3.3.1 and 3.3.2 below to RaboAgrifinance, Inc.;
   o $1,126,744.19 to Wells Fargo Bank;
   o $692,669.00 to John Deere Credit;

- o $810,058.00 to General Unsecured Creditors (Class 51); and
- o Remaining balance retained to fund future plan payments to secured and unsecured creditors and as working capital. See Appendix F to the Disclosure Statement for additional details.

2. The Debtor will pay creditors through improved farm operations, *while reserving the right to obtain take out financing and prepay unsecured creditors*.

Farm operation improvements consist of:

- Expanded Joint Venture/Crop Share Agreement[1] with Foster Co.: Of the 1,354 acres being sold to Foster Co. as part of the sale of the Steel Farm, the Debtor will expand its Joint Venture/Crop Share, sharing/minimizing risks, lowering amortization costs for use of equipment, improving cash flow, and most importantly allow for improved crop rotation, yield and quality;

- Improved Crop Rotation: The Expanded Joint Venture allows for better ground for potato production. The joint venture allows for there to be two years of grain production followed by one year of potatoes, instead of one year of grain followed by potatoes, improving soil nutrient levels, yield and quality.

- New Management has
  - o Increased potato yield and quality;
  - o Decreased costs; and
  - o Increased acres farmed.

All of these measures will allow the Debtor to retire debt as follows:

1. First, secured creditors will be paid the full amount of their claims, plus interest, under the terms set forth in the Plan

2. Second, General Unsecured Creditors with allowed claims will receive payment in full, with interest post-confirmation at the Wall Street Journal prime rate (anticipated to be 3.25%) in equal installments over the next six years, *with the Debtor reserving the right to prepay these creditors as funds allow or with take out financing*.

3. Third, the related entities class (Class 52) holding unsecured claims and the equity interests (Class 53) shall not be paid until other classes of creditors are satisfied.

4. Fourth, the Debtor will seek take out financing in order to prepay debts.

Each of these components is discussed in greater detail elsewhere herein.

---

[1] See page 42 herein for additional details regarding the Joint Venture/Crop Share Agreement with Mr. Foster.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

**1.1 Scope of Definitions; Rules of Construction.**

Except as expressly provided or unless the context otherwise requires, capitalized terms used but not otherwise defined in this Plan shall have the meanings ascribed to them in this Article I. Any term used in this Plan that is not defined herein, but is defined in the Disclosure Statement, the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it therein. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine.

**1.2 Definitions.**

1.2.1    "Administrative Claim" means a claim for the cost or expense of administration of this Chapter 11 case, including any actual and necessary expense of preserving or liquidating the estate, any actual and necessary expense of operating the business of the Debtor, and all allowances approved by the Court in accordance with the Bankruptcy Code.

1.2.2    "Administrative Claims Bar Date" shall have the meaning given it in Article 14.1.1 of this Plan.

1.2.3    "Allowed Claim" means a claim or any portion thereof (a) that has been allowed by a Final Order of the Bankruptcy Court or (b) as to which, on or by the Effective Date, (i) no proof of claim has been filed with the Bankruptcy Court and (ii) the liquidated and non-contingent amount of which is scheduled, other than a claim that is scheduled at zero, in an unknown amount, or as disputed, or (c) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by this Plan, the Bankruptcy Code or by any order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled or withdrawn or has been denied by a Final Order, or (d) is reflected in a schedule of Allowed Claims, if any, filed from time to time with the Bankruptcy Court by the Debtor, or (e) that is expressly allowed in a liquidated amount in this Plan. An Allowed Claim (a) includes a Disputed Claim to the extent such Disputed Claim becomes allowed after the Effective Date; and (b) shall be net of any valid setoff exercised with respect to such claim under the provisions of the Bankruptcy Code and applicable law.  Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code, or in any order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under this Plan, include for prepetition claims, interest on such claim or claims accruing from or after the Petition Date.

1.2.4    "Avoidance Actions" means any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims existing or arising under Chapter 5 of the Bankruptcy

Code, including but not limited to state law remedies available pursuant to Section 544 of the Bankruptcy Code, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.2.5  "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§101-1532, as now in effect or hereafter amended, and as applicable to Debtor's Chapter 11 case.

1.2.6  "Bankruptcy Court" means the United States Bankruptcy Court for the District of Idaho or any other court with jurisdiction over Debtor's Chapter 11 case.

1.2.7  "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, as applicable to the Debtor's Chapter 11 case or proceedings therein, and the Local Rules of the Bankruptcy Court, all as now in effect or hereafter amended, and as applicable to Debtor's Chapter 11 case.

1.2.8  "Business Day" means any day on which commercial banks are open for business in Idaho Falls, Idaho, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)).

1.2.9  "Case Interest Rate" means the federal judgment rate described in 28 U.S.C. § 1961 in effect on the Petition Date through the Effective Date and subsequent to the Effective Date the Wall Street Journal prime rate in place on the Confirmation Date.

1.2.10  "Causes of Action" means, individually or collectively, any and all actions, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims held by Debtor as of the Effective Date, including but not limited to Avoidance Actions, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.2.11  "Class" means one of the classes of claims listed in Article II of this Plan.

1.2.12  "Confirmation" means entry by the Bankruptcy Court of the Confirmation Order.

1.2.13  "Confirmation Date" means the date of entry of the Confirmation Order on the docket maintained by the Clerk of the Bankruptcy Court with respect to this Chapter 11 case.

1.2.14  "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code, to consider confirmation of this Plan under

section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.2.15    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

1.2.16    "Debtor" means Walker Land & Cattle, LLC, including in its capacity as debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

1.2.17    *Reserved.*

1.2.22    "Disclosure Statement" means the disclosure statement that relates to this Plan, as approved by the Bankruptcy Court as containing adequate information pursuant to section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017, as such disclosure statement may be amended, modified or supplemented from time to time.

1.2.23    "Disputed Claim" means any claim against or Interest in Debtor or any portion thereof that is not an Allowed Claim or a disallowed claim, as the case may be.

1.2.24    "Distribution Date" means the date, occurring within one hundred twenty (120) days of the Effective Date or as soon as is practicable thereafter, on which the Debtor first makes distributions under this Plan.

1.2.25    "Effective Date" means the first Business Day following the entry of the Confirmation Order.

1.2.26    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

1.2.27    "General Unsecured Claim" means a pre-petition unsecured claim against Debtor that is not entitled to priority under section 507 of the Bankruptcy Code, including any claim for money borrowed or guaranteed, rejection of executory contracts, unsecured deficiency claims, and claims for indemnification, if any.

1.2.28    "Interest" means the legal, equitable, contractual and other rights of any holder of a stock interest, membership interest, partnership interest or other equity interest in a corporation, limited liability company, limited partnership, general partnership or other entity, whether or not transferable, and any option, warrant or right, contractual or otherwise, to purchase, sell, subscribe for or otherwise acquire or receive any such interest.

1.2.29  "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.2.30  "Other Priority Claim" means a claim entitled to priority under section 507(a) of the Bankruptcy Code other than a priority tax claim or an administrative claim.

1.2.31  "Person" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, trustee, United States Trustee, estate, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code), agency or political subdivision thereof or other entity.

1.2.32  "Petition Date" means November 15, 2013, the date on which Debtor filed its petition for reorganization relief commencing the Chapter 11 case.

1.2.33  "Plan" means this reorganization Plan proposed by Debtor, together with all exhibits hereto, as it may be further amended, modified or supplemented from time to time in accordance with section 1127 of the Bankruptcy Code, including Plan Supplements, if any.

1.2.34  "Plan Supplement" means the compilation of documents or forms of documents specified in this Plan, including any exhibits to this Plan not included herewith, that may be filed with the Bankruptcy Court on or before the date that is fourteen (14) days prior to the Confirmation Hearing.

1.2.35  "Post-Effective Date Assets" means all property of the kind defined in Section 541, as limited by all subsections of Section 541, of the Bankruptcy Code.

1.2.36  "Pro Rata" means, at any time, the proportion that the face amount of an Allowed Claim in a particular Class bears to the aggregate face amount of all claims (including Disputed Claims, but excluding disallowed claims) in that Class, unless this Plan provides otherwise.

1.2.37  "Professional Fee Claims" shall have the meaning given it in Article 14.1.1 of this Plan.

1.2.38  "Proponent" means Debtor.

1.2.39  "Protective Order" means that certain protections afforded to the estate's financial information and limitations on use pursuant to paragraph 5.d of the "Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection and Adequate Protection Liens" entered in this Chapter 11 case on or about April 28, 2014 as Docket No. 321.

1.2.40  "Reorganized Debtor" means Walker Land & Cattle, LLC after the Effective Date.

1.2.41  "Secured Claim" means a claim, other than a Setoff Claim, that is secured by a lien that is valid, perfected and enforceable, and not avoidable, on property in which Debtor

has an interest, or the proceeds of the sale of such property, to the extent of the value, as of the Petition Date, of such interest or lien as determined by a Final Order of the Bankruptcy Court under section 506 of the Bankruptcy Code or as otherwise agreed upon in writing by the Debtor and the holder of such claim.

1.2.42  "Setoff Claim" means a claim of holder that has a valid right of setoff with respect to such claim, which right is enforceable under section 553 of the Bankruptcy Code as by a Final Order or as otherwise agreed writing by the Debtor, to the extent of the amount subject to such right of setoff.

1.2.43  "Voting Deadline" means the date and time, as fixed by an order of the Bankruptcy Court and set forth in the Disclosure Statement, by which all Ballots to accept or reject this Plan must be received.

## 1.3  Rules of Interpretation.

In this Plan (a) any reference to a contract, instrument, release, indenture or other agreement or document as being in a particular form or on particular terms and conditions means the agreement or document substantially in that form or on those terms and conditions; (b) any reference to an existing document or exhibit means that document or exhibit as it may have been amended, modified or supplemented; (c) unless otherwise specified, all references to Sections, Articles, Schedules and Exhibits are references to Sections, Articles, Schedules and Exhibits of or to this Plan; (d) the words "herein" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (e) captions and headings to Articles and Sections are for convenience and ease of reference only and are not intended to be a part of or to impact interpretation of this Plan; and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

## 1.4  Computation of Time.

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II.
## CLASSIFICATION OF CLAIMS AND INTEREST

## 2.1  Introduction.

All claims, except administrative claims and priority tax claims, are placed in the Classes set forth below in accordance with section 1123(a)(1) of the Bankruptcy Code.  Administrative claims and priority tax claims, as described below, have not been classified and are not entitled to vote on this Plan.  A claim is placed in a particular Class only to the extent that the claim falls within the description of that Class, and is classified in other Classes to the extent that any portion of the claim or Interest falls within the description of such other Classes.  A claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to

the extent that such claim is an Allowed Claim in that Class and such claim has not been paid, released, waived or otherwise settled prior to the Effective Date.

All allowed claims and allowed interests have been placed in the following classes:

**2.2. Unclassified Claims (not entitled to vote on the Plan).**

2.2.1  Administrative Claims.

2.2.2  Priority Tax Claims.

**2.3  Unimpaired Class of Claims (deemed to have accepted the Plan).**

2.3.1 Class 1:  Other Priority Claims.

Class 1 consists of all Other Priority Claims against the Debtor, if any.  There are no unpaid Other Priority Claims (consisting in relevant part of prepetition wage claims).  Prepetition wage claims have been paid previously pursuant to Court authorization.

2.3.2 Class 2:  *Reserved.*

2.3.3 Class 3:  Secured Claim of CHS Capital, LLC for the post-petition, § 364 loan secured by a super priority lien on the 2014 crop, related proceeds and that certain 215.91 acres of real property as more particularly described and identified in Exhibit A to the Court's Order Granting Motion for Authority to Incur Secured Credit 11 USC § 364(c) and (d) (Dkt. No. 318).

**2.4  Impaired Classes of Claims (entitled to vote on the Plan).**

2.4.1   Class 4:  Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property owned by the Debtor as tenant-in-common with Sometimes A Great Notion Land & Cattle Company, an Idaho general partnership, such real property more particularly described in that certain Mortgage, Assignment of Rents and Security Agreement and recorded on December 14, 2012 as Instrument No. 1434270 in the official records of Bonneville County, Idaho, also known as Loan No. F105400.00 and filed in the above captioned case as Claim No. 60.

2.4.2   Class 5:  This class consists of the four (4) cross-collateralized Secured Claims of Rabo Agrifinance, Inc., Claim Nos. 61, 62, 63 and 64, more particularly described as follows:

2.4.2.1  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain *Idaho Mortgage, Security Agreement and Fixture Filing* and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the

official records of Fremont County, Idaho and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain *Modification Agreement* dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No.F412350.00 and filed in the above captioned case as Claim No. 61.

        2.4.2.2  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain Idaho Mortgage, Security Agreement and Fixture Filing and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F-412350.02 and filed in the above captioned case as Claim No. 62.

        2.4.2.3  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain Idaho Mortgage, Security Agreement and Fixture Filing and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F-412657.00 and filed in the above captioned case as Claim No. 63.

        2.4.2.4  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain Idaho Mortgage, Security Agreement and Fixture Filing and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F-412350.04 and filed in the above captioned case as Claim No. 64.

2.4.3   Class 6:  *Reserved.*
2.4.4   Class 7:  *Reserved.*
2.4.5   Class 8:  *Reserved.*

2.4.6   Class 9:  Secured Claim of Wells Fargo Bank, N.A. with respect to that certain personal property (including farm products, crops, accounts, equipment, tools, machinery, goods, irrigation equipment, furnishings, furniture, rolling stock, untitled vehicles, insurance proceeds) and real property as more particularly described in that certain Mortgage and Assignment of Rents and Leases and recorded on May 9, 2013 as Instrument No. 404998 in Jefferson County, Idaho, as Instrument No. 543751 in Fremont County, Idaho and as Instrument No. 1446008 in Bonneville County, Idaho, consisting of, and as more particularly described in Claim No. 56.

2.4.7   Class 10:  Secured Claim of The Bank of Commerce with respect to that certain real property more particularly described in that certain Real Estate Mortgage and recorded as Instrument No. 379240 in Jefferson County, Idaho as amended by that certain Agreement to Amend Terms recorded as Instrument No. 383822, consisting of Claim No. 44.

2.4.8   Class 11:  Secured Claim of the Estate of Von Walker, or successors in interest, if any, with respect to that certain real property commonly known as Osgood Farms 1 & 2, Hamer Tracts and Hamer Rail Siding, relating to that claim listed on p. 56 of Schedule D (Doc. 75).

2.4.9   Class 12:   Secured Claim of the Dorothy Walker Family Limited Partnership, or successors in interest, if any, with respect to that certain real property commonly known as Osgood Farms 1 & 2, Hamer Tracts and Hamer Rail Siding, relating to that claim listed on p. 56 of Schedule D (Doc. 75).

2.4.10  Class 13:  *Reserved.*

2.4.11  Class 14:  Secured Claim of U.S. Bank/Wells Fargo Home Mortgage with respect to that certain real property commonly known as 397 North 3400th East, Lewisville, ID, consisting of Claim No. 113.

2.4.12  Class 15:  Secured Claim of the Estate of Blair Walker with respect to that certain real property commonly known as 397 North 3400th East, Lewisville, ID, consisting of Claim No. 126 .

2.4.13  Class 16:  Secured Claim of the Bonneville County Treasurer with respect to the Debtor's real property located in Bonneville County, Idaho pursuant to applicable statutory liens, consisting of Claim No. 14.

2.4.14  Class 17:  Secured Claim of Fremont County Tax Collector with respect to the Debtor's real property located in Fremont County, Idaho pursuant to applicable statutory liens, consisting of Claim No. 48.

2.4.15 Class 18:   Secured Claim of AAAUrethane, Inc. with respect to that certain real property commonly known as the shop on the Arco Highway pursuant to Idaho Code 45-501 et seq., consisting of Claim No. 29.

2.4.16 Class 19:   Secured Claim of Farm Credit Services with respect to that certain Reinke 2060 Center Pivots Serial Numbers: 0408-40413-2060, 0408-40482-2060, 0408-40414-2060, 0408-01513-2060, 0408-01512-2060, 0408-01511-2060, 0408-01514-2060, 0408-01517-2060, 0408-01519-2060, 0408-01516-2060, 0408-01518-2060, consisting of Claim No. 38.

