Robert J. Maynes
**MAYNES TAGGART, PLLC**
525 S. Park Ave., Suite 2E
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email: mayneslaw@hotmail.com
Idaho State Bar No. 6905

*Counsel for Debtor/Debtor-in-possession*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re: | Case No. 13-41437 JDP |
| WALKER LAND & CATTLE, LLC, | Chapter 11 |
| Debtor. | |

**DEBTOR-IN-POSSESSION'S CLOSING BRIEF IN SUPPORT OF
CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION**

COMES NOW, WALKER LAND & CATTLE, LLC, Debtor-in-possession, hereinafter "WLC" or "Debtor" as the plan proponent of the Third Amended Chapter 11 Plan filed February 20, 2015 (Doc. No. 693) (hereinafter the "Debtor's Plan"), and after eleven (11) days of trial testimony with numerous documentary exhibits and pursuant to the Court's invitation contained in its Minute Entry of February 6, 2015 (Doc. No. 677), submits the following Closing Brief in support of confirmation of the Debtor's Plan.

## I.    SUMMARY OF RELIEF REQUESTED

As noted by the Supreme Court: "[T]he policy of Chapter 11 is to permit successful rehabilitation of debtors . . . ."[1] Also, "the fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible

---

[1] *National Labor Relations Board v. Bildisco*, 465 U.S. 513, 527 (1984).

misuse of economic resources." *See* H.R.Rep. No. 95-595, p. 220 (1977).[2]  Here, the Debtor requests the opportunity to reorganize to (1) repay its creditors, in full with interest,  (2) avoid loss of jobs, and (3) avoid the negative impacts on the value of the estate attendant with Wells Fargo's proposed liquidation of this farmer.

The Debtor requests confirmation of its Plan of Reorganization and denial of confirmation of Wells Fargo's Liquidating Plan.  This request is based on 11 U.S.C. § 1129(a) and, in light of the pending objections filed by Wells Fargo and the Unsecured Creditors' Committee to the Debtor's Plan, compliance with 11 U.S.C. § 1129(b), as more fully discussed below.[3]

This Brief first addresses the factual evidence and testimony, followed by the legal authorities in support of reorganization.

## II.    RELEVANT FACTS

The Walkers are "good farmers."[4] Unfortunately, a number of events combined to result in the current chapter 11 case.

### A. *Significant Events Leading to Bankruptcy*

1.    <u>Family Deaths and Cancer Impacts</u>:    During the five years immediately preceding the bankruptcy, the family patriarch, Von Walker, passed away in 2009. Von was the original farmer in the Debtor's farming history. In 2011, Blair Walker, a brother to current management and son of Von Walker unexpectedly passed away. Blair Walker was the primary farm field manager at the time of his death. At the end of 2011, Blair Erickson, a brother-in-law to current management and son-in-law of Von Walker, retired to care for his

---

[2] *Id.* at 528.
[3] The Debtor filed its Pre-Confirmation Report on the Second Amended Plan of Reorganization on November 19, 2014, as Doc. 610, and the same is incorporated herein by reference.
[4] Trial Testimony, Brent Lyon, 1/16/15, 9:53:59; Trial Testimony, Greg Mondon, 2/5/15, 3:22:13-45**.**

wife, as she began her fight with cancer. Blair Erickson was primarily responsible for the various hay properties run by the Debtor and related irrigation systems at the time of his retirement. The impact of these family deaths and cancer diagnosis resulted in the management team being reduced to solely Keith Walker, who at the same time was responsible for managing Walker Produce, Inc.[5]

2.   2011 and 2012 Cost Over-runs:  In 2011 and 2012, the Debtor experienced higher overall costs for power, fertilizer and chemical, resulting from market increases, distracted and overwhelmed management and deficient internal controls.  These increased costs manifest themselves in the 2012 and 2013 financial statements.[6]

3.   2013 Seed Rot, Weeds and Harvest Frost:  During the 2013 growing season, the Debtor was required to deal with seed rot in its Hamer, Idaho fields which was compounded by the 2013 harvest frost, resulting in an increased level of shrinkage in the Debtor's stored potatoes and corresponding loss in value.[7]

4.   2013 Funding Delays Result in Increased Chemical/Fertilizer Costs, Weed Control Problems and Decreased Potato Quality:  Due to the funding delays experienced during the 2013 growing season, the Debtor was unable to apply chemical and fertilizer at the proper times, missing the window to prevent weeds that could otherwise have been controlled. As a result, the Debtor incurred significant additional expenses to deal with the weeds. Due to the weeds essentially forming a mat across the harvest machinery, a large number of the potatoes failed to make it into storage, but rather, were thrown out with the

---

[5] Trial Testimony, Rollie Walker, 11/26/14, 9:47:11 – 9:51:11.
[6] Exs. 123, 175, 178, 196, 215, 250, 299Z.
[7] Trial Testimony, Rollie Walker, 11/26/14, 9:51:11 – 10:03:05.

weeds.[8]   In addition, the potato plants' competition with the weeds negatively impacted

potato quality. *Id.* Further, due to the funding delays for chemicals and fertilizer, the 2013

potatoes were negatively impacted and the potato suberization[9] was lengthened significantly,

increasing the amount of damage to the potato and corresponding rot and shrinkage.[10]

     5.   <u>Wells Fargo Markedly Improves Its Position</u>.   On or about September 24,

2012, Wells Fargo was owed between $25,000,000 to $30,000,000 on the 2011 and 2012

Crop Lines.[11]   During 2013, the 2012 Crop Line was paid down by approximately $10

million.[12]   By November 15, 2013, the 2011 Crop Line had been paid in full, the 2012 Crop

Line was reduced to $6,145,673.16 and the 2013 Crop Line was $14,547,399.92—an

estimated pre-petition reduction of $4.3 to $9.3 million:[13]

| WELLS FARGO LOAN BALANCES | | |
|---|---|---|
| | September 24, 2012[14] | November 15, 2013[15] |
| 2011 Crop Line | Less than $10,000,000.00 | Paid in full. |
| 2012 Crop Line | 15,000,000.00 to 20,000,000.00 | 6,145,673.16 |
| 2013 Crop Line | 0.00 | 14,547,399.92 |
| Total | Less than 25,000,000.00 to 30,000,000.00 | 20,693,073.08 |
| **Estimated Pre-petition Reduction:** | **4,306,926.92 to 9,306,926.92** | |

Notably for the past sixteen (16) years, the Debtor has paid off the annual crop line.

---

[8] Ex. 199J, *Hamer, ID Weed Photos*; Trial Testimony, Rollie Walker, 11/26/14, 9:51:11 – 10:03:05, and 2/6/15, 11:04:52 – 11:08:32.
[9] Suberization is the process whereby the outer layer of the potato hardens such that the damage caused during harvest and while in storage is greatly reduced**.** Trial Testimony, Rollie Walker, 11/26/14, 10:02:29 – 10:03:05.
[10] Ex. 199J at p. 5; Trial Testimony, Rollie Walker, 11/26/14, 10:02:29 - 10:03:05, and 2/6/15, 10:31 – 11:09:17.
[11] Trial Testimony, Dan Diehl, 1/16/15, 10:33:57, 10:53:48 and 10:41:05.
[12] Trial Testimony, Greg Mondon, 2/5/15, 3:05:28; Ex. 220 at p. 10.
[13] Ex. 220 (Claim 56/WF POC) at p. 10; Trial Testimony, Greg Mondon, 2/5/15, 3:05:28 – 3:07:51.
[14] Ex. 299-Z, *Diehl Letter to Keith Walker dated 9/24/2012*; Trial Testimony, Dan Diehl, 1/16/15, 10:33:57, 10:53:48 and 10:41:05.
[15] Ex. 220 (Claim 56/WF POC) at p. 10; Trial Testimony, Greg Mondon, 2/5/15, 3:05:28 – 3:07:51.

