Monte C. Gray, ISB No. 5988
GRAY LAW OFFICES PLLC
427 North Main Street, Suite L
P.O. Box 37
Pocatello, Idaho  83204
Telephone:(208) 478-1250
Facsimile: (888) 900-1610
Email: *montegray@cableone.net*


Barry W. Davidson, *pro hac vice admission*
Bruce K. Medeiros, *pro hac vice admission*
DAVIDSON BACKMAN MEDEIROS PLLC
1550 Bank of America Financial Center
601 West Riverside Avenue
Spokane, Washington  99201
Telephone:(509) 624-4600
Facsimile: (509) 623-1660
Email:  *bdavidson@dbm-law.net* and *bmedeiros@dbm-law.net*

Counsel for the Official Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO

| | |
|---|---|
| In re: <br><br> **WALKER LAND & CATTLE, LLC,** <br><br> Debtor. | Case No.  **13-41437-JDP** <br> Chapter **11** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' CLOSING BRIEF
RE: CONFIRMATION OF DEBTOR'S SECOND AMENDED CHAPTER 11
PLAN OF REORGANIZATION AND THE AMENDED CHAPTER 11
LIQUIDATION PLAN (WELLS FARGO)**

## I.  <u>INTRODUCTION</u>

1.1    COMES NOW, the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), by and through its counsel Davidson Backman Medeiros PLLC and Gray Law Offices PLLC, and hereby submits the following as the closing argument of the Committee with respect to the confirmation of the Second Amended Chapter 11 Plan Of Reorganization filed herein by Walker Land & Cattle, LLC on September 19, 2014 *[Docket No. 501]*, as modified by the Stipulation Modifying Debtor's Second Amended Plan (Bank of Commerce) filed on November 14, 2014 *[Docket No. 590]* (the "<u>Bank of Commerce Stipulation</u>")*,* the Stipulation Modifying Debtor's Second Amended Plan (Rabo Agrifinance) filed on November 14, 2014 *[Docket No. 591]* (the "<u>Rabo Stipulation</u>")*,* the Supplements thereto filed on November 14, 2014 *[Docket Nos. 596 and 597]*, and Debtor's Modification of Its Second Amended Plan filed on January 14, 2015 *[Docket No. 654]* (hereinafter collectively referred to as the "<u>Debtor's Plan</u>") and the Amended Chapter 11 Liquidation Plan (Wells Fargo) filed by Wells Fargo on September 25, 2014 *[Docket No. 511]*, as modified by the Supplement to Amended Chapter 11 Plan (Wells Fargo) filed on November 21, 2014 *[Docket No. 615]*, and the Modification of Wells Fargo's Chapter 11 Liquidation Plan filed on February 2, 2015 *[Docket No. 671]* (hereinafter collectively referred to as the "<u>Liquidation Plan</u>").

## II.     ARGUMENT RE: DEBTOR'S PLAN

2.1     The Committee filed its Objection To Debtor's Second Amended Chapter 11 Plan Of Reorganization And Partial Joinder In Wells Fargo's Objection To Debtor's Plan on November 7, 2014 *[Docket No. 577]* ("Committee's Objection to Debtor's Plan").   In addition, the Committee filed an Objection To Stipulation Modifying Debtor's Second Amended Plan (Rabo Agrifinance) on November 26, 2014 *[Docket No. 626]* and a Reply To Rabo Agrifinance, Inc.'s Response To The Committee's Objection To Rabo's Plan Treatment filed on December 3, 2014 *[Docket No. 630]* (hereinafter collectively referred to as "Objections to Rabo Stipulation"). The Committee's Objection to Debtor's Plan and the Objections to Rabo Stipulation are hereby incorporated by reference herein and if possible will not be restated in this Brief.

2.2     The initial objection presented by the Committee in the Committee's Objection to Debtor's Plan was to the determination of the Effective Date under the Debtor's Plan.  The Bank of Commerce Stipulation and the Rabo Stipulation changed the definitions of the Distribution Date and the Effective Date under the Plan, which resolved the Committee's objection as to the determination of the Effective Date under the Plan.