2.4.17 Class 20:   Secured Claim of Agricredit Acceptance, LLC with respect to that certain Logan 30" Pro Scoopers (2), Serial Nos. 12-1688 and 12-1689, consisting of Claim No. 1.

2.4.18 Class 21:   Secured Claim of CNH Capital with respect to that certain Great Plains Turbo Chisel TC5113, consisting of Claim No. 2.

2.4.19 Class 22:  Secured Claim of Toyota Motor Credit Corporation with respect to that certain 2008 Sequoia VIN ending in -022010, consisting of Claim No. 5.

2.4.20 Class 23:  Secured Claim of Toyota Motor Credit Corporation with respect to that certain 2013 Tundra VIN ending in -281537, consisting of Claim No. 6.

2.4.21 Class 24:   Secured Claim of Ally Financial with respect to that certain 2013 Jeep Grand Cherokee, VIN ending in -503133, consisting of Claim No. 11.

2.4.22 Class 25:   Secured Claim of Ally Financial with respect to that certain 2013 Chevy Silverado, VIN ending in -371873, consisting of Claim No. 12.

2.4.23 Class 26:   Secured Claim of Commercial Credit Group with respect to those certain 2011 STC Trailers (4), Serial Nos. ending in -168017, -168018, -168020, and -168021, consisting of Claim 35.

2.4.24 Class 27:  Secured Claim of Les Schwab Tire Center of Boise with respect to those certain goods identified in and consisting of Claim 50.

2.4.25 Class 28:  Secured Claim of John Deere Credit with respect to that certain JD GPS Guidance System and related components identified in and consisting of Claim 88.

2.4.26 Class 29:  Secured Claim of John Deere Credit with respect to that certain JD GPS Guidance System and related components identified in and consisting of Claim 89.

2.4.27 Class 30:  Secured Claim of John Deere Credit with respect to that certain JD Model 4940 self-propelled sprayer, 2012 JD Model 0907 StarFire 3000 receiver and JD Model 7310 StarFire 900 RTK radio identified in and consisting of Claim 90.

2.4.28  Class 31:  Secured Claim of John Deere Credit with respect to that certain JD Model 1890 No-Till Air Drill and JD Model 1910 Commodity Cart, consisting of Claim 91.

2.4.29  Class 32:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 220), consisting of Claim 92.

2.4.30  Class 33:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 221), consisting of Claim 93.

2.4.31  Class 34:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 218), consisting of Claim 94.

2.4.32  Class 35:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 225), consisting of Claim 95.

2.4.33  Class 36:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 229) and 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 243), consisting of Claim 96.

2.4.34  Class 37:  Secured Claim of John Deere Credit with respect to that certain 2011 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 232), consisting of Claim 97.

2.4.35  Class 38:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 240), consisting of Claim 98.

2.4.36  Class 39:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 233) and 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 227), consisting of Claim 99.

2.4.37  Class 40:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 242), consisting of Claim 100.

2.4.38  Class 41:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 238), consisting of Claim 101.

2.4.39  Class 42:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 241), consisting of Claim 102.

2.4.40  Class 43:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 239), consisting of Claim 103.

2.4.41 Class 44:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 231), consisting of Claim 104.

2.4.42 Class 45:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 212), consisting of Claim 105.

2.4.43 Class 46:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 237), consisting of Claim 106.

2.4.44 Class 47:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 213), consisting of Claim 107.

2.4.45 Class 48:  Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 258), consisting of Claim 108.

2.4.46 Class 49:  Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 256), consisting of Claim 109.

2.4.47 Class 50:  Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 257), consisting of Claim 110.

2.4.48 Class 51:  General Unsecured Claims.  Class 51 consists of all General Unsecured Claims that exist against the Debtor, excluding those claimants who constitute members of Class 52 (*Related Entities Class*).  Class 51 includes claims against the Debtor for, without limitation, monies borrowed, rejection of executory contracts and unexpired leases, unsecured deficiency claims if timely filed, and claims for indemnification, if any, but claims for indemnification or contribution are only included to the extent not included in any other class.

2.4.49 Class 52:  Classified Unsecured Claims (Related Entities Class).  Class 52 consists of unsecured claims that exist against the Debtor held by claims who are related business entities, meaning that there is either shared ownership, control or familial relationship among owners of the Debtor and the related business entities comprising this Class 52.  This class consists of undisputed Schedule F Claims held by Lorin Walker, O3Co., Dos Lagos, LLC, Roland L. and Dorothy Walker Family Trust, Taylor Crossing Communications, LLC, Walker Produce Co., We Fly, LLC, McNeil Development and Spinners of Idaho/Utah.

2.4.50 Class 53:  Equity Interest Holders (Pre- and post-petition).  Class 53 consists of all Equity Interests in the Debtor.

## ARTICLE III.
## TREATMENT OF CLAIMS AND INTERESTS

### 3.1 Unclassified Claims.

#### 3.1.1 Administrative Claims.

Each holder of an Allowed Claim that is an administrative claim shall receive from the Debtor, in full satisfaction, settlement, release, and discharge of and in exchange for such allowed administrative claim, cash equal to the unpaid portion of such allowed administrative claim on or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date that is five (5) Business Days after the date an administrative claim becomes an Allowed Claim, or (c) the date that is five (5) Business Days after the date an administrative claim becomes payable pursuant to any agreement between the Debtor and the holder of an administrative claim, except as otherwise provided for in the Plan, and subject to the requirements of Article 14.1.2 of the Plan for Professional Fee Claims and substantial contribution claims; *provided however*, that obligations incurred by the Debtor after the Confirmation Date, including Professional Fee Claims, shall not be subject to applications to the Bankruptcy Court and may be paid by the Debtor in the ordinary course of business and without further Bankruptcy Court approval.

#### 3.1.2 Priority Tax Claims

Each holder of an Allowed Claim that is a priority tax claim shall be paid in full in equal bi-annual installments due on the first of each January and July, beginning on July 1st following the Effective Date over a four (4) year term, with the remaining balance paid on or before November 15, 2018; *provided, however*, that the Debtor reserves the right to pay any allowed priority tax claim or any remaining balance of any allowed priority tax claim, in full at any time on or after the Distribution Date without premium or penalty; and *provided further*, that no holder of an allowed priority tax claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising after the Petition Date with respect to or in connection with such allowed priority tax claim.

### 3.2 Unimpaired Class of Claims.

#### 3.2.1 Class 1: Other Priority Claims.

On, or as soon as reasonably practicable after, the later of (i) the Effective Date or (ii) the date an Other Priority Claim becomes an Allowed Claim, each holder of an allowed Other Priority Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such allowed Other Priority Claim, as applicable, (a) cash in an amount equal to the unpaid portion of such allowed Other Priority Claim or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

#### 3.2.2 Class 2: *Reserved.*

#### 3.2.3 Class 3: Secured Claim of CHS Capital, LLC for the post-petition, § 364 loan secured by a super priority lien on the 2014 crop, related proceeds and that certain 215.91 acres of real property as more particularly described and identified in Exhibit A to the Court's Order Granting Motion for Authority to Incur Secured Credit 11 USC § 364(c) and (d) (Dkt. No.

318).

Members of this class shall be paid in full pursuant to the terms and conditions of the Agricultural Loan Agreement, Promissory Note, Agricultural Security Agreement and Deed of Trust attached as Exhibits "A", "B", "C" and "D" to the Supplement to Motion to Incur Secured Credit (Dkt. No. 282) and approved pursuant to the Court's Order Granting Motion for Authority to Incur Secured Credit 11 USC § 364(c) and (d) (Dkt. No. 318).

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.  Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

### 3.3  Impaired Class of Claims.

  3.3.1   Class 4:   This class consists of the Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property owned by the Debtor as tenant-in-common with Sometimes A Great Notion Land & Cattle Company ("SAGN"), an Idaho general partnership, such real property (the "SAGN Property") more particularly described in that certain Mortgage, Assignment of Rents and Security Agreement and recorded on December 14, 2012 as Instrument No. 1434270 in the official records of Bonneville County, Idaho, also known as Loan No. F105400.00 and filed in the above captioned case as Claim No. 60.

Claim No. 60 shall be allowed pursuant to this plan in the principal amount of $290,000.00, plus accrued post-petition interest and fees (including post-petition attorney's fees and cost) resulting in a total  loan balance of $334,166.72 as of March 31, 2015 (after the crediting of the November and December 2014 cash collateral payments on Claim No. 60 of $2,356.68 and the crediting of the January and February and March 2015 cash collateral payments on Claim No. 60 of $1,178.34 each month, which the Debtor is authorized and ordered to pay) , and is fully secured. Further, while the Debtor does not believe any such claims or causes of action exist, the Debtor, as of the Effective Date, shall be deemed to have released and discharged Rabo Agrifinance, Inc., its agents, attorneys, representatives, predecessors (including RaboBank, N.A.), successors and assigns (collectively, the "**Rabo Release Parties**") from any and all manner of actions, causes of action in law or in equity, suits, debts, liens, contracts, liabilities, claims, demands, damages, losses, fees, costs, or expenses, set offs, or claims for recoupment, of any nature whatsoever, known or unknown, fixed or contingent that the Debtor or its estate may have against the Rabo Release Parties, from the beginning of time to the Effective Date, based upon any claims, acts or omissions of the Rabo Release Parties relating to the loan that is the subject of Claim No. 60.  By no later than June 1, 2015,  Loan No. F105400.00 (Claim No. 60) shall be

reinstated with a payment by the Debtor to Rabo Agrifinance, Inc. of $44,166.72 as of March 31, 2015, plus any additional amounts to account for the additional accrual of post-petition interest on Claim No. 60 after March 31, 2015 until the payment date (after crediting any additional cash collateral payments made on Claim No. 60) along with any additional post-petition attorney's fees and costs incurred by Rabo Agrifinance, Inc. on Claim No. 60 after March 31, 2015 until the payment date, for a resulting balance as of the payment date of the principal balance of $290,000.00. Interest shall accrue on the unpaid balance at a non-default rate equal to the one-month LIBOR plus 3.000% per annum, adjusted on the first date of each month. Semi-annual payments consisting of a principal payment of $10,000.00 plus payment of all accrued and unpaid interest as of the date of such payment plus any unpaid attorney's fees and other costs incurred by Rabo Agrifinance, Inc. on the loan that is the subject of Claim No. 60 shall be made each January 1st and July 1st, starting on July 1, 2015, and continuing thereafter until July 1, 2027 (the existing maturity date under the Credit Agreement dated November 29, 2012) at which time, the remaining balance, if any, shall be paid in full. Except as set forth herein, all existing terms and conditions of the Credit Agreement dated November 29, 2012 and related loan and security documents for Loan No. F105400.00 shall remain in full force and effect.

As previously acknowledged by Rabo Agrifinance, Inc., "[A]s set forth in the Mortgage, the [SAGN] Property secures all of the Debtor's obligations related to Loan 4000 [Loan No. F105400.00], including unpaid principal, interest and advances. The [SAGN] Property does not, however, secure the Debtor's obligations to Rabo under the other four loans between the Debtor and Rabo." See *Rabo Agrifinance, Inc.'s Response to SAGN's Letter Objection, as Supplemented, to the Debtor's Motion to Assume the SAGN Lease* at Paragraph 9, filed on April 21, 2014 as Dkt. 312.

To the extent terms and conditions elsewhere herein contradict the terms stated in this Paragraph 3.3.1, if any, including, but not limited to the terms and conditions contained in Paragraphs 3.5, 5.3, 7.1, 7.2, 7.7, 8.1, the discharge provisions of 12.1, 12.5, 12.61, 14.12, 14.5 and 14.10, the terms and conditions contained in this Paragraph 3.3.1 shall control. Specifically, and without limiting the foregoing, notwithstanding the language contained in Paragraph 3.5, Rabo Agrifinance, Inc. as the holder of this Class 4 shall be allowed all of Rabo Agrifinance, Inc.'s post-petition attorneys' fees and costs incurred in connection with its Class 4 claim, which shall be paid pursuant to Class 4; and notwithstanding the language contained in Paragraphs 7.1 and 7.2, payments to Rabo Agrifinance, Inc. as the holder of this Class 4 shall be paid and allocated as required under the terms and conditions of the Credit Agreement and related loan and security documents for Loan No. F105400.00.

Rabo Agrifinance, Inc. as the holder of this Class 4 shall retain the lien securing the Class 4 claim with the current priority that now exists for such lien, subject to the Debtor's sale rights exercised consistent with Article 5.2.2 below, until the allowed secured claim in Class 4 has been paid in full as provided herein. Rabo Agrifinance, Inc. as holder of this Class 4 class shall accept the foregoing claim treatment in full satisfaction of the Class 4 claim and shall receive no further distributions under the Plan on account of Claim 60. Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops

grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by Rabo Agrifinance, Inc. as the holder of Class 4 without the need for any consent or subordination from Rabo Agrifinance, Inc.

      3.3.2   Class 5:  This class consists of the four (4) cross-collateralized Secured Claims of Rabo Agrifinance, Inc., Claim Nos. 61, 62, 63 and 64, more particularly described as follows:

      3.3.2.1  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain *Idaho Mortgage, Security Agreement and Fixture Filing* and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain *Modification Agreement* dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F412350.00 and filed in the above captioned case as Claim No. 61.

      3.3.2.2  The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain *Idaho Mortgage, Security Agreement and Fixture Filing* and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F412350.02 and filed in the above captioned case as Claim No. 62.

      3.3.2.3 The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain Idaho Mortgage, Security Agreement and Fixture Filing and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded on April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F-412657.00 and filed in the above captioned case as Claim No. 63.

3.3.2.4 The Secured Claim of Rabo Agrifinance, Inc. with respect to that certain real property and water rights and related fixtures and personal property more particularly described in that certain Idaho Mortgage, Security Agreement and Fixture Filing and recorded on April 24, 2006 as Instrument No. 1221458 in the official records of Bonneville County, Idaho, and recorded April 25, 2006 as Instrument No. 501878 in the official records of Fremont County, Idaho, and recorded on April 25, 2006 as Instrument No. 348052 in the official records of Jefferson County, Idaho, and in that certain Modification Agreement dated May 4, 2007 and recorded on May 15, 2007 as Instrument No. 1263101 in the official records of Bonneville County, Idaho, and as Microfilm No. 50987 in the official records of Fremont County, Idaho, and as Instrument No. 358462 in the official records of Jefferson County, Idaho, and all related loan documents and Uniform Commercial Code filings relating to Loan No. F-412350.04 and filed in the above captioned case as Claim No. 64.