6.      While the pre-petition loan balances were being reduced in May 2013, for the first time Wells Fargo took an interest in real property collateral, with available equity of $24,578,188.01.[16] Notwithstanding the additional collateral, Wells Fargo declared a default in August 2013, back dated to the end of June 2013, and filed a state court action requesting a receiver on or about November 5, 2013.[17]

7.      Mr. Mondon candidly noted that Wells Fargo intended to prevent the Debtor from planting post-petition by fighting approval of use of cash collateral. When it was evident the Court was going to allow the Debtor to farm, Wells Fargo then proceeded with its efforts to liquidate the Debtor.  This strategy to liquidate may have begun well before the Petition was filed based on the request for an appraisal of the equipment at liquidation values only, and the decision to foreclose or appoint a receiver merely five (5) months after the June 2013 Credit Agreement.[18]

## B. *Post-petition Operational and Management Changes*[19]

8.      <u>Management Team Changes</u>: Prior to the filing of the bankruptcy during the 2013 growing season, Rollie Walker returned to handle the farm field operations.[20] Upon filing of the bankruptcy, Rollie Walker also assumed the CEO role and direct communications and negotiations with creditors. In February of 2014, Sam Cook replaced the former CFO, who left the Debtor in the fall of 2013.[21]

---

[16] Ex. 220 at p. 3, Paragraph 4; Ex. 108 at p. 1 (equity value is the sum of "1st Lien Collateral Market Value" and "2nd Lien Collateral Value"—showing without any other collateral Wells Fargo has 4.2 million in real estate collateral above the loan balances in Ex. 108); Trial Testimony, Mondon, 2/5/15, 3:07:51 - 3:11:33 (guesstimating in May 2013 that there was 20 million in available equity for Wells Fargo to attach).
[17] Trial Testimony, Greg Mondon, 2/5/15, 3:18:49 and 4:07:46.
[18] Ex. 199H; Trial Testimony, Greg Mondon, 2/5/15, 4:19:23 – 4:22:21.
[19] Ex. 101 at pp. 32-35.
[20] Trial Testimony, Rollie Walker, 11/26/14, 10:03:05 – 11:20:38.
[21] Trial Testimony, Sam Cook, 12/11/14, 1:35:14 – 1:37:27.

DEBTOR-IN-POSSESSION'S CLOSING BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION

9.    Post-petition, Lorin Walker was engaged to manage equipment repairs, and inventory and supply levels. He also assists in crop marketing.[22]

10.    <u>Accounting Team Changes</u>:  As noted above, there is a new CFO, Sam Cook, who testified extensively at trial. Mr. Cook's role has included improving coordination between the farm managers and the accounting team, helping the farm managers catch the overall vision of profitability, budgeting and promoting cost-cutting measures.[23]

As testified to by Mr. Cook, as the replacement CFO, he has implemented dual signature approvals on general journal entries, and he personally approves all checks, which are then submitted to Roland or Lorin Walker for signature.[24]

11.    <u>Improved Creditor Communication</u>:   There has been a concerted effort to improve communication with its creditors.  The best indication of that improved communication is the numerous stipulations for plan treatment entered into by the Debtor:

- Stipulation with CNH Capital;[25]
- Toyota Stipulation for Plan Treatment;[26]
- John Deere Stipulation;[27]
- Ally Stipulations (2);[28]
- Stipulation Modifying Second Amended Plan (Rabo);[29] and
- Stipulation Modifying Second Amended Plan (BOC).[30]

The number of unsecured creditors supporting the Debtor's Plan further evidences improved communications with creditors. Of the 142 ballots submitted by members of Class 51 (the

---

[22] Trial Testimony, Rollie Walker, 11/26/14, 11:18:59 – 11:19:47.
[23] Trial Testimony, Rollie Walker, 11/26/14, 11:20:03 - 11:20:38; Trial Testimony.
[24] Ex. 101; Trial Testimony of Sam Cook, 12/18/14, 12:00:20 – 12:02:18, Trial Testimony, Judith Brower, 12/17/14, 4:20:09 – 4:22:07.
[25] Doc. 415, Ex. 145.
[26] Doc. 429, Ex. 146.
[27] Doc. 436, Ex. 147.
[28] Docs. 459 and 460, Exs. 148 and 149.
[29] Doc. 591, Ex. 150.
[30] Doc. 590, Ex. 151.

unsecured class of unrelated creditors) on the Debtor's Plan, 140 accept the Debtor's Plan, while only 2 reject the Debtor's Plan.[31] Additionally, of those creditors that voted for both the Debtor's Plan and the Liquidating Plan, only Toyota (owed $27,941.82) indicated a preference for the Liquidating Plan. All of the other creditors accepting both plans prefer the Debtor's Plan.[32]

12.    <u>Strategic Planning Changes</u>:    Post-petition management instituted weekly meetings with the farm field managers, increasing and improving the communication between the field managers and the accounting team.[33]  Specifically, in the preparation of the 2014 budget, the field managers and the accounting team worked together to significantly cut costs.[34]

13.    <u>Field Management Changes</u>:  Post-petition, the Debtor shifted its focus from the farming operation as an integrated whole to individualized treatment of each individual field to maximize the productivity of each field and boost overall production.[35]

14.    <u>Soil Content Management</u>:  One of the most significant changes involved soil testing. The focus changed from just petiole[36] testing, but rather to test the "banked" fertilizer in the soil and by using specific chemicals, release the "banked" fertilizer so that it would be available for the plant. As testified by Mr. Rollie Walker, there is a significant amount of banked fertilizer within the soil, enabling them to reduce fertilizer costs significantly. By testing the actual soil and not just the petioles, and using the two types of tests, the Debtor is

---

[31] Debtor's Ballot Summary (Doc. 611) shows 142 total ballots submitted by members of class 51, with 138 accepting and 2 rejecting (inadvertently omitting 2 accepting ballots).  See Ex. B (Doc. 611-2) at p. 4.  In verifying these numbers, 140 accepting is the correct number of accepting ballots submitted for Class 51, with the amount accepting increasing by $4,540.82.  The amount rejecting remains the same.

[32] Doc. 611-5., Ex. E at p. 2.

[33] Trial Testimony, Rollie Walker, 11/26/14, 10:11:02 – 10:11:54.

[34] Trial Testimony, Rollie Walker, 11/26/14, 10:18:53 – 10:20:11.

[35] Trial Testimony, Rollie Walker, 11/26/14, 11:38:51 – 11:41:29.

[36] Petiole: Stalk attaching the leaf blade to the stem. The petiole is the transition between the stem and the leaf blade, and usually has the same internal structure as the stem.

able to apply the fertilizer in a way that anticipates the plants' needs, instead of reacting to the plants' deficiencies.[37]

15.    <u>Alfalfa Ground Returned to Crop Plan</u>:   The Debtor, in looking back at historic records since the retirement of Blair Erickson, has determined that in retrospect, leasing the hay ground out was financially imprudent, and as such, its farm operations, post-petition, have taken the hay ground back and projects growing alfalfa in the lower producing fields into the future.   Planting lower producing fields in alfalfa rebuilds the soil, while providing more revenue than simply leasing the ground. This increased the total 2014 acres farmed by 796 acres.[38]

### C.  *2014 Farming Results*

16.    <u>DIP Lender Timely Repaid</u>:   The post-petition loan was repaid in full on 1/28/2015 from the sale of crops, prior to its 1/31/2015 maturity date.[39]

17.    <u>Debtor's Improved Cash Position:</u> On the Petition Date, the Court will recall that Wells Fargo had frozen the Debtor's operating account such that the Debtor had no available cash. In November 2013, the Debtor began this case with $10,674.00 in the bank.[40] Through the Debtor's operations post-petition, the Debtor has generated sufficient cash to pay its ongoing operation expenses, adequate protection payments, and at the end of the 2014 growing season, had $722,060.00 in the bank.[41]

18.    <u>Cost Reductions</u>:  The Debtor's 2014 expenses came in $3,790,000.00 under budget.[42]

---

[37] Trial Testimony, Rollie Walker, 11/26/14, 10:08:53 – 10:15:47.
[38] Ex. 176; Trial Testimony, Rollie Walker, 11/26/14, 10:05:33 – 10:06:32.
[39] Trial Testimony, Sam Cook, 2/6/15, 1:39:08 – 1:39:21.
[40] This excludes the amount that was administratively frozen by Wells Fargo as a result of the Petition.
[41] Ex. 173.
[42] Ex. 154; Trial Testimony, Sam Cook, 12/17/14, 9:46:31; Ex. 196, pp. 4-5.

      a.    *Fertilizer/Chemical Cost Reductions*:  From 2013-2014, the Debtor reduced its fertilizer and chemical costs by $1.7 million. This is in addition to the reduction pre-petition from 2012-2013 of $1.1 million, for an overall reduction from 2012 of $2.8 million.[43]

      b.    *Cost-per-acre Reductions*:   The Debtor's cost-cutting measures resulted in an overall reduction in cost-per-acre from $1,474.54 to $1,442.46 (this is in addition to the pre-petition reduction from 2012 from $1,656.48.)[44] The Debtor reduced the cost per acre for potato production by $60.00 per acre from 2013 to 2014.[45] This is in addition to the reduction from 2012-2013 of $17.00, for an overall reduction from 2012-2014 of $77.00 per acre.[46]