2.3     Paragraph 2 of the Committee's Objection to Debtor's Plan states the Committee's concerns regarding the Debtor's sale of real property post-confirmation in the event such sales are necessary in order for the Debtor to fund its operations and/or its payments under the Plan.  The revisions to Section 5.2.2.3 of the Plan set forth on pages 11-12 of the Rabo Stipulation impose additional requirements on the Debtor with respect to its post-confirmation sale of real property other than the sale of the "Steel Farm" property that is provided for in the Plan.  The Rabo Stipulation provides that the property must be sold for the then existing fair market value determined by an appraised value based on a market appraisal that is not more than six (6) months old and that the Debtor is required to provide notice to secured creditors holding liens of record on any such real property to be sold and a copy of the proposed purchase and sale agreement along with an estimated HUD Settlement Statement.  The Rabo Stipulation further provides that secured creditors holding liens of record will have ten (10) business days to object to a sale.  However, the Plan is unclear as to what the process will be to resolve any such objections filed by secured creditors holding liens of record.

While the provisions added under the Rabo Stipulation do provide additional hurdles for the Debtor to deal with in order to sell its real property post-confirmation, no provisions were added for the holders of unsecured claims to receive any notice or

right to object to proposed post-confirmation sales. The concern remains that even if secured creditors are involved in the process, they will be concerned with the sufficiency of sale prices to cover their secured claims, not maximizing the value of the property. Therefore, the primary concerns raised by the Committee in paragraph 2 of the Committee's Objection to the Debtor's Plan remain unresolved.

2.4    Paragraph 3 of the Committee's Objection to Debtor's Plan seeks clarification of the Debtor's proposed payments to Class 51 creditors. The Debtor's Plan does not specifically address the concerns raised in paragraph 3 of the Committee's Objection to Debtor's Plan. During the course of trial, the Debtor's Exhibit 172 was admitted into evidence supported by the testimony of Sam W. Cook, the Debtor's CFO. Exhibit 172 sets forth the bi-annual payments that the Debtor believes will be made to the holder of each Class 51 claim. It also indicates that the term for payments to Class 51 creditors is seven (7) years. However, Exhibit 172 contains a semi-annual contingency payment of $161,321.66. Exhibit 172 does not specifically describe the purpose of the contingency. However, under cross-examination by counsel for the Committee Mr. Cook testified that the contingency is simply a figure that he included in Exhibit 172 to make it easier for him to reconcile the payments to earlier payment schedules that he had prepared regarding payments to Class 51 creditors. Mr. Cook acknowledged that the contingency amount would

actually be distributed pro rata to Class 51 creditors along with all other funds disbursed semi-annually to Class 51 creditors under the Debtor's Plan.  Mr. Cook further acknowledged that the actual term for payments to Class 51 creditors using the payments described in Exhibit 172, and including the contingency amount to be distributed pro rata, would actually be approximately five and half (5.5) years rather than the seven (7) years set forth in Exhibit 172.  According to calculations made by counsel for the Committee, Mr. Cook is correct in his estimation of the five and half (5.5) year payment period for all of the claims in Class 51.  Assuming that the initial payment to Class 51 creditors occurs on July 1, 2015, the last payment due would be a payment of approximately $40,000.00 distributed pro rata to the holders of allowed Class 51 claims on January 1, 2021, approximately five and half (5.5) years from the date payments commence.  As indicated in paragraph 3 of the Committee's Objection to Plan, if the Debtor's Plan is confirmed, the Debtor should file a supplement that clearly reflects the estimated time period over which payments to Class 51 creditors depending upon the Courts resolution of all objections to the Debtor's Plan.

2.5    As set forth in paragraph 4 of the Committee's Objection to Debtor's Plan, the Debtor's Plan improperly classifies the claim of Western Mortgage & Reality Company ("Western Mortgage"), Claim No. 123 in the amount of $3,026,452.05 (the "Western Mortgage Claim") in Class 51 with trade and ordinary course unsecured

creditors.  This aspect of the Committee's Objection to Debtor's Plan has not been resolved.