Claim Nos. 61, 62, 63 & 64 shall be allowed in the combined amount of $11,461,081.93 (after the crediting of the November and December 2014 cash collateral payments on Claim Nos. 61, 62, 63 and 64 of $70,160.34, which the Debtor is authorized to pay) as of December 31, 2014, consisting of the combined principal of Claim Nos. 61, 62, 63 and 64 plus all accrued post-petition interest, fees and costs as of December 31, 2014 (including post-petition attorney's fees and cost), and each of the loans under Claim Nos. 61, 62, 63 and 64 are fully oversecured. To the extent that the payment from the sale of the Steel Farm as outlined below occurs later than December 31, 2014, in addition to the allowed amount of $11,461,081.93 as of December 31, 2014 as outlined above, there shall also be allowed for Claim Nos. 61, 62, 63 and 64 an amount equal to the post-petition interest at the default interest rate that is currently accruing on Claim Nos. 61, 62, 63 and 64 for the period of time from January 1, 2015 until the payment date (after crediting the court authorized cash collateral payments made after January 1, 2015 on Claim Nos. 61, 62, 63 and 64 of $35,080.17 each month, which the Debtor is authorized to pay), such additional amount to be allowed in order to account for the additional accrual of post-petition interest on Claim Nos. 61, 62, 63 and 64 after December 31, 2014, plus allowance for any additional post-petition attorney's fees and costs incurred by Rabo Agrifinance, Inc. in connection with Claim Nos. 61, 62, 63 and 64 from January 1, 2015 until the payment date. Further, while the Debtor does not believe any such claims or causes of action exist, the Debtor, as of the Effective Date, shall be deemed to have released and discharged the Rabo Release Parties from any and all manner of actions, causes of action in law or in equity, suits, debts, liens, contracts, liabilities, claims, demands, damages, losses, fees, costs, or expenses, set offs, or claims for recoupment, of any nature whatsoever, known or unknown, fixed or contingent that the Debtor or its estate may have against the Rabo Release Parties, from the beginning of time to the Effective Date, based upon any claims, acts or omissions of the Rabo Release Parties relating to the loans that are the subject of Claim Nos. 61, 62, 63 & 64. Rabo Agrifinance, Inc., as the holder of this Class 5 shall be paid as follows: All accrued interest and fees, in the amount of $1,511,081.93 as of December 31, 2014, plus the additional allowed amount to account for the additional accrual of post-petition interest on Claim Nos. 61, 62, 63 and 64 after December 31, 2014 (after crediting the court authorized cash collateral payments made after January 1, 2015 on Claim Nos. 61, 62, 63 and 64), plus any additional post-petition attorney's fees and costs incurred by Rabo Agrifinance, Inc. in connection with Claim Nos. 61, 62, 63 and 64 from January 1, 2015 until the payment date, shall be paid on the closing of the sale of the Steel Farm

described elsewhere herein, but in no event later than June 1, 2015, with such payment funded from the sale of the Steel Farm.  Further, from the sale of real property, there shall be a principal reduction payment in the amount of $548,309.08 ("Principal Reduction Payment").   The Principal Reduction Payment shall be paid on the closing of the sale of the Steel Farm described elsewhere herein, but in no event later than June 1, 2015.  Upon payment of all accrued interest and fees (including post-petition attorney's fees and costs as outlined above) and the Principal Reduction Payment, the four above described loans, consisting of Claim Nos. 61, 62, 63 and 64, shall be consolidated and merged into a single consolidated loan (the "Consolidated Loan"). The Consolidated Loan, consisting of a principal balance of $9,950,000.00 shall accrue simple interest at the non-default interest rate of 5.0% per annum on the unpaid principal balance of the Consolidated Loan from the date that the payments from the sale of the Steel Farm described above are made (which will result in the reduction of the principal balance to $9,950,000.00), through December 31, 2017. On January 1, 2018, on January 1, 2021, and on January 1, 2024, the non-default interest rate on the Consolidated Loan shall be reset (the "Reset Interest Rate") pursuant to the following formula: 4.05 percent (4.05% or 405 basis points) above the then applicable index rate on the December 1 date prior to each reset date (i.e., on December 1, 2017, on December 1, 2020, and on December 1, 2023) for the 3 Year Treasury Constant Maturity Rate (which is the index published by the Federal Reserve Board based on the average yield of a range of Treasury securities, all adjusted to the equivalent of a 3-year maturity). Payments on the Consolidated Loan shall be paid initially in semi-annual payments of $350,817.67 (consisting of principal and interest) due on the first day of each January and July, beginning on July 1, 2015, and continuing until the payment made on January 1, 2018. Payments on the Consolidated Loan from July 1, 2018 through January 1, 2021, shall be paid in semi-annual payments due on the first day of each January and July, beginning on July 1, 2018, and continuing until January 1, 2021, consisting of the amount needed to amortize the principal balance of the Consolidated Loan as of January 1, 2018 over 22 years (264 months) at the Reset Interest Rate that went into effect on January 1, 2018. Payments on the Consolidated Loan from July 1, 2021 through January 1, 2024, shall be paid in semi-annual payments due on the first day of each January and July, beginning on July 1, 2021, and continuing until January 1, 2024, consisting of the amount needed to amortize the principal balance of the Consolidated Loan as of January 1, 2021 over 19 years (228 months) at the Reset Interest Rate that went into effect on January 1, 2021. The payment on the Consolidated Loan that is due on July 1, 2024, shall be the amount needed to amortize the principal balance of the Consolidated Loan as of January 1, 2024 over 16 years (192 months) at the Reset Interest Rate that went into effect on January 1, 2024. The Maturity Date of the Consolidated Loan shall be January 1, 2025, at which time the remaining balance of the Consolidated Loan, including all accrued and unpaid interest, all unpaid principal, and all unpaid fees under the Consolidated Loan, shall be due and payable. The Debtor and all current co-obligors of the four described loans shall each execute and deliver all required loan and security documents for the Consolidated Loan to Rabo Agrifinance, Inc. (and all co-obligors will provide Rabo Agrifinance, Inc. with a release of claims similar in form and content to the release discussed above), and said loan and security documents for the Consolidated Loan shall contain all covenants, protections and default and enforcement provisions currently contained in the current loan and security documents, plus Rabo Agrifinance, Inc.'s additional customary loan provisions that are not contained within the current loan and security documents. Further, said loan and security documents for the Consolidated Loan shall contain the following additional covenants and protections for Rabo Agrifinance, Inc. (a) a Debt Service Coverage Ratio (DSCR)

during the life of the Consolidated Loan of at least 1.25:1.0 based on EBITDA measured at the end of each fiscal year, beginning with the 2015 fiscal year, (b) a Current Ratio of at least 1.0:1.0 for the life of the Consolidated Loan measured at the end of each fiscal year, beginning with the 2015 fiscal year, (c) there will be a prepayment fee in the amount of two percent (2.0%) of the amount of the prepaid principal for any prepayment of the Consolidated Loan (beyond the semi-annual payments outlined above) that is made prior to January 1, 2018, with no prepayment fee after January 1, 2018 (provided, that any refinancing of the Consolidated Loan, whether before or after January 1, 2018, will not result in the Debtor being required to also pay the prepetition prepayment fees for Claim Nos. 61, 62, 63 and 64 that are outlined in the proofs of claim for Claim Nos. 61, 62, 63 and 64), (d) a covenant that the Debtor will spend $800,000 on Cap Ex improvements on real estate that is part of Rabo Agrifinance's collateral for its Class 5 claims as contemplated in the Debtor's Plan projections, with the Debtor's failure to complete such Cap Ex improvements by May 1, 2016 to be an event of default under the Consolidated Loan, (e) a covenant that the Debtor will carry crop insurance on all of its eligible crops so long as the Consolidated Loan remains unpaid, with the Debtor's failure to carry crop insurance to be an event of default under the Consolidated Loan, and (f) a covenant that the Debtor will make all of its required Plan payments on all of the Secured Claims and on the Unsecured Claims of CPS, Western Mortgage and Rocky Mountain Power under this Plan on a timely basis, with the Debtor's failure to make any such Plan payments after a payment default by any such creditor has been declared by the end of the applicable cure period (if any) under this Plan to be an event of default under the Consolidated Loan. All computations of accrued interest on the Consolidated Loan shall be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed. Upon the occurrence of a default under the Consolidated Loan, the default interest rate for the Consolidated Loan shall be the then applicable non-default interest rate for the Consolidated Loan plus an additional increment of 10.00% per annum. The default interest rate shall begin to accrue as of the occurrence of the default under the Consolidated Loan and shall continue until (1) the date Rabo Agrifinance, Inc. notifies the Debtor and the co-obligors that the default has been waived by Rabo Agrifinance, Inc., or (2) that the default has (if applicable) been cured by the Debtor and the coobligors, or (3) until the Consolidated Loan is paid in full. The form and content of all additional loan and security documents to be executed for the Consolidated Loan shall be attached to and approved by the Order entered by the Bankruptcy Court which confirms this Plan.

During the term of the Consolidated Loan, the Debtor shall provide: (1) CPA reviewed financial statements for the Debtor within 90 days of the end of the fiscal year; (2) CPA reviewed financial statements for Walker Produce Co., Inc., within 90 days of the end of the fiscal year; (3) Tax returns for the individual owners of the Debtor within 30 days of filing; (4) CPA prepared balance sheet for the individual owners of the Debtor, within 90 days of the end of the fiscal year; (5) Internal financial statements for the Debtor within 60 days of the end of each quarter of the fiscal year, along with self-prepared quarterly personal financial statements from the individual owners of the Debtor within 30 days of the end of each calendar quarter; and (6) Internal financial statements for Walker Produce Co., Inc. within 60 days of the end of each quarter of the fiscal year.

To the extent terms and conditions elsewhere herein contradict the terms stated in this Paragraph 3.3.2, if any, including, but not limited to the terms and conditions contained in Paragraphs 3.5,

5.3, 7.1, 7.2, 7.7, 8.1, the discharge provisions of 12.1, 12.5, 12.61, 14.12, 14.5 and 14.10, the terms and conditions contained in this Paragraph 3.3.2 shall control. Specifically, and without limiting the foregoing, notwithstanding the language contained in Paragraph 3.5, Rabo Agrifinance, Inc. as the holder of this Class 5 shall be allowed all of Rabo Agrifinance, Inc.'s post-petition attorneys' fees and costs incurred in connection with its Class 5 claims, in addition to the allowance of the principal balance of the Consolidated Loan; and notwithstanding the language contained in Paragraphs 7.1 and 7.2, payments on the Consolidated Loan to Rabo Agrifinance, Inc. as the holder of this Class 5 shall be paid and allocated as required under the terms and conditions of the additional loan and security documents to be executed for the Consolidated Loan.

Rabo Agrifinance, Inc. as holder of this Class 5 shall retain the liens and security interests and the other default and enforcement provisions and rights securing these claims and the Consolidated Loan shall enjoy the same lien and security interest perfection and priority that now exists under the current Loan Documents and perfecting instruments for Claim Nos. 61, 62, 63 and 64, subject to the Debtor's sale rights exercised consistent with Article 5.2.2 below, until the allowed secured claims in this Class 5 have been paid as provided herein. Specifically, Rabo Agrifinance, Inc.'s Class 5 Secured Claims shall continue to have priority over the Class 9 Secured Claim of Wells Fargo Bank, N.A. (to the extent that Wells Fargo Bank, N.A. has a mortgage lien on any of the real property and other property interests securing Rabo Agrifinance, Inc.'s Class 5 Secured Claims) and priority over all other existing Secured Claims on such real property and other property interests (if any), notwithstanding the modification and consolidation of the loans and Secured Claims under Claim Nos. 61, 62, 63 and 64 pursuant to this Plan. As a condition to the closing of the sale of the Steel Farm, the Debtor must also arrange and pay for a modification endorsement to Rabo Agrifinance, Inc.'s existing title insurance policy that continues to insure the current priority of Rabo Agrifinance, Inc.'s Secured Claims as the loans under Claim Nos. 61, 62, 63 and 64 are being modified and consolidated into the Consolidated Loan. Rabo Agrifinance, Inc. as holder of this Class 5 shall accept the foregoing claim treatment in full satisfaction of the Class 5 claim(s) and shall receive no further distributions in connection with its Class 5 claims under the Plan. Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by Rabo Agrifinance, Inc. as the holder of this Class 5 without the need for any consent or subordination from Rabo Agrifinance, Inc.

      3.3.3   Class 6: *Reserved*.
      3.3.4   Class 7: *Reserved*.
      3.3.5   Class 8: *Reserved*.

      3.3.6   Class 9:  Secured Claim of Wells Fargo Bank, N.A. with respect to that certain personal property (including farm products, crops, accounts, equipment, tools, machinery, goods, irrigation equipment, furnishings, furniture, rolling stock, untitled vehicles, insurance proceeds) and real property as more particularly described in that certain Mortgage and Assignment of Rents and Leases and recorded on May 9, 2013 as Instrument No. 404998 in

Jefferson County, Idaho, as Instrument No. 543751 in Fremont County, Idaho and as Instrument No. 1446008 in Bonneville County, Idaho, consisting of, and as more particularly described in Claim No. 56.

Members of this class shall be paid in full, as follows:

First, from the land sales scheduled to close in January 2015, members of this class shall receive a payment in the amount of three hundred sixty-one thousand four hundred forty-five and twenty-seven one hundredths ($361,445.27) which shall be paid from closing. The remaining balance shall than be paid in semi-annual installments of $765,298.92, due January 1st and July 1st with the first semi-annual payment due on July 1st following the Effective Date for a term of seven (7) years with the remaining balance due and payable on or before July 1, 2021. Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan. Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

3.3.7   Class 10:   Secured Claim of The Bank of Commerce with respect to that certain real property more particularly described in that certain Real Estate Mortgage and recorded on August 31, 2009 as Instrument No. 379240 in Jefferson County, Idaho as amended by that certain Agreement to Amend Terms recorded on March 8, 2010 as Instrument No. 383822 in Jefferson County, Idaho, as security for Loan No. -4825, consisting of Claim No. 44.

Claim No. 44 shall be allowed pursuant to this plan in the amount of 494,762.35, inclusive of prepetition fees and interest, less post-petition adequate protection payments, if any, plus accruing post-petition interest and fees (including reasonably post-petition attorney's fees and costs).

Members of this class shall be paid in full as follows: First, upon closing of the sale of the Steel Farm, described elsewhere herein, a payment for accrued interest (calculated at 6% a.p.r.) in the amount of $29,402.39 shall be made. Thereafter semi-annual installments of $17,021.88 due on the first of each January and July, beginning on July 1st following the Effective Date, with the remaining balance paid on or before July 1, 2021. Interest shall accrue on the unpaid balance at a rate equal to the Wall Street Journal prime rate (currently 3.25%) plus 2.000% per annum, but during the term of this Plan, the applicable interest rate will not be more than 18.00% (as set forth in Loan No. -4825) or less than 6.00%, adjusted annually on March 5 of each year. Except for the terms specifically modified herein, the covenants and terms in the loan documents related to Loan No. -4825 remain in full force and effect.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan. Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

      3.3.8  Class 11:  Secured Claim of the Estate of Von Walker, or successors in interest, if any, with respect to that certain real property commonly known as Osgood Farms 1 & 2, Hamer Tracts and Hamer Rail Siding, relating to that claim listed on p. 56 of Schedule D (Doc. 75).

Members of this class shall defer payment until after other secured creditors have been paid in full.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.  Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

      3.3.9  Class 12:  Secured Claim of the Dorothy Walker Family Limited Partnership, or successors in interest, if any, with respect to that certain real property commonly known as Osgood Farms 1 & 2, Hamer Tracts and Hamer Rail Siding, relating to that claim listed on p. 56 of Schedule D (Doc. 75).

Members of this class shall defer payment until after other secured creditors have been paid in full.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.  Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be

grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

    3.3.10  Class 13:  *Reserved*.

    3.3.11  Class 14:  Secured Claim of U.S. Bank/Wells Fargo Home Mortgage with respect to that certain real property commonly known as 397 North 3400th East, Lewisville, ID, consisting of Claim No. 113.

Members of this class shall be paid in full in equal monthly installments of $408.30 due on the first of each month, beginning on July 1st following the Effective Date over a thirty (30) year term, with the remaining balance paid on or before July 1, 2044.  Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.  Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year.  If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

    3.3.12  Class 15:  Contested Secured Claim of the Estate of Blair Walker with respect to that certain real property commonly known as 397 North 3400th East, Lewisville, ID, consisting of Claim No. 126.  The claim is based on an asserted interest in the equity in the real property, which was purchased and titled in the name of Blair Walker as the Debtor's manager and agent.  The Debtor has made all pre-petition mortgage payments; members of this class have no equitable interest in the property.  AN EFFECT OF CONFIRMATION SHALL BE THAT LEGAL TITLE TO 397 NORTH 3400TH EAST, LEWISVILLE, ID SHALL VEST IN THE DEBTOR, FREE AND CLEAR OF ANY INTEREST ASSERTED BY MEMBERS OF THIS CLASS.

    3.3.13  Class 16:  Secured Claim of the Bonneville County Treasurer with respect to the Debtor's real property located in Bonneville County, Idaho pursuant to applicable statutory liens, consisting of Claim No. 14.

Members of this class have been paid in full post-petition and shall receive no further payments on Claim No. 14 under this Plan.

    3.3.14  Class 17:  Secured Claim of Fremont County Tax Collector with respect to the Debtor's real property located in Fremont County, Idaho pursuant to applicable statutory liens, consisting of Claim No. 48.

Members of this class have been paid in full post-petition and shall receive no further payments on Claim No. 48 under this Plan.

       3.3.15 Class 18:  Secured Claim of AAAUrethane, Inc. with respect to that certain real property, commonly known as the shop on the Arco Highway, 14329 W. Arco Highway, Idaho Falls, ID 83402, pursuant to Idaho Code 45-501 et seq., consisting of Claim No. 29.