    20.   <u>Improved 2014 Potato Quality</u>:  Even with the cost cutting measures and the bankruptcy, the 2014 potato quality is, "above average for the industry." Above average quality is par for the course for the Walkers.[47]

    21.   <u>Improved 2014 Potato Yields</u>:  With respect to the Debtor's 2014 potato yields, in its cash collateral budget, the Debtor projected the yield per acre would be 362 cwt. per acre.  However, the Debtor exceeded the projected yield by 27 cwt. per acre.[48]  In the last five years, this 389 cwt. per acre is the highest yield that the Debtor has received, all

---

[43] Ex. 178.
[44] Ex. 175.
[45] Ex. 196.
[46] Ex. 196 at p. 1.
[47]   "Maynes:   And do you have an opinion as to the quality of the 2014 crop?
     Lyon:      Yeah.  It is probably average for the Walkers, but above average for the industry."
Trial Testimony, Brent Lyon, January 16, 2015, 9:49:50 to 9:49:59; *see also* Trial Testimony, Keith Walker, 12/30/14, 9:17:25.
[48] Ex. 125 (Ex. 125 was submitted for limited purpose of the first three columns of the chart showing acres, yield per acre, and total yield.).

while in the middle of a pending bankruptcy.[49] At the end of harvest, the Debtor had 1,651,639 cwt. of potatoes.[50]

22.    <u>Remaining 2014 Potato Inventory & Value</u>: To date, the Debtor has received a blended average return on its 2014 potato crop of $7.00 per cwt.[51] The remaining 2014 potato inventory, as of January 31, 2015, is 1,195,628 cwt. of potatoes.[52] Assuming that the blended average rate remains constant at $7.00, this equals $8,369,396.00.[53]  Historically, most potato sales take place between February and October with prices rising as the inventory is sold down during the year.[54]

23.    <u>Barley, Wheat and Hay Yields.</u>  The Court heard testimony with regards to the unusual and historic rainfall received last fall during August. Notwithstanding the rainfall, the Debtor still received 93 bushels of barley per acre, short of its projected bushel yield by just 9 bushels. The actual wheat yield was slightly short of the projected 98 bushels at 79.[55] The alfalfa yield was also negatively impacted due to the rain.[56] However, we heard testimony from Sam Cook that crop insurance claims were pending with respect to the crop loss due to the rainfall.[57]

24.    <u>Budgeted Crop Insurance:</u>  The Debtor's projected budget (Ex. 170) includes amounts for crop insurance to protect against future risks in subsequent years.[58]

---

[49] Ex. 177; Trial Testimony, Sam Cook, 12/17/14, 9:46:31.
[50] Ex. 169.
[51] Ex. 199M at p. 2; Trial Testimony, Sam Cook, 2/6/15, 11:51:23 – 11:51:44 and 1:35:54 – 1:36:45.
[52] Trial Testimony, Sam Cook, 2/6/15, 1:40:39 – 1:43:41 and 2:33:40 – 2:35:10.
[53] Ex. 199N; Trial Testimony, Sam Cook, 2/6/15, 11:51:23 – 11:51:44 and 1:35:54 – 1:36:45.
[54] Trial Testimony, Sam Cook, 2/6/15, 2:31:58 – 2:35:33 and 2:33:40 – 2:35:10.
[55] Ex. 126 (please note Ex. 126 was admitted with the limitation that it would only apply to the columns acres, yield per acre, total yield, and price per cwt./bushel.) The amounts with regards to the wheat were also admitted including the actual revenue. For additional detail with regards to the barley revenue, please see Ex. 127.
[56] Ex. 129 (Please note, Ex. 129, the first page and a portion of the second page were admitted, specifically the first three columns of the chart, acres, yield per acre, and total yield.)
[57] Trial Testimony, Sam Cook, 12/11/14, 2:13:40.
[58] Trial Testimony, Sam Cook, 12/18/14, 10:17:34 – 10:18:04.

25.    <u>Portion Control Fresh</u>:    The Court heard testimony about the marketing strategies implemented by the Debtor in conjunction with Walker Produce and Portion Control Fresh, allowing the Debtor to improve the grower's return for each 25% of the non-size A potatoes (or consumer potatoes) that the Debtor is able to sell through the Portion Control Fresh (PCF) contracts. Specifically, for every 25% of the non-size A's sold, the increase to the total potato crop return is $1.00 per cwt.[59] Notably the four PCF contracts in the record provide a significantly greater sales price, for instance, $48.00 per cwt. and $51.00 per cwt.[60] Mr. Keith Walker testified that sale shipments had begun under the PCF contracts and that he had confidence that payments would be made in ordinary course, given his long-standing relationships with the purchasers.[61] Mr. Keith Walker also explained how they calculate the grower return price increase and provided an example showing a $1.13 increase on an illustrated shipment of 5,000 cwt.[62] The sale of 25% of non-size A's (or consumers) through PCF is just a starting point, and it is the Debtor's intention to be able to sell 100% of its non-size A's, with each 25% being an additional $1.00 increase to the total return on the potato crop, up to a total of a $10.00 grower's return on the entire potato crop.[63] Mr. Keith Walker also testified about the benefits of having a related potato fresh shed.[64]

### D. *Plan Improvements*

26.    <u>Joint Venture Expansion/Crop Rotation Improvement</u>: The Debtor has proposed an expansion through the sale of the Steel farm under its Plan of its joint venture

---

[59] Ex. 197 (Illustrative); Trial Testimony, Keith Walker, 12/30/14, 10:13:44 – 10:18:15 and 9:40:26 – 9:50:31; Ex. 152 (Illustrative), Trial Testimony, Trial Testimony, Keith Walker, 12/30/14, 10:40:40 – 10:41:45, 11:10:32 – 11:12:27, and 4:41:55 – 4:44:45.
[60] Exs. 198, 199, 199C, 199D; see also Sample PCF Return, Ex. 197.
[61] Trial Testimony, Keith Walker, 12/30/14, 4:45:09 – 4:45:09 – 4:49:36, 9:54:31 – 9:54:52, and 10:06:42 – 10:09:29.
[62] Ex. 197.
[63] Trial Testimony, Keith Walker, 12/30/14, 9:50:31, 4:41:55 – 4:44:45, 4:53:17 – 5:01:24, 10:37:45 – 10:39:19, 10:40:40 – 10:41:45, 10:40:40 – 10:41:45, and 11:10:32 – 11:12:27.
[64] Trial Testimony, Keith Walker, 12/30/14, 3:05:01 – 3:05:18, 5:26:07 – 5:26:43, 10:37:45 – 10:39:19, 9:59:33.

with Boyd Foster, which will allow for an improved crop rotation, allowing two years of grain, followed by potatoes, which will improve the quality and yield of the potatoes.[65]

27.   <u>Receivables Oversight and Collection Committee Creation</u>: The Plan expressly prohibits loans or investments being made during the Plan Term. [66]  Further, the Plan provides that no related entities (Class 52) and no equity distributions (Class 53) will be paid until creditors have been paid in full, with interest.[67]

Specifically, the Debtor's Plan (1) prohibits lending or investing during the term of the Plan and (2) only allows sales of crops to Walker Produce or other Related Parties provided that such crops are paid for in the ordinary course of business.[68]  The Debtor's Plan further (3) creates a creditor Collection Committee to collect the related party receivables.  If the Debtor is unable to collect 50% or more of the pre-petition balances owed, then such accounts shall be assigned to the Collection Committee for collection after 6 months.  Post-petition balances more than 90 days past due shall be assigned to the Collection Committee.[69]

Walker Produce has paid $107,061.54 on its pre-petition balance.[70]  Additionally, Walker Produce is current on all of the post-petition potato purchases.

28.   <u>Advisory Board Created</u>: Pursuant to the Debtor's Disclosure Statement, there will be an Advisory Board to collaborate and brainstorm with regards to all aspects of the crop production, the joint venture contemplated under the Plan, and crop marketing. This board consists of Rollie Walker, Lorin Walker, Keith Walker, Boyd Foster of Vista Valley

---

[65] Ex. 100, pp. 42-43, and Ex. B (p. 63); Trial Testimony, Rollie Walker, 11/26/14, 10:32:18 - 10:37:52.
[66] Doc. 654 & 655, Ex. 199A.
[67] Ex. 100, pp. 31-32, Section 3.3.49, Class 52 and Section 3.3.50, Class 53 ("Members of this Class 53 shall receive no distributions on account of their equity interest until creditors holding Allowed Claims have been paid in full.").
[68] Ex. 199A adding Section 5.2.4 to the Plan.
[69] Ex. 199A adding Section 5.2.5 to the Plan.
[70] Ex. 199O; Trial Testimony of Sam Cook, 1:53:36 – 1:55:10.