During the confirmation hearing, Roland N. Walker testified that he was a party to the Western Mortgage Term Note in the original principal amount of $3,000,000.00 dated August 26, 2013 which is attached to the Western Mortgage Claim (the "Note") and is the basis for the Western Mortgage Claim.  Mr. Walker further testified that the Note, a copy of which was introduced as Wells Fargo Exhibit 270, was a true and accurate copy of the Note executed by Mr. Walker and the other makers of the Note. Mr. Walker and Judith G. Brower of Galusha Higgins & Galusha, P.C., the auditors employed by the Debtor herein, testified that the funds obtained by the makers of the Note from Western Mortgage were used to make a capital contribution to the Debtor. As is clearly stated on the face of the Western Mortgage Claim, it is a claim for the Debtor's guaranty of the Note under which sixteen (16) other parties are the makers. The Debtor and Walker Produce Co., Inc. ("Walker Produce") are guarantors of the Note, not makers.

No evidence was presented that the Note was ambiguous.  Therefore the Note speaks for itself.  The Note clearly indicates that Western Mortgage, as the payee, acknowledged and understood that the Debtor and Walker Produce were guarantors under the Note, not makers.  There is language in the Note that defines the amount that

the Debtor and Walker Produce have guaranteed as the amount that is due and payable by the makers under the Note.   However, it is clear that the Debtor and Walker Produce are not makers.

11 U.S.C. § 1122 governs the classification of claims or interests under a chapter 11 plan.  § 1122(a) states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."   Western Mortgage's claim against the Debtor is as guarantor of the Note.  Sixteen (16) other parties are primarily liable as the makers of the Note and Walker Produce is also liable as a co-guarantor.  Therefore, there are numerous other sources for payment of the Note other than the Debtor.  On that basis alone, the Western Mortgage Claim is not substantially similar to other holders of other Class 51 claims who are primarily trade creditors and ordinary course unsecured creditors.   *In re Loop 76, LLC*, 465 B.R. 525, 541 (9th Cir. BAP 2012).   *Id.*  In *Loop 76*, the Bankruptcy Appellant Panel for the Ninth Circuit determined that a creditor who has third party sources for recovery of its claim and may be paid prior to the holders of general unsecured claims, is not substantially similar to the claims of trade creditors and ordinary course unsecured creditors and should not be classified in the same class as such creditors.  *Id.*  The Western Mortgage claim should either be classified with other insider claims in Class 52 since the makers of the Note are

primarily insiders and the funds borrowed from Western Mortgage under the Note were used for a capital contribution to the Debtor, or it should be placed in its own separate class. The Debtor's Plan should not be confirmed unless the Western Mortgage claim is re-classified in a separate class or in Class 52.

  2.6 The Committee's Objection to the provisions in the Rabo Stipulation which make a default by the Debtor in its Plan payments to secured creditors other than Rabo and to unsecured creditors Crop Production Services, Western Mortgage and Rocky Mountain Power, an event of default that would entitle Rabo to assert its default remedies, as defined in the Rabo Stipulation, was not resolved. According to the testimony of Sam Cook under cross-examination by the counsel for the Committee, it would be extremely difficult if not impossible for the Debtor to fund its operations and its proposed Plan payments if the additional default interest of ten percent (10%) is imposed by Rabo. While the Committee understands that such provisions may be common in non-bankruptcy loan documents, to include such provisions in a plan of reorganization only reduces the probability that the Debtor can successfully complete its plan of reorganization. As further set forth in the Objections to Rabo Stipulation, the language in subparagraph f) of Section 3.3.2.4 of the Debtor's Plan, as stated in the Rabo Stipulation, providing that it is a covenant as to the treatment of Rabo's claim under the Debtor's Plan that the Debtor will make all of its