Members of this class have expressly agreed to waive treatment under this Plan as a secured creditor, including, but not limited to, a waiver of any right to attorney's fees pursuant to 11 U.S.C. § 506, and the right to post-petition interest. In lieu of treatment as a secured creditor, each member of this class shall release the lien securing the claim upon payment of its claim pursuant to § 3.1.1 Administrative Claims under this Plan.  AAAUrethane, Inc., shall be allowed an administrative claim under 11 U.S.C. § 503(b)(9) in the amount of $22,179.00, which shall be paid pursuant to Paragraph 3.1.1 Administrative Claims above.

       3.3.16 Class 19:  Secured Claim of Farm Credit Services with respect to those certain Reinke 2060 Center Pivots Serial Numbers: 0408-40413-2060, 0408-40482-2060, 0408-40414-2060, 0408-01513-2060, 0408-01512-2060, 0408-01511-2060, 0408-01514-2060, 0408-01517-2060, 0408-01519-2060, 0408-01516-2060, 0408-01518-2060, consisting of Claim No. 38.

Members of this class shall be paid in full in equal annual installments of $29,431.00 due on the first of each July, beginning on July 1st following the Effective Date over a seven (7) year term, with the remaining balance paid on or before July 1, 2021.  Simple interest shall accrue on the unpaid balance at the rate of 4.9% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.  Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year. If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to the lien held by members of this class without the need for any consent or subordination from members of this class.

       3.3.17 Class 20:  Secured Claim of Agricredit Acceptance, LLC with respect to those certain Logan 30" Pro Scoopers (2), Serial Nos. 12-1688 and 12-1689, consisting of Claim No. 1.

Members of this class shall be paid in full in equal annual installments of $4,189.00 due on the first of each July, beginning on July 1st following the Effective Date over a seven (7) year term,

with the remaining balance paid on or before July 1, 2021.  Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.18  Class 21:  Secured Claim of CNH Capital with respect to that certain Great Plains Turbo Chisel TC5113, consisting of Claim No. 2.

Members of this class shall be paid in full pursuant to the terms of that certain *Stipulation to Modify Debtor's Proposed Chapter 11 Plan of Reorganization and for Plan Treatment* filed on July 17, 2014, as Dkt. No. 415, which provides in relevant part:

Members of this class shall be paid in full in equal annual installments of $4,563.00 due on the first of each July, beginning on July 1st following the Effective Date over a five (5) year term, with the remaining balance paid on or before July 1, 2019.  Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.19  Class 22:  Secured Claim of Toyota Motor Credit Corporation with respect to that certain 2008 Sequoia VIN ending in -022010, consisting of Claim No. 5.

Members of this class shall be paid pursuant to the terms of the *Stipulation for Plan Treatment* filed on July 29, 2014, as Dkt. No. 429, which provides in relevant part that Claim No. 5 shall be paid in monthly installments in the amount of $180.00 per month, with payments continuing monthly on the 15th of each month until the balance owed is paid in full.  Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.20  Class 23:  Secured Claim of Toyota Motor Credit Corporation with respect to that certain 2013 Tundra VIN ending in -281537, consisting of Claim No. 6.

Members of this class shall be paid in full pursuant to the terms of the *Stipulation for Plan Treatment* filed on July 29, 2014, as Dkt. No. 429, which provides in relevant part that Claim No. 6 shall be paid in monthly installments of $237.00 on the 15th of each month until the

balance owed is paid in full. Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.21  Class 24:  Secured Claim of Ally Financial with respect to that certain 2013 Jeep Grand Cherokee, VIN ending in -503133, consisting of Claim No. 11.

Members of this class shall be paid in full pursuant to the terms of the *Stipulation for Adequate Protection Payments and Plan Treatment* filed on August 29, 2014, as Dkt. No. 459, which provides in relevant part that Claim No. 11 shall be paid $8,321.18 in 48 monthly installments of $187.85 until Claim No. 11 is paid in full.  The monthly adequate protection payments paid prior to confirmation shall be applied to principal and interest to reduce both the amount owed on Claim No. 11 and the remaining monthly payments required under this Plan.  Simple interest shall accrue on the unpaid balance at the rate of 3.99% a.p.r.  The monthly installments due to members of this class shall be paid on before the 12th of each month.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.22  Class 25:  Secured Claim of Ally Financial with respect to that certain 2013 Chevy Silverado, VIN ending in -371873, consisting of Claim No. 12.

Members of this class shall be paid in full pursuant to the terms of the *Stipulation for Adequate Protection Payments and Plan Treatment* filed on August 29, 2014, as Dkt. No. 460, which provides in relevant part that Claim No. 12 shall be paid $10,455.77 in 36 monthly installments of $312.19 until Claim No. 12 is paid in full.  The monthly adequate protection payments paid prior to confirmation shall be applied to principal and interest to reduce both the amount owed on Claim No. 12 and the remaining monthly payments required under this Plan.  Simple interest shall accrue on the unpaid balance at the rate of 4.9% a.p.r.  The monthly installments due to members of this class shall be paid on or before the 15th of each month.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.23  Class 26:  Secured Claim of Commercial Credit Group with respect to those certain 2011 STC Trailers (4), Serial Nos. ending in -168017, -168018, -168020, and -168021, consisting of Claim No. 35.

Members of this class shall be paid in full pursuant to the terms of the *Stipulation Regarding Use of Cash Collateral and Adequate Protection Between Commercial Credit Group, Inc. and the Debtor* (Dkt. No. 107) in equal monthly installments of $5,754.00 due on the 5th of each month until Claim No. 35 is paid in full. Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.24 Class 27: Secured Claim of Les Schwab Tire Center of Boise with respect to those certain goods identified in and consisting of Claim 50.

Members of this class shall be paid in full on or before July 1, 2015. Simple interest shall accrue on the unpaid balance at the rate of 5.0% a.p.r.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.25 Class 28: Secured Claim of John Deere Credit with respect to those certain JD GPS Guidance System and related components identified in and consisting of Claim 88.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436, which provides in relevant part that this Claim 88 will be paid in full on or before February 1, 2015, which at that time the estimated balance will be $8,035.08 (Contract No. ***96067).

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.26 Class 29: Secured Claim of John Deere Credit with respect to those certain JD GPS Guidance System and related components identified in and consisting of Claim 89.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436, which provides in relevant part that this Claim 89 will be paid in full on or before February 1, 2015, which at that time the estimated balance will be $12,965.41 (Contract No. ***54110).

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.27  Class 30:  Secured Claim of John Deere Credit with respect to that certain JD Model 4940 self-propelled sprayer, 2012 JD Model 0907 StarFire 3000 receiver and JD Model 7310 StarFire 900 RTK radio identified in and consisting of Claim 90.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.28  Class 31:  Secured Claim of John Deere Credit with respect to that certain JD Model 1890 No-Till Air Drill and JD Model 1910 Commodity Cart, consisting of Claim 91.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.29  Class 32:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 220), consisting of Claim 92.

Members of this class shall be paid pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall

accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.30  Class 33:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 221), consisting of Claim 93.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.31  Class 34:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 7215 (Debtor's Unit No. 218), consisting of Claim 94.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.32  Class 35:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 225), consisting of Claim 95.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.33  Class 36:  Secured Claim of John Deere Credit with respect to that certain

2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 229) and 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 243), consisting of Claim 96.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.34  Class 37:  Secured Claim of John Deere Credit with respect to that certain 2011 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 232), consisting of Claim 97.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.35  Class 38:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 240), consisting of Claim 98.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

3.3.36  Class 39:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 233) and 2012 JD Tractor Model 5075 (Utility Tractor) (Debtor's Unit No. 227), consisting of Claim 99.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

> 3.3.37  Class 40:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 242), consisting of Claim 100.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

> 3.3.38  Class 41:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 238), consisting of Claim 101.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein.  Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

> 3.3.39  Class 42:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 241), consisting of Claim 102.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.40  Class 43:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 239), consisting of Claim 103.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.41  Class 44:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8235 (Row Crop Tractor) (Debtor's Unit No. 231), consisting of Claim 104.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.42  Class 45:  Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 212), consisting of Claim 105.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. §*

*365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

   3.3.43 Class 46: Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 237), consisting of Claim 106.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

   3.3.44 Class 47: Secured Claim of John Deere Credit with respect to that certain 2012 JD Tractor Model 8360 (Track Tractor) (Debtor's Unit No. 213), consisting of Claim 107.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

   3.3.45 Class 48: Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 258), consisting of Claim 108.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan..

       3.3.46  Class 49:  Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 256), consisting of Claim 109.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.47  Class 50:  Secured Claim of John Deere Credit with respect to that certain 2013 JD Tractor Model 8360 (Row Crop Tractor) (Debtor's Unit No. 257), consisting of Claim 110.

Members of this class shall be paid in full pursuant to the terms and conditions of the *Stipulation for Treatment of Claims and Assumption and Rejection of Equipment Leases under 11 U.S.C. § 365(d)(2)* filed on July 31, 2014, as Dkt. No. 436. To the extent that the Stipulation filed as Dkt. No. 436 and this Plan contradict, the terms and conditions of the Stipulation filed as Dkt. No. 436 shall control.

Each secured creditor in this class shall retain the lien securing the claim, subject to Article 5.2.2, until the allowed secured claims have been paid as provided herein. Members of this class shall accept the foregoing claim treatment in full satisfaction of the claim(s) and shall receive no further distributions under the Plan.

       3.3.48  Class 51:  General Unsecured Claims.  Class 51 consists of all General Unsecured Claims that exist against the Debtor, excluding those claimants who constitute members of Class 52 (*Related Entities Class*).  Class 51 includes claims against the Debtor for, without limitation, monies borrowed, rejection of executory contracts and unexpired leases, unsecured deficiency claims if timely filed, and claims for indemnification, if any, but claims for indemnification or contribution are only included to the extent not included in any other class.

Members of this class shall be paid their respective pro rata shares of semi-annual installments of $810,058.45 due on the first of each January and July, beginning on July 1st following the Effective Date over a eight (8) year term, with the remaining balance, if any, paid in full on or

before July 1, 2022.

Claims included in this Class 51 shall accrue interest at the Case Interest Rate. Specifically, simple interest shall accrue on the unpaid balance at the federal judgment rate in effect on the Petition Date of 0.13% a.p.r. through the Effective Date. Subsequent to the Effective Date, simple interest shall accrue on the unpaid balance at a fixed rate from the Effective Date until paid in full. The post-Effective Date interest rate shall be fixed at the Wall Street Journal prime rate[2] in place on the Confirmation Date.

3.3.49  Class 52:  Classified Unsecured Claims (Related Entities Class). Class 52 consists of unsecured claims that exist against the Debtor held by claimants who are related business entities, meaning that there is either shared ownership, control or familial relationship among owners of the Debtor and the related business entities comprising this Class 52.

This class consists of undisputed Schedule F Claims held by Lorin Walker, O3Co., Dos Lagos, LLC, Roland L. and Dorothy Walker Family Trust, Taylor Crossing Communications, LLC, Walker Produce Co., We Fly, LLC, McNeil Development and Spinners of Idaho/Utah, in the following amounts:

| Creditor | Amount |
|---|---|
| Lorin Walker | 369.90 |
| 03Co. | 221,935.63 |
| Dos Lagos, LLC | 572.00 |
| Roland Dorothy Walker Fam Sp Trust | 116,633.77 |
| Roland Walker/Family Trust | 308,265.46 |
| Taylor Crossing Com., LLC | 5,004.90 |
| Walker Produce Co | 2,220,438.04 |
| We Fly, LLC | 552.50 |
| McNeil Development LLC | 29,608.58 |
| Spinners of Idaho/Utah | 2,184.32 |
| **Class 52 Total:** | **2,905,565.10** |

Members of this class shall be paid in full, first through application of all applicable set offs, and second, the remaining balances, in equal annual installments due on the first of each July, beginning on July 1, 2022 over a five (5) year term, with the remaining balance paid on or before July 1, 2026.

3.3.50  Class 53:  Equity Interest Holders (Pre- and post-petition). Class 53 consists of all Equity Interests in the Debtor. An effect of confirmation shall vest equity ownership in the Reorganized Debtor in the same persons and at the same percentages that existed pre-petition. Members of this Class 53 shall receive no distributions on account of their equity interests until creditors holding Allowed Claims have been paid in full.

---

[2] On the date of filing of this Second Amended Plan, the Wall Street Journal prime rate was 3.25% a.p.r.; however, the applicable rate shall be the Wall Street Journal prime rate at the time of confirmation.

### 3.4  Allowed Claims.

Notwithstanding any provision herein to the contrary, the Debtor shall make distributions only to holders of Allowed Claims.  No holder of a Disputed Claim shall receive any distribution on account thereof until and to the extent that its Disputed Claim becomes an Allowed Claim.  The presence of a Disputed Claim in any Class shall not be a cause to delay distribution to Allowed Claims in that Class.  Any holder of a Disputed Claim that becomes an Allowed Claim after the Distribution Date shall not receive its distribution, except as otherwise expressly provided in this Plan, and except as set forth in Article VIII of this Plan.

### 3.5  Accrual of Post-Petition Interest and Attorney's Fees.

In accordance with section 502(b)(2) of the Bankruptcy Code, the amount of all claims against the Debtor shall be calculated as of the Petition Date. Except as otherwise provided elsewhere in this Plan or in an order of the Bankruptcy Court, no holder of an Allowed Claim shall be entitled to the accrual of post-petition interest or the payment by Debtor of post-petition interest on account of such Allowed Claim for any purpose. Notwithstanding the foregoing, holders of Allowed Claims that are secured claims shall be entitled to post-petition interest to the extent provided for in Bankruptcy Code section 506(b) and reasonably attorney's fees pursuant to section 506(b) as allowed by the United States Bankruptcy Court.  Requests for reasonable attorney's fees by holders of Allowed Claims that are secured claims shall be made pursuant to the procedure and timeframe set forth in Paragraph 14.1.2 herein.

### ARTICLE IV.
### TREATMENT OF EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

### 4.1 Assumed Contracts and Leases.

Except as otherwise provided in this Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, as of the Effective Date, Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease was (i) previously expired, or terminated pursuant to its own terms, or (ii) rejected as a matter of law pursuant to 11 U.S.C. § 365, or (iii) is the subject of a motion to reject filed on or before the Confirmation Date; provided, however, that Debtor reserves the right, at any time prior to the Confirmation Date, to seek to reject any executory contract or unexpired lease to which a Debtor is a party. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the contract and lease rejections described elsewhere herein or as noted in the Disclosure Statement, as of the Effective Date.