(joint venture party and unsecured creditor), and Sam Cook. Advisory Board members serve

without compensation for their service on the board.[71]

29.    <u>Refinance/Take Out Financing Flexibility</u>: As the Debtor's post-petition

performance continues forward, the Debtor will be able to refinance in a few years.[72]

### E. *Wells Fargo Plan Treatment*

30.    The Debtor's Plan provides for Class 9, i.e. Wells Fargo, that members of this

class will be paid in full, first from the Steel farm sale, with a payment of $361,445.27, which

would be paid from closing. The remaining balance would then be paid semi-annually in

installments of $765,298.92 for a term of seven (7) years, with the remaining balance being

due and payable on or before July 1, 2021. Interest would accrue at the fixed rate of 5.0%.[73]

31.    Further, Wells Fargo continues to enjoy a floating lien on post-petition crops,

equipment, machinery, etc. As provided in Class 9 of the Plan, Wells Fargo retains its lien

(subject to Article 5.2.2 of the Plan) in the remaining real property, as well as the personal

property (including farm products, crops, accounts, equipment, tools, machinery, goods,

irrigation equipment, furnishings, furniture, rolling stock, untitled machinery, insurance

proceeds, etc.) as provided in its pre-petition lien documentation.[74] As acknowledged by Mr.

Mondon, if the Steel sale is approved, Wells Fargo will continue to have a lien in $27 million

worth of real estate collateral in excess of their outstanding loan.[75]

---

[71] Ex. 101, pp. 35-36.
[72] Ex. 100, p. 43, Section 5.3; Trial Testimony, Russell Haycock, 2/6/15, 9:38:49 – 9:40:29.
[73] Ex. 100, p. 17, Section 3.3.6 Class 9.
[74] Ex. 100, Section 3.3.6 at p. 17.
[75] Trial Testimony, Greg Mondon, 2/5/15, 4:59:38 – 5:00:41.

32.    <u>Interest Rate</u>:  The applicable interest rate under the Plan of 5.0% for Wells

Fargo is commercially reasonable and is better than the historic interest rates charged by

Wells Fargo, including the June 2013 contract rate.[76]

33.    <u>Comparison of Wells Fargo's collateral position from September 2012 to</u>

<u>post-Steel Sale Closing</u>:  Wells Fargo's collateral position under the Plan provides $49

million of collateral, which is an improvement from its position in 2012 of approximately

$25 million, calculated as follows:

| WELLS FARGO'S COLLATERAL EQUITY POSITION[77] | | |
|---|---|---|
| | As of September 24, 2012 | As of post-closing of the Steel Farm under Debtor's Plan |
| Cash | 314,800[78] | 60,000 (estimated)[79] |
| Crops | 2012 Crops:<br>Potatoes: 6,903,913[80]<br>Grain: 3,734,358[81]<br>Hay: 0.00 | Remaining 2014 Crops:<br>Potatoes:  8,369,396[82]<br>Grain: 1,128,763[83]<br>*2013: 189,792*<br>*2014: 938,971*<br>Hay:  60,564[84]<br>Fertilizer: 28,136[85] |
| Accounts Receivable[86] | 2,523,439[87] | 1,887,539[88] |
| Life Insurance | 1,807,285[89] | 2,133,834[90] |

---

[76] Ex. 137; Trial Testimony, Russell Haycock, 2/6/15, 9:41:43. See also, Exs. 137 & 138, and 246 at pp. 4-5; Trial Testimony, Greg Mondon, 2/5/15, 1:42:32; Trial Testimony, Sam Cook, 10:20:17 – 11:21:35.

[77] See generally Ex. 220 for collateral description and security interests.

[78] Ex. 102 at p. 2, as of 12/31/2012; see also Ex. 214 at p. 12.

[79] Ex. 199E (Ending Cash) as of 12/31/2014 less amounts to pay of CHS in January 2015.

[80] Ex. 214 at p. 18, Note C.

[81] Ex. 251.

[82] Ex. 199N, remaining potato inventory as of 1/31/2015, multiplied by actual, weight blended average of grower's return through 1/31/2015 of $7.00 (Plan Ex. 199M at p. 2; Trial Testimony, Sam Cook, 2/6/15, 1:34:15 – 1:37:55).  This amount is calculated after payment in full of the DIP 2014 Crop Loan, which was paid 1/28/2014.  Trial Testimony, Sam Cook, 2/6/15, 1:37:55 – 1:40:39.

[83] Ex. 199F at pp. 1 and 3.  This is valued at "cost."  Trial Testimony, Sam Cook, 2/6/15, 1:36:00 to 1:40:39 (discussing "cost" value in the context of Ex. 299-Y and MOR).

[84] Ex. 199F at p. 1

[85] *Id.*

[86] Excluding amounts owed by related entities and parties.

[87] Ex. 102 at p. 2, as of 12/31/2012.

[88] Ex. 199F at p. 1, as of 12/31/2014; and Ex. 299FF, p. 5 (same report).

[89] Ex. 215 at p. 17 ("Net cash surrender value"); and Ex. 102 at p. 2 ("Cash Surrender Value of Life Insurance").

| Real Estate | 0.00 | 27,000,000.00[91] |
|---|---|---|
| Vehicles | No interest. | No Interest. |
| Office Equipment | 12,195[92] | 12,195[93] |
| Farm Equipment | 4,316,650.00[94] | 4,316,650.00[95] |
| Farm Machinery | 4,642,199.60[96] | 4,642,199.60[97] |
| **TOTAL:** | **$24,242,645.60** | **$49,627,081.60** |

34.    <u>Steel Farm Sale and Proceeds Distribution</u>: The Steel Farm is proposed to be sold for $4,500.00 per acre, for a gross sales price of $6,183,000.00, and allows the Debtor to expand its joint venture with Boyd Foster, improving the crop rotation, allowing for various bulk discounts, savings on equipment, and a continued historic positive working relationship.[98] From the Steel Farm Sale, after payments to creditors and closing costs, Debtor will gain roughly $1 million in working capital to better facilitate its operations going forward:

| | |
|---|---|
| Gross Sales Price[99] | 6,183,000.00 |
| Estimated Closing Costs (2% of Sales Price) | (123,660.00) |
| Secured Creditors Payments from closing[100] | (2,796,573.40) |

---

[90] Ex. 107 at p. 1.
[91] Trial Testimony, Greg Mondon, 2/5/15, 4:59:38 – 5:00:41.
[92] Ex. 107 at p. 1.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] Trial Testimony of Rollie Walker,, 11/26/14, 10:32:06 - 10:37:52.
[99] Ex. 100, pp. 41-42, Item No. 6.
[100] See Ex. 100 at Sections 3.3.2 Class 5 (p. 15), Section 3.3.6 Class 9 (p. 17), Section 3.3.7 Class 10 (p. 18), Section 3.3.25-47 Classes 26-50 (pp. 23-30); See also Exs. 147 (John Deere Stipulation), 150 (RABO Stipulation) & 151 (Bank of Commerce Stipulation).

| | Steel Sale Closing |
|---|---|
| Rabo Ag. | $2,059,391.01 |
| Wells Fargo | $361,445.27 |
| John Deere | $346,334.73 |
| BOC | $29,402.39 |

DEBTOR-IN-POSSESSION'S CLOSING BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S
PLAN OF REORGANIZATION
Page 15

| | |
|---|---|
| Secured Creditors Payments 7/1/2015[101] | (1,479,473.20) |
| Earmarked Funds for Capital Expenditures[102] | (800,000.00) |
| Remaining after 7/1/2015: | 983,293.40[103] |

During the first five (5) months of the Plan, Wells Fargo will receive $1,126,744.19. Creditors with lien positions senior to Wells Fargo in real estate (Rabo and BOC) and equipment (John Deere) will receive $2,349,302.41 during the same five (5) months.[104]

### F. *Plan Projections*

32.    Historic Prices:  The Debtor's historic crop prices are contained in Ex. 105. The Court heard testimony explaining the reasons for why 2012 and 2013's prices should be excluded as aberrations, and focus on the three-year average for 2009, 2010 and 2011. That three-year average is $7.55 per cwt. Notably, the Debtor's projections contained in Ex. 170 project a price per cwt. of $7.43 for the 2014 crop and $7.87 for the subsequent years.  As noted, the 2014 crop has already reached an average as of 1/31/15 of $7.00.[105]  Historically, prices have gone up as the majority of the inventory is sold later in the Spring.[106]