required plan payments to Secured Claims, as defined in the Rabo Stipulation, and to three (3) unsecured creditors, Crop Production Services, Western Mortgage and Rocky Mountain Power only.   The inclusion in that particular provision of the Rabo Stipulation of only those three (3) unsecured creditors, not to all unsecured creditors in Class 51 results in unequal treatment among Class 51 creditors by creating an incentive for the Debtor to pay only those creditors in order to avoid the default consequences under the Rabo Stipulation.  Such discriminatory treatment of creditors in the same class is prohibited by 11 U.S.C. § 1123(a)(4) which provides that a chapter 11 plan must treat claims within the same class the same.  As testified to by Roland Walker and Sam Cook during cross-examination by counsel for the Committee, if the Debtor did not have sufficient funds to make the full semi-annual payment to unsecured creditors under its Plan, the Debtor would clearly have incentive to pay only the pro rata amounts to the three (3) creditors identified above in order to avoid the default consequences under the Rabo Stipulation.  Therefore, the Debtor's Plan cannot be confirmed unless all Class 51 creditors are included in the above referenced provision of the Rabo Stipulation regarding the triggering of Rabo's default remedies or no unsecured creditors are included in that provision.

　　　　2.7    As the Court is well aware, a significant portion of the confirmation hearing was devoted to the presentation of evidence regarding the feasibility of the

Debtor's Plan.   The Committee acknowledges that there are significant concerns regarding the Debtor's ability to successfully operate its way out of its current financial difficulties, including the Debtors optimistic and perhaps unsupported income projections relying on higher crop prices and lower operating expenses than have been obtained in recent years, questions as to the competency of Debtor's current management and the conflicts of interest of its current management with respect to the Debtor's transactions and dealings with its related entities, all of which have been thoroughly discussed in the Memorandum in support of the Liquidation Plan and in Opposition to the Debtor's Plan filed by Wells Fargo on November 20, 2015 *[Docket No. 686]* and need not be re iterated here.   Based on the Debtor's operations particularly from 2011-2013, Wells Fargo has presented numerous exhibits and testimony which indicated that the Debtor's income projections are dramatically inconsistent with its pre-filing operating data.   Using selected historical data and the testimony of Bruce Huffaker as to forecasted increases in potato prices, Well Fargo produced exhibits in order to its contention that the Debtor's Plan is not feasible. While Mr. Huffaker certainly has many years of experience analyzing the potato industry, his testimony also indicated that the forecast model he used has a significant margin of error and is based on a number of assumptions.   The result is that his forecasts are far from certain.   Mr. Huffaker and other witnesses testified that pricing

within the potato industry has been and will continue to be volatile.  That fact operates both for and against the Debtor in that the Debtor's ability to pay its operating expenses and make the projected plan payments depends heavily upon the average price/cwt the Debtor is able to obtain for its potatoes being as high as the Debtor projects.  Based on exhibits prepared by Wells Fargo's expert Charles Hoyt and his testimony, the prices will obtain for its potatoes in the next few years will not be sufficient to fund the Debtor's operation and make the required Plan payments.  The Debtor presented evidence indicating that particularly during the 2012 and the 2013 crop years, the Debtor encountered problems which were unique to those years including, issues related to the weather and the late application of the weed control, all of which are discussed in detail in the Debtor's Closing Brief filed on February 20, 2015 *[Docket No. 686]* (the "<u>Debtor's Closing Brief</u>") and need not be restated here.

The Debtor also presented testimony as to cost saving practices put into place by the Debtor in 2014 which differentiate 2014 and future operations from their operations during the five (5) year period immediately preceding the filing of this chapter 11 case.  Among those are the marketing of the Debtor's potatoes by Portion Control Fresh, LLC directly to the end users of those potatoes in an effort to increase the price obtained by the Debtor.  However, the Portion Control Fresh's marketing program is brand new and as yet unproven because there is limited data available to

analyze in order to determine the long term effects of the marketing of the Debtor's potatoes through Portion Control Fresh.

The unsecured creditors are at great risk if this Court confirms the Debtor's Plan and the Debtor is unable to sustain its operations and the proposed Plan payments. This is especially true if this occurs within the first few years after confirmation of the Debtor's Plan. If the Debtor is unable to fund its operations and the Plan as proposed and secured creditors are forced to execute against their collateral in order to be paid, there will not be an orderly liquidation of the Debtor's assets under a liquidation plan. Instead, it will be a free for all with the secured creditors at the top of the food chain and the unsecured creditors at the bottom. It is unlikely that steps will be taken in that scenario to insure the highest and best price is obtained for the assets that will be liquidated by the secured creditors. The same would be true for any unencumbered assets that are executed upon by the first creditors to obtain judgments against the Debtor and execute upon those judgments.