Unless specifically rejected pursuant to the provisions of the preceding paragraph, the Debtor has or is assuming all prepetition executory contracts and unexpired leases, except as otherwise noted below:

| PARTY | PROPERTY | ASSUME/REJECT/MODIFICATIONS |
|---|---|---|
| Allan R. Shupe 2496 N. 2375 E. Hamer, ID 83425 | Hamer Farmland Lease Agreement | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Allan R. Shupe (Hamer) Lease, executed post-petition is assumed". |
| Allan R. Shupe 2496 N. 2375 E. Hamer, ID 83425 | Butikofer Farmland Lease Agreement | This lease has been rejected pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Allan R. Shupe (Butikofer) Lease, is REJECTED". |
| Alvin Sharp Alvin Sharp Estate c/o Claudia Pullman 3722 E. 400 N. Rigby, ID 83442 | 18 acres located in Jefferson County, Idaho. | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Alvin Sharp Lease and Assignment is assumed. |
| Kent Sperry Hatchett Ranch 46 N. 4600 E. Rigby, ID 83442-5840 | 214.2 Acres located in Bonneville County, Idaho. | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Kent Sperry dba Hatchett Ranch Lease is Assumed". |
| Kingston Properties 477 Shoup Ave., #207 Idaho Falls, ID 83402 | Potato Storage Leases  (2) Located in Idaho Falls, Idaho, | These leases have been assumed pursuant to the terms and conditions of the Order Granting Motion to Assume Potato Storage Leases (Dkt. No. 323) entered on April 28, 2014 that states in relevant part that "The two Commercial Agreements between the Debtor and the Kingston Properties, LLP, both dated July 16, 2013 for potato storage are assumed." |
| Heath Lewis Mike Telford 548 North | Feed Lot Lease Agreement | This lease is subject to anticipated litigation as noted elsewhere herein and assumed solely to preserve the right to |

| | | |
|---|---|---|
| Lewis Lane Rigby, ID 83442 | | pursue unpaid, pre- and post-petition rents. |
| Lyle Shupe 2296 E. 1950 N. Hamer, ID 83425 | 100 Acres | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Lyle/Karlene Shupe Lease, executed post-petition, is assumed". |
| Roger & Vicky Sauer 340 N. 3400 E. Lewisville, ID 83431 | 34.5 acres located in Jefferson County, Idaho. | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Roger and Vicky Sauer Lease and Assignment is assumed". |
| SAGN 115 North Morningside Idaho Falls, ID 83402 | 840 Acres | Assumed, with alleged defaults resolved pursuant to this Plan as set forth elsewhere herein, i.e. plan treatment regarding Rabo Agrifinance, Inc.. See Plan at Section 3.3.1, Class 4. |
| Vernon K. Smith Victoria Smith, P.R. 1900 Main Street Boise, ID 83702 | 1043 acres located in Jefferson County, Idaho. | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Estate of Vernon K. Smith Lease and Extension is assumed." |
| Waterstone 1070 Riverwalk Dr., Ste. 200 Idaho Falls, ID 83402 | 37.7 acres Bonneville County, Idaho. | Rejected as a matter of law under § 365(d). |
| Wright Brothers Attn: John H. Wright 1978 Sheridan Road Salt Lake | Crop share lease-882 acres Located in Bonneville County, Idaho. | This lease has been assumed pursuant to the terms and conditions of the Order (Dkt. No. 328) entered on April 29, 2014 that states in relevant part, "The Wright Brothers Company Lease, executed post-petition, is assumed." |

| City, UT 84108 | | |
|---|---|---|
| C&B Operations dba Bonneville County Implement and Deere Credit, Inc. | Executory contracts pertaining to the acquisition of 8 new lease tractors and proposed trade in tractors, consisting of the following:<br><br>1) WLC Unit No. 245 1L06330XJBP699303 and WLC Unit No. 265 1L06105RKDP766417, collectively comprising Purchase Order No. 02427999 and Proof of Claim 74;<br><br>2) WLC Unit No. 244 1L06330XJBP700028 and WLC Unit No. 266 1L06105REDP770851, collectively comprising Purchase Order No. 02441968 and Proof of Claim 81;<br><br>3) WLC Unit No. 228 RW8235R063349 and WLC Unit No. 268 1RW8235RCDD073267, collectively compromising Purchase Order No. 02427899 and Proof of Claim 75;<br><br>4) WLC Unit No. 224 RW8235R063386 and WLC Unit No. 269 1RW8235RCDD070457, collectively comprising Purchase Order No. 02427907 and Proof of Claim 76;<br><br>5) WLC Unit No. 230 RW8235R063506 and WLC Unit No. 270 1RW8235RCDD073141, collectively comprising Purchase Order No. 02427912 and Proof of Claim 78; | These contracts have been dealt with by the terms of the Order (Dkt. No. 513) entered on September 25, 2014 as follows:<br><br>A. Rejection of the 8 new tractor leases, with a withdrawal of the proofs of claims associated with the 8 leases, with an aggregate claimed value of $1,122,704.98 (Claims 74-81 filed by Deere Credit, Inc.), and a withdrawal of the proof of claim associated with the 8 trade-in tractors, with a claimed value of $1,129,020.00 (Claim 114 filed by C&B Operations)<br>B. Sale of the 8 trade-in tractors, with an estimated value of $1,197,000.00 back to C&B Operations free and clear of liens (as identified in the Stipulation for Settlement).<br>C. Lease back by the Debtor of (i) harvest tractors and (ii) lease with an option to purchase on 2 small loader tractors at competitive rental rates. |

| | | |
|---|---|---|
| | 6) WLC Unit No. 223 RW7215RACD008355 and WLC Unit 271 1RW7215RPDD012805, collectively comprising Purchase Order No. 02428059 and Proof of Claim 80;<br><br>7) WLC Unit No. 222 RW7215RVCD008046 and WLC Unit No. 272 1RW7215RTDD012785, collectively comprising Purchase Order No. 02427925 and Proof of Claim 77; and<br><br>8) WLC Unit No. 219 RW7215RCCD008068 and WLC Unit No. 273 1RW7200RLDD012717, collectively comprising Purchase Order No. 02428018 and Proof of Claim No. 79. | |
| CAC Recovery Services | Potash AntiTrust Litigation Services Agreement | Assume pursuant to the terms of this Plan. There are no defaults. |
| Farm Credit Services | 2007 Case 845 Road Grader | Assume. Debtor shall remain current with post-confirmation payments pursuant to the lease terms and pay a single lump sum cure payment of $56,952.10 within thirty (30) days of the Effective Date. |
| Foster Company Boyd & Laurie Foster P.O. Box 626 Ririe, ID 783443 | 2013 Joint Venture/Crop Share Agreement 490 Acres | Reject. Upon confirmation, replaced with new Joint Venture/Crop Share Agreement, attached hereto as Exhibit B. The amounts due and owing on the prepetition joint venture/crop share agreement shall be paid as a general unsecured claim under Class 51, as noted in Claim No. 65 in the amount of $33,474.49 filed by Vista Valley Ag, Inc. |
| Ideal Truck Leasing | Four Rental Agreements on Trucks | These four Rental Agreements have been assumed pursuant to the terms and |

| | | |
|---|---|---|
| | | conditions of the Order (Dkt. No. 333) entered on April 30, 2014 that states in relevant part, "The Rental Agreements are assumed and Debtor is authorized to pay the cure payments requested in the Motion to the extent such payments are provided for in its approved cash collateral budget". |
| McNeil Development 1070 Riverwalk Dr. #200 Idaho Falls, ID 83402 | Property Mgt Agreement (oral) | Assume pursuant to the terms of the Plan. |
| Steve Worthen Farms 2498 N 2375 E Hamer, ID 83425 | Contractor Services Agreement | Assume. Debtor shall remain current with post-confirmation payments pursuant to the contract terms and pay a single lump sum cure payment of $5,899.94 within thirty (30) days of the Effective Date. |
| Toyota Financial Services | Lease 2013 Toyota Tundra VIN – 287946 (Unit No. 15) | Assume. Pursuant to the terms and conditions of that certain Stipulation for Plan Treatment filed on July 29, 2014, as Dkt. No. 429. The Debtor shall make monthly payments in the amount of $271.00 on the 15th of each month until lease maturity. Lease maturity shall be extended an additional eight (8) months to October 16, 2015. |
| Toyota Financial Services | Lease 2013 Toyota Tundra VIN – 288989 (Unit No. 5) | Assume. Pursuant to the terms and conditions of that certain Stipulation for Plan Treatment filed on July 29, 2014, as Dkt. No. 429. The Debtor shall make monthly payments in the amount of $271.00 on the 15th of each month until lease maturity. Lease maturity shall be extended an additional eight (8) months to October 16, 2015. |
| John Deere Credit | Lease 2012 JD STS Combine S670-6088; 2012 Draper Platform 630D-5482, Proof of Claim No. 83 | Reject. This lease has been rejected pursuant to the terms and conditions of the Order (Dkt. No. 444) entered on August 7, 2014, wherein the Court |

| | | |
|---|---|---|
| | | approved the Stipulation for Rejection of Equipment Leases (Dkt. No. 436). Pursuant to the Stipulation (Dkt. No. 436), the parties expressly agree that the rejection damages for this lease would be capped at $73,260.00 and paid as a general unsecured claim pursuant to Class 51 as set forth hereinabove. |
| John Deere Credit | Lease 2012 JD STS Combine S670-6827; 2012 Draper Platform 630D-5419, Proof of Claim No. 84. | Reject. This lease has been rejected pursuant to the terms and conditions of the Order (Dkt. No. 444) entered on August 7, 2014, wherein the Court approved the Stipulation for Rejection of Equipment Leases (Dkt. No. 436). Pursuant to the Stipulation (Dkt. No. 436), the parties expressly agree that the rejection damages for this lease would be capped at $73,260.00 and paid as a general unsecured claim pursuant to Class 51 as set forth hereinabove. |
| John Deere Credit | Lease 2012 JD STS Combine S670-6971; 2012 Draper Platform 630D-5438, Proof of Claim No. 85. | Reject. This lease has been rejected pursuant to the terms and conditions of the Order (Dkt. No. 444) entered on August 7, 2014, wherein the Court approved the Stipulation for Rejection of Equipment Leases (Dkt. No. 436). Pursuant to the Stipulation (Dkt. No. 436), the parties expressly agree that the rejection damages for this lease would be capped at $73,260.00 and paid as a general unsecured claim pursuant to Class 51 as set forth hereinabove. |
| John Deere Credit | Lease 2012 JD STS Combine S670-5815; 2012 Draper Platform 630D-5422, Proof of Claim No. 86. | Reject. This lease has been rejected pursuant to the terms and conditions of the Order (Dkt. No. 444) entered on August 7, 2014, wherein the Court approved the Stipulation for Rejection of Equipment Leases (Dkt. No. 436). Pursuant to the Stipulation (Dkt. No. 436), the parties expressly agree that the rejection damages for this lease would be capped at $73,260.00 and paid as a general unsecured claim |

| | | pursuant to Class 51 as set forth hereinabove. |
|---|---|---|
| John Deere Credit | Lease JD Skid Steer Loader 320D-4431, Proof of Claim No. 87. | Assume. This lease is assumed pursuant to the terms and conditions set forth in the Stipulation filed July 31, 2014, as Dkt. No. 436, which provides in relevant part that the "the Debtor has paid the first lease payment and the second lease payment is due September 13, 2014, in the amount of $4,637.88. The third and final lease payment of $4,637.88 is due September 13, 2015. The lease will terminate on September 13, 2016, at which time the Debtor may exercise its purchase option and buy the leased equipment by paying Deere Credit the purchase option price of $16,454.60. If the purchase option price is not exercised by the Debtor, the leased equipment will be surrendered to Deere Credit pursuant to the terms of the Assumed Lease." |

**4.2 Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

If the rejection by Debtor, pursuant to this Plan or otherwise, of an executory contract or unexpired lease results in a claim for damages, then such claim shall be forever barred and shall not be enforceable against the bankruptcy estate, unless a proof of claim is filed with the clerk of the Bankruptcy Court and served on counsel for Debtor within the earlier of thirty (30) days after service of the earlier of (i) notice entry of the Confirmation Order or (ii) other notice that the executory contract or unexpired lease has been rejected.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 5.1 Cash Disbursements

5.1.1 Payment of Administrative Expenses and Professional Fees.

All Administrative Expenses and Professional Fees shall be paid, upon Court approval, pursuant to the terms and conditions contained in Articles 14.1.1 and 14.1.2.

5.1.2  First Annual Disbursement.

The first annual disbursement under this Plan shall be made on or before July 1, 2015 pursuant to the terms set forth elsewhere herein, excepting the payments made from closing of the real estate sales (anticipated in January 2015).  See Paragraph 5.2.2.3 below.

**5.2 Distributions from Business Operations**

      5.2.1  Plan Term.

For a period of eight (8) years from the Effective Date, the Debtor shall dedicate such portion of the distributions from business operations as is necessary to implement the Plan.

      5.2.2  Sales of Estate Assets.

          5.2.2.1 Crops: Provided the Debtor is current with its payment obligations to secured creditors with an interest in crops and crop proceeds under the terms of this Plan, as set forth elsewhere herein, Debtor is empowered and entitled to sell crops free and clear of liens, and use crop proceeds, throughout the Plan Term to make the payments required under this Plan and fund ongoing business operations.

          5.2.2.2 Titled Vehicles and Untitled Machinery & Equipment: The Debtor may sell free and clear of liens, at its sole and absolute discretion, titled vehicles, untitled machinery and equipment. The proceeds from such sale(s) shall be used to pay those secured creditors with valid liens and security interests in such vehicles, machinery or equipment, in order of their respective priority, unless otherwise agreed by each secured creditor with a valid lien in such vehicle, machinery or equipment being sold.

          5.2.2.3 Real Property:  After the Effective Date, provided the real property being sold is for the then-existing fair market value (meaning for the appraised value based on a market appraisal not more than 6 months old), the Debtor may sell real property free and clear of liens. The Debtor shall provide those secured creditors holding liens of record in such property with a copy of the signed purchase and sale agreement and an estimated HUD-1. Secured creditors holding liens of record in such property shall have ten (10) business days to object to such sale. Any objection shall be provided to the Debtor and its counsel of record within ten (10) business days of the Debtor's written notice of the sale. Failure to object in writing to the proposed sale within the ten (10) business days shall waive any objection to the proposed sale. The net proceeds of any such sales shall be used to pay those secured creditors with valid liens and security interests in such real property, in order of their respective priority, unless otherwise agreed by the secured creditor(s) with valid lien(s) in the property sold.

Confirmation of this Plan constitutes approval of the following sales of real property, free and clear of liens, and Rabo Agrifinance, Inc. shall be deemed to have consented to the following sale upon confirmation of this Plan:

<u>**Sale of The Steel Farm**</u>

1.    DESCRIPTION OF PROPERTY:    1,354 farmable acres commonly known as:

| Field/Description | Parcel Number | Parcel Description |
|---|---|---|
| Steel 01 | RP03N36E186001 | S1/2 SW1/4, SEC 18 T3N R36E |
| Steel 01 a | RP03N36E182401 (SEE STEEL 1) | |
| Steel 02 | RP03N36E182401 | NW1/4, N1/2 SW1/4, SEC 18 T3N R36E |
| Steel 03 | RP03N36E075401 | W1/2 SW1/4, SEC 7 T3N R36E |
| Steel 04 | RP03N36E075401 (SEE STEEL 03) | |
| Steel 07 | RP03N36E040002 | LOTS 1-2, S1/2 NE1/4, SE1/4, SEC 4, T3N R36E |
| Steel 08 | RP03N36E040002 (SEE STEEL 07) | |
| Steel 09 | RP03N36E030601 | LOT 2, S1/2 NE1/4, W1/2, SEC 3, T3N R36E |
| Steel 10 | RP03N36E030601 (SEE Steel 9) | |
| Steel 11 | RP03N36E100002 | E1/2 E1/2, SEC 10 T3N R36E |
| Steel 11 a | RP03N36E100601 & RP03N36E100002 | W1/2 NE1/4, SEC 10 T3N R36E |
| Steel 12 | RP03N36E107801 & RP03N36E100002 (SEE STEEL 11) | W1/2 SE 1/4, SEC 10 T3N R36E |
| Steel 13 | RP03N36E037801 | W1/2 SE1/4, SEC 3 T3N R36E |
| Steel 14 | RP03N36E030601 (SEE Steel 9) | |
| Steel 15 | RP03N36E030601 (SEE Steel 9) | |
| Steel Dry Corners | (SEE STEEL 7-10,13-15) | |
| Steel Handlines | (SEE STEEL 7-10,13-15) | |
| Steel Irr | (SEE STEEL 7-10,13-15) | |

2.      TYPE OF SALE: Private sale to Foster Co., an Idaho general partnership, P.O. Box 626, Ririe, Idaho 83443, consisting of Boyd S. and Laurie Foster as the general partners.

3.      TERMS OF SALE:  Cash at closing in the amount of $6,183,000.00.

4.      TIME AND PLACE OF SALE:
         a.      Date:  Upon confirmation.

         b.      Place:   Closing to be held at Alliance Title & Escrow Corp., upon Court approval.

5.      TREATMENT OF EXISTING LIENS:   Sale shall be free and  clear of liens, with all valid interests in the property to attach to the sale proceeds and subject to the terms and conditions of Debtor's Chapter 11 Plan of Reorganization upon confirmation. As noted in Appendix L to the Disclosure Statement, Rabo Agrifinance, Inc. holds the first lien holder position on the Steel Farm and Wells Fargo holds the second lien holder position. The Debtor believes there are no other liens, with the exception of 2014 property taxes which shall be paid at closing from the sales proceeds (with the 2014 property taxes to be prorated if the sale occurs in 2014), and with the exception of 2015 property taxes which shall also be paid at closing from the sales proceeds if the sale occurs in 2015 (with such property taxes to be prorated).