33.    Projected Budget:  Ex. 170 is the Debtor's projected budget under its Plan, and includes all of the total operating costs of the company from month to month and

---

[101] *Id.*

| | $2,796,573.40 |
|---|---|
| | 7/1/2015 Payments |
| Rabo Ag. | $350,817.67 |
| Wells Fargo | $765,298.92 |
| John Deere | $346,334.73 |
| BOC | $17,021.88 |
| | $1,479,473.20 |

[102] Ex. 150 at p. 9.
[103] Please note that under the Liquidating Plan, Wells Fargo is willing to fund up to $1,750,000 out of its collateral to fund the Administrative Fund.  Trial Testimony, Greg Mondon, 2/5/15, 3:31:00 to 3:31:22.
[104] Ex. 100, Articles 3.3.2.4, 3.3.6, 3.3.7, 3.3.25 and 3.3.26.
[105] Ex. 199M, p. 2.
[106] Trial Testimony, Sam Cook, 12/11/14, 4:00:54.

provides the assumptions and economic drivers in support of the Debtor's budget (the "Budget"). The Budget provides for a contingency budget, as well as a cash reserve and is based on the historic prices *before* any contribution from PCF.[107] Debtor will be able to meet its projections.[108]

### III.    POINTS AND AUTHORITIES

#### A. *Status of Objections to Debtor's Plan*

There were three objections to confirmation filed: (1) Wells Fargo Bank (Doc. 575); (2) Unsecured Creditors' Committee (UCC) (Doc. 577); and (3) Commercial Credit Group (CCG) (Doc. 570).    All three objections remain pending; however, portions of the UCC Objection to Confirmation have been addressed via modification of the Plan.  The UCC filed an additional Objection (Doc. 626) asserting that the Modification stipulated to with Rabo runs afoul of classification requirements under Section 1122(a).

The Objections are addressed below.[109]

#### B.  *Debtor's Plan is Feasible.  11 U.S.C. § 1129(a)(11).*

The Court should confirm the Debtor's Plan because it "has a reasonable probability of success."[110] "The Code does not require the debtor to prove that success is inevitable,[] and a relatively low threshold of proof will satisfy § 1129(a)(11),[] so long as adequate evidence supports a finding of feasibility."[111]  Here, the Debtor's post-petition performance, operational changes and projections under the Debtor's Plan more than satisfy the low threshold of feasibility proof.

---

[107] Ex. 170; Trial Testimony, Sam Cook, 12/11/14, 4:21 – 4:32.
[108] Trial Testimony, Sam Cook, 12/17/14, 1:33:13 – 10:22:32.
[109] In addition, Sometimes A Great Notion (SAGN) has objected to the proposed lease assumption under the Debtor's Plan.  At the Court's invitation, the Debtor has opted to file a separate brief addressing the objection to lease assumption.
[110] *In re Acequia, Inc.*, 787 F. 2d 1352, 1364 (9th Cir. 1986).
[111] *In re Brotby*, 303 B.R. 177, 191 (9th Cir. BAP 2003)(internal citations omitted).

As set forth above in Section II.B above, the Debtor has made substantial changes to its farm operations. The management team has been expanded and the CFO replaced and accounting controls improved. Communications between the office and the field have been greatly improved with weekly meetings. Communications with creditors have been maintained and improved. Farming practices have been improved, e.g. soil testing has been enhanced, and field focus instead of the whole farm.

The 2014 Farming Results best show the Debtor's improvements. *See* Section II.C above. The DIP lender, owed approximately $4.2 million, has been timely repaid.[112] The Debtor's cash position has improved post-petition. The Debtor has saved $3,790,000.00 off its budget and cut growing costs. Fertilizer and chemical costs were reduced by $1.7 million (from 2013 to 2014) and the cost-per-acre was also reduced. Notably, the cost-per-potato acre was reduced $60.00 per acre (from 2013 to 2014). *See* II.C above at Paragraphs 17-19.

Debtor produced an above average quality potato crop. See II.C above at Paragraph 20. And the Debtor's 2014 potato yield of 389 cwt. per acre exceeds its yearly yields for the past five years. *See* II.C. above at Paragraph 21.

The Debtor's average potato price for 2009, 2010 and 2011 of $7.55 supports the Debtor's projected price of $7.43 (2014) and $7.87 for subsequent years. The actual 2014 average price through 1/31/2015 of $7.00 also supports the Debtor's projections.

In short, the Plan is feasible as demonstrated by Debtor's post-petition income and performance.

---

[112] Trial Testimony, Sam Cook, 12/11/14, 4:00:54 – 4:10:00; 2/6/15, 1:37:55 – 1:40:39.

**C.  Debtor's Plan is Fair and Equitable.  11 U.S.C. § 1129(b).**

1.  Debtor's Plan Complies with 11 U.S.C. § 1129(b)(2)(A)(i).

Here, Wells Fargo retains its pre-existing liens that are substantially in excess of their claim.[113] There is no dispute over liquidation values.  According to the parties' shared liquidation analysis, Wells Fargo's collateral is more than adequately protected under the Debtor's Plan. Where Wells Fargo has an equity cushion of approximately 35%,[114] and the Debtor's Plan provides for a continued floating lien on future crops and crop proceeds, retains the existing liens on real property, machinery and equipment, the Debtor's Plan adequately protects Wells Fargo's interest.[115]

Further, the interest rate of 5% and floating lien under the Plan adequately compensates Wells Fargo for its risks under the Plan.  *See* Section II.E, Paragraphs 30-32.

Notably, Wells Fargo failed to establish that there exists an efficient market for Chapter 11 Debtor, as such, the Court is left to employ the formula approach endorsed by the *Till* authority.[116] Notably, the Supreme Court in *Till* placed the evidentiary burden squarely on Wells Fargo to show the necessity of a higher interest rate based on quantifiable risks.[117] In  this case, while there was much discussion regarding associated risks, Wells Fargo failed to distinguish how risks in the bankruptcy were different than the risks pre-petition when

---

[113] Subject to Debtor's right to obtain secured crop financing.  *See* Ex. 100, Article 3.3.6.

[114] This 35% is calculated based on a collateral position with equity of $27 million (Trial Testimony, Greg Mondon, 2/5/15, 4:59:38 – 5:00:41) and a remaining debt of approximately $20 million after accounting for the payments to Wells Fargo noted above II.E, Paragraph 33.  Naturally, if we were to include the amounts paid to senior secured creditors, Wells Fargo's equity cushion would be greater.  As senior creditors are paid down during the Plan, Wells Fargo's equity cushion will continue to grow.

[115] *In re Boulders on the River, Inc.*, 164 B.R. 99, (9th Cir. BAP 1994) (Affirming confirmation and satisfaction of § 1129(b)(2)(A)(i) where secured creditor is adequately protected with *only 11.45% equity cushion* and allowing use of cash collateral to implement the plan).

[116] *E.g.*, *In re Dunlap Oil Co., Inc.*, BAP No. AC-14-1172-JuKiDAZ (9th Cir. BAP 2014), at p. 41. (Unpublished.)

[117] *Id.* at p. 42. (Unpublished.)

they agreed to an interest rate significantly less than the 5.0% offered in the Plan, and failed to quantify any of those risks.

With respect to Wells Fargo's pre-existing loan covenants, that "[t]here is no requirement that the lender's pre-petition security agreement or mortgage, with all its various terms and obligations, be used in order for the lender to retain its lien."[118] There is broad support for this principle.   "The covenants to be included in the loan documents of a cramdown need not precisely track the covenants in the parties' existing loan agreement."[119]

Further, Wells Fargo has failed to quantify the degree of risk generated by the lack of the pre-existing loan covenants.[120] Wells Fargo has not linked any degree of quantifiable risk on their part to a lack of loan covenants.  In fact, in addition to its collateral position, there are a number of protections for Wells Fargo under the Debtor's Plan, enumerated as follows:

- o   Payment of $361,445.27 from sale of the Steel Farm.[121]
- o   Semi-annual installments of $765,298.92, due January 1st and July 1st.[122]
- o   The remaining balance due and payable on or before July 1, 2021.[123]
- o   Retention of their lien.[124]
- o   Post-petition interest to the extent provided for in Bankruptcy Code section 506(b) and reasonable attorney's fees pursuant to section 506(b) as allowed by the United States Bankruptcy Court.[125]

---

[118] *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 159 (Bankr. D. N.J. 2010) *quoting* 7 Lawrence P. King, Collier on Bankruptcy, ¶ 1129.04[2][a][iii] (16th Ed. 2009).
[119] *In re American Trailer and Storage, Inc.*, 419 B.R. 412, 440-41 (Bankr. W.D. Mo.  2009 *quoting In re P.J. Keating Co.*, 168 B.R. 464, 473 (Bankr. D. Mass. 1994) *quoting In re Western Real Estate Fund, Inc.*, 75 B.R. 580 (Bankr. W.D.Okla. 1987); *also citing In re Stratford Assoc. Ltd. P'ship.*, 145 B.R. 689, 703 (Bankr. D. Kan. 1992) (finding that if a debtor could not modify loan documentation it would make the whole reorganization process unworkable).
[120] *In re North Valley Mall, LLC*, 432 B.R. 825, 836 (Bankr. C.D. Cal. 2010) ("We are left with the issue of loan covenants, which the bank complains affects the degree of risk if left out from the reorganized debtor's set of obligations. While this proposition is certainly true logically, little or no evidence is presented from which the Court might quantify that degree of risk.").
[121] Ex. 100, Article 3.3.6
[122] *Id.*
[123] *Id.*
[124] *Id.* (subject to Article 5.2.2).