However, there are other factors to be considered as well. A significant number of unsecured creditors in this case have existing relationships with the Debtor and those relationship would be lost with a resulting negative economic impact upon the future of those unsecured creditors if the Debtor were to cease its operations and be liquidated under the Liquidation Plan. Employees of the Debtor and its related entities

would also be negatively impacted by the Debtor's cessation of operations and liquidation of the Debtor's assets under the Liquidation Plan. While these may not be factors the Court is required to consider under 11 U.S.C. § 1129 as to whether the Debtor's Plan is confirmable, they are the realities of this case which should be taken into consideration along with the legal requirements for confirmation of the Debtor's Plan.

As noted above, the Committee has objected to the classification of the Western Mortgage Claim along with other Class 51 creditors. If this Court finds that the Western Mortgage Claim should not be classified within Class 51 and should be included in Class 52 or in another subordinated class and the payments to Class 51 remain at $810,058.45 semi-annually, the period for full payment to Class 51 creditors would be reduced from five and half (5.5) years to three and half (3.5) years thereby significantly increasing the probability that unsecured creditors will be paid in full under the Debtor's Plan and reducing the risk to unsecured creditors associated with the serious question as to the Debtor's long term viability. This Courts determination as to the classification of the Western Mortgage Claim will therefore have a direct impact upon the feasibility of the Debtor's Plan as it relates to Class 51 creditors.

Based on the evidence presented, this Court will determine whether the Debtor's Plan is feasible. If this Court determines that the Debtor's Plan is not feasible

and cannot be confirmed, confirmation of the Liquidation Plan would be preferable to dismissal.  Allowing much additional time for parties to further modify their plans in the hope of presenting confirmable plans raises other problems, not the least of which will be how to handle the farming operations for the 2015 crop.  The Committee does not believe that additional time would provide any benefit to the Debtor as far addressing the concerns regarding the feasibility of the Debtor's Plan.  If the Debtor were to propose the sale of the Debtor's other encumbered real property, other than the Steel Farm property, it would have no immediate benefit to unsecured creditors because all of the proceeds would be used to pay the claims secured by the property being sold.

### III.   ARGUMENT RE: LIQUIDATION PLAN

3.1    The Committee filed its Objection to the Amended Chapter 11 Liquidation Plan (Wells Fargo) on November 7, 2014 *[Docket No. 578]* ("Committee's Objection to Liquidation Plan").

3.2    Paragraph 1 of the Committee's Objection to Liquidation Plan set forth the Committee's concerns regarding the Effective Date of the Liquidation Plan.  Those concerns were resolved by the modification of the provision in the Liquidation Plan as to the Effective Date in the Supplement to Amended Chapter 11 Plan (Wells Fargo) filed on November 21, 2014 *[Docket No. 615]*.

3.3      The concern of the Committee with respect to the lack of certainty in the

Liquidation Plan as to the Plan Administrator's use of fund in the Unsecured Creditors

Fund, as defined in the Liquidation Plan was resolved by the Modification of Wells

Fargo's Amended Chapter 11 Liquidation Plan filed on February 2, 2015 *[Docket No.*

*671]* ("Modification of Liquidation Plan").   The Modification of Liquidation Plan

deleted the first sentence of Section 3.2.21(c) of the Liquidation Plan that read "[A]fter

the payment of the Plan Administrator's costs and expenses."   The Modification of

Liquidation Plan made it clear that the plan administrator does not have the ability to

draw from the Unsecured Creditors Fund to pay his costs and expenses.  However, the

timing as to the distribution to unsecured creditors under the Liquidation Plan still

remains uncertain.  This is in part due to the fact that the Liquidation Plan provides

that unsecured creditors receive no funds from encumbered assets until all secured

claims that encumber those assets are paid.  Therefore, the Unsecured Creditors Fund

as defined in the Liquidation Plan will only be funded from the sale from those assets

that are currently unencumbered or become unencumbered because all claims secured

by those assets have been paid.