6.      VALUE OF PROPERTY BEING SOLD:  $6,183,000.00.

7.      AUTHORITY FOR CONDUCTING THE SALE:  11 U.S.C. §§ 363(f), 1123(a)(5)(D) and 1129(b)(2)(A).

8.      PURCHASER'S RELATIONSHIP TO THE DEBTOR:  Boyd Foster and the principals of the Debtor are second cousins.  Mr. Foster is also one of the principals of Vista Valley Ag, an unsecured creditor in the case.

9.      MISCELLANEOUS INFORMATION:

         a.      This sale will, upon Court approval (either of the sale or the Debtor's proposed plan) and closing, be effective immediately and the fourteen-day (14-day) stay imposed by Bankruptcy Rule 6004(h) and other rules shall be waived.

         b.      A copy of the Draft Real Estate Purchase and Sale Agreement is attached hereto as Exhibit "A".

         c.      **JOINT VENTURE/CROP SHARE:** In conjunction with approval of this Sale of the Steel Farm, confirmation of the Plan constitutes approval of the Joint Venture Agreement between the Debtor and Foster Company, an Idaho general partnership with respect to the Steel Farm. This Joint Venture provides, in relevant part, that the Debtor and Foster shall split the potato planting, growing, harvesting and storing costs 50-50. Management

of the potato cultivation shall be the Debtor's responsibility, but the parties shall jointly determine the marketing strategy for the potatoes, with either party able to determine what should be done with their ó of the potato crop. The parties shall split the net proceeds 50-50. Foster will provide the land, with a rental value of $300.00 an acre. 7 pivots are to be planted with potatoes, with actual acreage varying from year-to-year based on good farm management practices. This agreement is for 1-year beginning in January 2015, renewable automatically unless either party opts out 60 days prior to the end of the year.

The terms and conditions of the joint venture are contained in the Joint Venture Agreement attached hereto as Exhibit "B" and incorporated herein by this reference.

### 5.2.3   Joint Venture.

In conjunction with approval of this Sale of the Steel Farm, confirmation of the Plan constitutes approval of the Joint Venture Agreement between the Debtor and Foster Company, an Idaho general partnership with respect to the Steel Farm. This Joint Venture provides, in relevant part, that the Debtor and Foster shall split the potato planting, growing, harvesting and storing costs 50-50. Management of the potato cultivation shall be the Debtor's responsibility, but the parties shall jointly determine the marketing strategy for the potatoes, with either party able to determine what should be done with their ó of the potato crop. The parties shall split the net proceeds 50-50. Foster will provide the land, with a rental value of $300.00 an acre. 7 pivots are to be planted with potatoes, with actual acreage varying from year-to-year based on good farm management practices. This agreement is for 1-year beginning in January 2015, renewable automatically unless either party opts out 60 days prior to the end of the year. The terms.  and conditions of the joint venture/crop share are contained in the Joint Venture Agreement attached hereto as Exhibit B and incorporated herein by this reference.

### 5.2.4    Limitations and Prohibition on Related Party Transactions:

a.    During the Plan Term, the Debtor shall not loan any funds to any person, for so long as members of classes 1 through 51 remain unpaid under the Plan. The Debtor shall continue to sell its potatoes in the ordinary course of business to Walker Produce Co. Inc. or any other Related Parties, so long as Walker Produce Co. Inc. or any other Related Parties pay for such potatoes in the ordinary course of business.  "Related Parties" are defined as persons with either shared ownership, control or familial relationship with the equity interest holders of the Debtor.

b.    During the Plan Term, the Debtor may extend credit to Related Parties on an open account in the ordinary course of the Debtor's business for the sale of crops, subject to the provisions of Section 5.2.5 below.

### 5.2.5    Formation of Related Parties Receivables Collection Committee; Duties and Rights:   On, or within 21 days after the Effective Date, a Related Parties Receivables Collection Committee (the "Collection Committee") shall be formed consisting of the then

current membership of the pre-confirmation Unsecured Creditors Committee and two additional unsecured creditors consisting of Nature's Way, Inc. and Parkinson Seed Farm, Inc.

       a.     Assignment of Related Parties Receivables:

       i.     <u>Pre-petition Related Parties Receivables:</u>  Attached hereto as Exhibit "A" is a list of the pre-petition Related Parties Receivables, net of applicable set off amounts, owed to the Debtor as of the date noted on Exhibit "A", including both accounts and notes receivable (the amounts noted on Exhibit "A" are referred to collectively herein as the "pre-petition Related Parties Receivables"). The Debtor shall endeavor to collect the pre-petition Related Parties Receivables during the six (6) months following the Effective Date. With regards to the pre-petition Related Parties Receivables listed on Exhibit "A", if the Debtor is able to successfully collect fifty percent (50%) of the pre-petition Related Parties Receivables, on or before six (6) months from the Effective Date, then no pre-petition Related Parties Receivables shall be assigned to the Collection Committee and Debtor shall continue its collection efforts. The sums collected by the Debtor from the pre-petition Related Parties Receivables shall be paid to creditors pursuant to subparagraph iv, e (2) below. If the Debtor is unable to successfully collect fifty percent (50%) of the pre-petition Related Parties Receivables on or before six (60) months from the Effective Date, then the Debtor shall assign the remaining balance of all pre-petition Related Parties Receivables to the Collection Committee for collection pursuant to the terms and conditions of this modification.

       ii.     <u>Post-petition Related Parties Receivables:</u> Any post-petition credit extended to Related Parties on an open account for the sale of crops in the ordinary course of business that becomes fully mature and more than ninety (90) days past due, shall be transferred and assigned to the Collection Committee for collection pursuant to the terms and conditions of this modification.

       b.     The Collection Committee, and its members, shall have the following duties, and shall be entitled to the following rights:

       i.     <u>Retention of Professionals.</u>  If the Collection Committee is unable to reach reasonable payment arrangements with the Related Parties within ninety (90) days of the assignment of any account to the Collection Committee, the Collection Committee shall be entitled to retain professionals at reasonable market rates for Eastern Idaho to assist it in the performance of its collection duties and the enforcement of its rights, with reasonable fees and expenses of such professionals to be paid from the amounts collected.

       ii.     <u>Collection Committee Operating Procedures.</u>  The Collection Committee may adopt bylaws governing its operations, which may permit telephonic meetings, election of a chairperson, and proxy voting. Decisions of the Collection Committee shall be by majority vote. Any bylaws and minutes of Collection Committee meetings and decisions shall be maintained by the Collection Committee, or by its counsel, and shall be available for inspection by the Debtor, any creditor or other party in interest in the case during the Plan Terms, *excluding* (i) confidential communication between the Collection Committee and

its counsel, (ii) discussion of litigation strategy, and (iii) discussions involving matters designated by the Reorganized Debtor or the Court as confidential trade secrets.

                iii.    <u>No Compensation for Collection Committee Members.</u> Members of the Collection Committee shall serve without compensation.

                iv.    <u>Rights and Duties of Collection Committee.</u>   The Collection Committee shall:

                a)    Subject to the provisions of 5.2.5(a), endeavor to collect all pre-petition receivables of Related Parties (as itemized on Exhibit "A") that are fully mature and more than ninety (90) days past due, subject to all applicable rights of set off under 11 U.S.C. § 553.

                b)    Endeavor to collect all post-petition receivables for the sale of crops to Related Parties that are fully mature and more than ninety (90) days past due assigned to the Collection Committee.

                c)    Review and approve any proposed settlements of claims, including structured settlement or installment payment plans, and causes of action on all pre-petition receivables and post-petition receivables of Related Parties that are assigned to the Collection Committee.

                d)    Obtain financial information from the Reorganized Debtor as the Collection Committee shall in good faith reasonably request to ensure full and timely performance of its collection duties in this Section 5.2.5.

                e)    Pay, from the sums collected:

                (1) All reasonable costs of collection and reasonable attorney's fees; and

                (2) Distribute the net remaining balance collected between Class 51 and Class 9 with each class receiving 50% of the net remaining balance collected. Amounts collected shall be applied as a prepayment of the next payment(s) due under the Plan.

              c.    <u>Limitation on Liability of the Collection Committee, its members and its counsel.</u>  With the exception of gross negligence and willful misconduct, neither the Reorganized Debtor, any creditor of the Debtor or any third party shall have any claim against the Collection Committee, its members or its counsel.

              d.    <u>Limitation on Collection Committee Duties.</u>   The Collection Committee shall have no duty, power or responsibility to influence, advise, administer or supervise Reorganized Debtor, and, in particular, shall have no duty, power or responsibility to

affect the business and farm operations of the Reorganized Debtor, except as set forth hereinabove with regards to the Related Parties receivables.

> e.    Replacement of Collection Committee Members.  In the event a member of the Collection Committee resigns or is otherwise unable or unwilling to continue to serve as a committee member during the Plan Term the remaining members of the Collection Committee shall solicit a replacement member from those members of Class 51 holding allowed, undisputed claims willing to serve on the Collection Committee, considering the size of each member of Class 51's respective allowed, undisputed claim.

> f.    Termination of Collection Committee.  Upon entry of an order closing the case, the Collection Committee shall continue to exist until (1) completion of all payments to Class 51 required under the Plan; or (2) the Collection Committee determines, at its sole discretion, based on the Debtor's performance under the Plan or any other reason, that the Collection Committee is no longer needed.  In the event of either circumstance set forth in (1) or (2) above, the Collection Committee shall assign all pending collection accounts back to the Reorganized Debtor.  Upon completion of such assignment, the Collection Committee shall automatically be terminated, and its members and counsel shall be discharged of their duties.

### 5.3 Take Out Financing.

The Debtor will attempt to obtain take out financing to retire debts during the Plan Term.  The Debtor, at its discretion, may refinance all or part of any secured loan(s) and to the extent of any available equity, prepay other creditors, including the prepayment of unsecured creditors.  In the event Debtor obtains take out financing the Debtor will pay Class 9 (Wells Fargo) and Class 51 (General Unsecured Creditors).

### 5.4 Post-Effective Date Assets.

All Post-Effective Date Assets shall be retained by the Debtor except as set forth herein.

### 5.5 Exemption from Certain Transfer Taxes.

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer from Debtor to any other Person or entity pursuant to a sale or transfer authorized by this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.6 Transaction on Business Days.

If the date on which a transaction may occur under this Plan shall occur on a day that is not a

Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### 5.7 Implementation.

Pursuant to the Confirmation Order and upon Confirmation of this Plan, the Debtor shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of this Plan, in accordance with its terms. On or before the Effective Date, Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of this Plan and the other agreements referred to herein. Debtor shall execute such documents and take such other actions as necessary to effectuate the transactions provided for in this Plan, without the need for any additional approvals, lien releases, authorizations or consents.

### 5.8 The Protective Order.

The Protective Order shall continue to apply after the Confirmation Date and the Effective Date. Further, the Protective Order shall continue to apply to establish the rights and obligations of those persons referenced, expressly or impliedly, in the Protective Order.

## ARTICLE VI.
## ACCEPTANCE OR REJECTION OF THE PLAN

### 6.1 Classes Entitled to Vote.

Each impaired Class of claims under this Plan is entitled to vote to accept or reject this Plan.  By operation of law, each unimpaired Class of claims, if any, is deemed to have accepted this Plan and, therefore, is not entitled to vote.

### 6.2 Acceptance by Impaired Classes.

An impaired Class of claims shall have accepted this Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

### 6.3 Elimination of Classes.

Any Class that does not contain, as of the date of the commencement of the Confirmation Hearing, any Allowed Claims or Interests or any claims temporarily allowed for voting purposes under Fed. R. Bankr. P. 3018 shall be deemed to have been deleted from this Plan for purposes of (i) voting to accept or reject this Plan and (ii) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

### 6.4 Cramdown.

If, and to the extent, necessary to confirm this Plan notwithstanding the deemed rejection of this Plan by any Class, the Debtor shall request confirmation of this Plan, as it relates to such Classes and as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to modify this Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### 7.1 Time of Distribution for Claims.

The above referenced distributions shall be made within the forty-five (45) days of the payment due days designated herein.

### 7.2 Allocation of Consideration.

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class of claims under this Plan shall be treated first, as satisfying the stated principal amount of each holder's Allowed Claim and second, to the extent of any remaining consideration, as satisfying accrued but unpaid interest, if any.

### 7.3 Means of Cash Payment.

Cash payments under this Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Debtor, by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Debtor. Cash payments to foreign creditors, if any, may be made, at the option, and in the sole discretion, of the Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to this Plan in the form of checks issued by the Debtor shall be null and void if not cashed within one hundred twenty (120) days of the date of the issuance thereof.

### 7.4 Fractional Dollars; *De Minimis* Distributions.

Any other provision of this Plan notwithstanding, payments of fractions of dollars shall not be made. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. The Debtor shall not make any payment of less than $100.00 with respect to any claim unless a request therefore is made in writing to the Debtor.

### 7.5 Delivery of Distributions; Undeliverable or Unclaimed Distributions; No Requirement to Surrender Certificates.

Distributions to holders of Allowed Claims shall be made by the Debtor (i) at the holder's last known address, (ii) at the address in any written notice of address change delivered to the Debtor, or (iii) at the address shown in a duly filed Notice of Transfer under Bankruptcy Rule

3001.  If any holder's distribution is returned as undeliverable, is unclaimed or such holder fails to cash a check within ninety (90) days of its issuance, such distribution shall be deposited with the Bankruptcy Court as unclaimed funds.

### 7.6 Withholding and Reporting Requirements.

In connection with this Plan and all distributions hereunder, the Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements.

### 7.7 Set Offs.

The Debtor may, but shall not be required to, set off against any claim the payments or other distributions to be made pursuant to this Plan in respect of such claim, claims, or Causes of Action of any nature whatsoever that Debtor may have against the claim's holder; provided, however, that neither the failure to do so nor the allowance of any claim hereunder shall constitute a waiver or release by Debtor of a Cause of Action that Debtor may have against such holder.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING DISPUTED,**
**CONTINGENT, AND UNLIQUIDATED CLAIMS**

### 8.1 Objections to Claims; Disputed Claims

No later than as soon as practicable after the Effective Date, the Debtor shall file objections, if any, to proofs of claim with the Bankruptcy Court. Notwithstanding any provision of this Plan to the contrary, the Debtor shall have the right and standing to process and bring on for final hearing claims objections filed during the term of the Plan.

### 8.2 No Distribution Pending Allowance.

Notwithstanding any other provision hereof, if any portion of a claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such claim unless and until such Disputed Claim becomes an Allowed Claim.  Pending the Court determination on disallowance, the Debtor shall reserve any portion of plan distributions otherwise attributable to such disputed claim if it were allowed.   Within thirty (30) days after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, such formerly Disputed Claim will receive the portion of reserved plan payments held by the Debtor attributable to such claim.

### 8.3 Estimation of Claims; Distribution Reserve.

#### 8.3.1  Estimation of Claims.

Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether Debtor has previously objected to such claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any claim at any time during litigation concerning any objection to any claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated claim, that estimated amount will constitute either the allowed amount of such claim or a maximum limitation on such claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such claim, Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such claim.  All of the aforementioned claims and objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 8.4 Distribution After Allowance/Disallowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, all future distributions shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. Within thirty (30) days after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Debtor shall provide to the holder of such claim the future distributions to which such holder is entitled under this Plan.  To the extent that any Disputed Claim is ultimately disallowed the monies reserved by the Debtor pending final determination as to the allowance/disallowance of such disallowed claim shall be distributed as a part of the next annual disbursement required under this Plan.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 9.1 Conditions to Effective Date.

The following are conditions precedent to the occurrence of the Effective Date that must be satisfied:

9.1.1 The Confirmation Date shall have occurred and the Confirmation Order confirming this Plan, as the same may have been modified, supplemented or amended, shall have been entered by the Bankruptcy Court.