- o  If equipment is sold, Debtor must pay Wells Fargo's valid liens in such.[126]

- o  Any future real property sold must be sold at then-existing fair market value.[127]

- o  The opportunity of Wells Fargo to review the purchase & sale agreement on such real property, if any sale proposed.[128]

- o  The right to object to any such real property sale.[129]

- o  The right to be paid the value of their lien, subject to its relative priority.[130]

- o  A prohibition on Related Party Transactions.[131]

- o  Potential payments from collection activities of Related Parties Receivables from the Collection Committee.[132]

- o  When the Debtor obtains take out financing, Wells Fargo will be paid.[133]

Given their grossly over-secured position and the above noted protections, the Debtor's treatment of Wells Fargo's claim satisfies § 1129(b)(2)(A)(i).

### 2.  Debtor's Plan Complies with 11 U.S.C. § 1129(b)(2)(A)(ii)—Cause Under § 363(k) Exists in this Case

The Debtor's Plan provides for the limited right to sell crops, but provides replacement collateral of future crops grown and related proceeds.  Section 5.2.2 Sales of Estate Assets provides that the Debtor, if current with its payments, may sell crops and fund the Plan and ongoing operations.

With regards to untitled machinery, if the Debtor sells such machinery, the proceeds from such shall be used to pay the secured creditors, i.e., Wells Fargo.  Subsequent sales of real property may occur, but real property must be sold at then-existing fair market value

---

[125] *Id.* at Article 3.5
[126] *Id.* at Article 5.2.2.2
[127] Article 5.2.2.3
[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] Ex. 199A, Article 5.2.4.
[132] *Id.* at Article 5.2.5.
[133] Ex. 100, Article 5.3.

based on a market appraisal not more than six (6) months old.  Secured creditors must be provided notice, including a copy of the estimated HUD-1 and are given ten (10) days to object to the sale.  The net proceeds from the sale of real property shall be paid to secured creditors.

With regards to the Steel Farm Sale, the Plan lays out the distribution of proceeds.[134] Wells Fargo objects to the sale and asserts a right to credit bid.  However, the right to credit bid is not absolute.[135] "A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization . . . ."[136]

Here, the Steel Farm is sold to expand the joint venture. The joint venture allows an improved crop rotation and corresponding improvements in the quality and yield of potatoes. *See* Section II.D, Paragraph 26 above.

Thus, cause exists under § 363(k) to limit the right to credit bid.  Additionally, cause also exists in this instance due to Wells Fargo's first lien position in 1.1 million dollars of real estate and a second lien position in $23.4 million of real estate, and the floating lien in all of the crops, and Wells Fargo's' second lien position in machinery and equipment.

As such, the Debtor's Plan complies with § 1129(b)(2)(A)(ii).

### 3.  Debtor's Plan Complies with 11 U.S.C. § 1129(b)(2)(A)(iii).

The Debtor respectfully submits that the Plan also provides the indubitable equivalent of its claim to Wells Fargo and meets the statutory requirements of 1129(b)(2)(A)(iii) by providing for cash payments, while retaining the floating lien in

---

[134] *See* Section II.E, Paragraph 34 and corresponding footnotes above for a summary of the proposed distributions from closing.
[135] *See In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 59-60 (Bankr. D. Del. 2014) and cases cited therein.
[136] *Id.* at 60 n. 14 (internal citations omitted).

crops, and receipt of net sale proceeds, if sold, of other collateral by order of respective

priority.

4. Debtor's Plan Complies with 11 U.S.C. § 506.

Contrary to Wells Fargo's mistaken assertion,[137] Debtor's Plan does comply with 11

U.S.C. § 506(b). The Debtor's Plan expressly provides in relevant part:

> [H]olders of Allowed Claims that are secured shall be entitled
> to post-petition interest to the extent provided for in
> Bankruptcy Code section 506(b) and reasonably [sic]
> attorney's fees pursuant to section 506(b) as allowed by the
> United States Bankruptcy Court.  Requests for reasonably
> attorney's fees by holders of Allowed Claims that are secured
> claims shall be made pursuant to the procedure and timeframe
> set forth in Paragraph 14.1.2 herein.
> *Ex.* 100 at p. 32, Paragraph 3.5, *Accrual of Post-Petition
> Interest and Attorney's Fees.*
>
> [R]equests for attorney's fees pursuant to section 506 of the
> Bankruptcy Code, shall be filed and served on Debtor and his
> [sic] counsel, and the Office of the United States Trustee, as
> well as those parties filing notices of appearance in these cases
> or otherwise requesting notice of such application, no later than
> thirty (30) calendar days after the Confirmation Date, unless
> otherwise ordered by the Bankruptcy Court.
> *Id.* at p. 52, Paragraph 14.1.2, *Professional Fee Claims;
> Substantial Contribution.*

Where the Debtor's Plan expressly provides secured creditors with an opportunity to

request reasonable fees pursuant to 11 U.S.C. § 506, Wells Fargo's objection is not well

taken.

---

[137] *See* Objection to Confirmation, Section C, paragraphs 40-42 (Doc. 575 at p. 18).

**D.  *Debtor's Proposed Management and Advisory Board are consistent with the interests of creditors and equity security holders and with public policy.* 11 U.S.C. § 1129(a)(5)**

Under Section 1129(a)(5), the identity of post-confirmation management must be disclosed and the Court must determine that management's service is "consistent with the interests of creditors and equity security holders and with public policy."[138]

The Court previously approved Debtor's disclosure statement, which contained the required disclosures of post-petition management.  Moreover, "[i]n order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors."[139] As previously noted, Wells Fargo's own witness indicated that Debtor's management produces crops that are better than most farmers.[140]

Wells Fargo objects asserting that current management is not in the best interest of creditors due largely to the pre-petition related party receivables.  The Debtor has modified its Second Amended Plan addressing this objection.

Specifically, the Debtor's Plan (1) prohibits lending or investing during the term of the Plan and (2) only allows sales of crops to Walker Produce or other Related Parties provided that such crops are paid for in the ordinary course of business.[141]  The Debtor's Plan also (3) creates a creditor collection committee to collect the related party receivables.  If the Debtor is unable to collect 50% or more of the pre-petition balances owed, then such accounts shall be assigned to the Collection Committee for collection after six (6) months.

---

[138] 11 U.S.C. § 1129(a)(5); *See also*  7 Collier On Bankruptcy ¶ 1129.02[5][B] at p. 1129-31 (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2009).
[139] *In re Landing Associates, Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) (citation omitted).
[140] *See* note 47 *supra.*
[141] Ex. 199A adding Section 5.2.4 to the Plan.

Post-petition balances more than 90 days past due shall be assigned to the Collection Committee.[142]

Further, with respect to Walker Produce, testimony and evidence were presented that the relationship between a grower and a shed is (1) a common relationship in the industry, and (2) allows the Debtor to maximize the price for its potatoes. This benefit is maximized exponentially with regards to McNeil Fruit & Vegetable, dba Portion Control Fresh.[143]

In short, the Debtor's Plan retains the new, post-petition management team allowing post-petition farming performance to continue, while removing any perceived conflict of interest with regards to pre-petition receivables. As such, proposed management for the Reorganized Debtor is in the best interest of all interested parties and consistent with 11 U.S.C. § 1129(a)(5).

### E. *Western Mortgage's claim is properly included in Class 51.* 11 U.S.C. § 1122.

The Western Mortgage unsecured claim is substantially similar to other unsecured claims and properly classified in Class 51.[144] The UCC objects to the inclusion of Western Mortgage as a part of Class 51, asserting that Western Mortgage should be included in Class 52 and subordinated to members of Class 51, in order to accelerate the payoff of other members of Class 51.