3.4      Wells Fargo presented a significant amount of evidence as to the

feasibility of the Plan.   However, Wells Fargo did not provide any evidence or

testimony which indicated that Wells Fargo undertook any independent analysis as to

the value of the Debtor's assets.  Instead Wells Fargo relied exclusively on the values

provided by the Debtor which may not be indicative of the value the Plan

Administrator will be able to obtain under the Liquidation Plan.  The proposed plan

administrator, Gary Rainsdon testified that he has done nothing to verify or

independently determine the reasonableness of the values determined by the Debtor

upon which the Liquidation Plan is based.  Greg Mondon, who testified as the plan

proponent for the Liquidation Plan, indicated Wells Fargo did little if any analysis to

determine whether the asset values provided by the Debtor would be reasonable under

the Liquidation Plan proposed by Wells Fargo.  As a result there is significant

uncertainty associated with the Liquidation Plan as to when unsecured creditors would

be paid or whether they would be paid in full.  This is in contrast to the Debtor's Plan

which provides for a specific payment schedule for Class 51 claims.  Despite the

amendments to the Liquidation Plan set forth in the Modification of Liquidation Plan it

is still oriented heavily in favor of secured creditors.   The Liquidation process

proposed by Wells Fargo does not inspire confidence that it will maximize the value of

the Debtor's assets and yield sufficient funds to eventually pay Class 51 Unsecured

Creditors in full as is proposed in the Liquidation Plan.

   3.5  As set forth in the Committee's Objection to Liquidation Plan, although

the impact of the cessation of the Debtor's operation and the liquidation of its assets on

the local farming economy generally and specifically on a number of the holders of Class 51 claims who have business relationships with the Debtor and are dependent upon those business relationships are not required to be considered by the Court to determine if the Liquidation Plan is confirmable, they are practical considerations that should be considered in evaluating whether the Liquidation Plan should be confirmed.

The Liquidation Plan proposes the immediate liquidation of the Debtor expected over the period of approximately eight (8) months to a year after confirmation.  Although the Liquidation Plan has incentives for its proposed plan administrator to accomplish not only liquidation but full payment of all administrative, priority, secured and general unsecured claims within one (1) year or fifteen (15) months of the Effective Date of the Liquidation Plan, the process proposed by Wells Fargo does not appear to be a process that will result in the Plan Administrator obtaining the highest and best price for the Debtor's assets thereby maximizing the probability that there will be sufficient funds available in excess of secured claims to pay unsecured claims and possible to leave some distribution for equity holders.

## IV.    <u>CONCLUSION</u>

Unfortunately, both plans raise concerns for the Committee.  The Debtor's Plan is not confirmable in its current form based on the improper classification of the Western Mortgage Claim as a Class 51 claim and because of the discrimination among

Class 51 claim holders that results from the Rabo Stipulation.   There are also significant concerns as to the feasibility of the Debtor's Plan which may lead the Court to determine that the Debtor's Plan cannot be confirmed.   If the Court determines that the Debtor's Plan is not feasible and cannot be confirmed it is the positon of the Committee that the confirmation of the Liquidation Plan, even with its uncertainty as to the true liquidation value of the Debtor's assets, would be preferable to dismissal of this Chapter 11 case.   If the Court determines that the Debtor's Plan is feasible and the Debtor can propose modifications that resolve the incorrect classification of the Western Mortgage Claim and the discrimination among Class 51 creditors resulting from the Rabo Stipulation referenced above, the Committee believes that the Debtor's Plan would then be confirmable and would be preferable over the Liquidation Plan, should the Court determine that both plans are confirmable.

DATED this 20th day of February 2015.