9.1.2  The Confirmation Order shall have become a Final Order.

## ARTICLE X.

## MODIFICATIONS AND AMENDMENTS

The Debtor may alter, amend or modify this Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended exhibits in this Plan or the Plan Supplement. After the Confirmation Date and prior to substantial consummation of this Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtor, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan so long as such proceedings do not materially adversely affect the treatment of holders of claims or Interests under this Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, Debtor's Chapter 11 case and this Plan to the fullest extent permitted by law, including, by way of illustration and not limitation, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity or amount of any claim or Interest, including, but not limited to, the resolution of any request for payment of any administrative claim, the resolution of any objections to the allowance or priority of claims, and the resolution of any adversary proceeding or contested matter to subordinate any claim or Interest under section 510 of the Bankruptcy Code or otherwise;

(b)     Hear and determine all applications for compensation and reimbursement of expenses of professionals under this Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(c)     Hear and determine all applications for compensation and reimbursement of expenses by the Debtor's professionals as described by this Plan.

(d)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any claims arising therefrom;

(e)     Effectuate performance of and payments under the provisions of this Plan;

(f)     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, Debtor's Chapter 11 case,

including, but not limited to, any Avoidance Actions;

(g)    Hear and determine any and all motions to subordinate claims or Interests at any time and on any basis permitted by applicable bankruptcy or non-bankruptcy law;

(h)    Enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(i)    Hear and determine disputes arising in connection with the interpretation, implementation, consummation or enforcement of this Plan, including disputes arising under agreements, documents or instruments executed in connection with this Plan;

(j)    Consider any modifications of this Plan, cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation, consummation or enforcement of this Plan or the Confirmation Order;

(l)    Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified or vacated;

(m)    Hear and determine any matters arising in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

(n)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtor's Chapter 11 case;

(o)    Recover all assets of Debtor and property of Debtor's estate, wherever located;

(p)    Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(q)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(r)    Enter a final decree closing Debtor's Chapter 11 case.

## ARTICLE XII.
## EFFECTS OF CONFIRMATION

### 12.1 Discharge.

The rights afforded in this Plan shall be in exchange for and in complete satisfaction and release of all claims and Interests of any nature against Debtor or Debtor's properties, both prior to, from and after, the commencement of this Chapter 11 case through the Confirmation Date; and, except as otherwise provided in this Plan, entry of the Order of Confirmation acts as a discharge effective as of the Effective Date of the Plan, of (i) any and all claims arising or occurring prior to the Effective Date, and (ii) any and all claims of the kind specified in §§ 502(g), 502(h), or 502(i) of the Code.  Such discharge will be effective under §1141 of the Code whether or not a Proof of Claim is filed or deemed filed, such claim is allowed, or the holder of such claim has accepted the Plan.  Further, confirmation of the plan terminates all rights and interests of pre-petition equity security holders as set forth in the Plan.

### 12.2 Binding Effect.

This Plan shall be binding on and inure to the benefit of Debtor, all current and former holders of claims against and Interests in Debtor and their respective successors and assigns, and all other parties-in-interest in Debtor's Chapter 11 case.

### 12.3 Authorization of Further Action.

The entry of the Confirmation Order shall constitute a direction to and authorization for the Debtor to take or cause to be taken any action necessary or appropriate to consummate the transactions contemplated by this Plan and any related documents or agreements prior to and through the Effective Date, and all such actions taken or caused to be taken in accordance with the provisions of this Plan shall be deemed to have been authorized and approved by the Bankruptcy Code without the need for any additional authorizations, approvals or consents.

### 12.4 Exculpation.

Debtor, and the agents, employees, attorneys, and accountants of the Debtor, each acting solely in their capacities as such, shall not be liable to any holder of a claim against the Debtor for any act or omission in connection with or arising out of the administration of this Chapter 11 Case, including, without limitation, the negotiation, preparation and pursuit of Confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan except in each case for liability based on willful misconduct or gross negligence as finally determined by the Bankruptcy Court. The Debtor and its agents, attorneys, and accountants each acting solely in their capacities, shall be entitled to rely, in every respect, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### 12.5 Injunction.

Except as otherwise expressly provided in this Plan, all holders of claims against or Interests in Debtor are permanently enjoined, from and after the Effective Date, from (1) commencing or continuing in any manner any action or other proceeding of any kind on any such claim against

or Interest in Debtor or against the property dealt with by this Plan, or Debtor's estate; (2) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the property dealt with by this Plan or Debtor's estate; and (3) creating, perfecting or enforcing any encumbrance or any kind against the property or interests in property of the Debtor's estate or property dealt with by this Plan. Further all creditors filing claims in this proceeding shall on the Effective Date of the Plan be required to dismiss Debtor from any action filed in any court.

**12.6 Releases.**

12.6.1 Nothing in this Plan shall release any Person (other than Debtor and the Debtor's estate as described in paragraph 12.4) from any claims, obligations, rights, Causes of Action, demands, suits, proceedings or liabilities based on any act or omission arising out of such Person's fraud, breach of fiduciary duty, malpractice, gross negligence or willful misconduct. The Debtor shall have the right to pursue such rights of action, including the rights under section 502(d) of the Bankruptcy Code as a defensive measure, including for purposes of setoff against distributions, if any, due to a holder of a claim or Interest pursuant to this Plan.

12.6.2 To the fullest extent permitted by applicable law, neither the Debtor, nor any of its attorneys, shall be liable or incur any liability to any holder of a claim against the Debtor for any act or omission in connection with, relating to, or arising out of, the Chapter 11 case, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the consummation of this Plan or the administration of this Plan except in each case for their fraud, breach of fiduciary duty, gross negligence or willful misconduct, and in all respects the Debtor shall be entitled to reasonably rely on the advice of counsel with respect to its duties and responsibilities under this Plan.

## ARTICLE XIII.
## COMPROMISES AND SETTLEMENTS

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), and except as provided by Article 5.1 and Article 5.2, the Debtor may compromise and settle various claims against claimants, creditors or other Persons, in accordance with the provisions of this Plan. Debtor expressly reserves the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle claims against it and claims that it may have against other Persons.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

**14.1 Bar Dates for Certain Claims.**

14.1.1 Administrative Claims.

The Confirmation Order shall establish the "Administrative Claims Bar Date" for filing

administrative claims (other than (i) claims previously allowed by the Bankruptcy Court, (ii) the claims of professionals employed in the cases ("Professional Fee Claims") and (iii) other claims for reimbursement), which date shall be thirty (30) days after the Confirmation Date. Holders of asserted administrative claims, except for Professional Fee Claims or United States Trustee fees, whose claims were not paid prior to the Confirmation Date, shall submit requests for payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of entry of the Confirmation Order to be delivered pursuant to Fed. R. Bankr. P. 3020(c) and 2002(f) shall set forth such date and constitute notice of the Administrative Claims Bar Date. The Debtor shall have sixty (60) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such administrative claims before a hearing for determination of allowance of such administrative claims.

14.1.2 Professional Fee Claims; Substantial Contribution.

All final requests for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered to Debtor prior to the Confirmation Date (including requests under section 503(b)(4) of the Bankruptcy Code by any professional or other entity for making a substantial contribution in Debtor's Chapter 11 case), and requests for attorney's fees pursuant to section 506 of the Bankruptcy Code, shall be filed and served on Debtor and his counsel, and the Office of the United States Trustee, as well as those parties filing notices of appearance in these cases or otherwise requesting notice of such application, no later than thirty (30) calendar days after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such professionals or other entities for compensation or reimbursement of expenses shall be filed and served on Debtor and its counsel, the Office of the United States Trustee, and the requesting professional or other entity within the time allotted by the Bankruptcy Rules.

**14.2 Payment of Statutory Fees.**

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

**14.3 Severability of Plan Provisions.**

If, prior to entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 14.4 Successors and Assigns.

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Person.

### 14.5 Term of Injunctions or Stays.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and in existence on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect during the term of the Plan. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 14.6 Revocation, Withdrawal or Non-Consummation.

Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other Plans of reorganization. If Debtor revokes or withdraws this Plan or if Confirmation does not occur, or if the Confirmation Order is vacated, then (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any claim or Interest or Class of claims or Interests), assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute a waiver or release of any claims by or against, or any Interests in, Debtor or any other Person; (b) prejudice in any manner the admission of any sort by Debtor or any other Person.

### 14.7 Plan Supplement.

Any and all exhibits, lists or schedules referred to herein but not filed with this Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least fourteen days prior to the date of the commencement of the Confirmation Hearing. Thereafter, any Person may examine the Plan Supplement in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of claims or Interests may obtain a copy of the Plan Supplement on written request to Debtor in accordance with Article 14.11 below and subject to the terms of the Protective Order.

### 14.9 Annual Crop Financing.

Nothing in this Plan shall prevent Debtor from obtaining secured crop financing which includes perfection of a super-priority lien by the crop lender on the crops growing or to be grown for a period not to exceed the beginning of the next crop year.  If Debtor exercises its right under this Plan to place a crop lien on the crops grown or to be grown during the Plan Term, such crop lien shall automatically be a superior lien to any and all liens held by secured creditors asserting liens

in crops, crop inventory and crop proceeds without the need for any consent or subordination from secured creditors.

### 14.10 Prepayment.

The Debtor shall have the right to prepay any or all of the claims hereinabove set forth, without penalty.  No notice of prepayment shall be required.  In the event Debtor prepays, or any other party pays, any secured claim, or any portion thereof, the remaining balance of such secured claim shall be re-amortized for the term specific to such secured claim and the annual payment amount adjusted accordingly.

### 14.11 Notices to Debtor.

Any notice, request or demand required or permitted to be made or provided to or on Debtor under this Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested; (b) hand delivery; (c) overnight delivery service; (d) first class mail; or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

|  |  |
|---|---|
| Debtor: | Walker Land & Cattle, LLC |
|  | Attn: Roland N. Walker, Manager |
|  | 1070 Riverwalk Drive, Suite 200 |
|  | Idaho Falls, ID 83402 |
|  |  |
| Attorney for Debtor | Robert J. Maynes |
|  | MAYNES TAGGART, PLLC |
|  | P.O. Box 3005 |
|  | Idaho Falls, ID  83403-3005 |

Or at such other address that Debtor may designate in writing in a Notice of Change of Address filed with the Court or served upon creditor(s).

### 14.12 Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the state of Idaho shall govern the construction and implementation of this Plan and any agreements, documents, and instruments reinstated or executed in connection with this Plan.

DATED:        February 20, 2015

WALKER LAND & CATTLE, LLC

By: _/s/ Rollie Walker_____
Its: Manager

MAYNES TAGGART, PLLC

By:__/s/ Robert J. Maynes_____
       Robert J. Maynes for the Firm

# EXHIBIT "A"

# EXHIBIT "A"

# EXHIBIT "A"

# REAL ESTATE PURCHASE AGREEMENT
(With Earnest Money Provision)

THIS CONTRACT CONTROLS THE TERMS OF SALE OF THE PROPERTY, READ CAREFULLY BEFORE SIGNING: IF ANY QUESTIONS, CONSULT YOUR ATTORNEY.

Dated: __July 22__, 20__14__

(Buyer): __Foster Co. a partnership; PO Box 626 Ririe ID 83443__
(hereinafter called "Buyer" agrees to purchase, and the undersigned agrees to sell the following described real estate hereinafter referred to as "premises" located in (City)_____in County of __Bonneville_____
State of __Idaho aaaaaaaaaa,__known as (Address):_____
Legally described as (legal description): __W¼ Sec 18, T3n, R36E; W½SW¼ Sec 7, T3N, R36E; S½NE¼ Sec 3, T3N, R36E__
_____
FULL AND COMPLETE LEGAL DESCRIPTION MUST BE INSERTED, ATTACHED OR WRITTEN ON THE REVERSE HEREOF PRIOR TO EXECUTION BY THE SELLER. Buyer hereby authorizes the correct legal description of the premises be added at a later date if unavailable at the time of signing, or to correct the legal description previously entered if erroneous or incomplete.

1. TOTAL PURCHASE PRICE IS __Six Million One Hundred Eighty Three Thousand__
   DOLLARS ($ __6,183,000.00__) payable as follows:
   A. EARNEST MONEY
   (a)    Buyer hereby deposits and a receipt is hereby acknowledged of __Five Thousand_____Dollars
          $(__5,000.00__) evidenced by: ☐ Cash, ☑ Personal Check, ☐ Cashier's Check, ☐ Note Due, or paid or delivered as
          earnest money in part payment of the purchase price for the premises.
   (b)    Earnest Money, to be deposed in trust account upon acceptance by all parties
   (c)    All Earnest Money shall be held by __Alliance Title & Escrow Corp__ for the benefit of the parties hereto.

   B. BALANCE of purchase price to be paid as follows: __Cash at Closing_____
   _____

2. Buyer's offer is made subject to the acceptance of Seller on or before __o'clock midnight_____.
   If Seller does not accept this agreement within the time specified, the entire Earnest Money shall be refunded to the buyer on demand.

3. Title of the Seller is to be conveyed by warranty deed, unless otherwise provided and is to be marketable and insurable except for rights reserved in federal patents, state or railroad deeds, building or use restrictions, building and zoning regulations and ordinances of any governmental unit, and rights of way and easements established or of record. Liens, encumbrances or defects to be discharged by Seller may be paid out of purchase money at date of closing. No liens, encumbrance or defects which are to be discharged or assumed by buyer or to which title is taken subject to exist, unless otherwise specified in this agreement.

4. The Seller shall, within a reasonable time after closing, furnish the buyer a title insurance policy in the amount of the purchase price of the premises from a title insurance company showing marketable and insurable title subject to the liens, encumbrances and defects elsewhere set out in the agreement to be discharged or assumed. Prior to closing the transaction, the Seller shall furnish the Buyer a preliminary report or commitment made by a title insurance company showing the condition of the title to said premises. The parties agree that __Alliance Title & Escrow Corp__ (Title Company) shall provide said title policy and preliminary report or title commitment. It is agreed that if the title to said premises is not marketable, or cannot be made so within thirty (30) days after notice containing a written statement of defects is delivered or mailed to the Seller, or if the Seller, having approved said sale failed to consummate the same as herein agreed, such failure can constitute a default and the Earnest Money shall be returned to the Buyer, and Seller shall pay for the cost of title insurance, escrow and legal fees, if any. Buyer's acceptance of the Earnest Money does not constitute a waiver of other remedies available.

5. It is hereby agreed that the "closing agent" for the agreement shall be __Alliance Title & Escrow Corp__. Where not otherwise provided by law, the parties shall each pay one-half of said closing agent's fees. The closing date shall be on or before _____

6. On or before closing date, Buyer and Seller shall deposit with the closing agent all funds and instruments necessary to complete the sale.

7. Seller shall deliver possession to buyer on or before_____, and taxes and water assessments (using the last available assessment as a basis), rents, and loans shall be prorated as of _____, except as follows: _____
   _____

8. The parties agree that this agreement contains the following additional terms and conditions: __1) This agreement is contingent upon Court approval, 2) This agreement is contingent on an option agreement that allows seller to re-purchase 50% of the land at a later date__

9. The following items of property, now on the premises, are specifically **excluded** from the sale: _____
   _____

10. All attached floor coverings, attached television antenna, attached plumbing, bathroom and lighting fixtures, window screens, screen doors, storm windows, storm doors, shades, venetian blinds, curtain rods, trees, plants, shrubbery, water heating apparatus and fixtures, attached fireplace equipment, awnings, cooling and heating systems including built-in dishwashers and drop-in ranges, (but excepting all other ranges), fuel tanks and irrigation fixtures and equipment, all water and water rights, and ditches and ditch rights appurtenant thereto that are now on or used in connection with the premises shall be included in the sale unless otherwise provided herein.

11. If financing is required, the Buyer agrees to make a best effort to procure same and further agrees to make application therefore within five (5) days after Seller's acceptance of the agreement. If VA, FHA, or II-IA financing is contemplated, additional provisions pertaining thereto may be attached hereto and are thereby incorporated herein by reference. The Buyer and Seller hereby authorize the parties designated in Paragraph

IA(c) hereof to advance such portion of the Earnest Money deposited as may be required to pay credit fees, appraisal and other initial loan charges attributable to Buyer's financing. The parties agree that the Earnest Money less such loan charges if any may be refunded in the event financing contemplated by the Buyer is not obtainable.