There are no special circumstances that warrant a separate classification of Western Mortgage. The Western Mortgage Note expressly provides that while the Debtor is guaranteeing the Note, the Debtor and Walker Produce, Inc. will be treated "in the same

---

[142] Ex. 199A adding Section 5.2.5 to the Plan.
[143] *See* Paragraph 25 and related notes supra.
[144] *See* 11 U.S.C. § 1122 and *Steelcase Inc. v. Johnston (In re Johnston),* 21 F.3d 323, 327 (9th Cir. 1994) ("bankruptcy court judges must have discretionary power in classifying claims under Sec. 1122(a)" and "broad latitude").

manner as if said entities were Makers."[145] The Note matured on December 16, 2013, and has not been paid. Therefore, the liability is a current obligation of the Debtor. Notably, 140 members of Class 51 support the Debtor's Plan "as-is." Unlike *Steelcase, Inc. v. Johnston*, the Western claim is not embroiled in litigation, and the testimony at trial was that the guarantors were not in a position to pay Western Mortgage.[146]

Presumably, if the Debtor were to reclassify Western Mortgage, as the UCC suggests, the Debtor would likely be accused of gerrymandering the classes. Without Western Mortgage's rejecting ballot, Class 51 would be an accepting class.[147]

The UCC also implies that Class 51 discriminates unfairly because Rabo's default language provides that non-payment to the three largest members of Class 51 constitutes a default under the Rabo loan/stipulation. Whether Crop Production Services (CPS), Western Mortgage (WM) and Rocky Mountain Power (RMP) are classified differently than the other creditors in Class 51 is a question of fact for the Court to determine. Courts are given broad latitude in classifying claims.[148]

The fact that Rabo under Class 5 can elect to declare a default if a payment to CPS, WM or RMP is missed does not change the nature of the Class 51 claims, including CPS, WM and RMP. Each of their claims is "substantially similar" to the other claims in Class 51. The fact that Debtor has a motivation to make sure these three claimants are paid does not rise to the level of a valid business or economic reason to separate. In fact, all interested

---

[145] See Ex. 270.

[146] Trial Testimony, Keith Walker, 12/30/14, 10:05:35 – 10:06:21. See also Ex. 220 at pp. 7-8, Paragraph 33; Ex. 221; see also Exs. 150 and 179 (noting the personal liability of the guarantors on the RABO note.); Ex. 270 (noting individuals/makers are the same on the RABO loan and the Wells Fargo loans.); and Exs. 221, 299H, 299I, 299J and 299K.

[147] As noted in the Debtor's Ballot Summary, Ex. B at p. 4 (Doc. 611-2). There were two (2) rejecting ballots submitted by members of Class 51 for a total rejecting amount of $3,028,225.06. Western Mortgage constitutes $3,026,452.05 of that amount. See Debtor's Ballot Summary, Ex. A at p. 8 (Doc. 611-1).

[148] *In re Johnston*, 21 F.3d 323, 327 (9th Cir. 1994).

parties have the same motivation to avoid a potential default.  The Rabo Stipulation does not alter the nature of their actual claims.  They do not have any additional security or third party source of payment to distinguish them from the other claimants in their class.  While it is possible to classify similar claims in different classes, there are limits to that right.  If claims are substantially similar, there must be a valid business or economic reason for the separate classifications.[149]

The treatment under Class 51 provides the same pro rata distribution for all members of that class.[150]

### F.  *Commercial Credit Group's Plan Treatment is Consistent with the Parties' Stipulation*

CCG's objection ignores that fact that the Debtor's Plan incorporates the parties' adequate protection stipulation and the terms and conditions incorporated in said stipulation by CCG until CCG is paid in full.[151] CCG did not appear in support of its objection, and at the confirmation hearing, both Wells Fargo and the Debtor requested that CCG's objection to confirmation be overruled for lack of prosecution. The Court took that request under advisement and the Debtor respectfully renews that request now.

### G. *Wells Fargo's Liquidating Plan Can Not Be Confirmed.*

In addition, there are several reasons the Court should deny confirmation of the Wells Fargo Liquidating Plan.

---

[149] *See In re Marlow Manor Downtown*, (BAP No. AK-14-122-JuKiKu) (Not Published) *citing In re Barakat*, 99 F. 3d 1520, 1527 (9th Cir. 1996).
[150] *See Id.*; and *In re Loop 76, LLC*, 465 B.R. 525 (B.A.P. 9th Cir., 2012).
[151] Ex. 144 (Stipulation, Doc. 107); Ex. 100 at p. 23 (Section 3.3.23, Class 26).

First, the Debtor joins in the objections made by Walker Produce and various equity holders and incorporates them as fully set forth herein.[152]

Second, Wells Fargo has failed to comply with the clear requirements of 11 U.S.C. § 1129(a)(5) in failing to identify the specific members who would serve on its Wind Down Committee, the management decision makers under the Wells Fargo Plan.  They have identified who will pick the members but not who the specific members will be.  The statute specifically requires the "identity and affiliations of any individual proposed to serve."[153] Without that information, as here, it is impossible for the Court, the Debtor, creditors or other interested parties to know what conflicts these parties might have.  That failure bars confirmation of the Wells Fargo Plan under the clear language of the Code.

Third, the proposed administrator of the Wells Fargo Plan, Mr. Rainsdon, is unlikely to be able to successfully balance the requirements of liquidating 8,500 acres of ground, the long term ground leases of an additional 3,500 acres, in excess of 1 million sacks of *perishable* potatoes,[154] plus millions of dollars in equipment, given the fact that he will simultaneously be dealing with hundreds of chapter 7 cases as a full-time chapter 7 Trustee, many of which involve Wells Fargo, plus his own farm operation.  This seems, at minimum, to be a superhuman task given the time limitations imposed by Wells Fargo.

Fourth, the Wells Fargo Liquidating Plan turns the protections of the Bankruptcy Code on their head.  Rather than an emphasis on maximizing the return to creditors[155], the

---

[152] In the interest of brevity and deference to the Court, the Debtor incorporates by this reference the arguments set forth in the Closing Briefs to be submitted by Walker Produce and the Equity Interest Holders and reserves the right to speak to those issues and issues raised in prior pleadings at oral argument.

[153] 11 U.S.C. § 1129(a)(5)(A)(i).

[154] Potatoes are currently stored in 24 different, climate controlled potato cellars, in Hamer, Osgood and Ririe, Idaho.  Naturally, as the weather warms up, maintaining the quality of each cellar is a unique challenge (temperature, humidity, sprout inhibitors, ozone applications, etc.).  The Plan Administrator's assertion that caring for these different cellars would not be a challenger is shortsighted.

[155] *U.S. v. Sims (In re Feiler)*, 218 F.3d 948, 952 (9th Cir. 2000).

Liquidating Plan puts the emphasis on speed.  Instead of the chapter 7 Trustee working in the best interest of creditors,[156] this Plan puts the interest of a select group of secured creditors first.  And, only after the issue was raised aggressively before the Court, did Wells Fargo amend its Plan to provide rudimentary due process protections.  Under *Lowenschuss*, this Court may not approve plans of reorganization that are inconsistent with the Bankruptcy Code.[157]

Last, in the event the Court determines both plans are confirmable, the Debtor respectfully notes that pursuant to 11 U.S.C. § 1129(c), the preference of the creditors in support of the Debtor's Plan leans heavily in favor of the Debtor's Plan and the proposed reorganization.[158]

[SPACING INTENTIONAL]

---

[156] 11 U.S.C. § 704(a)(1)("compatible with the best interests of parties in interest").

[157] "The bankruptcy court lacks the power to confirm plans of reorganization which do not comply with applicable provisions of the Bankruptcy Code."  *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995).  While that case analyzed 11 U.S.C. § 524(a), the same principles apply to other provisions in the Code, e.g. § 1112(c).

[158] *See* Debtor's Ballot Summary (Doc. 611) at Ex. E (Doc. 611-5); *See also In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999)(reorganization is preferable, provides a greater return, avoids losses due to dismemberment of the debtor, furthers the policy of chapter 11 to rehabilitate the debtor) (internal citations omitted).

## IV.    CONCLUSION

Based on the foregoing, the Debtor respectfully asserts that its Plan satisfies all the requirements under both § 1129(a) and (b).  Further, confirmation of the Debtor's Plan is in keeping with the fundamental purpose of chapter 11 "to prevent a debtor from going into liquidation" and "permit successful rehabilitation" of the Debtor.[159]   Confirmation of the Debtor's Plan will allow the Debtor to reorganize and to (1) repay its creditors, in full with interest,  (2) avoid loss of jobs, and (3) avoid the negative impacts on value attendant with Wells Fargo's proposed liquidation of this farmer.  The Debtor's Plan should be confirmed.