DAVIDSON BACKMAN MEDEIROS PLLC

_/s/ Bruce K. Medeiros_____
Bruce K. Medeiros, WSBA No. 16380
Barry W. Davidson, WSBA No. 07908
*Pro Hac Vice Admission*
Counsel for the Official Committee of
   Unsecured Creditors
1550 Bank of America Financial Center
601 West Riverside Avenue
Spokane, Washington  99201
Telephone: (509) 624-4600
Facsimile: (509) 623-1660

## <u>CERTIFICATE OF SERVICE</u>

I, Stephanie A. Abrahamson, a legal assistant with the law firm of Davidson Backman Medeiros PLLC, hereby certify that on the 20th day of February 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

- Thomas Timbridge Bassett
  *tom.bassett@klgates.com, pam.miller@klgates.com*

- Steven William Boyce
  *swboyce@smithbanks.net, sknueppel@smithbanks.net*

- Kirk Sterling Cheney
  *kscheney@hollandhart.com*

- Craig W. Christensen
  *cwcc@ida.net*

- Gregory L. Crockett
  *gregcrockett@hopkinsroden.com, tammytheiler@hopkinsroden.com*

- Bart M. Davis
  *bartdavis@me.com, theresacarson@me.com*

- Karl R. Decker
  *kdecker@holdenlegal.com, jtimberlake@holdenlegal.com, chomer@holdenlegal.com*

- Dan C. Dummar
  *dan@beardstclair.com*

- Monte C. Gray
  *montegray@cableone.net, livg@cableone.net, mikezlawoffice@cableone.net*

- Daniel C. Green
  *dan@racinelaw.net, rag@racinelaw.net, sab@racinelaw.net,
  brc@racinelaw.net*

- Charles A. Homer
  *chomer@holdenlegal.com, jtimberlake@holdenlegal.com,
  aulrich@holdenlegal.com*

- Michael R. Johnson
  *mjohnson@rqn.com, dburton@rqn.com, docket@rqn.com*

- R. Ron Kerl
  *Ron@cooper-larsen.com, kelli@cooper-larsen.com*

- Mary P. Kimmel
  *ustp.region18.bs.ecf@usdoj.gov*

- Jay A. Kohler
  *cindy@kohlerlawif.com*

- David Henry Leigh
  *dleigh@rqn.com, sglendening@rqn.com*

- Robert J. Maynes
  *mayneslaw@hotmail.com, robert.maynes@gmail.com,
  rosie.mayneslaw@gmail.com, brenda.mayneslaw@gmail.com,
  maynestaggart@gmail.com, maynestaggartecf@gmail.com*

- Joseph M. Meier
  *jmeier@cosholaw.com, jbean@cosholaw.com*

- Stephen A. Meikle
  *sammeikle@msn.com*

- James K. Miersma
  *ecfid@rcflegal.com*

- Derrick J. O'Neill
  *doneill@rcolegal.com, ecfid@rcolegal.com*

- Randall A. Peterman
  *rap@moffatt.com, kad@moffatt.com, ecf@moffatt.com,
  moffattthomas@hotmail.com, kgm@moffatt.com*

- Larry E. Prince
  *lprince@hollandhart.com, tahancock@hollandhart.com,
  boiseintaketeam@hollandhart.com*

- James A. Rubenstein
  *Jim.Rubenstein@lawmoss.com, Maureen.Montpetit@lawmoss.com*

- Lance J. Schuster
  *lance@beardstclair.com, shaunie@beardstclair.com,
  hammer@beardstclair.com, jessica@beardstclair.com*

- Sheila Rae Schwager
  *sschwager@hawleytroxell.com, cdavenport@hawleytroxell.com*

- Matthew K. Shriver
  *ecfid@rcolegal.com, mshriver@rcolegal.com*

- Marvin Marion Smith
  *mmsmith@smithbanks.net, marci@smithbanks.net*

- James A. Spinner;
  *spinjim@cableone.net*

- Steven L. Taggart
  *staggart101@gmail.com, rosie.mayneslaw@gmail.com,
  maynestaggarecf@gmail.com*

- Aaron J. Tolson
  *ajt@aaronjtolsonlaw.com*

- Brian T. Tucker
  *bttucker@nhptlaw.net*

- U.S. Trustee
  *ustp.region18.bs.ecf@usdoj.gov*

- Jeffrey M. Wilson
  *jeff@wilsonmccoll.com, cindy@wilsonmccoll.com*

*/s/ Stephanie A. Abrahamson*
Stephanie A. Abrahamson