12. Subdivision Homeowner's Association: Buyer is aware that membership in a Home Owner's Association may be required and agrees to abide by the Articles of Incorporation, by-laws, rules, and regulations of the Association. Buyer is further aware that the property may be subject to assessments levied by the Association, described in full in the Declaration of Covenants, Conditions and Restrictions.
   ☐ Yes ☐ No ☑ N/A Association fees/dues are $_____ per _____
   ☐ Buyer ☐ Seller ☑ N/A to pay Homeowner's Association set up and/or property transfer fees $_____ at closing.

13. If Seller executes this agreement, and title to said premises is marketable and insurable and the Buyer neglects or refuses to comply with the terms or any conditions of sale within five (5) days from the date on which said term or condition is to be complied with, then the Earnest Money upon written request from the seller shall be forfeited and considered as liquidated damages to Seller, and Buyer's interest in the premises shall be immediately terminated. The holder of the Earnest Money as designated herein shall pay from said Earnest Money the costs of title insurance, escrow fees, attorney fees and any other expenses directly incurred in connection with this transaction. Such forfeiture and acceptance of payment by the holder of the earnest money does not constitute a waiver of other remedies available to Seller and earnest money holder.

14. In the event of default by either of the parties in their performance of the terms and conditions of their agreement, the defaulting party agrees to pay all attorney fees and costs incurred by the non-defaulting party.

15. The undersigned hereby acknowledge that he/she has not received or relied upon any statements or representations by **ALLIANCE TITLE & ESCROW CORP** or any **ALLIANCE TITLE & ESCROW CORP**. representative. This and any accompanying forms have been provided as an accommodation and without charge. **ALLIANCE TITLE & ESCROW CORP** makes no representation as to the content and sufficiency of the forms, nor has neither **ALLIANCE TITLE & ESCROW CORP** nor its employees given advice in connection therewith. **ALLIANCE TITLE & ESCROW CORP** has not suggested the forms are appropriate or adequate for the purpose for which they will be used. **ALLIANCE TITLE & ESCROW CORP** suggests and encourages parties to seek advice and assistance from real estate professionals, including Realtors and Attorneys when using these forms.

16. Unless expressly stated otherwise herein, this agreement is the final agreement and shall be binding upon the heirs, personal representatives, successors and assigns of the respective parties hereto.

17. Costs in addition to those listed below may be incurred by BUYER and SELLER unless otherwise agreed to herein, or provided by law or required by lender, to otherwise state herein. The below costs will be paid as indicated. Some costs are subject to loan program requirements. SELLER agrees to pay up to $ **0** lender required repair costs only. Upon closing, SELLER agrees to pay up to EITHER_____% (N/A if left blank) of the purchase price OR $_____(N/A if left blank) of lender approved BUYERS closing costs, lender fees and pre-paid costs which include but are not limited to those items in BUYERS columns as marked below.

| | BUYER | SELLER | Shared | N/A | | BUYER | SELLER | Shared | N/A |
|---|---|---|---|---|---|---|---|---|---|
| Appraisal Fee | ✔ | | | | Title Ins. – Standard Owner's Policy | | ✔ | | |
| Appraisal Re-Inspection | ✔ | | | | Title Ins. - Lender's Extended Policy | | | | ✔ |
| Closing Escrow Fee | | | ✔ | | Additional Title Coverage | | | | ✔ |
| Lender Doc Prep Fee | ✔ | | | | Fuel in Tank - Amount TBD by Supplier | | | | ✔ |
| Tax Service Fee | ✔ | | | | Well Inspection | | | | ✔ |
| Flood Cert Tracking Fee | ✔ | | | | Septic Inspection | | | | ✔ |
| Lender Req'd Inspection | ✔ | | | | Septic Plumbing | | | | ✔ |
| Attorney Preparation Fee | | | ✔ | | Survey | | | | ✔ |

18. OCCUPANCY: BUYER does ☐ or does not ☑ intend to occupy property as BUYER'S primary residence.

19. Notwithstanding any termination of this contract, BUYER and SELLER agree that in the event of any controversy regarding the Earnest Money held by the closing agency, unless mutual written instructions are received by the holder of the Earnest Money, closing agency shall not be required to take any action but may await any proceeding, or at the closing agency's option and sole discretion, may interplead all parties and deposit any monies or things of value in a court of competent jurisdiction and shall recover court costs and reasonable attorney's fees.

20. Time is of the essence of this agreement.

Buyer:_____  Address: **PO Box 626, Ririe ID 83443**

Buyer:_____  Phone: **208-538-5170**
                                 e-mail: vistavalleyag@gmail.com
I/we hereby approve and accept the sale set forth in the above agreement and agree to carry out all terms thereof on the part of the Seller. I\We further acknowledge receipt of a true copy of this agreement with the complete legal description of the premises inserted and signed by both parties.

Seller:_____  Date:_____  Phone:_____

Seller:_____  Date:_____  "g/o ckr"_____

DRAFT

# PROPERTY CONDITION DISCLOSURE FORM

Seller's name and address: **Walker Land & Cattle Co**

Section 55-2501, et seq., Idaho code requires sellers of residential real estate to complete a property condition disclosure form.

**PURPOSE OF STATEMENT:** This is a statement of the conditions and information concerning the property known by the seller. Unless otherwise advised, the seller does not possess any expertise in construction, architectural, engineering, or any other specific areas related to the construction or condition of the improvements on the property. Other than having lived at or owning the property, the seller possesses no greater knowledge than that which could be obtained upon a careful inspection of the property by the potential buyer. Unless otherwise advised, the seller has not conducted any inspection of generally inaccessible areas such as the foundation or roof. It is not a warranty of any kind by the seller or by any agent representing any seller in this transaction. It is not a substitute for any inspections. Purchaser is encouraged to obtain his/her own professional inspections. Notwithstanding that transfer of newly constructed residential real property that previously has not been inhabited is exempt from disclosure pursuant to section 55-2505 Idaho code, sellers of such newly constructed residential real property shall disclose information regarding annexation and city services in the form as prescribed in questions 1, 2, and 3.

1. Is the property located in an area of city impact, adjacent or contiguous to a city limits, and thus legally subject to annexation by the city?
☐ Yes ☑ No
2. Does the property, if not within city limits; receive any city services, thus making it legally subject to annexation by the city?
☐ Yes ☑ No
3. Does the property have a written consent to annex recorded in the county recorder's office, thus making it legally subject to annexation by the city? ☐ Yes ☑ No
4. All appliances and service systems included in the sale (such as refrigerator/freezer, range/oven, dishwasher, disposal, hood/fan, central vacuum, microwave oven, trash compactor, smoke detectors, TV antenna/dish, fireplace, wood stove, water heater, garage door opener, pool/hot tub, Etc.) are functioning properly? ☐ Yes ☐ No If no, please list and explain:
Property sold "AS IS"

5. Specify problems with the following:                Describe Problem.  If none put N/A
- Basement water:            N/A
- Foundation:            N/A
- Roof condition:    Age:    N/A
- Well (type):
- Septic system (type):            N/A
- Plumbing:            N/A
- Drainage:            N/A
- Electrical:            N/A
- Heating:            N/A

6. Describe any conditions that may affect your ability to clear title (such as encroachments, easements, zoning violations, lot line disputes, etc.):
N/A

7. Are you aware of any hazardous materials or pest infestations on the property? ☐ Yes ☑ No
If yes, please explain:

8. Have any substantial additions or alterations been made without a building permit? ☐ Yes ☑ No
If yes, please explain:

9. Are there any other problems, including legal, physical, or other not listed above that you know concerning the property? ☐ Yes ☑ No If yes, please explain:

The seller certifies that the information herein is true and correct to the best of seller's knowledge as of the date signed by the seller. The seller is familiar with the residential real property and each act performed in making a disclosure of an item of information is made and performed in good faith.

Seller: _____ Date: _____ Seller: _____ Date: _____

WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS STATEMENT.

Buyer: _____ Date: _____ Buyer: _____ Date: _____



**ALLIANCE**
TITLE & ESCROW CORP.
*Yes, it matters where you close.*

**ESCROW INSTRUCTIONS**
**DEPOSIT OF EARNEST MONEY**

Escrow # _____     Date: _____

Property Address: _____     City: _____     State: **Idaho**     ZIP: _____

The undersigned hereby hand you the sum of $ __5,000.00__ , which you are to deposit into your trust account and hold, pending further instructions to follow.

These funds are to be credited to the undersigned Buyer(s) as payment in part of the purchase price of the above referenced property and in accordance with the terms and conditions set forth in the Purchase Agreement or Escrow instructions existing between the undersigned parties.

The undersigned hereby acknowledge and understand that in the event of the cancellation of this escrow, all funds deposited, except loan funds, shall be held subject to cancellation instructions acceptable to and signed by both buyer(s) and seller(s).

The undersigned also acknowledge and understand that fees advanced, Title Commitment Cancellation fees, or Escrow Cancellation fees may be deducted from these sums held in just compensation for services rendered by Alliance Title & Escrow Corp. Commitment cancellation requires a minimum $100 fee, pursuant to State regulations.

All money received by you in this escrow is to be deposited in your trust account pending closing. Seller and/or Buyer hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Escrowholder has or may have other banking relationships and further consent to the retention by Alliance Title & Escrow Corp. and/or its affiliates of any and all benefits Escrowholder which may be received from such financial institutions by reason of their maintenance of such accounts. Unless otherwise specifically agreed, you may commingle funds received by you in escrow with escrow funds of others and may deposit such funds in a checking account with any federally insured bank. It is understood that you shall be under no obligation to invest funds deposited with you on behalf of any depositor, nor shall you be accountable to the depositor for any earnings or other incidental benefits attributable to the funds which may be received by you while you hold such funds.

Escrowholder shall not be responsible for the penalties, or loss of principal or interest or any delays in the withdrawal of funds which may be imposed by the depository as a result of making or redeeming of the investment pursuant to our instructions, nor shall Escrowholder be liable for any loss or impairment of funds while those funds are in the course of collection or are on deposit in a financial institution if such a loss or impairment results from the failure, insolvency or suspension of financial institution, including any loss resulting from FDIC/FSLIC imposed regulations.

These instructions are effective for 120 days from date hereof; and, thereafter, without written instructions to continue, you are authorized and instructed to cancel this escrow. I/We, jointly and severally, agree to pay your cancellation fee and all charges in connection therewith.

If transaction fails to close all Earnest Money will be disbursed to:  ☐**BUYER** ☐**SELLER**

Should any disputes arise between parties interested in property or funds covered by these instructions, you shall have the option to hold all matters pending in their then existing status or to join in or commence a court action, or to bring an action in interpleader, at your option. Upon your determination to hold this escrow open for determination of the rights of the parties, you will be relieved of all responsibility to proceed until the rights of the parties are settled to your satisfaction. Further, you as Escrowholder shall be entitled to continue to so refrain to act until (a) the parties hereto have reached an agreement in their differences and shall have notified the Escrowholder in writing of such agreement or (b) the rights of the parties have been duly adjudicated by a Court of competent jurisdiction. It is further agreed that in the event of any suit or claim made against you by either or both parties to this escrow or in the event any suit is instituted by you to resolve your responsibility regarding conflicting claims of both parties to this escrow,

that said parties, jointly and severally, shall be required to pay you all expenses, costs and reasonable attorney's fees incurred by you in connection therewith, whether suit is instituted by you or any of the parties hereto, or not.

In the event of any disagreement between the parties hereto, or demands or claims made upon you by the parties hereto or interested herein or by any other party, you, as Escrowholder, shall have the right to employ legal counsel to advise you and/or represent you in any Suit or action brought affecting this escrow or the papers held in connection herewith or to bring an action in interpleader, at your option.  The parties hereto shall be jointly and severally liable to you for any and all attorney's fees, costs, and disbursements incurred by you in connection with the employment of counsel in such conflict and, upon demand, the parties shall forthwith pay the same to you, as Escrowholder.  If you are required to institute suit to collect such sums as are owned to you pursuant to this or any other provision of this instruction, you shall further be entitled to payment by the parties found liable for such unpaid charges of any costs and attorney's fees incurred in the prosecution of such action.

Buyer(s):                                            Seller(s)


_____       _____


_____       _____


_____
Date:                                            Date:


The foregoing instructions are hereby received and accepted by


BY: _____

EXHIBIT "B"

EXHIBIT "B"

EXHIBIT "B"

# Joint Venture Agreement

This Joint Venture Agreement ("Agreement") is executed by and between Walker Land & Cattle, LLC, an Idaho limited liability company ("Walker") and Foster Company, an Idaho general partnership whose partners are Boyd S. Foster and Laurie Foster ("Foster").  The parties form a joint venture pursuant to the term and conditions of this Agreement.

1. **Terms:**  The term of this Agreement shall be for one (1) year commencing January 1, 2015, and will automatically be renewed on an annual basis unless a written or cancellation is sent within 60 days of completion of lease agreement.

2. **Economic Inputs:**  Each party shall be responsible for fifty percent (50%) of all costs incurred in growing the potatoes, including but not limited to the costs of planting, cultivating, harvesting, and storing the potatoes grown by the joint venture.  To the extent the parties disagree on any cost, the costs shall be measured by the custom rates published by the University of Idaho.  There will be two costs comparison on seed, fertilizer and chemical. Foster will provide the land which shall be valued on a yearly basis to be set in November. The value of the land is agreed to be $300.00 for the year 2015.

3. **Management Decisions:**  Walker shall be responsible to plant, cultivate, and harvest the crop, including providing all labor and equipment necessary for such activities (for which Walker will receive credit under paragraph 2).  Walker shall have exclusive responsibility to make all decisions relating to planting, cultivating, and harvesting the crop.  The parties agree that fertilizer, chemicals, and other supplies required for the joint venture shall be purchased from the least expensive reputable dealer of such products.  There will be liability insurance in place and both party will share the expense.

4. **Marketing:**  Walker and Foster will determine the marketing strategy for the potatoes.  Each party can decide when to market one-half (1/2) of the potatoes.  Despite each party's ability to determine when to market one-half (1/2) the potatoes, the parties shall share equally in the net proceeds from each year's crop.

5. **Land Utilization:**  The parties will determine the amount of the potatoes grown each year. If the parties do not agree otherwise, 7 pivots will be planted on Foster's property.

6. It is agreed that the parties will meet no later than the first week of November to review Agreement and make decisions concerning the value of the land and credit for expenses, along with any and all additional issues identified by either party.  In the event that no such meeting is held, all existing Agreements from the previous year will remain in effect and controlling.

7. **Governing Law:**  This Agreement shall be governed by the laws of the State of Idaho.

8. **Dispute Resolution:**  In the event of a dispute, the parties agree to resort to mediation through a mutually acceptable mediator.  If they are unable to determine a mediator, or if they are unable to mediate a successful resolution to the dispute, they shall refer the matter to arbitration to the America Arbitration Association.  Such arbitration shall be conducted in accordance with all rules of said association.  Each party shall be responsible to pay their own attorney fees regardless of the outcome of the arbitration decision.

1

9. **Property Subject to Agreement:** The parties recognize that this joint venture is limited only to growing potatoes on certain of the Foster property at Osgood. The property which may be designated for potatoes under paragraph 5 of the Agreement shall be the following, all of which is in Bonneville County, Idaho:

> Township 3 North, Range 36 EBM
> Section 8: North ½
> Section 7: North ½ SW ½ of SW ¼
> Section 9 & 10
> Section 18 W ½
> Section 19: W ½
>
> Township 3 North, Range 35 EBM
> Section 12: East ½
> Section 13: East ½
> Section 24: NE ¼
>
> Township 4 North, Range 36 EBM
> Section 29: NE ¼ NE ¼
> Section 29: SE ¼; E ½ W ½ ; W ½ SE ¼ NE ¼
> Section 29: W ½ NE ¼
> Section 30: S ½ NE ¼ SE ¼

10. **Other Farms:** The parties recognize that each party is free to pursue its own farming interests in all other respects. Foster shall be permitted to grow whatever crops under whatever structure it chooses, whether growing crops on the property or whether leasing to other parties in any particular year.

11. **This Agreement supersedes all other Agreements between Walker and Foster.**

                                            **Walker Land & Cattle, LLC**

Dated:_____       _____

                                            Roland N. ("Rollie") Walker

Dated:_____       **Foster Company**

                                            _____

                                          Boyd S. Foster

2