DATED:         February 20, 2015

MAYNES TAGGART, PLLC

By:     _/s/ Robert J. Maynes_
Robert J. Maynes for the Firm

---

[159] _National Labor Relations Board v. Bildisco_, 465 U.S. 513, 527 & 528 (1984).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 20, 2015, I filed a copy of the attached pleading with the Court via CM/ECF and the following parties are reflected as receiving the Notice of Electronic Filing as CM/ECF Registered Participants:

PARTIES SERVED:

Thomas Timbridge Bassett on behalf of Creditor Helena Chemical Company
tom.bassett@klgates.com, pam.miller@klgates.com

Steven William Boyce on behalf of Creditor C&B Operations, LLC
swboyce@smithbanks.net, sknueppel@smithbanks.net

Kirk Sterling Cheney on behalf of Creditor Wells Fargo Bank NA
kscheney@hollandhart.com

Kirk Sterling Cheney on behalf of Creditor Wells Fargo Bank, N.A.
kscheney@hollandhart.com

Craig W Christensen on behalf of Creditor J R Simplot Company
cwcc@ida.net

Gregory L Crockett on behalf of Creditor Electrical Wholesale Supply Co., Inc.
gregcrockett@hopkinsroden.com, tammytheiler@hopkinsroden.com

Barry W Davidson on behalf of Creditor Unsecured Creditors Committee
bdavidson@dbm-law.net, cnickerl@dbm-law.net;sabrahamson@dbm-law.net;reception@dbm-law.net;ccusack@dbm-law.net

Bart M Davis on behalf of Creditor Bart M Davis
bartdavis@me.com, theresacarson@me.com

Bart M Davis on behalf of Interested Party R&S Farms Limited Partnership
bartdavis@me.com, theresacarson@me.com

Bart M Davis on behalf of Interested Party Lorin V. Walker
bartdavis@me.com, theresacarson@me.com

Bart M Davis on behalf of Interested Party Roland N. Walker
bartdavis@me.com, theresacarson@me.com

Bart M Davis on behalf of Interested Party Sally Walker
bartdavis@me.com, theresacarson@me.com

Bart M Davis on behalf of Interested Party Vickie L. Walker

bartdavis@me.com, theresacarson@me.com

Karl R Decker on behalf of Interested Party Allyson K. Walker
kdecker@holdenlegal.com, jtimberlake@holdenlegal.com;chomer@holdenlegal.com

Karl R Decker on behalf of Interested Party Keith T. Walker
kdecker@holdenlegal.com, jtimberlake@holdenlegal.com;chomer@holdenlegal.com

Dan C Dummar on behalf of Creditor C&B Operations, LLC
dan@beardstclair.com

Monte C Gray on behalf of Creditor Unsecured Creditors Committee
montegray@cableone.net, livg@cableone.net;dianegraylaw@cableone.net

Daniel C Green on behalf of Creditor Larsen Farms
dan@racinelaw.net, rag@racinelaw.net;sab@racinelaw.net;brc@racinelaw.net

Daniel C Green on behalf of Creditor Rabo Agrifinance, Inc.
dan@racinelaw.net, rag@racinelaw.net;sab@racinelaw.net;brc@racinelaw.net

Charles A Homer on behalf of Interested Party Allyson K. Walker
chomer@holdenlegal.com, jtimberlake@holdenlegal.com;aulrich@holdenlegal.com

Charles A Homer on behalf of Interested Party Keith T. Walker
chomer@holdenlegal.com, jtimberlake@holdenlegal.com;aulrich@holdenlegal.com

Michael R Johnson on behalf of Creditor Rabo Agrifinance, Inc.
mjohnson@rqn.com, dburton@rqn.com;docket@rqn.com

R Ron Kerl on behalf of 3rd Pty Defendant John Deere Credit
Ron@cooper-larsen.com, kelli@cooper-larsen.com

R Ron Kerl on behalf of Creditor Deere & Company
Ron@cooper-larsen.com, kelli@cooper-larsen.com

Mary P Kimmel on behalf of U.S. Trustee US Trustee
ustp.region18.bs.ecf@usdoj.gov

Jay A Kohler on behalf of Interested Party Blair G Erickson
cindy@kohlerlawif.com

Jay A Kohler on behalf of Interested Party Celia K Erickson
cindy@kohlerlawif.com

David Henry Leigh on behalf of Creditor Rabo Agrifinance, Inc.
dleigh@rqn.com, dburton@rqn.com;docket@rqn.com

Stephen Kent Madsen on behalf of Debtor Walker Land & Cattle, LLC
skmadsen.mayneslaw@gmail.com, rosie.mayneslaw@gmail.com


Bruce K Medeiros on behalf of Creditor Unsecured Creditors Committee
bmedeiros@dbm-law.net, sabrahamson@dbm-law.net;cnickerl@dbm-
law.net;reception@dbm-law.net

Joseph M Meier on behalf of Creditor 03 Zone Co., Inc.
jmeier@cosholaw.com, jbean@cosholaw.com

Joseph M Meier on behalf of Creditor Walker Produce Co., Inc.
jmeier@cosholaw.com, jbean@cosholaw.com

Stephen A Meikle on behalf of Creditor AAAUrethane, Inc.
sammeikle@msn.com

James K Miersma on behalf of Creditor Ally Financial, Inc.
ecfid@rcflegal.com

Derrick J O'Neill on behalf of Creditor U.S. Bank National Association
doneill@rcolegal.com, ecfid@rcolegal.com

Randall A Peterman on behalf of Creditor Commercial Credit Group Inc.
rap@moffatt.com,
kad@moffatt.com;ecf@moffatt.com;moffattthomas@hotmail.com;kgm@moffatt.com

Larry E Prince on behalf of Creditor Wells Fargo Bank NA
lprince@hollandhart.com, tahancock@hollandhart.com;boiseintaketeam@hollandhart.com

Larry E Prince on behalf of Defendant Wells Fargo Bank, National Association
lprince@hollandhart.com, tahancock@hollandhart.com;boiseintaketeam@hollandhart.com

James A Rubenstein on behalf of Creditor C&B Operations, LLC
Jim.Rubenstein@lawmoss.com, Maureen.Montpetit@lawmoss.com

Lance J Schuster on behalf of Creditor C&B Operations, LLC
lance@beardstclair.com,
shaunie@beardstclair.com;hammer@beardstclair.com;jessica@beardstclair.com

Lance J Schuster on behalf of Plaintiff C&B Operations, LLC
lance@beardstclair.com,
shaunie@beardstclair.com;hammer@beardstclair.com;jessica@beardstclair.com

Sheila Rae Schwager on behalf of Creditor c/o Sheila R. Schwager Crop Production

Services,Inc.
sschwager@hawleytroxell.com, cdavenport@hawleytroxell.com

Matthew K Shriver on behalf of Creditor Ally Financial, Inc.
ecfid@rcolegal.com, mshriver@rcolegal.com

Marvin Marion Smith on behalf of Creditor Estate of Blair M. Walker
mmsmith@smithbanks.net, marci@smithbanks.net

Marvin Marion Smith on behalf of Creditor Debbie Walker
mmsmith@smithbanks.net, marci@smithbanks.net

James A Spinner on behalf of Creditor Parkinson Seed Farm, Inc.
spinjim@cableone.net

Aaron J Tolson on behalf of Creditor Conrad & Bischoff
ajt@aaronjtolsonlaw.com

Aaron J Tolson on behalf of Creditor Sometimes A Great Notion Land And Cattle Company
ajt@aaronjtolsonlaw.com

Brian T Tucker on behalf of Creditor The Bank of Commerce
bttucker@nhptlaw.net

US Trustee
ustp.region18.bs.ecf@usdoj.gov

Jeffrey M Wilson on behalf of Creditor Toyota Lease Trust
jeff@wilsonmccoll.com, louis@wilsonmccoll.com

Jeffrey M Wilson on behalf of Creditor Toyota Motor Credit & Toyota Lease Trust
jeff@wilsonmccoll.com, louis@wilsonmccoll.com

Jeffrey M Wilson on behalf of Creditor Toyota Motor Credit Corp
jeff@wilsonmccoll.com, louis@wilsonmccoll.com

And as otherwise noted on the Court's Notice of Electronic Filing.

DATED: February 20, 2015

*/s/ Robert J. Maynes*
ROBERT J. MAYNES